UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

KEITH CHIN, Individually and on Behalf of
All Others Similarly Situated,

                     Plaintiff,

    vs.

KE HOLDINGS INC., PENG YONGDONG,
XU TAO, SHAN YIGANG, BAO FAN,
LI ZHAOHUI, CHEN XIAOHONG,
COLLEEN A. DE VRIES, GOLDMAN
SACHS (ASIA) L.L.C., MORGAN STANLEY
& CO. LLC, J.P. MORGAN SECURITIES
LLC, CHINA RENAISSANCE SECURITIES
(HONG KONG) LIMITED, GOLDMAN
SACHS & CO. LLC and CHINA
RENAISSANCE SECURITIES (US) INC.,

                  Defendants.

———————————————————— x

Civil Action No. 1:21-cv-11196-GHW

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ....................................................................................1

II.    JURISDICTION AND VENUE .............................................................................6

III.   PARTIES .............................................................................................................6

    A.   Lead Plaintiff ...............................................................................................6

    B.   KE Holdings ..................................................................................................7

    C.   The Individual Defendants ...........................................................................7

    D.   The Underwriter Defendants ........................................................................8

IV.    SUBSTANTIVE ALLEGATIONS .......................................................................10

    A.   Background of the Company's Business ....................................................10

    B.   KE Holdings Raises Billions of Dollars Through an IPO and a Secondary
         Offering in the United States ......................................................................13

    C.   KE Holdings Reports Positive Financial Results and Operating Metrics.............14

    D.   KE Holdings Admits that It Has Been Overstating the Numbers of Stores
         and Agents on Its Platform, by Including Inactive Stores and Agents, but
         Continues to Conceal the Full Extent of Its Inflated Metrics ...............................15

    E.   Muddy Waters Finds Substantial Evidence that the Reported Numbers of
         Stores and Agents on KE Holdings' Platform Were Even More
         Significantly Inflated than the Company Has Admitted........................................18

         1.   Evidence of Inflated Store Counts ............................................................18

                 a.   Muddy Waters Finds a Multitude of Nonexistent "Ghost
                      Stores"........................................................................................20

                 b.   Muddy Waters Finds a Multitude of Double-Counted
                      "Clone Stores" ...........................................................................27

                 c.   Muddy Waters' Case Study in the City of Sanhe Langfang
                      Finds that KE Holdings' Store Count Was Inflated by 59% ........30

                 d.   Muddy Waters Finds Brokerage Stores that Were
                      Registered as Company-owned Lianjia stores, but Were
                      Actually Less Profitable Franchised Deyou Stores .....................35

**Page**

2.      Evidence of Inflated Agent Counts ............................................................ 36

       a.      Local Government Real Estate Websites Shows that KE
            Holdings Overstated the Number of Agents on Its Platform ........ 37

       b.      SAIC Data from Shanghai and Beijing – KE Holdings'
            Two Largest Markets –Shows that KE Holdings Overstated
            the Number of Agents on Its Platform ....................................... 39

F.     Muddy Waters Also Finds Evidence that KE Holdings Reported Inflated
      GTV and Revenues in 2Q21 and 3Q21 ............................................... 41

1.      Evidence of Inflated GTV ................................................................ 42

       a.      Muddy Waters Finds that New Home GTV Was Inflated by
            Approximately 126% in 2Q21 and 3Q21 ..................................... 42

       b.      Muddy Waters Finds that Existing Home GTV Was
            Inflated by Approximately 33% in 2Q21 and 3Q21 ..................... 44

       c.      Muddy Waters Finds that Combined GTV Was Inflated by
            Approximately 65% in 2Q21 and 3Q21 ....................................... 45

2.      Evidence of Inflated Revenues ................................................ 46

V.    ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS ......................... 48

A.     Materially False and Misleading Statements Made During the Class Period........ 48

1.      The 3Q20 Press Release ................................................................. 48

2.      The Secondary Offering Documents ......................................... 49

3.      The 4Q20 Press Release ................................................................. 54

4.      The 2020 20-F ............................................................................... 54

5.      The 1Q21 Press Release ................................................................. 58

6.      The 2Q21 Press Release ................................................................. 58

7.      The 3Q21 Press Release ................................................................. 60

B.     The Truth Emerges ................................................................................. 63

**Page**

C.      Additional Scienter Allegations ................................................................65

D.      Loss Causation and Economic Loss ........................................................68

E.      A Presumption of Reliance Applies..........................................................69

F.      The Safe Harbor Does Not Insulate Defendants' Representations .......................70

VI.      ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS.........................71

A.      The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information.....................................72

VII.      CLASS ACTION ALLEGATIONS ..................................................................76

VIII.      CLAIMS ....................................................................................................78

A.      COUNT I:  For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against the Exchange Act Defendants) ....................................78

B.      COUNT II:  For Violations of Section 20(a) of the Exchange Act (Against the Executive Defendants) .....................................................................80

C.      COUNT III:  For Violations of Section 11 of the Securities Act (Against All Defendants) ......................................................................................81

D.      COUNT IV:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants) ..................................................................83

E.      COUNT V:  For Violations of Section 15 of the Securities Act (Against the Individual Defendants)....................................................................84

IX.      PRAYER FOR RELIEF ................................................................................85

Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by its counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of KE Holdings Inc. ("KE Holdings" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of those who purchased or otherwise acquired the American Depository Shares ("ADSs") of KE Holdings: (i) between November 16, 2020, and December 16, 2021, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) pursuant or traceable to the registration statements and prospectus, as amended, issued in connection with the Company's November 19, 2020 secondary offering (the "Secondary Offering"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.       KE Holdings, through its "Beike" brand, operates what it describes as "the leading integrated online and offline platform for housing transactions and services in China."  The Company has expanded its business by leveraging the benefits of both its online brokerage platform, and its network of physical brokerage stores across China.  Its brick-and-mortar stores provide a key "competitive advantage," serving as an "entry point" for customers and providing localized insight into the housing market and customers' needs.

3.      KE Holdings primarily generates revenues from commissions and fees for housing transactions and services.  Therefore, its profitability is driven by the number of brokerage stores and agents on its platform – since more brokerage stores and agents using the platform generally leads to more housing transactions taking place on the platform.  For this reason, the Company considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric." Another "key operating metric" is gross transaction value ("GTV"), which represents the total value of all transactions the Company facilitated on its platform.

4.      The Company went public in the United States via an initial public offering ("IPO") on the New York Stock Exchange ("NYSE") on August 13, 2020.  Just three months later, on November 16, 2020 – the same day that it announced financial results for its first quarter as a public company – KE Holdings also announced that it planned to conduct the Secondary Offering.  The IPO and the Secondary Offering *each* raised more than *$2.3 billion* in net proceeds for the Company.

5.      Thereafter, KE Holdings reported several quarters of positive financial results and operating metrics that exceeded its guidance and analysts' expectations – including increased numbers of stores and agents on the Company's platform, and corresponding growth in GTV and revenues.  Then, in the second quarter of 2021 ("2Q21"), the residential real estate market in China began to experience a slowdown in growth due to increased government regulation.  Unbeknownst to investors, however, by reporting inflated GTV and revenues – and using inflated agent and store counts to justify those numbers – KE Holdings was able to once again exceed its quarterly guidance, and analysts' expectations.

6.      On November 8, 2021, KE Holdings announced its financial results for the third quarter of 2021 ("3Q21"), and revealed that significant portions of the stores and agents on the

Company's platform were **inactive**.  For the first time, the Company disclosed both the numbers of stores and agents on its platform, and the numbers of "active" stores and agents – providing those numbers for 3Q21, and each quarter going back to the IPO.  The percentages of inactive stores disclosed by KE Holdings ranged from 7.8% to 9.1%, while the percentages of inactive agents disclosed by KE Holdings ranged from 9.8% to 15.5%.

7.      Through these purported disclosures, the Company accomplished its aim of obscuring the continuing discrepancies between its reported store and agent counts and the true numbers of stores and agents on its platform.  In truth, the reported numbers of stores and agents on KE Holdings' platform were even more inflated than the Company admitted, and included not just inactive stores and agents, but nonexistent ones.

8.      KE Holdings' ongoing inflation of its store and agent counts, in turn, provided justification for the inflated GTV and revenues that it reported in 3Q21 – allowing the Company to once again announce that it had exceeded its guidance and analysts' expectations, despite a downturn in China's residential real estate market.  This scheme enabled KE Holdings to blunt the impact of its admission concerning inactive agents and stores, while continuing to conceal the true extent of its overstatement of store and agent counts – thereby maintaining the artificial inflation in its share price.

9.      On December 16, 2021, shortly before the markets opened, Muddy Waters Capital LLC ("Muddy Waters") published a detailed, 77-page report setting forth the results of its investigation of KE Holdings.[1]  Muddy Waters explained that it conducted a comprehensive

---

[1]      The "Muddy Waters Report" or the "Report" (cited as "Report at __") is attached hereto as Exhibit A, and is electronically available at https://d.muddywatersresearch.com/tou/?redirect=/ content/uploads/2021/12/MW_BEKE_12162021.pdf.  Muddy Waters is a research-based equity investor known for exposing fraud at China-based companies, including Luckin Coffee Inc., Rino International Corp., China MediaExpress Holdings, Duoyan Global Water Inc., Sino-Forest Corp.,

investigation consisting of an analysis of data collected from KE Holdings' platform, as well as field work in multiple cities that included site visits to brokerage stores.

10.     The Muddy Waters Report revealed that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company had admitted in the 3Q21 press release.  Based on its analysis of platform data, for example, Muddy Waters estimated that in 2Q21, KE Holdings' reported store count was inflated by 23%, and its reported agent count was inflated by 26%.  Report at 14, 30.  Muddy Waters further detailed how its field work uncovered substantial evidence of nonexistent stores and agents.  Based on its investigation, Muddy Waters concluded that, in truth, "far fewer stores and agents use the platform (or even exist) than [KE Holdings] claims."  *Id.* at 3.

11.     The Muddy Waters Report also revealed evidence that KE Holdings had materially overstated its reported GTV and revenues during at least 2Q21 and 3Q21.  Based on its investigation, Muddy Waters found that KE Holdings had inflated its reported: (i) GTV of new home transactions by 126% during 2Q21 and 3Q21 combined; (ii) GTV of existing home transactions by 33% during 2Q21 and 3Q21 combined; (iii) GTV of new and existing home transactions combined by 75% in 2Q21; and (iv) GTV of new and existing home transactions combined by 51% in 3Q21.  Report at 7-9.  Muddy Waters likewise found that KE Holdings had inflated its reported revenues from new and existing home transactions by 88% in 2Q21, and by 63% in 3Q21 – amounting to a 77% inflation during 2Q21 and 3Q21 combined.  *Id.* at 11.  Muddy Waters summarized its findings as follows:

> ***We are short [KE Holdings] because we conclude the Company is engaged in systemic fraud***,[2] by our estimate, inflating its new home sales GTV by over ~126%

Superb Summit International Group Ltd., and China Huishan Dairy Holdings Co.  Muddy Waters disclosed a short position in KE Holdings ADSs.

[2]     All emphasis in quotations is added unless otherwise noted.

and its commission revenues by approximately ~77–96%.  ***We found massive discrepancies between the transaction volumes, store count and agent count reported to investors*** and the transaction data from our multi-month data collection program from [KE Holdings'] platform.  We corroborated these discrepancies by spot-checking our findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits.

[KE Holdings'] mantra, oft repeated on Company earnings calls, is "doing the right thing, even if it is difficult."  Nothing could seem further from the truth.  Put simply, we found massive fraud . . . . ***Our field work found ghost stores, clone stores*** and undisclosed schemes to inflate revenues by round tripping cash through connected brokerages. . . . ***[T]his is a real business with significant amounts of fraud***.

Report at 2.  (Emphasis altered).

12.     In response to the Muddy Waters Report, the price of KE Holdings' ADSs tumbled 4.47% on unusually heavy trading volume, from a closing price of $18.68 per ADS on December 15, 2021, to an opening price of $17.96 per ADS on December 16, 2021.  The price of the Company's ADSs declined further during the trading day, as the market digested the Muddy Waters Report, trading as low as $17.72 per ADS – a total decline of 5.74% from the closing price on December 15, 2021.

13.     The price of the Company's ADSs fell again on December 20, 2021, to close at $17.31 per ADS, after the Company issued an incomplete response to the Muddy Waters' Report, which failed to persuade investors that the Report lacked merit.

14.     Despite announcing an "internal review" of the Muddy Waters Report and assuring investors that "[t]he Company [would] provide updates on the internal review when appropriate," just six weeks later, KE Holdings reported that the review was "substantially complete," and declared that "the allegations in the Muddy Waters Report were not substantiated" – but failed to provide any supporting details.  Indeed, KE Holdings did not even provide the name of the "international law firm and forensic accounting experts" involved in the supposed internal review.  To date, the Company had not released any additional information about the internal review.

## II.   JURISDICTION AND VENUE

15.     The claims asserted herein arise under: (i) Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b), 78n(a), and 78t(a)], and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 [17 C.F.R. §240.10b-5]; and (ii) Sections 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1331.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. §1391(b).  KE Holdings ADSs trade and were distributed in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, the Underwriter Defendants (defined below) for the Secondary Offering conduct substantial operations in this District; and the ADSs are listed and trade on the NYSE, a national securities exchange based in this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.   PARTIES

### A.   Lead Plaintiff

19.     As set forth in its Certification previously filed with the Court and incorporated herein by reference, Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan purchased KE Holdings ADSs during the Class Period, and was damaged thereby.  *See* ECF No. 24-2. Additionally, as set forth in its Certification, Lead Plaintiff purchased KE Holdings ADSs on

November 19, 2020 at the Secondary Offering price of $58.00 per ADS pursuant and/or traceable to the Secondary Offering Documents, and was damaged thereby.  *See id*.

**B.     KE Holdings**

20.     Defendant KE Holdings is a Cayman Islands corporation headquartered in Beijing, China.  Under the brand name Beike, the Company operates an integrated online and offline platform that facilitates housing transactions between service providers and customers, including existing and new home sales, home rentals, home renovation, and real estate financial solutions.  KE Holdings conducted an initial public offering ("IPO") on August 13, 2020, and its ADSs now trade on the NYSE under the ticker symbol "BEKE."  Each ADS represents three Class A ordinary shares of the Company.

**C.     The Individual Defendants**

21.     Defendant Peng Yongdong ("Yongdong") is a co-founder of the Company and was, at all relevant times, an Executive Director and the Chief Executive Officer ("CEO") of KE Holdings.  Defendant Yongdong has also served as Chairman of the Board of Directors since May 2021.  He signed the Offering Documents for the Secondary Offering, and is described in KE Holdings' SEC filings as a "[k]ey member[] of [its] management team."  According to the Company's SEC filings, Yongdong is "the mastermind that spearheads [its] standardization and digitalization efforts[,]" and is responsible for the "[o]verall strategy, business development and management of the Company[.]"  Furthermore, Yongdong was "actively involv[ed] [in]" KE Holdings' IPO, and is "actively involv[ed] [in] overseeing the recruitment of all key management staff[.]"

22.     Defendant Xu Tao ("Tao") was, at all relevant times, the Chief Financial Officer ("CFO") of KE Holdings, and has also served as its Executive Director since August 2021.  He signed the Offering Documents for the Secondary Offering, and is described in KE Holdings' SEC

filings as a "[k]ey member[] of [its] management team." According to the Company's SEC filings, Tao's responsibilities include "[o]verall strategy, business development, accounting, . . . [and] internal control[.]"

23.     Defendant Shan Yigang ("Yigang") is a co-founder of the Company and was, at all relevant times, an Executive Director of KE Holdings. He signed the Offering Documents for the Secondary Offering, and is described in KE Holdings' SEC filings as a "[k]ey member[] of [its] management team." According to the Company's SEC filings, Yigang is responsible for KE Holdings' "[o]verall strategy and business development"; has been "deeply involved in all strategic decisions of . . . Lianjia"; and is "actively involv[ed] [in] overseeing the recruitment of all key management staff[.]"

24.     Defendants Bao Fan, Li Zhaohui, and Chen Xiaohong each served as a director of the Company at the time of the Secondary Offering, and signed the Offering Documents for the Secondary Offering.

25.     Defendant Colleen A. De Vries ("De Vries") served as a Senior Vice President of KE Holdings at the time of the Secondary Offering. De Vries was KE Holdings' "Authorized U.S. Representative" in connection with the Secondary Offering, and signed the Offering Documents in New York, New York in that capacity.

26.     The individual defendants referenced above in ¶¶21-25 are collectively referred to herein as the "Individual Defendants." Defendants Yongdong, Tao, and Yigang are collectively referred to herein as the "Executive Defendants." KE Holdings and the Executive Defendants are collectively referred to herein as the "Exchange Act Defendants."

**D.     The Underwriter Defendants**

27.     Defendants Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, and China Renaissance Securities (Hong Kong) Limited ("China

Renaissance") served as joint bookrunners of the Secondary Offering and representatives of the underwriters. Collectively, they received commissions and other professional fees of approximately $35.4 million in connection with the Secondary Offering.

28.     As shown below in a chart from the Prospectus on Form 424B4, dated November 19, 2020 (the "Secondary Offering Prospectus"), which is incorporated and forms part of the Secondary Offering Documents, the Underwriter Defendants received and offered the following number of ADSs for sale:

| Underwriter | Number of ADSs |
|---|---|
| Goldman Sachs (Asia) L.L.C. | 16,992,000 |
| Morgan Stanley & Co. LLC | 8,142,000 |
| J.P. Morgan Securities LLC | 6,018,000 |
| China Renaissance Securities (Hong Kong) Limited | 4,248,000 |
| **Total** | **35,400,000** |

29.     The above underwriters also received an option – which they exercised in full – to purchase on a *pro rata* basis up to 5,310,000 additional ADS at the Secondary Offering price, less underwriting discounts and commissions.

30.     Defendant Goldman Sachs & Co. LLC. ("GS&C") is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282. GS&C is Goldman Sachs' SEC-registered broker-dealer affiliate in the U.S. The Secondary Offering Prospectus represented that Goldman Sachs offered ADSs for sale in the U.S. through GS&C, and, upon information and belief, GS&C did offer the ADSs for sale in the U.S. Accordingly, GS&C acted as an underwriter of the ADSs and is liable under the Securities Act in the same manner and to the same extent as the other underwriters, including Goldman Sachs.

31.     Defendant China Renaissance Securities (US) Inc. ("CRSI") is a New York corporation whose principal executive office is located at 600 Fifth Avenue, 21st Floor, New York, New York 10020.  CRSI is China Renaissance's SEC-registered broker-dealer affiliate in the U.S.  The Secondary Offering Prospectus represented that China Renaissance offered ADSs for sale in the U.S. through CRSI, and, upon information and belief, CRSI did offer the ADSs for sale in the U.S.  Accordingly, CRSI acted as an underwriter of the ADSs and is liable under the Securities Act in the same manner and to the same extent as the other underwriters, including China Renaissance.

32.     The underwriters identified above, including GS&C and CRSI, are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants participated in drafting and disseminating the Offering Documents, soliciting investors for the Secondary Offering, and marketing and pricing the Secondary Offering.  The Underwriter Defendants failed to conduct adequate due diligence in connection with the Secondary Offering, and were negligent in failing to ensure that the Offering Documents were prepared accurately and in accordance with the rules and regulations governing their preparation.  The Underwriter Defendants' negligence was a substantial factor leading to the harm complained of herein.

33.     Unless otherwise noted, KE Holdings, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company's Business

34.     Defendant KE Holdings operates an integrated online and offline platform for housing transactions and services in China, under the brand name Beike.  The Company's Beike platform, launched in 2018, facilitates housing transactions between service providers and customers across the residential real estate ecosystem, including existing and new home sales, home rentals, home renovation, and financial solutions.  KE Holdings traces its origins to the real estate brokerage

brand Lianjia, founded in 2001, which it now operates as part of the Beike platform.  The Company serves a range of real estate industry participants, including housing customers, brokerage brands and agents, and developers.

35.   The brokerages on the Beike platform consist of both Company-owned Lianjia stores, and third-party brokerages that are not owned by the Company.  Third-party brokerages include franchise stores, which pay fees to KE Holdings for use of its "Deyou" franchise brand, and "connected" stores, which pay fees to KE Holdings to utilize the Beike platform while maintaining their status as independent brokerage brands.

36.   KE Holdings has expanded its operations by leveraging the integrated online and offline nature of its business.  According to the Company, its "extensive" network of "community-centric" physical stores represents a key strength, serving "as convenient access points for local . . . customers," and enabling KE holdings "to amass housing information offline" and gain insights into customers' needs.

37.   The foundation of the Company's platform is its "Agent Cooperation Network," which uses a commission allocation mechanism to prescribe rights and obligations to the various brokers and agents involved in each housing transaction, in effort to foster cooperative and efficient transactions.

38.   KE Holdings has three revenue sources: existing home transactions, new home transactions, and emerging and other services.  For existing home transactions, KE Holdings generates revenues from: (i) commissions for housing transactions facilitated by Lianjia, as well as commissions split with other brokerage firms that collaborate with Lianjia agents; (ii) franchise fees charged to brokerage firms associated with the Company's franchise brands, including Deyou; (iii) platform service fees charged to "connected" brokerages that utilize the Beike platform; and

(iv) fees for other value-added services, such as closing services.  For new home transactions, KE Holdings generates revenues from sales commissions charged to real estate developers for new home sales that the Company completes.  For emerging and other services, KE Holdings generates revenues from other home-related services, such as financial services and home renovation services.

39.     During the first half of 2020, KE Holdings reportedly generated 51.3% of its revenues from new home transactions, 46.1% from existing home transactions, and 2.67% from emerging and other services.

40.     The Company's method of revenue recognition differs based upon whether a transaction involved a new, versus an existing home transaction, as well as whether the transaction was facilitated by a Company-owned Lianjia store, versus a connected store.  For all new home transactions, KE Holdings recognizes revenue from commissions on a gross basis.  For existing home transactions, KE Holdings recognizes revenue from commissions: (i) on a gross basis for Company-owned Lianjia stores; and (ii) on a net basis for connected stores.

41.     KE Holdings' profitability is driven, in large part, by the number of brokerage stores and agents on its platform – since more brokerage stores and agents using the platform generally leads to more housing transactions taking place on the platform.  Therefore, the Company considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric."  Another "key operating metric" is GTV, which represents the total value of all transactions the Company facilitated on its platform during a given period, as evidenced by signed contracts.

42.     The Muddy Waters Report explained the importance of GTV to KE Holdings' business model, as follows:

> [KE Holdings'] value proposition is built on its claim to have the leading market share, measured by gross transaction value (GTV), in brokered housing transactions in China.  The Company claims a market leading GTV in existing and new home sales through its in-house brokerage (Lianjia) and its connected stores.  [KE

Holdings] also claims a GTV growth rate that vastly outperforms the underlying housing market.

Report at 2.

43.     Using KE Holdings' reported financial metrics, Muddy Waters illustrated the close correlation between the number of stores and agents on KE Holdings' platform, on the one hand, and the Company's reported GTV and revenues, on the other hand:



*Id*. at 3.

44.     KE Holdings claims to have generated a GTV of RMB2,128 billion (US$313 billion), and facilitated over 2.2 million housing transactions on its platform, during 2019 – making it China's largest housing transactions and services platform and the second largest commerce platform across all industries.  According the Company, as of September 30, 2020, the Beike platform had over 270 real estate brokerage brands, over 44,000 community-centric stores and over 477,000 agents across 103 cities in China.

**B.     KE Holdings Raises Billions of Dollars Through an IPO and a
Secondary Offering in the United States**

45.     Seeking to raise capital from the public by listing its shares on a U.S. stock exchange, on August 13, 2020, KE Holdings conducted an IPO of 121.9 million of its ADSs (each representing three Class A ordinary shares), at $20.00 per ADS.

46.     That day, the Company filed with the SEC a final prospectus on Form 424B4, and its ADSs began trading on the NYSE.  KE Holdings raised more than *$2.3 billion* in net proceeds from the IPO, after the underwriters exercised their over-allotment option.

47.     Just three months later, KE Holdings raised *an additional* $2.3 billion by again tapping the U.S. capital markets.  On November 6, 2020, the Company filed with the SEC, on a confidential basis, a draft registration statement on Form F-1 for the "Secondary Offering.

48.     Thereafter, on November 16, 2020, KE Holdings filed with the SEC a registration statement on Form F-1 (the "Registration Statement"), which would be utilized for the Secondary Offering.  The Registration Statement disclosed that the Company intended to offer 35.4 million additional ADSs to the public, and that the Underwriter Defendants had the right to exercise an over-allotment option to purchase an additional 5,310,000 ADSs.  The SEC declared the Registration Statement effective on November 18, 2020.

49.     On November 19, 2020, KE Holdings filed the Secondary Offering Prospectus with the SEC on Form 424B4 which, together with the Registration Statement, constitute the "Secondary Offering Documents" or the "Offering Documents."

50.     KE Holdings and the Underwriter Defendants priced the Secondary Offering at $58.00 per ADS – *nearly triple* the price at which the ADSs were sold in the IPO.  After the Underwriter Defendants fully exercised their over-allotment option, the Company once again received more than *$2.3 billion* in net proceeds.

**C.     KE Holdings Reports Positive Financial Results and Operating Metrics**

51.     Following the IPO and the Secondary Offering, KE Holdings reported successive quarters of positive financial results and operating metrics, including increased numbers of stores and agents on its platform, and corresponding growth in GTV and revenues.  For example, KE Holdings reported that: (i) in 3Q20, net revenues increased by 70.9% year-over-year ("y-o-y"),

"driven by solid growth of GTV"; (ii) in 4Q20, net revenues increased by 57.6% y-o-y, "exceeding the high end of [the Company's] previous guidance range"; and (iii) in 1Q21, net revenues increased by 190.7% y-o-y, "beating both the top end of [the Company's] previous guidance and street consensus."

52.     In 2Q21, the residential real estate market in China began to experience a slowdown in growth, due in part to a series of "market-cooling measures" and increased regulation imposed by the government.  Unbeknownst to investors, however, by reporting inflated GTV and revenues – and using inflated agent and store counts to justify those numbers – KE Holdings was able to once again exceed the high end of its quarterly guidance, and analysts' expectations.  In particular, the Company reported that net revenues increased by 20% y-o-y in 2Q21, "beating both the high end of [the Company's] guidance and street consensus."

### D.     KE Holdings Admits that It Has Been Overstating the Numbers of Stores and Agents on Its Platform, by Including Inactive Stores and Agents, but Continues to Conceal the Full Extent of Its Inflated Metrics

53.     Then, on November 8, 2021, KE Holdings announced its financial results for 3Q21. In what Muddy Waters later described as a "jaw-dropping" "admission" "[f]or a company that [went public] a little more than a year ago" (Report at 14), KE Holdings revealed that significant portions of the stores and agents on the Company's platform were inactive.  For the first time, the Company provided a breakdown of the number of stores versus "active" stores on its platform, stating that "as of September 30, 2021," the "[n]umber of stores was 53,946 . . . , a 20.2% increase from one year ago" – while the "[n]umber of active stores[] was 49,468 . . . , a 20.2% increase from one year ago." Thus, KE Holdings admitted that 4,478 stores – *approximately 9.1%* – were not "active" stores.

54.     The 3Q21 press release provided the following definition of "[a]ctive stores":

"Active stores" as of a given date is defined as stores on our platform excluding the stores which (i) have not facilitated any housing transaction during the preceding 60 days, (ii) do not have any agent who has engaged in any critical steps in housing

transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding seven days, or (iii) have not been visited by any agent during the preceding 14 days.

55.     The 3Q21 press release likewise provided a breakdown of the number of agents versus "active" agents on its platform, stating that "as of September 30, 2021," the "[n]umber of agents was 515,486 . . . , a 7.9% increase from one year ago" – while the "[n]umber of active agents[] was 468,014 . . . , a 13.1% increase from one year ago."  Thus, KE Holdings admitted that 47,472 agents – *approximately 10.1%* – were not "active" agents.  The 3Q21 press release provided the following definition of "[a]ctive agents":

> "Active agents" as of a given date is defined as agents on our platform excluding the agents who (i) delivered notice to leave but have not yet completed the exit procedures, (ii) have not engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding 30 days, or (iii) have not participated in facilitating any housing transaction during the preceding three months.[3]

56.     The 3Q21 press release also retroactively provided the numbers of "active stores" and "active agents" on KE Holdings' platform on a quarterly basis, for each quarter since the Company's IPO, stating as follows:

> The numbers of active stores on our platform are 41,152, 43,436, 44,937 and 49,046 as of September 30, 2020, December 31, 2020, March 31, 2021 and June 30, 2021, respectively.
>
> *            *            *
>
> The numbers of active agents on our platform are 413,732, 445,438, 479,308 and 499,690 as of September 30, 2020, December 31, 2020, March 31, 2021 and June 30, 2021, respectively.

---

[3]     Muddy Waters characterized the Company's definition as "a very low bar for an agent to remain listed as 'active' on the platform."  Report at 14 n.25.

57.   A comparison of the quarterly numbers of "active" stores and agents that KE Holdings disclosed in the 3Q21 press release, and the quarterly numbers of stores and agents that the Company previously reported, is set forth in the following chart:

| | Reported | Active | Amount Overstated | Percent Overstated |
|---|---|---|---|---|
| **Reported vs. Active Agents and Stores** | | | | |
| | | | **3Q20** | |
| Agents: | 477,810 | 413,732 | 64,078 | 15.488% |
| Stores: | 44,883 | 41,152 | 3,731 | 9.066% |
| | | | **4Q20** | |
| Agents: | 493,088 | 445,438 | 47,650 | 10.697% |
| Stores: | 46,946 | 43,436 | 3,510 | 8.081% |
| | | | **1Q21** | |
| Agents: | 528,424 | 479,308 | 49,116 | 10.247% |
| Stores: | 48,717 | 44,937 | 3,780 | 8.412% |
| | | | **2Q21** | |
| Agents: | 548,600 | 499,690 | 48,910 | 9.788% |
| Stores: | 52,868 | 49,046 | 3,822 | 7.793% |

58.   The 3Q21 press release stated that KE Holdings had supposedly "introduced the number of active agents and active stores" to "better reflect the operational activeness of stores and agents on [its] platform[,]" and attributed the decision to the Company's "accumulated operational experience[.]"  In truth, the Company's disclosures were not motivated by candor or operational experience.

59.   Instead, they were designed to "to obscure [the] discrepancies between" KE Holdings' reported store and agent counts and the true numbers of stores and agents on its platform. Report at 14.  In fact, the reported numbers of stores and agents on KE Holdings' platform were even more inflated than the Company admitted, and included not just inactive stores and agents, but nonexistent ones.

60.   The Company's continued inflation of its store and agent counts, in turn, provided justification for inflated GTV and revenues.  In the 3Q21 press release, KE Holdings again reported inflated GTV and revenues for 3Q21, stating that although net revenues had decreased by 11.9%

- 17 -

y-o-y in 3Q21, "the Company had nonetheless "exceed[ed] both the high end of [its] guidance and street consensus."

61.     By reporting inflated quarterly GTV and revenues that exceeded analysts' and investors' expectations, even in the face of a downturn in China's residential real estate market, KE Holdings was able to maintain the artificial inflation in its share price.  At the same time, the Company was able to blunt the impact of its admission concerning inactive agents and stores, while continuing to conceal the true extent of its overstatement of store and agent counts.

**E.      Muddy Waters Finds Substantial Evidence that the Reported Numbers of Stores and Agents on KE Holdings' Platform Were Even More Significantly Inflated than the Company Has Admitted**

62.     On December 16, 2021, Muddy Waters published its Report detailing the results of its investigation of KE Holdings.  With respect to the numbers of stores and agents that KE Holdings reported on its platform, Muddy Waters explained that it "***found massive discrepancies*** between the . . . store count and agent count[s] reported to investors and the transaction data from [its] multi-month data collection program from [KE Holdings'] platform."  Report at 2.

63.     Muddy Waters explained that it "corroborated these discrepancies by spot-checking [its] findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits."  *Id*.  Based on its analysis of platform data, field work, and site visits, Muddy Waters concluded that, in truth, "***far fewer stores and agents use the platform (or even exist) than [KE Holdings] claims***."  *Id*. at 3.

**1.      Evidence of Inflated Store Counts**

64.     In order to investigate the Company's reported store counts, Muddy Waters explained that it first analyzed KE Holdings' platform data – and found that the Company was inflating its 2Q21 store count by ***at least 23%***.  *Id*. at 14.  As Muddy Waters explained, it "wrote a [computer] program to collect the transaction data on [KE Holdings'] platform."  *Id*. at 2.  The "program

captured the transaction data on [KE Holdings'] platform from May 25[, 2021] to October 22, 2021." *Id.* at 5. n.2.[4]

65.     In KE Holdings' 2Q21 press release, the Company publicly reported having 52,868 brokerage stores on its platform as of June 30, 2021.  2Q21 Press Release; *see also id.* at 14. According to Muddy Waters, however, the platform data that it collected "showed that as of July 16, 2021" – just two weeks later – "the platform listed only 43,026 stores," indicating that KE Holdings' "2Q21 store count was inflated by at least 23%."  Report at 14.  Muddy Waters summarized its findings in the following table:

| Comparison of BEKE Claimed Store Number vs. BEKE's Own Platform Data | |
| --- | --- |
| | # of stores |
| Number of stores reported by BEKE (2Q 2021) | 52,868 |
| Lianjia stores from collected data (as of 7/16/2021) | 7,516 |
| Connected stores from collected data (as of 7/16/2021) | 35,510 |
| Number of stores found on BEKE's platform | 43,026 |
| Inflated % | 23% |

*Id.*

66.     To corroborate these findings, Muddy Waters then "conducted field work and physical site visits" to a sampling of brokerage stores listed on the Company's platform.  *Id.*  That field work reportedly uncovered a "multitude" of what Muddy Waters termed "ghost stores" – *i.e.*, brokerage stores that were listed on KE Holdings' platform as active stores, but did not exist, and "clone stores" – *i.e.*, brokerage stores that were listed on KE Holdings' platform as multiple, separate stores, but were actually a single store.  *Id.*  Based on these findings, Muddy Waters "***conclude[d] that [KE Holdings'] actual store count [was] even lower than" Muddy Waters' "data collection alone" had indicated***.  *Id.*; *see also id.* at 3.

---

[4]      Muddy Waters' methodology is set out in detail in Appendix I of the Report.  *Id.* at 47-71.

67.    Muddy Waters explained that its "investigators visited seven cities that [were] important markets for" KE Holdings' directly-owned Lianjia brokerage stores, its Deyou-branded franchise stores, or its recently-acquired brokerages. *Id.* at 15.  According to Muddy Waters, the seven cities that its investigators made field visits to were:

> [1] Beijing – a major market for Lianjia; [2] Langfang – a suburb of Beijing which also has a lot of Lianjia and Deyou operations and which shows as having a high level of activity at each store[;] [3] Shanghai – the second largest market for Lianjia; [4] Nanchang . . . ; [5] Hangzhou . . . ; [6] Nanjing . . . ; and [7] Shenzhen . . . .

*Id.* at 15 n.26.  Muddy Waters stated that it also made "[c]ontact . . . with [KE Holdings'] Lianjia, Deyou, and other connected store agents and managers at many other Tier 1, New Tier 1, Tier 2 cities." *Id.*

68.    In the course of its field work, Muddy Waters found "discrepancies in the names, addresses, [and] locations of the stores in comparison [to] the information shown on the [Company's] platform" and in pertinent "SAIC registrations." *Id.* at 15.[5]  According to Muddy Waters, [i]n many locations, where [it] should have found thriving, active stores, [it] found the opposite." *Id.*  The Report provided a number of examples of Muddy Watters' site visits to the Company's brokerage stores, as follows.

### a.    Muddy Waters Finds a Multitude of Nonexistent "Ghost Stores"

69.    *Ghost Store Example 1: The Nanchang Zhonghuan Ershishanzhong Store*.  In the city of Nanchang, Muddy Waters visited a Zhonghuan[6] brokerage store known as "Ershishanzhong."

---

[5]    "SAIC" refers to the State Administration for Industry and Commerce, the government agency in China formerly responsible for market regulation and enforcement, including registering and licensing business organizations.  In March 2018, the State Administration for Market Regulation ("SAMR") was established to replace the SAIC.  In practice, however, the SAMR and its local branches sometimes continue to be referred to as the SAIC.

[6]    KE Holdings acquired Zhonghuan Real Estate Agency, a regional real estate brokerage firm, in 2019.

The store appeared to be an active store on KE Holdings' platform, based on screen shots that showed 136 and 89 properties listed through the store as of October 5, 2021, and December 7, 2021, respectively. *Id*. According to Muddy Waters, "[t]he store's address listed on [KE Holdings'] platform [led] to a large apartment complex, while its SAIC certificate provide[d] a more detailed address." *Id*.

70.      However, when Muddy Waters' "investigator visited the store's SAIC[-]registered address," the investigator "found a derelict and abandoned store front located in a former gate guard's room[,]" and "found no further evidence of" the store's "existence elsewhere." *Id*. at 15. Based on this site visit, Muddy Waters concluded that the "abandoned guard's room is not likely an active location." *Id*. The Report provided the following photograph of the location:



*Id*. at 16.

71.      *Ghost Store Example 2: The Nuojia Chengjia 9 Dragon Seal Flagship Store*. Muddy Waters also investigated KE Holdings' "Nuojia Chengjia 9 Dragon Seal Flagship Store." *Id*.

According to data collected from KE Holdings' platform, the store had 12 agents as of August 2021; 23 to 24 agents as of October 2021; and 14 agents as of December 2021.  *Id*. at 16-17.  Furthermore, data collected from KE Holdings' platform in October and December 2021 showed 266 to 350 active property listings.  *Id*.  However, when Muddy Waters' "investigator visited [the] store at the address listed on [KE Holdings'] platform in September 2021," the investigator "found the store closed[,] with a 'for lease' sign displayed" (*id*. at 17), as shown in the following photograph:



*Id*.

72.    According to Muddy Waters, its investigator "then contacted a store agent to confirm the store address[,]" and was informed that the store had "moved to another store" known as "Shuxiangmendi."  *Id*.  As Muddy Waters explained, the "Shuxiangmendi" store was "listed on the [Company's] platform as a separate store" – meaning that "the platform ha[d] two stores listed, including one that ha[d] been shut down[,]" when there was actually only one active store.  *Id*.

73.    *Ghost Store Example 3: The Seven Colors Baichuan Store*.  Muddy Waters also conducted a site visit to KE Holdings' "Seven Colors Baichuan Store" in September 2021, and found

another apparent instance of a "double-counted" store. *Id.* "According to [KE Holdings'] platform," the "store had 4 [to] 8 agents, almost 200 clients and over 164 properties listed for sale or rent in the past three months" – indicating that it was "a thriving brokerage and certainly an 'active store.'" *Id.* However, Muddy Waters' site visit revealed that the store "[did not] exist." *Id.* at 18.

74.     According to Muddy Waters, "[t]he address listed on [the] store page only contain[ed] the name of the road," without providing a "street number." After finding a "detailed address on [the store's] SAIC certificate[,]" Muddy Waters' investigator visited the "location in September 2021" and found "a closed store front" (*id.*), as depicted in the following photograph:



*Id.*

75.     Muddy Waters explained that "[w]hen a store agent was contacted to check the address, the agent confirmed she worked at Seven Colors Baichuan[,] but gave the address of another store" on the Company's platform – "Zhonghuan Youjia No. 3 Store" located at "788 Bayuehu Road." *Id.* Muddy Waters concluded that this was "a single location accounting for two active stores on [KE Holdings'] platform." *Id.*

- 23 -

76.   *Ghost Store Example 4: Sanhe Langfang Lianjia Yanjiao Branches 2 and 15*.  In the city of Langfang, Muddy Waters reported finding "two Lianjia branches registered to the same street in the SAIC database."  *Id*.  Muddy Waters explained that "[o]n [KE Holdings'] platform, Branch 2 and [Branch] 15 [were] known as Tianyang Cheng No. 2 and Tianyang Cheng No. 6, respectively[,]" and "Yatai Street" [was] listed as the location for both stores.  *Id*.  According to Muddy Waters, that information was consistent with "the SAIC business certificates" for the two stores.  *Id*.

77.   Since the addresses for these stores provided on KE Holdings' platform contained "only . . . the street name" and "no street number," Muddy Waters "contact[ed] the stores' agents to get directions."  *Id*.  Muddy Waters "spoke with the agents at these two stores," and was "given identical locations for the branch: go to the intersection of Yatai Blvd. and Tianyang Cheng, [and] look for Building No. 9, on the ground floor, next to the Commercial Bank."  *Id*.  When Muddy Waters followed these directions, it reportedly "found only one Lianjia store at Building No. 9, on the ground floor, next to the Commercial Bank" (*id*.), as shown in the following photograph:



*Id*. at 19.

78.     When Muddy Waters "visited the store in the fall of 2021[,]" it observed "Branch No. 15's business registration hanging on the wall."  *Id*.  "An agent at the store" then "confirmed" to Muddy Waters "that the local Tianyang[ C]heng Store No[.] 2 (Branch No. 2) was closed and had merged with Tianyang [C]heng Store No. 6 (Branch No. 15)."  *Id*.  According to Muddy Waters, the agent explained that: "We are Store No. 6 . . . . [T]here was another store, but it was closed . . . . Store No. 2 used to be across the street.  But when its lease was up, they closed the store and moved here."  *Id*.  Based on its investigation, Muddy Waters concluded that Tianyang Cheng No. 2 and Tianyang Cheng No. 6 were "clearly the same store[,] even though "both stores appear[ed] separately on [KE Holdings'] platform."  *Id*.

79.     Although stores that were closed or merged into other stores, such as Branch No. 2 (Store No. 2) and Branch No. 15 (Store No. 6) should have been removed from the platform or "show[n] zero agents[,]" Muddy Waters reported that both of those stores "continue[d] to be" displayed on KE Holdings' platform "with transactions and active agents," (*id*. at 20), as depicted in the following screen shots:



*Id.*

80.     Muddy Waters also compared the names of the agents shown on KE Holdings'
platform as working at Store No. 2 and Store No. 6 as of November 2021, and reported that there
was "no overlap" – indicating that the Company continued to list both stores on its platform as
separate, active stores, after Store No. 2 had been merged into Store No. 6.  *Id*. at 20-21.

81.     Muddy Waters hypothesized that – in addition to inflating KE Holdings' reported
store count – the inclusion of ghost stores on the Company's platform enabled KE Holdings to report
inflated transaction volumes.  *Id*. at 20.  Muddy Waters reported that platform data showed 22
transactions for Branch No. 2 (Store No. 2), and 35 transactions for Branch No. 15 (Store No. 6)
between May 25, 2021 and October 22, 2021. *Id*. at 19.  According to Muddy Waters, platform data
from 30 other Lianjia stores in Sanhe Langfang showed that those stores had an average transaction
volume of 22 transactions per store during the same five-month period.  *Id*. at 20.  Since "Branch
No. 2 and [Branch] No. 15 [were] actually one store," Muddy Waters compared "their combined

transaction volume . . . to the average transaction volume per store for the remaining stores[,]"and

found that it was "159% higher than other Lianjia stores in Sanhe Langfang[.]" *Id*. at 19-20.  Muddy

Waters summarized its findings in the following chart:

| 5 Month Transaction Volumes Comparison | | | |
|---|---|---|---|
| | # of Existing Homes | # of New Homes | # of Total Homes |
| Branch No. 2, Tianyang Cheng Store No. 2 | 21 | 1 | 22 |
| Branch No. 15, Tianyang Cheng Store No. 6 | 31 | 4 | 35 |
| Subtotal | 52 | 5 | 57 |
| Other 30 stores' average | 19 | 3 | 22 |
| Difference % | 175% | 63% | 159% |

*Id*. at 20.

### b.  Muddy Waters Finds a Multitude of Double-Counted "Clone Stores"

82.     According to the Report, KE Holdings also utilized "clone stores" to inflate its

reported store count.  *Id*. at 21.  Muddy Waters described this tactic as follows: KE Holdings would

"set[] up multiple stores on its platform with the same or [a] similar name and/or location but a

different suffix, such A, B or C."  *Id*.  But "despite multiple stores appearing on [KE Holdings']

platform, often only one [store] exist[ed] in practice."  *Id*.

83.     In particular, Muddy Waters found evidence of a "large number of fake" Lianjia

brokerage stores that appear[ed] active on the platform but [did] not exist."  *Id*. at 24.  As Muddy

Waters explained, KE Holdings' franchise brand "Deyou labels its stores A and B based on the

stores' performance and the number of agents each store has."  *Id.* at 21.  According to Muddy

Waters, it had expected "Lianjia's A/B/C stores designations [to] follow[] a similar ranking

system[.]"  *Id*.  However, Muddy Waters' investigation revealed that "seemingly separate stores on

[KE Holdings'] platform" were actually "located in the same store, purportedly under different

managers."  *Id*.

84.     Muddy Waters reported that the Lianjia brokerage stores known as "Quanshuiwan

Flagship [Store] A" and "Quanshuiwan [Flagship Store] C" "appear[ed]" as "two separate stores" on

KE Holdings' platform – with "different number[s] of agents, [] different number[s] of clients serviced, and [] different number[s] of listings." *Id*. at 22. Specifically, the webpage for the "Quanshuiwan Flagship A store" displayed "18 agents, 1100 clients and 124 listing properties[,]" while the webpage for the "Quanshuiwan Flagship C store" displayed "15 agents, 150 clients and 163 listing properties[.]" *Id*.

85.    Yet when Muddy Waters "contacted Quanshuiwan Flagship C store," it was informed by an agent that "the A store and the C store [were] the same store." *Id*. According to Muddy Waters, "[t]he agent told [its] investigator that the reason the A and C stores were listed separately [was] because the store ha[d] two managers, and dividing the agents, listings and clients into two groupings under A and C [made] it easier to keep track of the business of the respective managers operating out of the same store." *Id*. The agent reportedly "confirmed that the letter designation of Lianjia stores on the platform represent[ed] the number of mangers or teams" operating out of the store – and not the actual store count[]." *Id*. at 23. As Muddy Waters noted, under this system, "one store can easily turn into two, three or more stores on the platform." *Id*.

86.    Muddy Waters confirmed that this practice was widespread by examining platform data for Lianjia brokerages across seven cities, as of November 30, 2021. *Id*. at 21. Muddy Waters explained that it "found five cities with significant numbers of cloned Lianjia [brokerage] stores on [KE Holdings'] platform." *Id*. at 21. In particular, platform data indicated that in the cities of "Xiamen and Haikou, 41% and 32% of the Lianjia stores" were "probable clone stores" – along with 9.1% of the stores in the Company's "key market of Beijing[.]" *Id*. at 21, 24.

87.    Muddy Waters provided the following example of its methodology for determining the percentages of clone stores:

> [O]ur data collection in Xiamen found 82 stores. 61 of these stores had designations suggesting that they were clones (such as ending with A, B or C), but they occupied

only 27 locations.  So, to estimate the number of clone stores, we simply subtracted the number of stores with such A/B/C designations (61) by the number of locations (27) to get a suspected to 34 clone stores.  Of the 82 stores in Xiamen, we therefore estimated that 41.5% were clones.

*Id*. at 23.

88.     Muddy Waters set forth the percentages of likely clone stores in the cities that it examined in the following table:

| | # of stores on BEKE's platform | # of stores with clone designations (e.g. A, B, C) | # of locations with multiple clone stores | Estimated # of clone stores | % of fake stores |
|---|---|---|---|---|---|
| | a | B | c | d=b-c | e=d/a |
| Xiamen | 82 | 61 | 27 | 34 | 41.5% |
| Haikou | 28 | 5 | 2 | 9 | 32.1% |
| Dalian | 330 | 62 | 31 | 31 | 9.4% |
| Beijing | 1,452 | 256 | 124 | 132 | 9.1% |
| Nanjing | 277 | 38 | 19 | 19 | 6.9% |

Note: The cloned store are the stores in one location with the name of [____]A store, [____]B store, or [____]C store, etc.; or [____]No.1 store, [____]No.2 store, or [____]No.3 store, etc.

*Id*. at 23; *see also id*. at 21.  Muddy Waters further explained that since "[n]ot all stores on [KE Holdings'] platform show[ed] SAIC certificates or detailed addresses" capable of verification, "the actual number of clone stores might be even higher."  *Id*. at 21.

89.     Muddy Waters reportedly "spot checked this analysis by searching on Baidu Maps[,]" and found that "[i]n instances of clone stores," there was "only one store listed on the map with the store name," and no "B or C stores."  *Id*. at 24.  Muddy Waters further noted that on KE Holdings' platform, "the A store usually show[ed] all [of] the detailed information[,] including address and business license, but the B or C stores [did] not."  *Id*.  Muddy Waters reasoned that this was "likely why approximately 30% of the stores listed on the platform [did] not have complete store information and/or a verifiable business license."  *Id*.  Moreover, Muddy Waters reported "that store names were frequently changing, and many stores did not display a correct and/or specific address, instead giving a vague, highly simplified general location or an incorrect location."  *Id*.

90.     Muddy Waters concluded that the "pattern of clone stores" uncovered by its investigation showed "that there [were] far fewer stores than appear[ed] on [the Company's] platform," and that KE Holding's "exaggeration of its store count [was] likely far more egregious than even the platform data suggest[ed]." *Id*. at 21.

        **c.**        **Muddy Waters' Case Study in the City of Sanhe Langfang Finds that KE Holdings' Store Count Was Inflated by 59%**

91.     According to Muddy Waters, the number of Lianjia brokerage stores reported in KE Holdings' "SEC filings generally align[ed] with the number of Lianjia stores registered [with] a given city's [local] SAIC." *Id*. at 24.  However, Muddy Waters reported that its "field work across China revealed . . . many stores with active SAIC registrations that did not exist." *Id*.  As Muddy Waters explained, this "suggest[ed] that branch store registrations were being created on paper and filed with . . . local SAIC" offices, "but no physical operation was being maintained." *Id*.

92.     In order to "[t]o investigate these store count discrepancies further[,]" Muddy Waters conducted a case study of Company-owned Lianjia brokerage stores in the city of Sanhe Langfang. *Id*.[7]  According to Muddy Waters, it "compared" publicly-available "SAIC data . . . with the results of physical site visits." *Id*.  Muddy Waters reported that "SAIC data show[ed] 51 Lianjia stores located in Sanhe Langfang." *Id*.  "Yet when [Muddy Waters] tried [to] visit [those] locations," it reportedly was "only able to confirm the existence of 32" brokerage stores – with the remaining 19 appearing to be "ghost stores." *Id*.  Indeed, Muddy Waters "observ[ed] non-existent stores, double[-

---

[7]     "Sanhe Langfang is a satellite city of Beijing located within the Hebei province." *Id*. at 24. Muddy Waters explained that it "chose this city for a deep dive because [KE Holdings] purports to be strong in and around Beijing, and the Company supposedly maintains a significant number of Lianjia brokerages in the area." *Id*.  Indeed, since "[t]he Sanhe Langfang Lianjia stores displayed very high numbers of transactions per store," Muddy Waters "expected to find a high degree of activity." *Id*.

]counted stores, and stores that appeared to be entirely different brands – including" KE Holdings'

franchise brand Deyou.  *Id*.[8]

93.     Muddy Waters explained that its "site visits and field work" in Sanhe Langfang

"indicate[d] that [KE Holdings] overstated the store count" in that city "by 59%" – "by keeping

branch SAIC registrations current" even though the registrations did not actually represent active

stores.  *Id*.  Given that KE Holdings claimed to have "an extensive national network" of Lianjia

stores, Muddy Waters posited "that Sanhe Langfang [was] representative of" other cities, and that

overstated Lianjia store counts were "endemic" throughout China.  *Id*. at 24, 74.

94.     *Case Study Example 1 – Muddy Waters found only one store where SAIC*

*registrations indicated there were seven*.  Muddy Waters provided an example from its field work in

Sanhe Langfang, in which it found seven Lianjia brokerage stores registered with the SAIC in the

same vicinity, but only two physical stores – one of which was closed.  *Id*. at 24.  In particular, SAIC

data for all seven Lianjia stores showed nearly-identical addresses "on the same street[,]" and

showed that the stores were "established at the same time" (May 25-26, 2017) "with the same legal

representative" (an individual named "Song Xinghua").  *Id*. at 24 & n.37.  According to Muddy

Waters, "[a]ll of these branches . . . filed . . . annual reports with SAIC in the past four years and

ha[d] active current registrations."  *Id*. at 27.

95.     Muddy Waters explained that it "visited the street to verify the existence of these

stores but found only one store" known as "Sanhe Lianjia Yanjiao Branch No. 53 . . . in suite A1-8."

*Id*. at 24-25.  Muddy Waters then reportedly "spoke with an agent at the operating Lianjia store[,]"

who "confirmed that there was indeed only one Lianjia store on the street."  *Id*. at 25.

---

[8]     This discrepancy is significant because KE Holdings reports revenue on a gross basis for its
wholly-owned Lianjia stores, and collects platform fees from its franchised Deyou stores.

96.     Muddy Waters also found additional "discrepancies" when it "compar[ed] the data of

the confirmed store with the SAIC data[.]"  *Id*.  As the Report explained:

> The only unique store of the seven observed, Branch No. 53, is located at E2-A1-8 of
> the MOBO apartment complex. . . . On [KE Holdings] platform, Branch 53 is also
> known as Lianjia ShouErTianCheng No. 2[,] and the listed address matches with the
> address plaque hung outside of the store. . . . However, the store has a different
> address listed in its SAIC business license certificate.  The accompanying SAIC
> business license provided to the store page shows Branch No. 53 is registered in
> District E, building 1, 1st Floor, Unit 1, Suite A1-8, which should be E1-A1-8 and
> not E2-A1-8 as listed elsewhere.

*Id*. at 25-26.  Muddy Waters posited that KE Holdings was "intentionally creat[ing] inconsistencies

such as these to misrepresent its actual store counts."  *Id*. at 26.



*Id*. at 27.

98.     *Case Study Example 2 – Muddy Waters found that Branch No. 10 and Branch No. 79 were a single store.*   In another example from its case study of Sanhe Langfang, Muddy Waters reportedly found "two [Lianjia] branches registered to the same street address in the SAIC database[,]" but only one physical store.  *Id.*  As Muddy Waters explained, "both Branch No. 10 and Branch No. 79" appeared on KE Holdings' platform "with the same vague location description: 'Shenwei North Street.'"  *Id.* at 72.  Indeed, Muddy Waters found that "[t]he use of similar but different store names and the extremely vague store location descriptions and addresses [was] a common theme on [KE Holdings'] platform."  *Id.* at 27.  Muddy Waters posited that this tactic was designed to "obfuscate, allowing some stores to exist on paper alone."  *Id.* at 72.

99.     According to Muddy Waters, its site visit showed that Lianjia "Branches 10 and 79 [were] co-located" – even though they appeared on KE Holdings' platform "as distinct and different stores" – "with different store numbers, different branch numbers, and different SAIC business registrations."  *Id.* at 27.[9]  During its site visit, Muddy Waters observed that the "SAIC business license displayed on the wall was for Branch No. 79."  *Id.*  On the opposite wall, however, Muddy Waters observed "award banners" for "both Branch No. 10[] and Branch No. 79[.]"  *Id.*  According to Muddy Waters, "[t]he agent at the store stated that Branch No. 10 . . . was closed and had merged with Branch [No.]79[.]"  *Id.*

100.     However, platform data collected by Muddy Waters reportedly showed "13 exiting home and 2 new home transactions" at Branch No. 10, and "27 existing home and 2 new home transactions" at Branch No. 79 during the period from May 25, 2021 to October 22, 2021.  *Id.*  Muddy Waters explained that – "like the example of Branch No. 2 (Tianyang Cheng No. 2) and No.

---

[9]     *See also id.* at 72 (depicting screenshots from KE Holdings' platform).

15 (Tianyang Cheng No. 6)" – "both stores" continued to "display[] active transactions even after one was closed and the two [had] seemingly merged." *Id*.

102.    *Case Study Example 4 – Lianjia Branches No. 4 and No. 88 were registered on the same street, but only Branch No. 88 existed*.   In another example from its case study of Sanhe Langfang, Muddy Waters reported that Lianjia "Branch[] [No.] 4 and" Lianjia Branch No. "88 [were] registered on the same street, only two stores [apart]." *Id*.   Both branches reportedly "filed their 2020 annual reports and [were] supposedly active" brokerage stores.   *Id*. at 76.   But when Muddy Waters visited the location during the fourth quarter of 2021, it "found one Lianjia store" – "Branch [No.] 88" – and found "a restaurant" at [t]he location where Branch 4" should have been (*id*.), as depicted below:



*Id*. at 29.  Baidu Maps corroborated that Branch No. 4 did not exist – likewise showing the restaurant

at Branch No. 4's registered location.  *Id*. at 75-76.

> **d.     Muddy Waters Finds Brokerage Stores that Were
> Registered as Company-owned Lianjia stores, but Were
> Actually Less Profitable Franchised Deyou Stores**

103.     Muddy Waters' investigation also uncovered instances of brokerage stores that were

registered as Company-owned Lianjia brokerages, but were actually franchised Deyou brokerages.

Muddy Waters explained that "[w]hen reviewing Lianjia's SAIC registrations, [it] found two Lianjia

stores that share[d] addresses with two Deyou stores."  *Id*. at 76.  "More importantly," during a site

visit, Muddy Waters reportedly "found a Deyou store at one of these physical locations, but not [a]

Lianjia [store]."  *Id*.

104.     According to Muddy Waters, Lianjia "Branch No. 56" was registered with the SAIC

at: "ShouErYuan TianCheng, District E, building 7, 1st Floor, Unit 1, Suite A1-8 in the Yanjiao

New High-Tech Zone[.]"  *Id*.  However, "[t]he same address [was] also registered with the SAIC" as

the location of the "Langfang Wisdom Deyou Real Estate Agency Co., Ltd."  *Id*.

105.     In another instance, Muddy Waters reportedly found that Lianjia "Branch No. 36 and

another Deyou store share[d] [the] same registered address" – "Yanjiao New Development Zone,

West side of Yanxing Rd., Xiangxin Store, No. 92."  *Id*. at 77.  "When [Muddy Waters] visited" that

location, however, it "only the found the Deyou store[.]"  *Id*.

106.     As Muddy Waters explained, these Deyou brokerages "appear[ed] to be pulling

double duty – doubling up as [] Lianjia store[s] and being counted as [] Deyou store[s]."  *Id*. at 76.

The Report further explained:

> Lianjia stores and Deyou franchise stores present very different economic
> contributions to [KE Holdings].  All of the commissions collected by Lianjia stores
> are reported on a gross basis, while only a small percent of the commissions
> generated by Deyou stores plus some other possible fees flow to [KE Holdings] from
> Deyou operations.  Therefore, changing from a Lianjia to a Deyou store is not a

matter of rebranding, but one of economics – directly impacting commission revenue.

*Id*. at 77.

### 2. Evidence of Inflated Agent Counts

107.    According to Muddy Waters, its investigation also uncovered evidence that KE Holdings was significantly overstating the number of agents on its platform.  *Id*. at 5, 30.  Muddy Waters explained that  "[m]ultiple [i]ndependent [d]ata [p]oints" supported this finding, including platform data, local government real estate websites, and SAIC data.  *Id*. at 30; *see also id*. at 31-37. As Muddy Waters further explained, "much like the store count, [its] field work and independent evidence . . . suggest[ed] that the agent count [was] even more exaggerated" than its analysis of platform data indicated.  *Id*. at 5.

108.    Muddy Waters described the significance of the agent overstatement, as follows:

> Home sales on [KE Holdings'] platform are a function of the number of agents using its platform.  Clearly, the more agents on the platform, the more home sales closed and recorded through the platform, and the larger the Company's GTV and related revenues.  This link between agent growth and GTV and revenue growth is an important pillar of the narrative supporting [the Company's] stock price.

*Id*. at 30.  In other words, since "[r]evenue and GTV are a function of agent count," Muddy Waters posited that, "to justify its fabricated GTV and revenue figures," KE Holdings "also significantly inflated the number of agents on its platform" to mislead investors about the scale of its business.  *Id*. at 38, 41.

109.    As it did with KE Holdings' store count, Muddy Waters first examined data that it collected from the Company's platform – which indicated that KE Holdings was "inflat[ing] its agent count by ***approximately 26%***."  *Id*. at 30.  Muddy Waters explained that it "used a program to collect the number of agents listed on the Company's platform as of July 16, 2021[,]" and used the "Find Agent" function on KE Holdings' platform "to locate the agents."  *Id*.

110.    In KE Holdings' 2Q21 press release, the Company publicly reported having 548,600

agents on its platform as of June 30, 2021.  2Q21 Press Release; *see also* Report at 30.[10]  According

to Muddy Waters, however, the platform data that it collected on July 16, 2021 – two weeks after the

end of 2Q21 – "detected only 435,888 agents," which "suggest[ed]" that KE Holdings' 2Q21 agent

count was "inflated . . . by approximately 26%."  *Id*.  Muddy Waters summarized its findings in the

following table:

| Comparison of BEKE Claimed Agent Number vs. BEKE Platform Data | |
| --- | --- |
| | # of Agents |
| Number of agents reported by BEKE (2Q 2021) | 548,000 |
| Number of Lianjia agents from collected data (as of 7/16/2021) | 115,940 |
| Number of Connected stores agents from collected data(as of 7/16/2021) | 319,948 |
| Total agents on BEKE's platform (as of 7/16/2021) | 435,888 |
| Difference | (112,112) |
| Inflated % | 26% |

*Id*.

### a.    Local Government Real Estate Websites Shows that KE Holdings Overstated the Number of Agents on Its Platform

111.    Muddy Waters sought to verify these findings by "compar[ing] a local real estate

license registry" in the city of Nanchang "against the detailed disclosures provided by [KE Holdings]

in connection [with its 2019] acquisition" of the real estate brokerage firm Zhonghuan.  *Id*. at 31.

112.    Muddy Waters described the local real estate registry as follows:

As a protection against unscrupulous real estate agents, the city of Nanchang in
Jiangxi Province provides a quantitative score and ranking for all agents, tracking
good and bad behaviors with 100 points (5 stars) being the highest ranking.

These scores are listed in Nanchang City's Real Estate Broker Credit Registry (the
"Registry").  Agents with scores below 60 are entered onto a blacklist and their
brokerage credentials are cancelled.  The Registry is public and searchable.  Local
authorities confirmed that the Registry is updated frequently and that the registry is []
current, displaying whether an agent is still with an agency, or if they have resigned
or have been blacklisted.

---

[10]    Muddy Waters used a slightly lower figure – 548,000 – which it took from an investor
presentation for 2Q21, posted by KE Holdings to its investor relations website, which reported
"548,000+" agents as of June 30, 2021.  *Id*. at 30.

*Id*. (footnotes omitted).

113.    According to Muddy Waters, its collection of KE Holdings' platform data showed that "in late August 2021, Zhonghuan's Nanchang operation had 363 stores with 2,050 agents." *Id*. at 32.  But when Muddy Waters "checked [those] numbers against the Nanchang Registry[,]" it found that "although the reported store count closely matched, the number of Zhonghuan agents was exaggerated by 50%." *Id*. at 32.  The Report summarized these findings in the following table:

| Zhonghuan's operation in Nanchang | # of Stores | # of Agents |
|---|---|---|
| BEKE platform | 363 | 2,050 |
| Nanchang Real Estate Bureau Registry | 360 | 1,307 |
| **Inflated %** | **1%** | **50%** |

*Source: Nanchang Housing Security and Real Estate Administration database, Data collected from BEKE platform*

*Id*.

114.    Muddy Waters found a similar pattern when it looked at a single store.  "[A]ccording to [KE Holdings'] platform, Zhonghuan Youjia No. 3 store supposedly ha[d] 12 agents" as of December 10, 2021.  *Id*. at 32.  "Yet when [Muddy Waters] compared the listed agents at Zhonghuan Youjia No. 3 and the Registry," it reportedly "found three agents [who] had . . . left Zhonghuan." *Id*. at 33.

115.    Indeed, "the Nanchang registry implie[d] that the number of active agents [was] substantially less than the number of agents on the platform," which Muddy Waters explained was "likely because the registry [was] scrubbed far more often for real estate agents who drop out of the business or leave the Company." *Id*.  Muddy Waters concluded that KE Holdings "use[d] former agents who ha[d] left the Company to inflate the agent count on its platform." *Id*. at 32.

b.      **SAIC Data from Shanghai and Beijing – KE Holdings'
Two Largest Markets –Shows that KE Holdings
Overstated the Number of Agents on Its Platform**

116.    Muddy Waters explained that it examined SAIC data for Shanghai and Beijing

because those cities were KE Holdings' "two primary markets" – collectively generating 32% of the

Company's reported revenues for 2020.  *Id.* at 34; *see also* 2020 20-F at 19.[11]  As Muddy Waters

further explained, "Chinese companies are required to report [their] number of employees to [the]

SAIC" in connection with making mandatory "contribution[s] to social insurance for all employees."

Report at 34.  Therefore, Muddy Waters performed "[a] simple check of the SAIC data for [KE

Holdings'] subsidiaries" – which indicated "that the Company [was] materially inflating its agent

count in the[] key markets of Shanghai and Beijing.  *Id*.

117.    <u>Shanghai</u>:  According to KE Holdings' 2020 20-F, the Company's Lianjia brokerages

"had approximately . . . 21,000 agents" in Shanghai as of December 31, 2020.  2020 20-F at 60; *see

also* Report at 34 n.48.  Muddy Waters examined KE Holdings' SEC filings and SAIC corporate

registry databases, and identified two Company subsidiaries in Shanghai.  Report at 34 & n.50.

Muddy Waters then looked at "the annual SAIC data for [KE Holdings'] Shanghai subsidiaries"

from publicly-available databases, and found a total of 9,996 employees registered at the two

subsidiaries.  *Id*. at 34-35.  Muddy Waters also examined the Company's other Shanghai businesses,

including variable interest entities, and found 199 additional employees registered with the SAIC.

*Id*. at 35.

118.    Muddy Waters' investigator also contacted six Lianjia stores in Shanghai, and was

reportedly told "that Lianjia stores do not employ part-time or temporary agents and that Lianjia

pays social insurance for its employees" – meaning that the number of employees reported in the

---

[11]     KE Holdings' Annual Report for the year ended December 31, 2020 was filed with the SEC
on Form 20-F on April 6, 2021 (the "2020 20-F").

"SAIC data should generally match the agent count reported by the Company in its SEC filings." *Id.* at 36.

119.    Instead, the total number of registered Shanghai employees found by Muddy Waters – 10,197 – was ***106%*** lower than the 21,000 Shanghai-based agents that the Company reported in its 2020 20-F.  *Id.* at 35.  Muddy Waters posited that the true agent overstatement was likely even greater, since a portion of "of the 10,197 employees reported in the SAIC data . . . should be non-agent support staff[.]"  *Id.*

120.    Beijing:  Muddy Waters reported that it encountered "the same pattern when [it] compare[d]" KE Holdings' SEC "disclosures with independent records from the Company's other key market, Beijing."  *Id.* at 5, 36.  According to KE Holdings' 2020 20-F, the Company's Lianjia brokerages "had approximately 27,000 . . . agents" in Beijing as of December 31, 2020.  2020 20-F at 60; *see also* Report at 34 n.48.  Muddy Waters examined KE Holdings' SEC filings and SAIC corporate registry databases, and identified 28 Company subsidiaries and variable interest entities in Beijing.  Report at 36 & n.53.  According to Muddy Waters, SAIC data for those entities showed that they "reported a total of only 14,236 employees[.]"  *Id.* at 36.  That figure "indicat[ed] that [KE Holdings was] exaggerating the number of its agent in Beijing by ***90%***" in comparison to the 27,000 Beijing-based agents that the Company reported in its 2020 20-F.  *Id.*

121.    Moreover, since KE Holdings is headquartered in Beijing, "[a] large portion of [its] employees are based" there, including employees working in non-agent roles such as platform operations, research and development, and administration.  2020 20-F at 130; *see also* Report at 36.  Therefore, Muddy Waters explained that the actual agent overstatement was likely even greater, since the 14,236 employees registered with the SAIC would presumably include a significant number of non-agent employees.  Report at 37.

- 40 -

**F.   Muddy Waters Also Finds Evidence that KE Holdings Reported Inflated GTV and Revenues in 2Q21 and 3Q21**

122.   Muddy Waters explained that, in order "[t]o assess the authenticity of [KE Holdings']

reported GTV and associated commission revenues, [it] wrote a program to collect the publicly

available [transaction] data on [KE Holdings'] platform." *Id.* at 6.  Muddy Waters described its

research methodology in detail, in a 24-page appendix to the Report.  *Id.* at 47-71 ("Appendix I:

Data Collection Methodology and Results").  The Report contained the following summary:

> The program begins with the Find Agent function in the app.  After finding the
> agents, it collects the stores with which they are affiliated and the store information.
> Then it collects the transaction information and other transaction details that are
> included in its code.  The [KE Holdings] platform contains at least 15 collectable
> data points, including the total number of new and existing home sales on the
> platform.  The Lianjia and Deyou agents with whom we spoke also confirmed that
> the transactions posted on the external network match up with sales transactions on
> their internal network.  We collected and analyzed code and detailed transaction data
> accessible via [KE Holdings'] external platform from May through mid-November
> 2021, enabling us to compare [the Company's] claimed GTV over that period to the
> GTV evidenced by the data on [its] platform.

*Id.* at 6 (footnotes omitted); *see also id.* at 5 n.2.

123.   "To verify that [its] collected data was comprehensive," Muddy Waters then

"compared the key metrics from the data [it] collected from the platform with [KE Holdings'] SEC

disclosures."  Muddy Waters reported the following results of this comparison:

> [KE Holdings] reported connecting with 278 real estate brokerage brands other than
> Lianjia.  [2020 20-F at 60.]  In our July data collection, we identified 310 brands.
> [KE Holdings] stated that its Lianjia stores operate in 29 cities in China.  [*Id.*]  Our
> collected data captured Lianjia brokerage transaction data in 29 cities.  [KE
> Holdings] reported that its platform includes connected brokerages in "more than 100
> economically vibrant cities in China."  [2020 20-F at 54.]  We collected transaction
> data from connected and franchise stores with agents for 142 cities, including Beijing
> and Shanghai.

*Id.* at 6-7 (footnotes omitted).

1.      **Evidence of Inflated GTV**

a.      **Muddy Waters Finds that New Home GTV Was
Inflated by Approximately 126% in 2Q21 and 3Q21**

124.    Muddy Waters first analyzed KE Holdings' reported GTV of new home transactions,

by comparing the reported GTV to data that Muddy Waters collected from the Company's platform.

Muddy Waters explained its methodology for analyzing GTV of new home transactions, in pertinent

part:

> The methodology for comparing [KE Holdings'] claims against the data we collected
> for new home sales on its platform was straightforward and required few
> assumptions.  We collected data covering late May through mid-November 2021,
> which gave us the number of new home transactions on the platform during that
> period for both Lianjia and connected brokerages.   We then multiplied this
> transaction data by the new home prices previously disclosed by [KE Holdings] . . . .

*Id.* at 7.

125.    Muddy Waters further explained:

> In its SEC filings, [KE Holdings] disclosed the average price per new home
> transaction on its platform for both Company[-]owned and connected brokerages in
> 2020.  For Lianjia, [KE Holdings] disclosed GTV and the number of transactions,
> which yield an average price of RMB 2.06 million per new home.  For the connected
> brokerages, [KE Holdings'] numbers equate to an average price of RMB 1.4 million
> per new home.

*Id.* (footnote omitted); *see also id.* at 55.  Since "housing data show[ed] that the price of new homes

in China . . . remained flat from 2020 to 2021[,]" Muddy Waters "use[d] the average prices for 2020

reported by [KE Holdings] in its SEC filings to estimate" 2Q21 and 3Q21 "GTV from the collected

transaction data."  *Id.* at 7 (footnote omitted).

126.    Since "data from [KE Holdings'] platform [was] available in 76-day increments" (*id.*

at 7 n.13), Muddy Waters examined "the number of new home transactions collected from [KE

Holdings'] platform for Lianjia stores for two overlapping 76-day windows" (*id.* at 7), as set forth in

the following table:

| May 25, 2021 - Aug 8, 2021 | | | | June 30, 2021 - Sep 13, 2021 | | | |
|---|---|---|---|---|---|---|---|
| Ref. | City | | # of transactions | Ref. | City | | # of transactions |
| 1 | Dalian | 大连 | 1,119 | 1 | Dalian | 大连 | 1,144 |
| 2 | Shenyang | 沈阳 | 680 | 2 | Shenyang | 沈阳 | 660 |
| 3 | Jinan | 济南 | 1,082 | 3 | Jinan | 济南 | 782 |
| 4 | Chengdu | 成都 | 4,180 | 4 | Chengdu | 成都 | 4,240 |
| 5 | Zhengzhou | 郑州 | 1,046 | 5 | Zhengzhou | 郑州 | 745 |
| 6 | Changsha | 长沙 | 432 | 6 | Changsha | 长沙 | 339 |
| 7 | Qingdao | 青岛 | 585 | 7 | Qingdao | 青岛 | 495 |
| 8 | Foshan | 佛山 | 209 | 8 | Foshan | 佛山 | 181 |
| 9 | Nanjing | 南京 | 787 | 9 | Nanjing | 南京 | 699 |
| 10 | Yantai | 烟台 | 522 | 10 | Yantai | 烟台 | 403 |
| 11 | Guangzhou | 广州 | 659 | 11 | Guangzhou | 广州 | 664 |
| 12 | Shijiazhuang | 石家庄 | 337 | 12 | Shijiazhuang | 石家庄 | 315 |
| 13 | Tianjin | 天津 | 808 | 13 | Tianjin | 天津 | 717 |
| 14 | Hefei | 合肥 | 388 | 14 | Hefei | 合肥 | 348 |
| 15 | Wuhan | 武汉 | 1,238 | 15 | Wuhan | 武汉 | 1,129 |
| 16 | Xian | 西安 | 614 | 16 | Xian | 西安 | 693 |
| 17 | Hangzhou | 杭州 | 312 | 17 | Hangzhou | 杭州 | 340 |
| 18 | Wuxi | 无锡 | 159 | 18 | Wuxi | 无锡 | 94 |
| 19 | Beijing | 北京 | 1,661 | 19 | Beijing | 北京 | 1,379 |
| 20 | Suzhou | 苏州 | 363 | 20 | Suzhou | 苏州 | 323 |
| 21 | Shanghai | 上海 | 1,278 | 21 | Shanghai | 上海 | 1,328 |
| 22 | Langfang | 廊坊 | 97 | 22 | Langfang | 廊坊 | 69 |
| 23 | Xiamen | 厦门 | 154 | 23 | Xiamen | 厦门 | 108 |
| 24 | Chongqing | 重庆 | 859 | 24 | Chongqing | 重庆 | 940 |
| 25 | Dongguan | 东莞 | 68 | 25 | Dongguan | 东莞 | 57 |
| 26 | Shenzhen | 深圳 | 222 | 26 | Shenzhen | 深圳 | 207 |
| 27 | Zhongshan | 中山 | 55 | 27 | Zhongshan | 中山 | 61 |
| 28 | Huizhou | 惠州 | 49 | 28 | Huizhou | 惠州 | 40 |
| 29 | Haikou | 海口 | 0 | 29 | Haikou | 海口 | 1 |
| Total | | | 19,963 | Total | | | 18,501 |

*Id*. at 8.

127.   Based on the number of new home transactions found by Muddy Waters' data collection, and the average sales price reported by KE Holdings in its SEC filings, Muddy Waters "estimate[d] that [KE Holdings'] actual GTV [of] new home sales" through both its Lianjia brokerages and connected stores was only RMB 402 billion during 2Q21 and 3Q21 combined.  *Id*. at 7.  By contrast, the Company reported that GTV of new home transactions on its platform was: (i) RMB 498.3 billion in 2Q21; and (ii) and RMB 410.1 billion in 3Q21 – a GTV of approximately RMB 908 billion during 2Q21 and 3Q21 combined.  *See id*.  Thus, Muddy Waters' analysis indicated that KE Holdings had inflated its GTV of new home transactions by ***approximately 126%*** during 2Q21 and 3Q21.  *Id*. at 7-8.  Muddy Waters summarized its analysis in the following table:

**The Collected Data Suggest BEKE Grossly Overstates its New Home GTV**

| RMB M | Avg. Price per Home | 76 days (May 25 - Aug 8) | | 2Q 2021 (91 days) | 2Q 2021 | 2Q 2021 |
|---|---|---|---|---|---|---|
| | | # of new homes | Estimated GTV | Estimated GTV | Reported GTV | Inflated% |
| New homes - Lianjia | 2.06 | 19,963 | 41,099 | 49,211 | 83,800 | 70% |
| New homes - Connected Stores | 1.40 | 93,975 | 131,668 | 157,655 | 414,500 | 163% |
| Total | | 113,938 | 172,767 | 206,866 | 498,300 | 141% |
| RMB M | Avg. Price per Home | 76 days (Jun 30 - Sep 13) | | 3Q 2021 (92 days) | 3Q 2021 | 3Q 2021 |
| | | # of new homes | Estimated GTV | Estimated GTV | Reported GTV | Inflated% |
| New homes - Lianjia | 2.06 | 18,501 | 38,089 | 46,108 | 72,550 | 57% |
| New homes - Connected Stores | 1.40 | 87,998 | 123,293 | 149,249 | 337,550 | 126% |
| Total | | 106,499 | 161,382 | 195,358 | 410,100 | 110% |
| RMB M | Avg. Price per Home | 152 days | | 2Q-3Q 2021 | 2Q-3Q 2021 | 2Q-3Q 2021 |
| | | # of new homes | Estimated GTV | Estimated GTV | Reported GTV | Inflated% |
| New homes - Lianjia | 2.06 | 38,464 | 79,189 | 95,319 | 156,350 | 64% |
| New homes - Connected Stores | 1.40 | 181,973 | 254,961 | 306,904 | 752,050 | 145% |
| Total | | 220,437 | 334,150 | 402,224 | 908,400 | 126% |

*Id*. at 9.

### b.   Muddy Waters Finds that Existing Home GTV Was Inflated by Approximately 33% in 2Q21 and 3Q21

128.   Next, Muddy Waters analyzed KE Holdings' reported GTV of existing home transactions, by comparing the reported GTV to data that Muddy Waters collected from the Company's platform.  Muddy Waters summarized its methodology for analyzing GTV of existing home transactions, in pertinent part:

> The methodology for estimating existing home GTV required more assumptions than for new homes.  Our estimate of [KE Holdings'] GTV exaggeration of existing home transactions would be significantly greater had we not intentionally made so many assumptions in the Company's favor.

> Our program collected hundreds of thousands existing home transactions during the period.  For many such existing home transactions, prices were also readily available, making price assumptions unnecessary.  For other existing home transactions, however, price assumptions were necessary to estimate GTV.

*Id*. at 9; *see also* Appendix 1 at 58-69 (setting forth a detailed explanation of Muddy Waters' methodology and assumptions).

129.   Based on its data collection, Muddy Waters estimated that KE Holdings' actual GTV of existing home transactions through both its Lianjia brokerages and connected stores was

"approximately RMB 775 billion" during 2Q21 and 3Q21 combined. *Id*. at 9. By contrast, the Company reported that GTV of existing home transactions on its platform was: (i) RMB 652.0 billion in 2Q21; and (ii) RMB 378.2 billion in 3Q21 – a GTV of approximately RMB 1,030.2 billion during 2Q21 and 3Q21 combined. *See id*. Thus, Muddy Waters' analysis indicated that KE Holdings had inflated its GTV of existing home transactions by ***approximately 33%*** during 2Q21 and 3Q21. *Id*. Muddy Waters summarized its analysis in the following table:

| RMB M | 2Q 2021 | | | 3Q 2021 | | | 2Q-3Q 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% |
| GTV of existing home sales by Lianjia | 309,500 | 216,839 | 43% | 185,300 | 160,866 | 15% | 494,800 | 377,706 | 31% |
| GTV of existing home sales by connected stores | 342,500 | 232,630 | 47% | 192,900 | 164,791 | 17% | 535,400 | 397,421 | 35% |
| GTV of existing home sales | 652,000 | 449,469 | 45% | 378,200 | 325,657 | 16% | 1,030,200 | 775,126 | 33% |

*Id*.

### c. Muddy Waters Finds that Combined GTV Was Inflated by Approximately 65% in 2Q21 and 3Q21

130. Muddy Waters then analyzed the inflation in KE Holdings' reported GTV of new and existing home transactions on a combined basis. KE Holdings' reported GTV of new and existing home transactions was approximately RMB 1,150.2 billion in 2Q21, and approximately RMB 788.4 billion in 3Q21.[12]

131. According to Muddy Waters, however, "the data collected from [KE Holdings'] platform" indicated that 3Q21 GTV of new and existing home transactions was "RMB 521 billion, compared to a reported RMB 788 billion" – which amounted to approximately a "***51% overstatement***" of 3Q21 GTV. Report at 7. For 2Q21, Muddy Waters "[a]djust[ed] for the partial Q2 data" by "using company[-]favorable assumptions[,]" which "yielded an estimated" 2Q21 GTV of new and existing home transactions of RMB 656 billion, compared to a reported RMB 1,150 billion – which amounted to approximately a "***75% overstatement***" of 2Q21 GTV. *Id*. Muddy

---

[12] *See* 2Q21 Press Release; 3Q21 Press Release. These figures do not include reported GTV of "emerging and other services." *Id*.

| RMB BN | 2Q 21 | 3Q 21 | 2Q-3Q 2021 |
|---|---|---|---|
| Reported home sales GTV | 1,150 | 788 | 1,939 |
| Home sales GTV estimate from collected data | 656 | 521 | 1,177 |
| **Inflated %** | **75%** | **51%** | **65%** |

*Source: MW Data Collection*

*Id*.

### 2.   Evidence of Inflated Revenues

132.   Finally, Muddy Waters evaluated the impact of KE Holdings' GTV inflation in 2Q21 and 3Q21 on the Company's reported revenues from new and existing home transactions during those quarters. *See id*. at 10.

| Reported commission rate | 2Q 2021 | 3Q 2021 | 2Q-3Q 2021 |
|---|---|---|---|
| New home sales by Lianjia and connected stores | 2.79% | 2.76% | 2.77% |
| Existing home sales by Lianjia | 2.75% | 2.86% | 2.79% |
| Existing home sales by connected stores | 0.32% | 0.41% | 0.35% |

*Id*.

134.   Muddy Waters then "appl[ied] [KE Holdings'] reported commission rates to the GTV data" that it had "collected from [the Company's] platform[.]" *Id*.[13]

---

[13]   As Muddy Waters explained, KE Holdings' commission revenues are a direct "function of its GTV[.]" *Id*. Moreover, because KE Holdings recognizes revenues from commissions on a gross

**BEKE Likely Inflated Its Home Sales Transaction Services Revenues (using reported commission rates)**

| RMB M | 2Q 2021 | | | 3Q 2021 | | | 2Q - 3Q 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% |
| GTV of new home sales by Lianjia and connected | 498,300 | 206,866 | 141% | 410,100 | 195,358 | 110% | 908,400 | 402,224 | 126% |
| Reported commission rate | 2.79% | 2.79% | | 2.76% | 2.76% | | 2.77% | 2.77% | |
| Rev from new home sales | 13,900 | 5,770 | 141% | 11,300 | 5,383 | 110% | 25,200 | 11,153 | 126% |
| | | | | | | | | | |
| GTV of existing home sales by Lianjia | 309,500 | 216,839 | 43% | 185,300 | 160,866 | 15% | 494,800 | 377,706 | 31% |
| Reported commission rate | 2.75% | 2.75% | | 2.86% | 2.86% | | 2.79% | 2.79% | |
| Rev from existing home sales by Lianjia | 8,500 | 5,955 | 43% | 5,300 | 4,601 | 15% | 13,800 | 10,556 | 31% |
| | | | | | | | | | |
| GTV of existing home sales by connected stores | 342,500 | 232,630 | 47% | 192,900 | 164,791 | 17% | 535,400 | 397,421 | 35% |
| Reported commission rate | 0.32% | 0.32% | | 0.41% | 0.41% | | 0.35% | 0.35% | |
| Rev from existing home sales by connected stores | 1,100 | 747 | 47% | 800 | 683 | 17% | 1,900 | 1,431 | 33% |
| | | | | | | | | | |
| GTV of home sales | 1,150,300 | 656,335 | 75% | 788,300 | 521,015 | 51% | 1,938,600 | 1,177,350 | 65% |
| **Revenue from commission of home sales** | **23,500** | **12,473** | **88%** | **17,400** | **10,667** | **63%** | **40,900** | **23,140** | **77%** |

*Source: BEKE's Public Filings, Data collected from BEKE's platform, MW calculation*

*Id.*

basis for all new home transactions – regardless of whether they were facilitated by a Company-owned Lianjia store, or by a connected store – new home transactions have an outsized impact on the Company's revenues.  *See id.* at 9-10.

## V.      ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS

### A.      Materially False and Misleading Statements Made During the Class Period

#### 1.      The 3Q20 Press Release

136.      The Class Period begins on November 16, 2020, when KE Holdings issued a press release announcing its financial results for the third quarter of 2020, ended September 30 ("3Q20"). The same day, the Company filed the 3Q20 press release with the SEC as an exhibit to a Current Report on Form 6-K, which was signed by Defendant Tao.  Under the heading "Business Highlights for the Third Quarter of 2020," the 3Q20 press release represented that the "*[n]umber of stores*" on KE Holdings' platform "*was 44,883 as of September 30, 2020, a 41.7% increase year-over-year*." It further represented that the "*[n]umber of agents*" on the Company's platform "*was 477,810 as of September 30, 2020, a 50.7% increase year-over-year*."

137.      The statement referenced above in ¶136 reporting 44,883 stores on KE Holdings' platform as of September 30, 2020 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores.  Likewise, the statement referenced above in ¶136 reporting 477,810 agents on KE Holdings' platform as of September 30, 2020 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

## 2. The Secondary Offering Documents

138. Also on November 16, 2020, KE Holdings issued a separate press release announcing the Secondary Offering, and filed with the SEC the Registration Statement for the Secondary Offering. Shortly thereafter, on November 19, 2020, the Company filed with the SEC the Secondary Offering Prospectus. The Secondary Offering Documents were signed by each of the Exchange Act Defendants, among others.

139. The Secondary Offering Documents repeatedly highlighted the numbers of stores and agents on KE Holdings' platform, stating that, "*[a]s of September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage stores on [the Company's] platform* . . . ."

140. The statements referenced above in ¶139 were materially false and misleading when made because they failed to disclose that – as KE Holdings has now admitted: (i) at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores; and (ii) at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents. In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones. The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

141. The Secondary Offering Documents further cited both "the number of real estate brokerage stores and agents on [KE Holdings'] platform and their activity level" as factors specifically affecting the Company's operating results:

Specific Factors Affecting Our Results of Operations

\*       \*       \*

*The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level*. Since the inception of our Beike platform,

we have attracted an increasing number of real estate brokerage stores and agents to join our platform while maintaining high service quality.

142.    The Secondary Offering Documents likewise highlighted the importance of the Company's "large and active network" of agents and brokerage stores, stating, in pertinent part:

> **We believe the large and active network of** real estate brokerage brands and their affiliated **stores and agents contributes significantly to the success of our platform**.
>
> \*       \*       \*
>
> **We believe a large and active network of agents, brokerage stores** and brokerage brands across China **provides a solid foundation for serving a large number of housing customers**.
>
> \*       \*       \*
>
> Through the agents, stores and brokerage brands on our platform, we are able to effectively hone local market expertise, generate leads and build relationships with our housing customers.

143.    The statements referenced above in ¶¶141-142 were materially false and misleading when made for the reasons set forth in ¶140.  In addition, upon choosing to speak about the "activity level" of the "brokerage stores and agents on [the Company's] platform" as a factor affecting KE Holdings' "gross transaction value" and "revenues," and to speak about the Company's "large and active network" of stores and agents as a factor that "provide[d] a solid foundation" and "contribute[d] significantly to the success of [KE Holdings'] platform," the Exchange Act Defendants assumed a duty to speak completely and accurately.  The Exchange Act Defendants' failure to disclose that material portions of both the stores and agents on KE Holdings' platform as of September 30, 2020 were inactive – and in some cases, nonexistent – rendered these statements materially false and misleading.

144.    Similarly attributing the Company's success to how "actively" and "proactive[ly]" agents and stores engaged with housing market participants, the Secondary Offering Documents stated, in pertinent part:

We believe our reputation for high-quality service among the large housing customer base and ***our growing network of real estate brokerage stores and agents that transact actively on our platform*** well position us to increase cooperation with existing and new real estate developers.

*        *        *

We believe our ***proactive engagement with platform participants both online and offline*** enables us to know them better and serve them better.

145.     The statements referenced above in ¶144 were materially false and misleading when made for the reasons set forth in ¶140 and because they failed to disclose that a material portion of KE Holdings' "network of . . . brokerage stores and agents" did not "transact actively on [the Company's] platform" or "proactive[ly] engage[] with platform participants both online and offline[.]"

146.     The Secondary Offering Documents further described the "scale" of KE Holdings' network of agents and stores as both a "crucial indicator[] of [its] operations," and a "[k]ey [s]uccess [f]actor[]," stating as follows:

We believe ***the numbers of real estate brokerage stores and agents on our platform demonstrate our scale and are crucial indicators of our operations***.

*        *        *

***Key Success Factors***

The following are key factors to a successful integrated housing transactions and services platform in China:

***Scale and quality of agent and store network.  Agents and physical stores are fundamental to China's housing transactions and services market, playing a key role in helping brokerage service providers capture potential customers by serving as a gateway into local communities.  It is important to build an extensive agent and store network across brokerage brands***.  The platform's strong and unique value propositions to agents and store not only increase their stickiness to the platform, but also empower them to meet housing customers' evolving needs and establish trust with customers.  An extensive agent and store network with an effective and efficient collaboration mechanism allows the platform to maintain close relationships with both housing customers and other industry participants such as real estate developers and other home-related service providers.

- 51 -

147.    The statements referenced above in ¶146 were materially false and misleading when made for the reasons set forth in ¶140.  In addition, upon choosing to characterize "the numbers of real estate brokerage stores and agents on [KE Holdings'] platform" as "crucial indicators of [the Company's] operations" that "demonstrate[d] [its] scale," to emphasize the "importan[ce] [of] build[ing] an extensive agent and store network," and to describe the "[s]cale and quality of [its] agent and store network" as a "[k]ey [s]uccess [f]actor[]," the Exchange Act Defendants assumed a duty to speak completely and accurately.  The Exchange Act Defendants' failure to disclose that material portions of both the stores and agents on KE Holdings' platform as of September 30, 2020 were inactive – and thus were not contributing to the Company's success – rendered these statements materially false and misleading.   Likewise, although "[a]gents and physical stores [were] fundamental" to KE Holdings' business and "play[ed] a key role in . . . captur[ing] potential customers by serving as a gateway into local communities," the Exchange Act Defendants failed to disclose that material portions of both the physical stores and agents on KE Holdings' platform as of September 30, 2020 were inactive – and in some cases, nonexistent.

148.    Under a heading listing the Company's "[s]trengths," the Secondary Offering Documents characterized KE Holdings' brokerage stores as its "competitive advantage," stating, in pertinent part:

> ***Our offline stores serve as an entry point for our customers to our platform*** as they are conveniently located within the communities ***and at the same time have become our competitive advantage in the industry***.

149.    The statement referenced above in ¶148 was materially false and misleading when made for the reasons set forth in ¶140 and because it failed to disclose that a material portion of the "offline stores" on KE Holdings' platform as of September 30, 2020 were not providing a "competitive advantage" for the Company because those stores were inactive – and in some cases, nonexistent.

150.    The Secondary Offering Documents referenced hypothetical risks associated with "inaccuracies" in the Company's "key operating metrics," including the "number of . . . brokerage stores and agents on [its] platform," stating as follows:

> *We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business*.
>
> *We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the performance of our business*.  Our operating metrics may differ from estimates published by third parties or from similarly titled metrics used by other companies due to differences in methodology and assumptions. We calculate these operating metrics using internal company data.  *If we discover material inaccuracies in the operating metrics we use*, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which could negatively affect our business.  If investors make investment decisions based on operating metrics we disclose that are inaccurate, we may also face potential lawsuits or disputes.

151.    The statements referenced above in ¶150 were materially false and misleading when made because they portrayed "inaccuracies" in "key operating metrics," including "the number[s] of . . . brokerage stores and agents on [the Company's] platform," as hypothetical future risks, when in truth, the numbers of stores and agents as of September 30, 2020 that KE Holdings provided in the Secondary Offering Documents were presently inaccurate.  As KE Holdings has now admitted: (i) at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores; and (ii) at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

### 3.    The 4Q20 Press Release

152.    On March 15, 2021, KE Holdings issued a press release announcing its financial results for the fourth quarter and full year of 2020, ended December 31 ("4Q20" and "FY20," respectively).  The following day, the Company filed the press release with the SEC as an exhibit to a Current Report on Form 6-K, which was signed by Defendant Tao.  Under the heading "Business Highlights for the Fourth Quarter of 2020," the 4Q20 press release represented that the "*[n]umber of stores*" on KE Holdings' platform "*was 46,946 as of December 31, 2020, a 25.1% increase from one year ago*."  It further represented that the "*[n]umber of agents*" on the Company's platform "*was 493,088 as of December 31, 2020, a 37.9% increase from one year ago*."

153.    The statement referenced above in ¶152 reporting 46,946 stores on KE Holdings' platform as of December 31, 2020 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 3,510 of the stores – *approximately 8.2%* – were not "active" stores.  Likewise, the statement referenced above in ¶152 reporting 493,088 agents on KE Holdings' platform as of December 31, 2020 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 47,650 of the agents – *approximately 10.7%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

### 4.    The 2020 20-F

154.    On April 6, 2021, KE Holdings filed its annual report for the year ended December 31, 2020 with the SEC on Form 20-F.  The 2020 20-F repeatedly highlighted the numbers of stores and agents on KE Holdings' platform, stating that, "*[a]s of December 31, 2020, there were*

*more than 493,000 real estate agents and approximately 47,000 brokerage stores on [the Company's] platform* . . . ."

155.     The statements referenced above in ¶154 were materially false and misleading when made because they failed to disclose that – as KE Holdings has now admitted: (i) at least 3,510 of the stores – *approximately 8.2%* – were not "active" stores; and (ii) at least 47,650 of the agents – *approximately 10.7%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

156.     Just as the Secondary Offering Documents had, the 2020 20-F cited both "the number of real estate brokerage stores and agents on [KE Holdings'] platform and their activity level" as factors specifically affecting the Company's operating results:

> Specific Factors Affecting Our Results of Operations
>
> *           *           *
>
> **The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level**.  Since the inception of our Beike platform, we have attracted an increasing number of real estate brokerage stores and agents to join our platform while maintaining high service quality.

157.     Like the Secondary Offering Documents, the 2020 20-F also highlighted the importance of the Company's "large and active network" of agents and brokerage stores, stating, in pertinent part:

> **We believe the large and active network of** real estate brokerage brands and their affiliated **stores and agents contributes significantly to the success of our platform**.
>
> *           *           *

*We believe a large and active network of agents, brokerage stores* and brokerage brands across China *provides a solid foundation for serving a large number of housing customers*.

\*   \*   \*

Through the agents, stores and brokerage brands on our platform, we are able to effectively hone local market expertise, generate leads and build relationships with our housing customers.

158.   The statements referenced above in ¶¶156-157 were materially false and misleading when made for the reasons set forth in ¶155.  In addition, upon choosing to speak about the "activity level" of the "brokerage stores and agents on [the Company's] platform" as a factor affecting KE Holdings' "gross transaction value" and "revenues," and to speak about the Company's "large and active network" of stores and agents as a factor that "provide[d] a solid foundation" and "contribute[d] significantly to the success of [KE Holdings'] platform," the Exchange Act Defendants assumed a duty to speak completely and accurately.  The Exchange Act Defendants' failure to disclose that material portions of both the stores and agents on KE Holdings' platform as of December 31, 2020 were inactive – and in some cases, nonexistent – rendered these statements materially false and misleading.

159.   Similar to the Secondary Offering Documents, the 2020 20-F attributed the Company's success to how "actively" agents and stores engaged with housing market participants, stating, in pertinent part:

We believe our reputation for high-quality service among the large housing customer base and *our growing network of real estate brokerage stores and agents that transact actively on our platform* well position us to increase cooperation with existing and new real estate developers.

160.   The statements referenced above in ¶159 were materially false and misleading when made for the reasons set forth in ¶155 and because they failed to disclose that a material portion of

- 56 -

KE Holdings' "network of . . . brokerage stores and agents" did not "transact actively on [the Company's] platform[.]"

161.    Just as the Secondary Offering Documents had, the 2020 20-F referenced hypothetical risks associated with "inaccuracies" in the Company's "key operating metrics," including the "number of . . . brokerage stores and agents on [its] platform," stating as follows:

> **We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business**.
>
> **We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the performance of our business**.  Our operating metrics may differ from estimates published by third parties or from similarly titled metrics used by other companies due to differences in methodology and assumptions.  We calculate these operating metrics using internal company data.  **If we discover material inaccuracies in the operating metrics we use**, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which could negatively affect our business.  If investors make investment decisions based on operating metrics we disclose that are inaccurate, we may also face potential lawsuits or disputes.

162.    The statements referenced above in ¶161 were materially false and misleading when made because they portrayed "inaccuracies" in "key operating metrics," including "the number[s] of . . . brokerage stores and agents on [the Company's] platform" as hypothetical future risks, when in truth, the numbers of stores and agents as December 31, 2020 that KE Holdings provided in the 2020 20-F were presently inaccurate.  As KE Holdings has now admitted: (i) at least 3,510 of the stores – **approximately 8.2%** – were not "active" stores; and (ii) at least 47,650 of the agents – **approximately 10.7%** – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

### 5.       The 1Q21 Press Release

163.    On May 19, 2021, KE Holdings issued a press release announcing its financial results for the first quarter of 2021, ended March 31 ("1Q21").  The following day, the Company filed the 1Q21 press release with the SEC as an exhibit to a Current Report on Form 6-K, which was signed by Defendant Tao.  Under the heading "Business Highlights for the First Quarter of 2021," the 1Q21 press release represented that the "*[n]umber of stores*" on KE Holdings' platform "*was 48,717 as of March 31, 2021, a 25.4% increase from one year ago*."  It further represented that the "*[n]umber of agents*" on the Company's platform "*was 528,424 as of March 31, 2021, a 41.8% increase from one year ago*."

164.    The statement referenced above in ¶163 reporting 48,717 stores on KE Holdings' platform as of March 31, 2021 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 3,780 of the stores – *approximately 8.4%* – were not "active" stores.  Likewise, the statement referenced above in ¶163 reporting 528,424 agents on KE Holdings' platform as of March 31, 2021 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted –at least 49,116 of the agents – *approximately 10.2%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

### 6.       The 2Q21 Press Release

165.    On August 11, 2021, KE Holdings issued a press release announcing its financial results for 2Q21, ended June 30.  The following day, the Company filed the 2Q21 press release with the SEC as an exhibit to a Current Report on Form 6-K, which was signed by Defendant Tao.  Under

the heading "Business Highlights for the Second Quarter of 2021," the 2Q21 press release represented that the "*[n]umber of stores*" on KE Holdings' platform "*was 52,868 as of June 30, 2021, a 25.1% increase from one year ago*."  It further represented that the "*[n]umber of agents*" on the Company's platform "*was 548,600 as of June 30, 2021, a 20.3% increase from one year ago*."

166.    The statement referenced above in ¶165 reporting 52,868 stores on KE Holdings' platform as of June 30, 2021 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 3,822 of the stores – *approximately 7.8%* were not "active" stores.  Likewise, the statement referenced above in ¶165 reporting 548,600 agents on KE Holdings' platform as of June 30, 2021 was materially false and misleading when made because it failed to disclose that – as KE Holdings has now admitted – at least 48,910 of the agents – *approximately 9.8%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

167.    The 2Q21 press release also reported that KE Holdings' *GTV for 2Q21* "*was RMB1,220.8 billion* (US$189.1 billion), an increase of 22.2% year-over-year."  The 2Q21 press release further broke down the Company's quarterly GTV of existing and new home transactions, as follows:

> *GTV of existing home transactions was RMB652.0 billion* (US$101.0 billion), an increase of 11.7% year-over-year.

> *GTV of new home transactions was RMB498.3 billion* (US$77.2 billion), an increase of 32.3% year-over-year.

168.    The statements referenced above in ¶167 were materially false and misleading when made because they failed to disclose that – as Muddy Waters found – the Company's actual 2Q21

GTV of new and existing home transactions was RMB 656 billion, compared to a reported RMB 1,150.2 billion[14] – an overstatement of ***approximately 75%***.  In addition – as Muddy Waters found – the Company's reported GTV of new home transactions was inflated by ***approximately 126%***, and the Company's reported GTV of existing home transactions was inflated by ***approximately 33%***. The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

169.    Finally, the 2Q21 press release reported that KE Holdings' "***[n]et revenues*** increased by 20.0% [y-o-y,] to ***RMB24.2 billion*** (US$3.7 billion) in [2Q21.]"  The 2Q21 press release further broke down the Company's quarterly net revenues from existing and new home transactions, as follows:

> ***Net revenues from existing home transaction services*** increased by 4.9% [y-o-y,] to ***RMB9.6 billion*** (US$1.5 billion) in [2Q21.]

> ***Net revenues from new home transaction services*** increased by 31.9% [y-o-y,] to ***RMB13.9 billion*** (US$2.2 billion) in [2Q21.]

170.    The statements referenced above in ¶169 were materially false and misleading when made because they failed to disclose that – as Muddy Waters found – the Company's actual 2Q21 net revenues from new and existing home transactions were RMB 12.5 billion, compared to a reported RMB 23.5 billion[15] – an overstatement of ***approximately 88%***.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

### 7.    The 3Q21 Press Release

171.    On November 8, 2021, KE Holdings issued a press release announcing its financial results for 3Q21, ended September 30.  The following day, the Company filed the 3Q21 press release with the SEC as an exhibit to a Current Report on Form 6-K, which was signed by Defendant Tao.

---

[14]    Excluding "GTV of emerging and other services" of RMB 70.6 billion.

[15]    Excluding "[n]et revenues from emerging and other services" of RMB 0.7 billion.

172.    As set forth above, in the 3Q21 press release, KE Holdings revealed that significant portions of the stores and agents on the Company's platform were inactive – for the first time providing a breakdown of the numbers of stores and agents versus "active" stores and agents on its platform.  The 3Q21 press release stated that "as of September 30, 2021," the "[n]umber of stores was 53,946 . . . , a 20.2% increase from one year ago" – while the "[n]umber of active stores[] was 49,468 . . . , a 20.2% increase from one year ago."  Thus, KE Holdings admitted that 4,478 stores – *approximately 9.1%* – were not "active" stores.  It further stated that "as of September 30, 2021," the "[n]umber of agents was 515,486 . . . , a 7.9% increase from one year ago" – while the "[n]umber of active agents[] was 468,014 . . . , a 13.1% increase from one year ago."  Thus, KE Holdings admitted that 47,472 agents – *approximately 10.1%* – were not "active" agents.

173.    The statements referenced above in ¶172 were materially false and misleading when made because they failed to disclose that – as Muddy Waters found – the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company admitted, and included not just inactive stores and agents, but nonexistent ones.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

174.    The 3Q21 press release also reported that KE Holdings' **GTV for 3Q21 "was RMB830.7 billion** (US$128.9 billion), a decrease of 20.9% year-over-year."  The 3Q21 press release further broke down the Company's quarterly GTV of existing and new home transactions, as follows:

> **GTV of existing home transactions was RMB378.2 billion** (US$58.7 billion), a decrease of 34.3% year-over-year.
>
> **GTV of new home transactions was RMB410.1 billion** (US$63.7 billion), a decrease of 2.5% year-over-year.

175.    The statements referenced above in ¶174 were materially false and misleading when made because they failed to disclose that – as Muddy Waters found – the Company's actual 3Q21

GTV of new and existing home transactions was RMB 521 billion, compared to a reported RMB 788.4 billion[16] – an overstatement of *approximately 51%*.  In addition – as Muddy Waters found – the Company's reported GTV of new home transactions was inflated by *approximately 126%*, and the Company's reported GTV of existing home transactions was inflated by *approximately 33%*. The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

176.    Finally, the 3Q21 press release reported that KE Holdings' "*[n]et revenues* decreased by 11.9% [y-o-y,] to *RMB18.1 billion* (US$2.8 billion) in [3Q21.]"  The 3Q21 press release further broke down the Company's quarterly net revenues from existing and new home transactions, as follows:

> *Net revenues from existing home transaction services were RMB6.1 billion* (US$0.9 billion) in [3Q21.]

> *Net revenues from new home transaction services* increased by 2.5% [y-o-y,] to *RMB11.3 billion* (US$1.8 billion) in [3Q21.]

177.    The statements referenced above in ¶176 were materially false and misleading when made because they failed to disclose that – as Muddy Waters found – the Company's actual 3Q21 net revenues from new and existing home transactions were RMB 10.7 billion, compared to a reported RMB 17.4 billion[17] – an overstatement of *approximately 63%*.  The Exchange Act Defendants knew, or recklessly disregarded, these undisclosed facts.

---

[16]    Excluding "GTV of emerging and other services" of RMB 42.3 billion.

[17]    Excluding "[n]et revenues from emerging and other services" of RMB 610 million.

**B.     The Truth Emerges**

178.    On December 16, 2021, shortly before the markets opened, Muddy Waters issued its

comprehensive, 77-page report on its investigation of KE Holdings.[18]   Muddy Waters summarized

its findings as follows:

> **We are short [KE Holdings] because we conclude the Company is engaged in systemic fraud**, by our estimate, inflating its new home sales GTV by over ~126% and its commission revenues by approximately ~77–96%.   **We found massive discrepancies between the transaction volumes, store count and agent count reported to investors** and the transaction data from our multi-month data collection program from [KE Holdings'] platform.   We corroborated these discrepancies by spot-checking our findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits.
>
> [KE Holdings'] mantra, oft repeated on Company earnings calls, is "doing the right thing, even if it is difficult."  Nothing could seem further from the truth.  Put simply, we found massive fraud . . . . **Our field work found ghost stores, clone stores** and undisclosed schemes to inflate revenues by round tripping cash through connected brokerages. . . . **[T]his is a real business with significant amounts of fraud**.

Report at 2.  (Emphasis altered).

179.    As set forth above, the Muddy Waters Report revealed a multitude of evidence

showing that the reported numbers of stores and agents on KE Holdings' platform were even more

significantly inflated than the Company had admitted in the 3Q21 press release – and included not

just inactive stores and agents, but nonexistent ones.  The Muddy Waters Report also revealed

evidence that KE Holdings had materially overstated its reported GTV and revenues during at least

2Q21 and 3Q21.

180.    In response to the Muddy Waters Report, the price of KE Holdings' ADSs tumbled

4.47% on unusually heavy trading volume, from a closing price of $18.68 per ADS on December 15,

2021, to an opening price of $17.96 per ADS on December 16, 2021.  The price of the Company's

ADSs declined further during the trading day, as the market digested the Muddy Waters Report,

---

[18]      Muddy Waters tweeted a link to The Report at 8:48 EST on December 16, 2021.

trading as low as $17.72 per ADS – a total decline of 5.74% from the closing price on December 15, 2021.

181.    On Friday, December 17, 2021, after the close of the market, KE Holdings issued a press release, filed with the SEC on Form 6-K, attempting to address some, but not all, of the Muddy Waters Report.  For example, the press release stated that Muddy Waters' agent count was "incomplete" because "agents responsible solely for new home sales" could "in their discretion, [] opt out from the search results page" on the Company's "'Find Agent' function" (without explaining why an agent would have any reason to do so) – and did not even attempt to address Muddy Waters' evidence of ghost stores and clone stores.

182.    The press release also stated that KE Holdings' "Board of Directors ha[d] authorized the independent audit committee to conduct an internal review of the key allegations contained in the Muddy Waters' report, with assistance and advice from independent third-party advisors to be engaged by the audit committee."  The press release assured investors that "[t]he Company [would] provide updates on the internal review when appropriate."  Reflecting investors' dissatisfaction with the Company's incomplete response, the price of KE Holdings' ADSs fell to a closing price of $17.31 per ADS on Monday, December 20, 2021.

183.    Just six weeks later, on January 28, 2022, KE Holdings issued a press release announcing that its internal review of Muddy Waters' allegations was "substantially complete," and declaring that "the allegations in the Muddy Waters Report were not substantiated" – but failing to provide any supporting details.  Indeed, KE Holdings did not even provide the name of the "international law firm and forensic accounting experts" involved in the supposed internal review. To date, the Company had not released any additional information about the internal review.

### C.      Additional Scienter Allegations

184.    As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Company or in their own names during the Class Period were materially false and misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

185.    The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding KE Holdings, their control over, and/or receipt and/or modification of KE Holdings' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning KE Holdings, were active and culpable participants in the fraudulent scheme alleged herein.

186.    The Exchange Act Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Executive Defendants (Yongdong, Tao, and Yigang).

187.    The Executive Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Executive Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements

and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

188. KE Holdings, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing KE Holdings' true operating condition from investors.

189. The fact that in 3Q21, KE Holdings disclosed the numbers of "active stores" and "active agents" on its platform for each prior quarter during the Class Period gives rise to a strong inference that the Exchange Act Defendants had contemporaneous knowledge, at the time of their misstatements, that a material portion of the reported stores and agents on its platform were inactive. Indeed, it is implausible that the numbers of "active store" and "active agents" in previous quarters could have been determined retroactively.

190. The Exchange Act Defendants' lack of candor in response to the Muddy Waters Report, including: (i) their incomplete response; (ii) the speed with which the Company completed its purported internal review; and (iii) the Exchange Act Defendants' failure to release any details about the internal review, also supports a strong inference of scienter. Likewise, shortly after Muddy Waters issued its report, KE Holdings reportedly removed some of the information used by Muddy Waters from its platform. As shown in screenshots of the Company's platform that Muddy Waters posted to Twitter on January 12, 2022, "[e]ach store" on KE Holdings' platform "previously

displayed the number of agents, and also provided access to the names of the agents."  But as of January 12, 2022, the number of agents, and the agents' names, were no longer publicly available on KE Holdings' platform.  As Muddy Waters explained via Twitter, KE Holdings likely "chang[ed] its system" in an effort "to prevent further data collection" that would provide evidence of the Company's fraud.

191.    In addition to the fraudulent scheme alleged herein, Muddy Waters uncovered evidence of additional improprieties at KE Holdings, which further contribute to an inference of scienter.

192.    In particular, while Muddy Waters used the Company's reported commission rates to estimate that KE Holdings was overstating its revenues by approximately 77% during 2Q21 and 3Q21, Muddy Waters found evidence that the actual overstatement was likely greater because KE Holding's true commission rates were lower than reported.  *See* Report at 11-12.

193.    The evidence found by Muddy Waters included: (i) a 2020 blog post by "[a] former Lianjia agent . . . revealing that [KE Holdings'] company policy was to go as low as 2% on commissions"; and (ii) "field work" in "nine cities[,]" which included "discuss[ing] home purchases with Lianjia and connected store agents," and which reportedly found that "the average discounted commission rate was close to 2%[.]" *Id*. at 11.  Muddy Waters also cited evidence that KE Holdings was inflating commission revenues by disguising franchised stores as Company-owned Lianjia stores, in order to improperly book gross commission revenues – instead of smaller franchise fees – from those stores.  *Id*. at 12.

194.    Finally, Muddy Waters pointed to evidence that KE Holdings was disguising its inflated revenues through a sham acquisition of Zhonghuan Real Estate Agency ("Zhonghuan"), which KE Holdings claimed to have paid RMB 1.8 billion to acquire in 2020.  *Id*. at 42.  KE

Holdings claimed to have "acquired 100% of Zhonghuan" in a two-part transaction, first paying "RMB 931 million for 62% of Zhonghuan on July 12, 2019[,]" and then paying "RMB 910 million for the remaining 38% in April 2020." *Id.*

195.    According to Muddy Waters however, "SAIC data" showed that in the first part of the transaction, KE Holdings only acquired 28%, while Tianjin Yunju Real Estate Agency – a likely straw entity, incorporated just six weeks earlier and controlled by an apparent Company proxy – acquired 33.6% of Zhonghuan, and "[w]ithin six months, . . . flipped its newly acquired . . . ownership" to KE Holdings, and then "deregistered." *Id.* Muddy Waters posited that KE Holdings had "routed" its acquisition of Zhonghuan though a straw buyer in order to fraudulently inflate the purchase price, thereby gaining a mechanism to account for fake cash that was a byproduct of the Company's inflated revenues. *Id.* at 44.

### D.    Loss Causation and Economic Loss

196.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of KE Holdings ADSs and operated as a fraud or deceit on Class Period purchasers of KE Holdings ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of KE Holdings ADSs fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of KE Holdings ADSs during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

197.    By failing to disclose to investors the adverse facts detailed herein, the Exchange Act Defendants presented a misleading picture of KE Holdings' business and prospects. The Exchange Act Defendants' false and misleading statements and omissions had the intended effect and caused

KE Holdings ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.40 per ADS on November 16, 2020, the first day of the Class Period.

198.    The precipitous decline in the price of KE Holdings ADSs was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of KE Holdings ADSs negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of KE Holdings ADSs and the subsequent significant decline in the value of KE Holdings ADSs when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### E.    A Presumption of Reliance Applies

199.    Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for KE Holdings' publicly traded ADSs was open, well-developed, and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, KE Holdings ADSs traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other Class members purchased KE Holdings ADSs in reliance on the integrity of the market price of the securities and the market information relating to KE Holdings, and were damaged thereby.

200.    At all relevant times, the market for KE Holdings ADSs was efficient for at least the following reasons:

(a)    KE Holdings ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     KE Holdings ADSs traded at volumes during the Class Period that reflected the impact of available information, and the trading price of the ADSs reacted promptly to publicly available news and information;

(c)     KE Holdings filed periodic public reports with the SEC and otherwise regularly communicated with analysts and investors using established market communication mechanisms, including press releases; and

(d)     Securities analysts and investors followed KE Holdings and issued reports on its prospects and performance, and information on KE Holdings regularly entered the marketplace and was reflected in the trading price of its ADSs.

201.    As a result, the market for KE Holdings ADSs promptly digested relevant information from publicly available sources and the trading price of the ADSs reflected such information.  Under these circumstances, all purchasers of KE Holdings ADSs during the Class Period suffered similar injury by purchasing the ADSs at artificially inflated prices and a presumption of reliance applies.

202.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Because the claims alleged are predicated in part upon omissions of material fact for which there was a duty to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Exchange Act Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

**F.     The Safe Harbor Does Not Insulate Defendants' Representations**

203.    The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements or omissions alleged herein.

204.    *First*, the materially false and misleading statements and omissions relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor.  Such false or misleading statements are not forward-looking because they: (i) relate to historical or current fact; (ii) implicate existing conditions; and (iii) do not contain projections of future performance or future objectives.  If any statements might be construed to touch on future intent, they are mixed statements of present fact and future intent and are not entitled to safe harbor protection with respect to the part that refers to the present.

205.    *Second*, any purported cautionary language was not meaningful and therefore was ineffectual because any risks warned of had already transpired and the language was boilerplate, was not specifically tailored to the risks at issue, did not change as risks evolved or conditions changed, and did not mention important factors of similar significance to those actually realized.

206.    *Third*, the Exchange Act Defendants are liable for any forward-looking statement identified as such (or otherwise) because they knew the statement was false or misleading when made.  Additionally, any such statement was authorized or approved by a defendant or executive officer who could bind any of the Exchange Act Defendants and who knew the statement was false or misleading when made.  All such false or misleading statements are accordingly attributable to KE Holdings and/or the other Exchange Act Defendants, whether identified as forward-looking or otherwise.

## VI.    ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS

207.    The allegations set forth above in §§I-IV are incorporated by reference herein, except to the extent they sound in fraud.  The Securities Act allegations herein are based in strict liability and negligence, and Lead Plaintiff expressly disclaims any allegation or inference of fraud or scienter for these allegations.  The only statements and omissions actionable under Sections 11, 12(a)(2) and 15 of the Securities Act are those in the Secondary Offering Documents.

A. **The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information**

208. The Secondary Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

209. The Secondary Offering Documents repeatedly highlighted the numbers of stores and agents on KE Holdings' platform, stating that, "*[a]s of September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage stores on [the Company's] platform* . . . ."

210. The statements referenced above in ¶209 were materially false and misleading when made because they negligently failed to disclose that – as KE Holdings has now admitted: (i) at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores; and (ii) at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.

211. The Secondary Offering Documents further cited both "the number of real estate brokerage stores and agents on [KE Holdings'] platform and their activity level" as factors specifically affecting the Company's operating results:

Specific Factors Affecting Our Results of Operations

\*       \*       \*

*The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level*.  Since the inception of our Beike platform, we have attracted an increasing number of real estate brokerage stores and agents to join our platform while maintaining high service quality.

212.    The Secondary Offering Documents likewise highlighted the importance of the

Company's "large and active network" of agents and brokerage stores, stating, in pertinent part:

> ***We believe the large and active network of*** real estate brokerage brands and their
> affiliated ***stores and agents contributes significantly to the success of our platform***.

*       *       *

> ***We believe a large and active network of agents, brokerage stores*** and brokerage
> brands across China ***provides a solid foundation for serving a large number of***
> ***housing customers***.

*       *       *

> Through the agents, stores and brokerage brands on our platform, we are able to
> effectively hone local market expertise, generate leads and build relationships with
> our housing customers.

213.    The statements referenced above in ¶¶211-212 were materially false and misleading

when made for the reasons set forth in ¶210.  In addition, upon choosing to speak about the "activity

level" of the "brokerage stores and agents on [the Company's] platform" as a factor affecting KE

Holdings' "gross transaction value" and "revenues," and to speak about the Company's "large and

active network" of stores and agents as a factor that "provide[d] a solid foundation" and

"contribute[d] significantly to the success of [KE Holdings'] platform," Defendants assumed a duty

to speak completely and accurately.  Defendants' negligent failure to disclose that material portions

of both the stores and agents on KE Holdings' platform as of September 30, 2020 were inactive –

and in some cases, nonexistent – rendered these statements materially false and misleading.

214.    Similarly attributing the Company's success to how "actively" and "proactive[ly]"

agents and stores engaged with housing market participants, the Secondary Offering Documents

stated, in pertinent part:

> We believe our reputation for high-quality service among the large housing customer
> base and ***our growing network of real estate brokerage stores and agents that***
> ***transact actively on our platform*** well position us to increase cooperation with
> existing and new real estate developers.

- 73 -

\*       \*       \*

We believe our ***proactive engagement with platform participants both online and offline*** enables us to know them better and serve them better.

215.     The statements referenced above in ¶214 were materially false and misleading when made for the reasons set forth in ¶210 and because they negligently failed to disclose that a material portion of KE Holdings' "network of . . . brokerage stores and agents" did not "transact actively on [the Company's] platform" or "proactive[ly] engage[] with platform participants both online and offline[.]"

216.     The Secondary Offering Documents further described the "scale" of KE Holdings' network of agents and stores as both a "crucial indicator[] of [its] operations," and a "[k]ey [s]uccess [f]actor[]," stating as follows:

We believe ***the numbers of real estate brokerage stores and agents on our platform demonstrate our scale and are crucial indicators of our operations***.

\*       \*       \*

***Key Success Factors***

The following are key factors to a successful integrated housing transactions and services platform in China:

• ***Scale and quality of agent and store network.  Agents and physical stores are fundamental to China's housing transactions and services market, playing a key role in helping brokerage service providers capture potential customers by serving as a gateway into local communities.  It is important to build an extensive agent and store network across brokerage brands***.  The platform's strong and unique value propositions to agents and store not only increase their stickiness to the platform, but also empower them to meet housing customers' evolving needs and establish trust with customers.  An extensive agent and store network with an effective and efficient collaboration mechanism allows the platform to maintain close relationships with both housing customers and other industry participants such as real estate developers and other home-related service providers.

217.     The statements referenced above in ¶216 were materially false and misleading when made for the reasons set forth in ¶210.  In addition, upon choosing to characterize "the numbers of

real estate brokerage stores and agents on [KE Holdings'] platform" as "crucial indicators of [the Company's] operations" that "demonstrate[d] [its] scale," to emphasize the "importan[ce] [of] build[ing] an extensive agent and store network," and to describe the "[s]cale and quality of [its] agent and store network" as a "[k]ey [s]uccess [f]actor[]," Defendants assumed a duty to speak completely and accurately.  Defendants' negligent failure to disclose that material portions of both the stores and agents on KE Holdings' platform as of September 30, 2020 were inactive – and thus were not contributing to the Company's success – rendered these statements materially false and misleading.  Likewise, although "[a]gents and physical stores [were] fundamental" to KE Holdings' business and "play[ed] a key role in . . . captur[ing] potential customers by serving as a gateway into local communities," Defendants negligently failed to disclose that material portions of both the physical stores and agents on KE Holdings' platform as of September 30, 2020 were inactive – and in some cases, nonexistent.

218.    Under a heading listing the Company's "[s]trengths," the Secondary Offering Documents characterized KE Holdings' brokerage stores as its "competitive advantage," stating, in pertinent part:

> ***Our offline stores serve as an entry point for our customers to our platform*** as they are conveniently located within the communities ***and at the same time have become our competitive advantage in the industry***.

219.    The statement referenced above in ¶218 was materially false and misleading when made for the reasons set forth in ¶210 and because it negligently failed to disclose that a material portion of the "offline stores" on KE Holdings' platform as of September 30, 2020 were not providing a "competitive advantage" for the Company because those stores were inactive – and in some cases, nonexistent.

220.    The Secondary Offering Documents referenced hypothetical risks associated with "inaccuracies" in the Company's "key operating metrics," including the "number of . . . brokerage stores and agents on [its] platform," stating as follows:

> *We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business*.
>
> *We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the performance of our business*.  Our operating metrics may differ from estimates published by third parties or from similarly titled metrics used by other companies due to differences in methodology and assumptions. We calculate these operating metrics using internal company data.  *If we discover material inaccuracies in the operating metrics we use*, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which could negatively affect our business.  If investors make investment decisions based on operating metrics we disclose that are inaccurate, we may also face potential lawsuits or disputes.

221.    The statements referenced above in ¶220 were materially false and misleading when made because they negligently portrayed "inaccuracies" in "key operating metrics," including "the number[s] of . . . brokerage stores and agents on [the Company's] platform," as hypothetical future risks, when in truth, the numbers of stores and agents as of September 30, 2020 that KE Holdings provided in the Secondary Offering Documents were presently inaccurate.  As KE Holdings has now admitted: (i) at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores; and (ii) at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents.  In addition, Muddy Waters uncovered substantial evidence that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones.

## VII.   CLASS ACTION ALLEGATIONS

222.    Lead Plaintiff brings this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased or otherwise acquired KE

Holdings ADSs: (i) pursuant or traceable to the Offering Documents, including purchasers who were successfully solicited by any defendant, seeking to pursue remedies under the Securities Act; and (ii) during the Class Period, seeking to pursue remedies under the Exchange Act (collectively, the "Class").  Excluded from the Class are Defendants and their families; officers, directors and affiliates of Defendants and members of their immediate families at all relevant times; legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

223.    The members of the Class are so numerous that joinder of all members is impracticable.  KE Holdings ADSs are actively traded on the NYSE and millions of shares were sold in the Secondary Offering.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, there are likely hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be: (i) identified from records maintained by KE Holdings or its transfer agent; (ii) notified of the pendency of this action using a form of notice customarily used in securities class actions; and (iii) given an opportunity to exclude themselves from the Class.

224.    Common questions of law and fact exist as to all Class members that predominate over any questions solely affecting individual Class members, including:

(a)    whether Defendants violated the Securities Act and/or the Exchange Act;

(b)    whether Defendants misrepresented or omitted material information in the Offering Documents and/or during the Class Period; and

(c)    whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

225.    Lead Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by Defendants' conduct.

226.    Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

227.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged.  There will be no difficulty in managing this action as a class action.

## VIII.   CLAIMS

### A.    COUNT I:  For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against the Exchange Act Defendants)

228.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, except those that disclaim fraud or scienter, as if fully set forth herein.

229.    This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, on behalf of the Class, against the Exchange Act Defendants (*i.e.*, KE Holdings and the Executive Defendants).

230.    During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other Class members to purchase KE Holdings ADSs at artificially inflated prices.

231.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately

disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

232.   The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

233.   As alleged herein, the Exchange Act Defendants acted with scienter in that they knew that the public documents and statements they issued, approved, or otherwise disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

234.   Additionally, the Exchange Act Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts, their control over the allegedly materially false and misleading statements and omissions, and their access to nonpublic information.

235.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for KE Holdings ADSs.  Lead Plaintiff and the Class would not have purchased KE Holdings ADSs at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and/or omissions.

236.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of KE Holdings ADSs during the Class Period.

**B.     COUNT II:  For Violations of Section 20(a) of the Exchange Act**
**(Against the Executive Defendants)**

237.     Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, except those that disclaim fraud or scienter, as if fully set forth herein.

238.     This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of the Class, against the Executive Defendants.

239.     The Executive Defendants acted as controlling persons of KE Holdings within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of KE Holdings, the Executive Defendants had, and exercised, power and authority to cause KE Holdings to engage in the wrongful conduct complained of herein.

240.     As set forth above, KE Holdings and the Executive Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for KE Holdings' Section 10(b) and Rule 10b-5 violations.  To the extent necessary, each of the Executive Defendants culpably participated in the underlying violation given their knowledge of and/or involvement in the wrongful conduct alleged herein.

241.     As a direct and proximate result of the Executive Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.  By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

C.     **COUNT III:  For Violations of Section 11 of the Securities Act**
       **(Against All Defendants)**

242.     Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

243.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed.

244.     The Registration Statement, which was incorporated in and formed part of the Secondary Offering Documents, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

245.     KE Holdings was the registrant for the Secondary Offering.  As an issuer of securities to the public, KE Holdings is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

246.     The Individual Defendants each signed and/or authorized the signing of the Registration Statement.  Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material misstatements and/or omissions of material facts.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

247.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the Secondary Offering was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

248.     Defendants were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Secondary Offering Documents were complete, accurate or non-misleading.

249.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

250.     Lead Plaintiff and the other members of the Class purchased KE Holdings ADSs pursuant and/or traceable to the Registration Statement for the Secondary Offering and have sustained damages as a result.  The price of the ADSs has declined substantially subsequent and due to Defendants' violations.

251.     At the time of their purchases of KE Holdings ADSs, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein, and could not have reasonably discovered those facts prior to the disclosures herein.

252.     Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time this action was filed.  Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

D.     **COUNT IV:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants)**

253.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

254.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 12(a)(2) claim, and any implication of fraud or scienter is disclaimed.

255.    By means of the defective Secondary Offering Prospectus, Defendants promoted and sold KE Holdings ADSs to Lead Plaintiff and other members of the Class.

256.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Secondary Offering Prospectus for their own financial benefit.  But for their participation in the Secondary Offering, including their solicitation, the Secondary Offering could not, and would not, have been accomplished.  Specifically, the Underwriter Defendants:

(a)     made the decision to conduct the Secondary Offering and do it at the price set forth in the Secondary Offering Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Secondary Offering Prospectus and participated in its being declared effective by the SEC.  The Secondary Offering Prospectus was calculated to create interest in KE Holdings ADSs and was widely distributed by, or on behalf of, the Underwriter Defendants for that purpose; and

(b)     conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of KE Holdings ADSs to the investing public by issuing, promoting and supervising the distribution and ultimate sale of KE Holdings ADSs to the investing public.

257.    The Secondary Offering Prospectus contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above.  Defendants owed Lead

Plaintiff and the other members of the Class who purchased KE Holdings ADSs pursuant to the Secondary Offering Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

258.    Lead Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Secondary Offering Prospectus at the time Lead Plaintiff acquired KE Holdings ADSs.

259.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased KE Holdings ADSs pursuant to the Secondary Offering Prospectus sustained damages in connection with their purchases.  Accordingly, Lead Plaintiff and the other members of the Class who hold the ADSs issued pursuant to the Secondary Offering Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADSs to the defendants sued herein.  Class members who have sold their ADSs seek damages to the extent permitted by law.

E.    **COUNT V:  For Violations of Section 15 of the Securities Act (Against the Individual Defendants)**

260.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

261.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is disclaimed.

262.     The Individual Defendants each were control persons of KE Holdings by virtue of their positions as directors and/or senior officers of KE Holdings.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of KE Holdings.

263.     The Individual Defendants each were culpable participants in the primary violations of Sections 11 and 12(a)(2) of the Securities Act alleged herein, based on their having signed or authorized the signing of the Secondary Offering Documents and having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying the Class accordingly, designating Lead Plaintiff as class representative, and appointing Lead Counsel as Class Counsel;

B.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.      Awarding rescission or a rescissory measure of damages, to the extent available under the Securities Act, together with prejudgment interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, counsel and expert fees; and

E.      Granting such other, further and/or different relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  June 17, 2022

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN

*/s/ Erin W. Boardman*
ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com

**CERTIFICATE OF SERVICE**

I, Erin W. Boardman, hereby certify that on June 17, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Erin W. Boardman*
ERIN W. BOARDMAN