UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KEITH CHIN, Individually and on Behalf of   :
All Others Similarly Situated,   :
  :
         Plaintiff,   :
  :
      vs   :
  :
KE HOLDINGS INC., PENG YONGDONG,   :
XU TAO, SHAN YIGANG, BAO FAN, LI   :  21-cv-11196 (GHW)
ZHAOHUI, CHEN XIAOHONG, COLLEEN   :
A. DE VRIES, GOLDMAN SACHS (ASIA)   :  Oral Argument Requested
L.L.C., MORGAN STANLEY & CO. LLC, J.P.   :
MORGAN SECURITIES LLC, CHINA   :
RENAISSANCE SECURITIES (HONG   :
KONG) LIMITED, GOLDMAN SACHS &   :
CO. LLC and CHINA RENAISSANCE   :
SECURITIES (US) INC.,   :
  :
        Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR JOINT MOTION TO DISMISS
## <u>THE AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendants KE Holdings Inc.
and Colleen A. De Vries*

O'MELVENY & MYERS LLP
Jonathan Rosenberg
B. Andrew Bednark
7 Times Square
New York, NY 10036
Phone: (212) 326-2000
Fax: (212) 326-2061
jrosenberg@omm.com
abednark@omm.com

William K. Pao (*pro hac vice*)
400 South Hope Street
18th Floor
Los Angeles, CA 90071
Phone: (213) 430-7272
Fax: (213) 430-6407
wpao@omm.com

*Counsel for Defendant KE Holdings Inc.*

GOODWIN PROCTER LLP
Douglas H. Flaum
Gabrielle Lisa Gould
620 Eighth Avenue
New York, NY 10018
Phone: (212) 813-8800
Fax: (212) 355-3333
dflaum@goodwinlaw.com
ggould@goodwinlaw.com

*Counsel for Underwriter Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

      A.     KE Holdings' Diversified Real Estate Business ....................................... 3

      B.     The Company's Disclosures ....................................................................... 5

      C.     The Muddy Waters Report........................................................................ 6

      D.     The Company Promptly Refutes the Muddy Waters Report ................................. 7

      E.     This Action and the Audit Committee Review........................................... 8

ARGUMENT ...................................................................................................................... 9

I.     ALL OF PLAINTIFF'S CLAIMS FAIL BECAUSE THE COMPLAINT
      FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION ......................... 9

      A.     Plaintiff Fails to Plead That Reported
             Store and Agent Metrics Were False .................................................... 10

      B.     Plaintiff Fails to Plead That Reported
              GTV and Revenue Were Inflated .......................................................... 17

II.    PLAINTIFF'S FAILURE TO PLEAD A "STRONG INFERENCE"
      OF SCIENTER REQUIRES DISMISSAL OF ALL CLAIMS....................................... 20

III.   ALL OF PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE LACK
      OF LOSS CAUSATION IS APPARENT ON THE FACE OF THE COMPLAINT ....... 24

IV.   PLAINTIFF FAILS TO PLEAD SECURITIES ACT STANDING ................................ 25

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re ARIAD Pharmaceuticals, Inc. Securities Litigation*,
842 F.3d 744 (1st Cir. 2016)..................................................................................25, 26

*Arkansas Public Employees Retirement System v. Bristol-Meyers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ......................................................................................21

*Asay v. Pinduoduo Inc.*,
No. 18-cv-7625 (PKC), 2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020), *aff'd*, No.
20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ....................................................9, 20

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................................3, 26

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)......................................25

*Caiafa v. Sea Containers Ltd.*,
Nos. 06 Civ. 2565 (RMB), 06 Civ. 2670 (RMB), 06 Civ. 2744 (RMB), 06 Civ.
2776 (RMB), 06 Civ. 2909 (RMB), 06 Civ. 3099 (RMB), 06 Civ. 3563 (RMB),
06 Civ. 5655 (RMB), 2008 WL 11516813 (S.D.N.Y. May 15, 2008) ..............................20

*In re Chembio Diagnostics, Inc. Securities Litigation*,
No. 20-CMV-2706 (ARR) (PK), 2022 WL 2872671 (E.D.N.Y. July 21, 2022)...............20

*In re China XD Plastics Co. Ltd. Securities Litigation*,
No. 14-cv-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016)..............14, 16, 20

*City of Brockton Retirement System v. Avon Products, Inc.*,
No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) .........................23

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014).......................................................................................12

*Coronel v. Quanta Capital Holdings Ltd.*,
No. 07 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y Jan. 26, 2009).........................20, 21

*In re Cosi, Inc. Securities Litigation*,
379 F. Supp. 2d 580 (S.D.N.Y. 2005)..........................................................................26

*Delfonce v. Eltman Law, P.C.*,
No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017), *aff'd*,
712 F. App'x 17 (2d Cir. 2017) .....................................................................................3

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)....................................................................................................25

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................................................21

*Galati v. Commerce Bancorp, Inc.*,
    220 F. App'x 97 (3d Cir. 2007) .............................................................................................12

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................................22

*In re HEXO Corp. Securities Litigation*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)......................................................................................9

*Jedrzejczyk v. Skillz Inc.*,
    Case No. 21-cv-03450-RS, 2022 WL 2441563 (N.D. Cal. July 5, 2022) ...........................26

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................................24

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).....................................................................................................22

*In re L & L Energy, Inc. Securities Litigation*,
    908 F. Supp. 2d 1147 (W.D. Wash. 2012)..............................................................................14

*Lehmann v. Ohr Pharmeceutical, Inc.*,
    830 F. App'x 349 (2d Cir. 2020) ............................................................................................21

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).....................................................................................................24

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American
    Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)...................18

*In re Longtop Financial Technologies Ltd. Securities Litigation*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012)....................................................................................13

*In re Manulife Financial Corp. Securities Litigation*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ..............................................................................................25

*Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................13, 14, 17, 18, 19, 23

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d Cir. 2010)......................................................................................................9

iii

*In re Morgan Stanley Technology Fund Securities Litigation*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010) .......................10

*In re Nice Systems, Ltd. Securities Litigation*,
    135 F. Supp. 2d 551 (D.N.J. 2001) ...................................................................................15

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)..............................................................................................25

*Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)................................................................................22

*Pope Investments II, LLC v. Deheng Law Firm*,
    586 F. App'x 1 (2d Cir. 2014) ...........................................................................................23

*In re Pretium Resources Inc. Securities Litigation,*
    256 F. Supp. 3d 459 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732
    F. App'x 37 (2d Cir. 2018) ...............................................................................................16

*In re Puda Coal Securities Inc. Litigation*,
    No. 11 Civ. 2598 (KBF), 2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013)..............................26

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................................................9

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................................................23

*Schaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ........................12, 19

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)...................................................................................................9

*In re Supreme Industries, Inc. Securities Litigation,*
    CAUSE NO. 3:17-CV-143-PPS/MGG, 2019 WL 1436022 (N.D. Ind. Mar. 29,
    2019) ................................................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................20, 21, 24

*Yaroni v. Pintec Technology Holdings Ltd.*,
    No. 20-CV-8062 (JMF), 2022 WL 1215450 (S.D.N.Y. Apr. 25, 2022) .....................10, 11

*In re Yunji Inc. Securities Litigation*,
    No. 19-CV-6403 (LDH) (SMG), 2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021)..............12

iv

*Zheng v. Pingtan Marine Enterprise Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019) ................................................................................25

**PRELIMINARY STATEMENT**

Plaintiff bases this putative securities class action solely on allegations copied from a report by a self-professed short seller, whose flawed methodology and admittedly speculative claims have not been investigated, much less corroborated, by Plaintiff or its counsel.  Defendant KE Holdings, Inc. ("KE Holdings" or the "Company") operates Beike, the leading online and offline real estate brokerage platform in China.  On December 16, 2021, more than a year after the Company's November 19, 2020 secondary public offering ("SPO"), short-seller Muddy Waters Capital LLC ("Muddy Waters") published a report (the "Muddy Waters Report") accusing KE Holdings of overstating its gross transaction value ("GTV"), revenue, and store and agent counts.  On its face, the Muddy Waters Report is nothing more than rank speculation piled on incomplete public data and baseless assumptions.  The market was appropriately unfazed, with KE Holdings' American Depositary Share ("ADS") price closing *higher* than it opened that day.

The next day, KE Holdings unequivocally denied Muddy Waters' allegations in their entirety, noting that the Report relied on incomplete data and flawed assumptions.  Still, in an abundance of caution, the Company also announced that its independent audit committee would investigate the allegations.  That day, the Company's ADS price increased by 5.7%.  The committee ultimately confirmed the allegations were unsubstantiated.  To date, KE Holdings has not restated any financial or operational metrics or been subject to any regulatory investigation relating to these allegations.

Nevertheless, Plaintiff parrots Muddy Waters' debunked allegations to assert violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Both sets of claims rely on the same fraud-based allegations and thus both must be pleaded with particularity.  For several

1

independently dispositive reasons, the Amended Complaint should be dismissed with prejudice.[1]

First, the Complaint fails to plead any actionable misstatement or omission. KE Holdings' voluntary November 8, 2021 decision to provide investors with additional information regarding the number of "active" agents and "active" stores did not render any prior statement false or misleading. Plaintiff's other allegations regarding overstated agent and store numbers, GTV, and revenue do not adequately plead falsity because they are all lifted from the Muddy Waters Report without corroboration of the short-seller's methodology or anonymous sources. In fact, the Report cannot be grounds to plead the falsity of the majority of statements challenged in the Complaint, including the November 2020 SPO Prospectus and Registration Statement (together, the "SPO Documents") underlying Plaintiff's Securities Act claims. That is because Muddy Waters itself only challenges the Company's Q2 and Q3 2021 metrics. Plaintiff acknowledges the Company's identification of the Report's many flaws, but does not allege any facts that refute them, and thus fails to plead falsity even for the Q2 or Q3 2021 statements. Plaintiff does not allege, for example, that the data Muddy Waters gathered from the Company's customer-facing online "platform"— including the Beike website and mobile application—is the same as the "internal company data" on which the Company's SEC filings are based, rendering meaningless any comparison between the two. Additional data gaps mark Plaintiff's Exchange Act claims based on the Company's reported Q2 and Q3 2021 GTV and revenues, as Muddy Waters did not collect data for 71 days— nearly 39%—of those quarters. Worse still, Muddy Waters attempted to plug these gaps with unsupported and arbitrary assumptions, failing even Rule 8's pleading requirements.

Second, Plaintiff fails to plead particularized facts supporting the "strong inference" of

---

[1]    The Amended Complaint (ECF No. 51) ("Complaint" or "AC") is attached as Exhibit A to the accompanying Declaration of Robert A. Fumerton, dated September 23, 2022, exhibits to which are cited herein as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All citations and quotations marks are omitted, and all emphases are added, unless otherwise indicated.

scienter necessary to state an Exchange Act claim or its Securities Act claims (which likewise sound in fraud). Plaintiff does not even attempt to plead a motive to defraud investors. And Plaintiff cannot plead recklessness based on the Individual Defendants' executive positions and assertions of what they "must have known," nor on the Company's actions *after* the Muddy Waters Report. As to Underwriter Defendants, Plaintiff makes absolutely no allegations of scienter and disclaims any fraudulent intent. The Complaint supports the more cogent and compelling inference that no fraud occurred—as the audit committee's independent investigation confirmed.

Third, all of Plaintiff's claims fail because lack of causation is apparent on the face of the Complaint. The Company's ADS price closed higher than it opened on the day the Muddy Waters Report was released. Moreover, because the Report is based explicitly on public information, it did not and could not have revealed to the market any prior misstatement by the Company.

Finally, Plaintiff has not pleaded standing under the Securities Act. In the SPO context at issue here, Plaintiff must allege facts showing that it purchased shares (i) traceable to the SPO registration statement (not a prior registration statement from an earlier offering), and (ii) directly in the SPO (not in the open market). Plaintiff's conclusory one-sentence allegation that it purchased shares "pursuant and/or traceable to" the SPO does neither.

**STATEMENT OF FACTS**[2]

### A.    KE Holdings' Diversified Real Estate Business

KE Holdings operates Beike, a leading integrated online and offline platform for housing transactions and services in China. (AC ¶ 2.) Through Beike, the Company facilitates a range of

---

[2]    These alleged facts are drawn from the Complaint and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law,*, 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

3

housing transactions, including existing- and new-home sales, home rentals, home renovation, real estate financial solutions, and other services. (*Id.* ¶ 34.) In 2019, the Company generated $313 billion in GTV and facilitated more than 2.2 million housing transactions, making Beike China's largest housing transactions and services platform. (Ex. B, SPO Prospectus at 1.)

KE Holdings maintains a large network of agents, brokerage stores, and brokerage brands through its integrated online and offline model. (*Id.* at 166.) The Company owns and operates Lianjia, China's leading real estate brokerage brand. (*Id.* at 1.) The Company also owns the Deyou brand, which is offered under a franchise model to third-party brokerage stores, and separately enters into cooperation agreements with other third-party brokerage brands featured on the Beike platform. (*Id.* at 168.) As of September 30, 2020, there were more than 477,000 agents and 44,000 brokerage stores in Beike's extensive offline network, representing 273 brokerage brands. (*Id.* at 143, 166.) Its offline stores, conveniently located within local communities, serve as an entry point for customers to its network, while its online operations are designed to share knowledge, mobilize resources, and allow agents to track, manage, and complete the transaction process. (*Id.* at 143.)

The Company has three main revenue streams: existing-home transaction services, new-home transaction services, and emerging and other services. (*Id.* at 91.) For existing-home transactions, the Company generates revenue from: (i) commissions for existing-home sales and home rentals facilitated by Lianjia, as well as commissions split with third-party brokerage firms that collaborate with Lianjia agents; (ii) service fees charged to third-party brokerage firms that own and operate brokerage stores on Beike, as well as franchise fees charged to franchise brands, such as Deyou; and (iii) fees for other services, including transaction closing services, field work assistance such as on-site verification, agent recruiting, and training services. (*Id.*) For new-home transaction services, the Company generates revenue from sales commissions charged to real estate

developers.  (*Id.*)  For emerging and other services, the Company generates revenue from other home-related services, such as financial and home renovation-related services.  (*Id.*)  Commissions revenue on existing-home transactions is recognized on a gross basis when Lianjia serves as the principal agent, and on a net basis when a third-party brokerage firm serves as the principal agent.  (*Id.* at F-33-34.)  Revenue is recognized on a gross basis for new-home transactions.  (*Id.* at F-35.)

KE Holdings conducted its initial public offering ("IPO") on the New York Stock Exchange on August 13, 2020, pricing its ADSs at $20.  (AC ¶ 45.)  On November 19, 2020, it conducted its SPO, pricing its ADSs at $58.  (*Id.* ¶¶ 49–50.)

### B.    The Company's Disclosures

In both its IPO and SPO Documents, the Company accurately disclosed its GTV, revenues, and the total number of agents and stores in its extended network, all of which were calculated "using internal company data."  (Ex. B at 40, 103; Ex. C, IPO Prospectus at 40, 106.)  Although the Company did not state how many of its agents and stores were "active," it disclosed that "most of the brokerage stores on our platform were *subject to lockdown* and *low activity level* for a certain period of time in . . . 2020 due to the COVID-19 pandemic."  (Ex. B at 103; Ex. C at 106.)

KE Holdings reported net-revenue increases for several consecutive quarters following its IPO and SPO: a 70.9% year-over-year ("YoY") increase in Q3 2020 (the quarter of its IPO), a 57.6% YoY increase in Q4 2020 (the quarter of its SPO), and a 190.7% YoY increase in Q1 2021— none of which Plaintiff challenges as false.  (AC ¶ 51.)  In Q2 2021, as China's real estate market began to experience a slowdown in growth, due in part to increased regulation, the Company reported a 20% YoY increase in net revenues.  (*Id.* ¶ 52.)

On November 8, 2021, KE Holdings released financial results for Q3 2021.  (*Id.* ¶ 53.) Acknowledging a "challenging and difficult [quarter] for the industry," the Company reported a 11.9% YoY decrease in net revenues, but noted that it continued to "outperform[] the market."

(Ex. D, Q3 2021 Press Release at 1-2.)   The Company also explained that "[b]ased on our accumulated operational experience, we have introduced the number of active agents and active stores on our platform which can better reflect the operational activeness of stores and agents on our platform."  (*Id.* at 1 n.3.)  It defined "active" agents and stores as follows:

"Active stores" as of a given date is defined as stores on our platform excluding the stores which (i) have not facilitated any housing transaction during the preceding 60 days, (ii) do not have any agent who has engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding seven days, or (iii) have not been visited by any agent during the preceding 14 days . . . .

"Active agents" as of a given date is defined as agents on our platform excluding the agents who (i) delivered notice to leave but have not yet completed the exit procedures, (ii) have not engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding 30 days, or (iii) have not participated in facilitating any housing transaction during the preceding three months.  (*Id.* at 1–2 nn.3–4.)

KE Holdings also disclosed the number of "active" agents and stores for Q3 2021 and prior quarters, which are reproduced alongside previously disclosed total agent and store counts below[3]:

|  | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 |
|---|---|---|---|---|---|
| **Total Agents** | 477,810 | 493,088 | 528,424 | 548,600 | 515,486 |
| **Active Agents** | 413,732 | 445,438 | 479,308 | 499,690 | 468,014 |
| **Total Stores** | 44,883 | 46,946 | 48,717 | 52,868 | 53,946 |
| **Active Stores** | 41,152 | 43,436 | 44,937 | 49,046 | 49,468 |

In voluntarily introducing this new "active" subset, the Company did not restate any prior financial or operating metrics, including GTV, revenue, or the number of agents and stores.

### C.     The Muddy Waters Report

Prior to market open on December 16, 2021—39 days after KE Holdings issued its Q3 2021 Press Release—short-seller Muddy Waters published a report hypothesizing "that far fewer stores and agents use the platform (or even exist) than [KE Holdings] claims."  (AC ¶ 62; AC Ex.

---

[3]     (*See* Ex. D at 1–2, nn.3–4; Ex. E, Q3 2020 Press Release at 1; Ex. F, Q4 2020 Press Release at 1; Ex. G, Q1 2021 Press Release at 1; Ex. H, Q2 2021 Press Release at 2.)

6

A, Muddy Waters Rep. at 3.)  Muddy Waters claimed it "wrote a program to collect the transaction data on [Beike's] platform," and "found massive discrepancies between the transaction volumes, store count and agent count reported to investors and the transaction data from our multi-month data collection program from [Beike's] platform."  (AC Ex. A at 2.)  Based on its limited review of such platform data from May 25, 2021, to October 22, 2021, Muddy Waters alleged that in Q2 and Q3 2021, KE Holdings "inflat[ed] its new home sales GTV by over ~126%," existing-home sales GTV by approximately 33%, and the associated commission revenues.  (*Id.* at 2, 5 n.2, 9.)

The market shrugged off these sensational claims, with KE Holdings' ADS price increasing during the trading day, opening at $17.96 after the Report was released and closing at $18.31, down just 1.98% from the prior day's close of $18.68.  (Ex. I at 9, Historical Stock Prices.)

### D.    The Company Promptly Refutes the Muddy Waters Report

The next day, prior to market open, the Company issued a press release describing Muddy Waters' "numerous errors of fact, unsubstantiated statements, and misleading speculations and interpretations" and its "lack of basic understanding of the housing transactions industry in China." (Ex. J, Dec. 17, 2021 Press Release at 1; AC ¶ 181.)  In particular, Muddy Waters' methodology for measuring agents and stores "relies on incomplete information" based on the "Find Agent" function on Beike's platform, which "does not include sales agents responsible solely for new home sales," who are instead "listed separately on another page on the Company's website—the 'New Home' subpage—and who, in their discretion, can opt out from the search results page." (Ex. J at 1.)  With respect to GTV for new-home sales, the Company explained that Muddy Waters' methodology failed to account for other sources of new-home sales revenue, such as revenue generated "through its dedicated new home sales team and other new home sales channels."  (*Id.*) And with respect to GTV for existing-home transactions, Muddy Waters "does not purport to rely on the Company's actual data," but instead on "the average sales prices found in the China Real

7

Estate Associate platform ('CRE Prices') for so-called comparable properties to derive the GTVs for Beike's existing home sales." (*Id.*)  The Company also pointed out Muddy Waters' "subjective and manipulative" tactic of "appl[ying] an upward adjustment of 9.66% in calculating the GTV for" Q2 2021 to account for "market movement." (*Id.*)  Nonetheless, in an abundance of caution, the Company announced that its "Board of Directors has authorized the independent audit committee to conduct an internal review of the key allegations contained in the Muddy Waters' report, with assistance and advice from independent third-party advisors to be engaged by the audit committee." (*Id.*; AC ¶ 182.)

That day, the Company's ADS price increased by 5.7%, closing at $19.36.  (Ex. I at 9.)

### E.       This Action and the Audit Committee Review

On December 30, 2021, just days after the Muddy Waters Report, shareholders initiated this Action.  On January 28, 2022, KE Holdings announced the substantial completion of the independent internal review by the Board's audit committee, which was assisted by "third-party professional advisors including an international law firm and forensic accounting experts from a Big-Four accounting firm that is not the Company's auditor." (Ex. K, Jan. 28, 2022 Press Release at 1.)  "[T]he Audit Committee has concluded that the allegations in the Muddy Waters Report were not substantiated." (*Id.*)  That day, the Company's ADS price closed at $18.93, a 2.2% increase from the prior day's closing price of $18.53.  (Ex. I at 9.)

On June 17, 2022, Plaintiff filed the Amended Complaint, asserting (i) Securities Act violations based on alleged misstatements about store and agent numbers in the SPO Documents, and (ii) Exchange Act violations based on the same alleged misstatements about store and agent numbers in the Company's SPO Documents, 2020 20-F, and Q3 2020 to Q3 2021 Press Releases, and alleged misstatements about GTV and revenue in the Q2 and Q3 2021 Press Releases.

8

**ARGUMENT**

All of Plaintiff's claims must satisfy heightened pleading requirements.  The Exchange Act claims must satisfy Rule 9(b) and the PSLRA, which require Plaintiff to "state with particularity the circumstances constituting fraud," "specify the statements that the plaintiff contends were fraudulent," and "explain why the statements were fraudulent."  *Asay v. Pinduoduo Inc.*,, 2020 WL 1530745, at *4–5 (S.D.N.Y. Mar. 30, 2020), *aff'd*, No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021).  Rule 9(b) also applies to the Securities Act claims because they "sound in fraud." *Rombach v. Chang*, 355 F.3d 164, 170, 172 (2d Cir. 2004) (applying Rule 9(b) to Section 11 claims because "wording and imputations of the complaint are classically associated with fraud").  They rely on the same factual allegations as the Exchange Act claims, including Muddy Waters' allegation that the Company inflated agent and store count as part of a "multivariate fraud" (AC Ex. A at 5).  (*See, e.g.*, AC ¶¶ 210, 221 (alleging falsity based on Muddy Waters' allegation that store and agent numbers "were even more significantly inflated than the Company has admitted, and included not just inactive stores and agents, but nonexistent ones").)  Because all their claims "rest on the same theory," the Complaint's attempts to "separate [these] claims . . . and disclaim fraud as a basis for [its] Securities Act claims" are unavailing.  *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021).  In any event, Plaintiff has not even plausibly alleged its claims under Rule 8.

I.    **ALL OF PLAINTIFF'S CLAIMS FAIL BECAUSE THE COMPLAINT FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION**

All of Plaintiff's claims require Plaintiff to plead a materially false or misleading statement. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).  Plaintiff premises its claims on the Company's alleged failure to disclose its number of "active" agents and "active" stores in (i) the

9

SPO Documents (Securities Act and Exchange Act claims), and (ii) its quarterly and annual SEC filings between November 16, 2020 and November 8, 2021 (Exchange Act claims). Plaintiff also alleges that KE Holdings' Q2 and Q3 2021 Press Releases overstated GTV and revenue in violation of the Exchange Act. None of these allegations adequately pleads a material misrepresentation.

### A.    Plaintiff Fails to Plead That Reported Store and Agent Metrics Were False

Plaintiff contends that the Company's reported store and agent numbers misleadingly did not disclose the number of "active" agents and stores (AC ¶¶ 136–66, 171–73, 208–21), a metric the Company voluntarily introduced in Q3 2021 to "better reflect the operational activeness of stores and agents on [its] platform." (Ex. D at 1 n.3.) These allegations fail because (i) the Company had no duty to disclose "active" stores and agents, and (ii) Plaintiff does not plead facts showing that the Company's disclosed store and agent totals were otherwise false or misleading.

### 1.    There Is No Duty to Disclose "Active" Stores and Agents

"[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material." *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd,* 592 F.3d 347 (2d Cir. 2010). A duty to disclose can arise (i) based on an obligation imposed by statute or rule; or (ii) where necessary to make other disclosures not misleading. *Id.* The Complaint does not even attempt to allege any statute or rule that required the Company to disclose how many of its agents or stores were "active." Nor did voluntarily offering this information in Q3 2021 retroactively obligate the Company to provide it previously. The Company's prior disclosures were not materially misleading without it, and it did not result in any restatement of prior financial or operational metrics. (Ex. D at 1–2 nn.3–4.) *See Yaroni v. Pintec Tech. Holdings Ltd.*, 2022 WL 1215450, at *10 (S.D.N.Y. Apr. 25, 2022) (dismissing claim based on "change from gross-basis to net-basis recognition of revenue," because

10

"'gross profit remained the same' before and after"); *In re Supreme Indus., Inc. Sec. Litig.,* 2019 WL 1436022, at *4 (N.D. Ind. Mar. 29, 2019) (decision to provide greater detail about past-quarter backlogs did not render prior-quarter statements misleading).  And none of the Company's prior statements regarding the total number of agents and stores in its extended network represented that *all* agents and stores were "active," as that term was later defined in the Q3 2021 Press Release. (AC ¶¶ 136–41, 152–55, 163–66, 209.)  To the contrary, the Company repeatedly disclosed that "***most of the brokerage stores on our platform were subject to . . . low activity level[s]*** for a certain period of time in . . . 2020 due to the COVID-19 pandemic." (Ex. B at 103; Ex. C at 106; Ex. L at 99.)  Plaintiff all but concedes the point by failing to allege that the disclosure of "active" stores and agents was a corrective disclosure.  (*See* AC ¶¶ 178–79.)

Equally nonactionable are the Company's generalized statements about its store and agent numbers, such as those regarding its "large and active network," "proactive engagement," and "growing network of real estate brokerage stores and agents that transact actively on our platform." (*Id.* ¶¶ 142–45, 157–60, 212–15.)  *First*, Plaintiff fails to plead facts to show that these statements were false or misleading.  Rather, when the Company introduced the "active" agent and store metrics, it confirmed that tens of thousands of stores and hundreds of thousands of agents were "active" throughout the Class Period:  413,732 to 468,014 "active" agents and 41,152 to 49,468 "active" stores from Q3 2020 to Q3 2021—a "large and active" network under any definition.  (*Id.* ¶ 57; Ex. D at 1–2.)  *Second*, soft, unquantified descriptions of a "large" or "growing" network that was "transact[ing] actively" on the Company's platform are inactionable puffery because they are "too general to cause a reasonable investor to rely upon them."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *see also In re Yunji Inc. Sec. Litig.*,  2021 WL 1439715, at *8 (E.D.N.Y. Mar. 31, 2021) (statements of "high-quality" and

11

"carefully curated" products "are non-actionable puffery"); *Galati v. Com. Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) (statements of "'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute nothing more than mere 'puffery'").

### 2. Parroting the Muddy Waters Report Does Not Plead That KE Holdings Inflated Its Agent and Store Numbers

Plaintiff argues that the alleged truth was revealed not by the Company's November 8, 2021 breakdown of "active" stores and agents, but by the Muddy Waters Report's allegation that "the reported numbers of stores and agents on KE Holdings' platform . . . included not just inactive stores and agents, but nonexistent ones." (AC ¶ 59.) For several reasons, this claim also fails.

#### (a)    Muddy Waters Reviewed Only a Fraction of Relevant Data

Plaintiff challenges various statements the Company made between November 16, 2020, and November 8, 2021 (AC ¶¶ 138–177), but Muddy Waters only collected platform data from May 25 to October 22, 2021, covering only Q3 2021 and half of Q2 2021. (AC Ex. A at 2, 5 n.2.) Because Muddy Waters does not purport to have analyzed *any data* from financial periods reported in the SPO Documents, the Report cannot support Plaintiff's Securities Act claims. The Exchange Act claims are premised on the same and similar statements in the SPO Documents, 2020 20-F and Q3 2020 to Q2 2021 Press Releases also fail. *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at \*8 (S.D.N.Y. Jan. 18, 2018) (allegations relating to fraction of class period cannot "support claims of [falsity] for the entire [c]lass [p]eriod" and "fall short of establishing, with the requisite degree of particularity, the existence of a company-wide practice").

#### (b)    Uncorroborated Allegations Copied From the Muddy Waters Report Do Not Satisfy Rule 9(b)'s or Rule 8's Pleading Requirements

As many courts have observed, short-sellers like Muddy Waters "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012). (*See* AC Ex. A at 1 (admitting Muddy

12

Waters "stand[s] to realize significant gains in the event that the price[] of [KE Holdings' ADSs] decline").) Hence, there is "a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration," because "the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing." *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).

Here, Plaintiff does not allege *any* attempt to independently corroborate Muddy Waters' allegations, which the Complaint ***admits*** are speculative. (*See, e.g.*, AC ¶¶ 81, 96, 98 (alleging falsity based on what "Muddy Waters hypothesized" or "posited").) The lack of corroboration is especially glaring because the Muddy Waters Report presents the "twinned" reliability concerns about which the court warned in *Miao*: not only does the authorless Report rely on anonymous investigators, it also relies on information relayed to those investigators by other anonymous sources, none of whom is alleged to have spoken with Plaintiff's counsel, or is alleged "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Miao*, 442 F. Supp. 3d at 798. None of these anonymous sources even claims that the Company's reported store and agent counts were false.

Nor does Plaintiff allege any facts to refute KE Holdings' prompt explanation of the flaws in the Report's methodology. (AC ¶ 181; Ex. J at 1.) Muddy Waters based all its claims, for example, on a computer "program" it allegedly wrote to analyze data from the Company's customer-facing platform using the "Find Agent" function. (AC Ex. A at 47.) But the "Find Agent" function does not include all agents, many of whom appear elsewhere on Beike's platform, and all of whom have discretion to opt out of search results. (Ex. J at 1.) Plaintiff's failure to engage with the Report's flaws does not present a disputed issue of fact, as Plaintiff asserts (Pl.

13

Pre-Mot. Letter, ECF No. 76 at 2), but rather a pleading failure:  The "failure to recognize and engage with the dubious reliability of the short-seller report[]"—especially after such flaws were identified by the Company here—"suggests the lack of the reasonable inquiry required on plaintiff's counsel's part," and "necessarily raises doubt as to whether the other factual representations in the same short-seller's report . . . can be credited as a reliable basis to establish the factual falsity of [the Company's] representations to the market."  *Miao*, 442 F. Supp. 3d at 804; *see also id.* at 801 ("factual attributions to short-seller reports [fail] to satisfy *pleading requirements*" in the absence of independent corroboration by counsel).

(c)    Plaintiff Does Not Allege that Muddy Waters Analyzed The Same Internal Data on Which the Company's SEC Filings Are Based

The Complaint does not plead falsity also because it includes no allegation that the public platform data that Muddy Waters analyzed is the same as the "internal company data" on which KE Holdings' SEC disclosures are based.  (AC ¶ 150; AC Ex. A at 47.)  Thus, it is "virtually impossible to determine whether the comparisons [plaintiff] draws are apples-to-apples."  *In re L & L Energy, Inc. Sec. Litig.*, 908 F. Supp. 2d 1147, 1153 (W.D. Wash. 2012); *see also In re China XD Plastics Co. Ltd. Sec. Litig.*,2016 WL 1241522, at \*5 (S.D.N.Y. Mar. 23, 2016) ("[T]he reasonableness of the allegation that [defendant's] SEC filings are fraudulent depends entirely on whether the pleaded facts support a reasonable inference that there is indeed a significant discrepancy between [its SEC filings and plaintiff's contrary data].").  Plaintiff does not allege that it or Muddy Waters reviewed any "internal company data" to support any plausible inference that (i) Muddy Waters captured complete agent and store data from the customer-facing online platform's "Find Agent" function (Muddy Waters' sole data source); or (ii) the complete set of agent and store data (as opposed to the partial data available through the "Find Agent" function) was inconsistent with the Company's reported numbers.  (AC ¶ 150.)  Plaintiff's vague allegation

14

(copied from Muddy Waters) that anonymous "agents" said that unidentified "transactions" listed on the external network matched up with their internal network does not support an inference that the external agent listings are comprehensive.  (*Id.* ¶ 122.)

Muddy Waters' purported "field work" and cross-checks add nothing.  The short-seller's anecdotal claims of "ghost" or "clone" stores (*Id.* ¶ 11) do "not equal 'widespread' [conduct] and cannot support a fraud claim." *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577–78 (D.N.J. 2001).  Moreover, such "field work" is based on the same incomplete data pulled from the customer-facing online platform.  (AC ¶¶ 66–115).  For instance, Plaintiff's allegation regarding "***probable*** clone stores" is based on Muddy Waters' claim that some stores appeared "*on [the online] platform* with the same or [a] similar name and/or location but a different suffix, such A, B or C," when "often only one [store] exist[ed] in practice."  (AC ¶ 82 (alterations in original).) Plaintiff alleges no facts, however, indicating that KE Holdings' internal company data or SEC filings improperly counted one store as multiple entities.[4]  Similarly, Plaintiff's speculation that certain stores "did not exist" or "exist on paper alone" (AC ¶¶ 91, 98) is based solely on Muddy Waters' inability to verify the existence of a handful of stores using the address listed on the online platform or the stores' State Administration for Industry and Commerce ("SAIC") certificates. (AC ¶¶ 68–76, 91–106.)  But Plaintiff ***admits*** that in most instances, Muddy Waters' investigators found that the stores had simply moved to a new location or merged with another store.  (*Id.* ¶¶ 71–78, 96–99.)  Thus, Plaintiff's conclusory assertion that such stores did not exist ignores "alternative explanations so obvious that they render plaintiff's inferences unreasonable," *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 470 (S.D.N.Y. 2017), *aff'd sub nom. Martin v.*

---

[4]    In fact, Plaintiff alleges that the A/B/C designations were used only "to keep track of the business of the respective managers operating out of the same store."  (AC ¶ 85.)  That allegation confirms the Company's prior statement that its online operations are "designed to share knowledge, mobilize resources and ***allow agents to track, manage and complete the transaction process***[.]"  (Ex. B at 143.)

*Quartermain*, 732 F. App'x 37 (2d Cir. 2018)—namely, investigators could not "confirm the existence" of all stores because some had moved or merged, and such recent developments were not reflected on Beike's platform or the store's SAIC certificate. (AC ¶ 92.) Indeed, Muddy Waters itself acknowledged the possibility that the Company's platform data could be outdated when it compared certain platform agent listings against a local registry of real estate agents. (*Id.* ¶¶ 111–15.) Because Plaintiff fails to plead that any allegedly outdated or duplicate store or agent information that appeared on the *online platform* was also reflected in the Company's *SEC filings*, the Complaint cannot plead falsity by citing Muddy Waters' investigation.

(d)    Comparisons with SAIC Filings Do Not Plead Falsity

Muddy Waters' comparison of agent numbers reported in KE Holdings' 2020 20-F with the SAIC filings of certain subsidiaries in Shanghai and Beijing is also insufficient. (*Id.* ¶¶ 116–21). "It is not reasonable to infer that [KE Holdings'] SEC filings must be false based upon a comparison to less than a complete set of its subsidiaries' SAIC filings." *China XD*, 2016 WL 1241522, at *6. Here, Muddy Waters reviewed SAIC filings for only "the Company's *major* subsidiaries and consolidated VIEs" listed in its 2020 20-F, whereas the Company's SEC filings report consolidated data from *all* its operations. (Ex. L, 2020 20-F at F-11; *see* AC Ex. A at 34–37.) Plaintiff does not allege that Muddy Waters' review captured *all* subsidiaries in Shanghai or Beijing, let alone that the SAIC requires companies to report employees for all affiliated stores, each of which has its own unique SAIC registration. (*See, e.g.*, AC ¶¶ 69, 91.) This is made plain by Muddy Waters' inapposite comparison of the number of *Lianjia* agents reported in the Company's 2020 20-F with the number of employees at *Deyou* subsidiaries reported in the Company's SAIC filings—an apples-to-oranges comparison between two *different types* of stores. (AC Ex. A at 34 (comparing Lianjia's Shanghai agent totals in 2020 20-F with SAIC filings of

16

"Deyou Real Estate Agency Co. Ltd." and "Shanghai Deyou Property Consulting Co. Ltd.").) Plaintiff's uncritical "reproduc[tion] [of] these incorrect facts" underscores the Complaint's unreliability. *Miao*, 442 F. Supp. 3d at 804. Finally, the Company disclosed that Lianjia agents include "agents employed by [the Company] and from labor dispatching or outsourcing agencies." (Ex. B at 167.) Although Plaintiff claims a Muddy Waters investigator was allegedly told "that Lianjia stores do not employ part-time or temporary agents," (AC ¶ 118), neither Plaintiff nor Muddy Waters alleges any facts "to support the probability that a person in the position occupied by [this] source would possess the information alleged." *Miao*, 442 F. Supp. 3d at 798.

**B.    Plaintiff Fails to Plead That Reported GTV and Revenue Were Inflated**

Plaintiff's Exchange Act claims include the additional allegation—which again comes *solely* from the Muddy Waters Report—that KE Holdings reported inflated GTV and revenues in Q2 and Q3 2021. (AC ¶¶ 167–70, 174–77.) These uncorroborated allegations also fail.

First, these allegations also rely on Muddy Waters' flawed methodology that "begins with [data pulled from] the 'Find Agent' function in the app" and "collects the transaction information" associated with stores and agents pulled from the "Find Agent" function. (*Id.* ¶ 122; AC Ex. A at 6.) As explained above, Plaintiff fails to allege that data pulled from the "Find Agent" function was complete or accurate or was the same as the "internal company data" used to prepare the Company's SEC filings. (*Supra* § I.A.2.) Hence, any transaction data derived from this flawed methodology—like Muddy Waters' flawed agent and store analyses—cannot establish falsity. The alleged comments by unidentified "Lianjia and Deyou agents" to unknown Muddy Waters investigators "that the transactions posted on the external network match up with sales transactions on their internal network" add nothing, (AC ¶ 122), because (i) Plaintiff's counsel "appear to have done nothing whatsoever to confirm the identities or statements of the confidential sources cited

17

in the [short-seller] report," *Miao*, 442 F. Supp. 3d at 804; (ii) Plaintiff alleges no facts to support the probability that agents "employed in rank-and-file positions or by outside contractors" at a handful of stores had "access to aggregated data" reported in the Company's SEC filings, *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd,* 430 F. App'x 63 (2d Cir. 2011); and (iii) the Complaint does not allege that these agents' so-called "internal network" contains the aggregated "internal company data" about *all transactions* reflected in the Company's SEC disclosures.  (AC ¶¶ 122, 150.)

Second, Plaintiff fails to engage with numerous other flawed assumptions in Muddy Waters' methodology that render its claims entirely speculative.  For example, although Plaintiff asserts that the Muddy Waters Report revealed that GTV and revenues for Q2 and Q3 2021 (*i.e.*, April 1 to September 30, 2021) were inflated, the Complaint ***admits*** that the short-seller's conclusion is based only on data from May 25 to September 13, 2021, excluding 71 of the 183 days in this two-quarter period—***nearly 39%*** of such transaction data.  (AC ¶ 126; AC Ex. A at 58–62.)  Worse still, Muddy Waters was unable to pull existing-home sales data for Chengdu and Shanghai, which the Complaint admits is the "the second largest market for Lianjia."[5]  (AC Ex. A at 58; AC ¶ 67.)  Such allegations, which relate to only a ***fraction*** of the relevant quarters, cannot "support claims of [falsity]  . . . for the entire" two quarters.  *See Schaffer*, 2018 WL 481883, at *8.

Similarly, to calculate GTV for new-home sales, Muddy Waters did not use the actual sales price of any actual transaction, but the "average value per transaction" for the ***prior year*** in 2020, based on another online source's generalization that new-home prices were "*relatively* unchanged"

---

[5]    For Chengdu, Muddy Waters did not collect ***any*** data, and instead made a rough estimate based on all stores' average transaction numbers.  (AC Ex. A at 58.)  For Shanghai, it only collected data for a 20-day period— ***excluding nearly 90%*** of relevant data—which it "pro-rated [] to 76 days to match the data set[.]"  (*Id.*)

18

"on *average* over the past two years"—a claim that Plaintiff again failed to corroborate. (AC Ex. A at 53 n.71, 56.) This method ignores potential regional and local disparities and seasonal fluctuations in real estate pricing, rendering Muddy Waters' conclusion entirely speculative.

To calculate GTV for existing-home sales, Muddy Waters *admits* it was unable to obtain transaction prices for *a third* of the cities on the platform—including Shanghai and Beijing, "KE Holdings' two primary markets," among others (AC ¶ 116)—and relied instead on the average transaction value for "a city with similar characteristics," which it adjusted "using data on existing home sales from" the China Real Estate Association "in order to approximate its localized value." (AC Ex. A at 58–59.) Compounding the speculative and arbitrary nature of its methodology, Muddy Waters used Shanghai—a city for which it admittedly did not obtain an average transaction value—to estimate the average transaction value for Beijing and Shenzhen.[6] (*Id.* at 59, 61.)

Third, even setting aside these methodological flaws, Plaintiff ignores additional sources of GTV and revenue, rendering implausible its claim that these figures were overstated for Q2 and Q3 2021. For example, as the Company explained, the short seller ignored new-home transaction GTV and revenue generated "through its dedicated new home sales team and other new home sales channels"—significant revenue streams that cannot be overlooked. (Ex. J at 1; *see* Ex. H at 4.) Plaintiff does not address this explanation, much less plead any facts to refute it or to support a plausible inference that the Company's new-home GTV or revenues are nonetheless misstated, thus failing "to satisfy pleading requirements." *Miao*, 442 F. Supp. 3d at 801. (*See supra* § I.A.2.) Plaintiff also parrots Muddy Waters' claim that GTV for existing-home *transactions* was inflated based on the short-seller's estimate of GTV for existing-home *sales* by Lianjia and connected stores. (AC ¶ 129.) As the Company disclosed, however, existing-home transactions revenue is

---

[6] Muddy Waters estimated Shanghai's average transaction value based on data collected for only 20 out of 183 days of Q2 and Q3 2021—*just 10%* of such transaction data. (AC Ex. A at 59.)

generated not only through home *sales*, but also through home *rentals*, platform service fees, franchise fees, and other value-added services, including transaction closing services, field work assistance such as on-site verification, and agent recruiting and training services.  (Ex. B at 95.) Plaintiff's failure to "close the gap between the incomplete  . . . data presented in the [Complaint] and [KE Holdings'] SEC filings" requires dismissal.  *China XD*, 2016 WL 1241522, at \*6.

## II.  PLAINTIFF'S FAILURE TO PLEAD A "STRONG INFERENCE" OF SCIENTER REQUIRES DISMISSAL OF ALL CLAIMS

The Complaint also should be dismissed for the separate and independent reason that it fails to plead facts supporting the requisite "strong inference" of scienter.  *Asay*, 2020 WL 1530745, at \*4–5 (Exchange Act plaintiffs "must allege with particularity facts that give rise to 'a strong inference'" of scienter); *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at \*5 (S.D.N.Y. May 15, 2008) (dismissing under Rule 9(b) Securities Act claim that sounded in fraud and failed to "plead with particularity a strong inference of scienter"), *aff'd*, 331 F. App'x 14 (2d Cir. 2009).[7] The inference of scienter must be "cogent and at least as compelling as any [competing] inference" of non-fraud.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiff must allege particularized facts showing "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Meyers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).

Here, because Plaintiff does not even ***attempt*** to plead motive, its allegations of recklessness "must be correspondingly greater."  *Id.* at 355.  To plead recklessness, Plaintiff must allege "'highly unreasonable' behavior or that which evinces 'an extreme departure from the

---

[7]   *See also In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 2872671, at \*7 (E.D.N.Y. July 21, 2022) ("[C]ourts in this circuit have consistently . . . dismiss[ed] Securities Act claims that sound in fraud but fail to plead scienter."); *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at \*16 (S.D.N.Y Jan. 26, 2009) (requiring "factual allegations that the defendants made materially false statements . . . with scienter" when Securities Act claims sound in fraud).

standards of ordinary care.'"  *Id.*  Plaintiff's allegations regarding the Company and Individual Defendants, even holistically, fail to meet this standard.  Additionally, Plaintiff expressly disclaims any allegations of "fraud or scienter" against the Underwriter Defendants (AC ¶¶ 243, 254), yet Plaintiff had to plead such allegations to state its Securities Act claims sounding in fraud against the Underwriter Defendants.  *Coronel*, 2009 WL 174656, at *16.

First, Plaintiff alleges the Individual Defendants[8] "knew" or "were reckless in not knowing" of the alleged misstatements "by virtue of their receipt of information reflecting the true facts[.]"  (AC ¶¶ 184–85.)  Where "plaintiffs assert that defendants had access to contrary facts, the complaint must 'specifically identify the reports or statements containing this information.'"  *Francisco v. Abengoa*, *S.A.*, 481 F. Supp. 3d 179, 214–15 (S.D.N.Y. 2020).  Here, Plaintiff fails to allege that Defendants received any internal report, communication, or other information contradicting the Company's filings.  *See Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020) (conclusory allegation that defendants "were aware of a variety of information that Plaintiffs say is inconsistent with those statements" insufficient to plead recklessness).

Second, Plaintiff alleges the Company's "high-level" executives were involved in "day-to-day operations."  (AC ¶ 187.)  But "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."  *Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (allegations that "Defendants *must have known*" insufficient to support scienter) (emphasis in original).

Third, Plaintiff claims that the Company's disclosure of "active" stores and agents in its Q3 2021 Press Release "gives rise to a strong inference that the Exchange Act Defendants had

---

[8]    Colleen A. De Vries is the Senior Vice President of Cogency Global Inc., KE Holdings' authorized U.S. representative, not the "Senior Vice President of KE Holdings," as the Complaint mistakenly alleges.  (AC ¶ 25.)

21

contemporaneous knowledge" of those metrics because it would be "implausible" to determine such data retroactively.  (AC ¶ 189.)  Because "plaintiff's claim lies in non-disclosure," however, such allegations "do not provide *strong* evidence of conscious misbehavior or recklessness" absent "facts indicating a clear duty to disclose," *Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001) (emphasis in original), which Plaintiff fails to allege here (*supra* § I.A.1).  *See also Plumbers*, 694 F. Supp. 2d at 301 ("after-the-fact 'allegations that statements in one report should have been made in earlier reports [does] not make out a claim of securities fraud'").  Nor do such allegations suggest anything at all about the Company's GTV and revenue.

Fourth, Plaintiff asserts that Defendants displayed a "lack of candor in response to the Muddy Waters Report[.]"  (AC ¶ 190.)  Pejorative characterizations about the Company's allegedly "incomplete response" to Muddy Waters and "the speed" and lack of "details about the internal review" cannot substitute for well-pled factual allegations showing any flaw in the Company's response or internal investigation.  (*Id*.)  To the contrary, the Company denied the Report the day after it was issued by detailing the patently obvious flaws in Muddy Waters' methodology—flaws with which Plaintiff does not engage, much less contest.  (Ex. J at 1.)  The Company also immediately launched an internal investigation—carried out by the Board's independent audit committee with the assistance of an international law firm and Big-Four accounting firm—which ultimately found Muddy Waters' allegations unsubstantiated.  (*Id.*; Ex. K at 1.)  Far from supporting recklessness, "the fact that [KE Holdings] commenced an internal investigation tends to undermine any inference of scienter."  *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("[P]laintiffs inference of scienter based on the unreported findings of an . . . internal investigation is not as compelling as an alternative

22

nonfraudulent inference: defendants did not have knowledge that their statements . . . were misleading because [the] internal investigation . . . did not uncover any unlawful activity.").

Fifth, Plaintiff notes that, as of January 2022, the Company's online platform no longer shows the number of agents at each store and suggests this was to "prevent further data collection." (AC ¶ 190.)  That is pure speculation.  Moreover, the design change was made "well after the alleged misrepresentation," and thus cannot "indicate knowledge . . . at the time of the alleged misrepresentation." *Pope Invs. II, LLC v. Deheng Law Firm*, 586 F. App'x 1, 4 (2d Cir. 2014).

Sixth, Plaintiff makes passing reference to two "additional improprieties" alleged in the Muddy Waters Report: that the Company's "true commission rates were lower than reported" and that it "was disguising inflated revenues through a sham acquisition of Zhonghuan Real Estate Agency."  (AC ¶¶ 191–95.)  But Plaintiff does not plead any facts to support these short-seller accusations, which the Complaint does not incorporate in its theory of falsity.  Regardless, allegations of "other accounting improprieties are not themselves enough to constitute recklessness." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 625 (S.D.N.Y. 2005).

The far more "cogent and compelling" inference is that there was no fraud.  *See Tellabs*, 551 U.S. at 324.  The Company promptly denied Muddy Waters' accusations in full, provided a detailed rebuttal and commenced an independent investigation, which "supports the [nonculpable] inference." *Miao*, 442 F. Supp. 3d at 808.  Moreover, its voluntary disclosure of "active" stores in its Q3 2021 Press Release demonstrates candor and a willingness to provide investors with additional, clarifying information about previously reported operating metrics.  On the other hand, Muddy Waters had an obvious motive to lodge sensational and speculative accusations in an effort to drive down the Company's ADS price and profit on its short position.  Because Plaintiff fails to plead scienter, the Complaint should be dismissed.

23

### III.   ALL OF PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE LACK OF LOSS CAUSATION IS APPARENT ON THE FACE OF THE COMPLAINT

The Exchange Act requires Plaintiff to plead a "causal link between the alleged misconduct and [plaintiff's] economic harm" by alleging "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172–73 (2d Cir. 2005).  The Muddy Waters Report did neither.  While Plaintiff claims a loss based on a price decline that occurred "during the trading day" after the Muddy Waters Report was released, the Company's ADS price actually ***increased*** during the trading day.  (AC ¶ 12.)  It opened at $17.96 after the Report was released and closed at $18.31 after "the market digested" it, down just 37 cents (1.98%) from the prior day's $18.68 closing price.  (*Id.*; Ex. I at 9.)  The price ***increased further*** by 5.7% the next day, after the Company refuted Muddy Waters' accusations, closing at $19.36—even higher than before the Report was released—and reached $20.19 by time this Action was filed two weeks later.[9]  (*Id*.) The Company's ADS price continued to average around $19 for the next three months.  (*Id.*)  *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("Plaintiffs' failure to address or explain [stock price's] rebound renders their loss causation allegation implausible in this case.").  Moreover, the Muddy Waters Report did not disclose any "concealed" facts; it admits that "all information contained herein . . . has been obtained from public sources."  (AC Ex. A at 1.)  *See Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019) (short-seller article that "relied on public information" "did not reveal any undisclosed information"); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (a "negative characterization of already-public information . . . cannot constitute a corrective disclosure").

---

[9]   Plaintiff pleads no facts or authority indicating why loss should be assessed based on a fleeting 5.74% *intraday* decline.  (AC ¶ 12.)  The price on December 20, 2021 is irrelevant (*id.* ¶ 13), as KE Holdings issued its response prior to market open on December 17, 2021.  (Ex. J at 1.)

When "the absence of loss causation is apparent on the face of the complaint," Securities Act claims will likewise be dismissed. *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010). The Muddy Waters Report—the only alleged corrective disclosure (AC ¶ 178)—could not have revealed any misstatement in the November 2020 SPO Documents because it reviewed data only for portions of Q2 and Q3 2021.

## IV.   PLAINTIFF FAILS TO PLEAD SECURITIES ACT STANDING

Pleading Section 11 standing requires factual allegations that Plaintiff purchased securities traceable to the registration statement. *See DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003). In the secondary-offering context, pleading traceability is "more complicated" because Plaintiff "must prove that [its] shares were issued under the" SPO registration statement, "rather than some other registration statement," such as the IPO. *In re ARIAD Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016). Plaintiff's one-sentence allegation that it purchased ADSs on the offering date at the offering price "pursuant and/or traceable to" the SPO Documents (AC ¶ 19) does not meet this standard. The "obvious alternative explanation" is that "the shares purchased originated from the prior offering but were being traded at the secondary offering price." *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D. Cal. July 5, 2022).[10] Nor does this allegation plead Section 12(a)(2) standing, which is limited to purchases made directly in the offering. *See In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (allegation that plaintiffs bought "pursuant to or traceable to the Prospectus" is insufficient).[11]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

---

[10]   *See also In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *7 (S.D.N.Y. Oct. 1, 2013) (insufficient "to note that [plaintiff] bought shares on the day of an offering in a marketplace actively trading issued shares, and rely on the similarity of date and share price").

[11]   Because Plaintiff fails to plead primary liability, its control person claims necessarily fail. *ATSI*, 493 F.3d at 108.

25

Dated: New York, New York
       September 23, 2022

                                      Respectfully submitted,

/s/ *Douglas H. Flaum*                  /s/ *Robert A. Fumerton*

GOODWIN PROCTER LLP           SKADDEN, ARPS, SLATE,
Douglas H. Flaum                         MEAGHER & FLOM LLP
Gabrielle Lisa Gould                  Scott D. Musoff
620 Eighth Avenue                   Robert A. Fumerton
New York, NY 10018                 Michael C. Griffin
Phone: (212) 813-8800              One Manhattan West
Fax: (212) 355-3333                New York, NY 10001
dflaum@goodwinlaw.com         Phone: (212) 735-3000
ggould@goodwinlaw.com         Fax: (212) 735-2000
                                       scott.musoff@skadden.com
*Counsel for Underwriter Defendants*    robert.fumerton@skadden.com
                                       michael.griffin@skadden.com

                                       *Counsel for Defendants KE Holdings Inc.*
                                       *and Colleen A. De Vries*

                                       O'MELVENY & MYERS LLP
                                       Jonathan Rosenberg
                                       B. Andrew Bednark
                                       7 Times Square
                                       New York, NY 10036
                                       Phone: (212) 326-2000
                                       Fax: (212) 326-2061
                                       jrosenberg@omm.com
                                       abednark@omm.com

                                       O'MELVENY & MYERS LLP
                                       William K. Pao (*pro hac vice*)
                                       400 South Hope Street
                                       18th Floor
                                       Los Angeles, CA 90071
                                       Phone: (213) 430-7272
                                       Fax: (213) 430-6407
                                       wpao@omm.com

                                       *Counsel for Defendant KE Holdings Inc.*