M8AGchiC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KEITH CHIN, et al.,

                    Plaintiffs,

          v.                            21 Civ. 11196 (GHW)

KE HOLDINGS INC., et al.,

                                        Remote Conference

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        August 10, 2022
                                        1:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge

                         APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiffs
BY:  ERIN W. BOARDMAN

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Defendant KE HOLDINGS INC.
BY:  ROBERT A. FUMERTON
     MICHAEL C. GRIFFIN

GOODWIN PROCTER LLP
     Attorneys for Defendants Underwriters
BY:  DOUGLAS H. FLAUM
     GABRIELLE L. GOULD

M8AGchiC

(The Court and all parties present remotely)

THE COURT:  I'd like to begin by taking appearances for the parties.  I'm going to ask the principal spokesperson for each party to identify him or herself and the members of their team, rather than having each lawyer introduce themselves individually.

Let me begin with counsel for plaintiff.  Who is on the line for plaintiff?

MS. BOARDMAN:  Good afternoon, your Honor.  This is Eric Boardman from Robbins Geller for the lead plaintiff Saskatchewan Healthcare Employees' Pension Plan.  And I also have on the line Brent Mitchell, who is a law clerk in our office who is listening in today.

THE COURT:  Thank you.

Who is on the line on behalf of each of the defendants?

I'll begin with the defendant KE Holdings Inc.

MR. FUMERTON:  Good morning, your Honor.  Robert Fumerton from Skadden Arps.  And I'm joined by my colleague, Michael Griffin.

THE COURT:  Thanks.

Who is on the line on behalf of Goldman Sachs, Morgan Stanley and JPMorgan and China Renaissance?

MR. FUMERTON:  Your Honor, this is Douglas Flaum from Goodwin Prcoter, along with my partner Garbrielle Gould, on

M8AGchiC

behalf of the underwriter defendants.

THE COURT:  Thank you very much.

Let me begin with just a few brief comments about the rules that I'd like the parties to follow during this conference.  At the outset, please remember that this is a public proceeding.  Any member of the public or press is welcome to audit this conference.  I'm not presently monitoring whether or not they are.  I just ask you to keep in mind that, again, this is a public proceeding.  Second, please keep your lines on mute at all times, except when you are speaking to me or to the representative of a party.  Third, please state your name each time that you speak.  Please do that even if you have spoken previously.  Fourth, I'm inviting our court reporter to let us know if she has any difficulty hearing or understanding anything that we have to say here today.  If she asks you to do something that will make it easier for her to do her job, please do it to the extent that you can.  Finally, I'm ordering that there be no recording or rebroadcast of all or any portion of today's conference.

With that out of the way, counsel, let's turn to the substance of today's proceeding.  I scheduled this as a pre-motion conference with respect to a proposed motion to dismiss the operative complaint in this case.

Counsel, I have looked at the letters that have been submitted in connection with the proposed motion, but it can be

M8AGchiC

helpful for me to hear from you about the bases for the anticipated motion and to begin to get a sense of the arguments that will be presented in opposition.

Let me turn first to counsel for defendants.  Counsel, what are the arguments that you expect to present in your motion to dismiss.

MR. FUMERTON:  Thank you, your Honor.

I'd like to give just a very brief background about the company and this lawsuit and then walk through what we submit are the multiple grounds that warrant dismissal.  So.

This action, your Honor, was filed on the heels of a short seller report by Muddy Waters claiming that the company, which operates a leading online and offline real estate brokerage in China overstated two categories of information; one, its store and agent counts, and two, its gross transaction value or GTV and revenue.

Now, the company responded the very next day after the short seller report denying the report in its entirety, reaffirming the accuracy of its audited financial and operational results.  In explaining the flaws in Muddy Waters attempt to reverse engineer what really is the company's internal data, the company also announced that its independent audit committee was nevertheless launching an internal investigation aided by an international law firm and a big four accounting firm.  And six weeks later, the company announced

M8AGchiC

that the internal investigation was substantially complete and confirmed that the allegations in the short seller report were unsubstantiated.

Now, as I'll get to in greater detail in discussing loss causation, the whole episode was a nonevent for the market. The stock barely moved on the day the report came out, closing down less than 2 percent. And the very next day it increased to even higher than it was before the report was published. And the average trading price for the 90 days following the report was also higher than the price immediately preceding the report.

So this entire action is an attempt by plaintiff to simply parrot this self-interested short seller who, again, had a disclosed short position in the company whose only interest was to drive the stock price down, to parrot the speculative allegations in an effort to state securities claims.

As we have outlined in the letter and as we'll demonstrate in the motion papers, plaintiff's claims should be dismissed for multiple independent reasons. The first and foremost is that the immense complaint fails to allege any of the company's statements were false or misleading.

So turning to the first category of alleged misstatement. Plaintiff claims that the company's reported agent and store counts must be inflated because Muddy Waters didn't get the same numbers when it supposedly added up the

M8AGchiC

stores and agents on the company's online platform.  Your Honor, as a threshold issue, and as Jundge Engelmayer held in the *Long Miao* case, plaintiff cannot allege a misstatement by blindly copying and pasting a speculative report from a short seller.  That's exactly what they have done here.  Plaintiff does not allege any facts showing that they have done anything to corroborate any of Muddy Waters' accusations.  Plaintiff does not even claim to have spoken with Muddy Wataers, much less any of Muddy Waters' alleged anonymous sources.

In any event, even if plaintiffs could parrot these allegations, there's no facts establishing that Muddy Waters' approach should yield the same numbers as the company's internal data.  As the company explained in its response to the report, its online platform simply does not reflect all of its stores and agents.  The company has brick and mortar stores that are not reflected in its online platform.

Now, plaintiff, claims this is a factual dispute.  But it's not.  Plaintiff has the burden to allege facts and particularize facts as opposed to just legal conclusions that would establish that the company's reported data was false.

Now, plaintiff makes much of the company's decision to start breaking out active versus inactive stores and agents beginning of third quarter of 2021.  But this disclosure, your Honor, of additional operation data -- which, by the way, came before, came more than a month before the Muddy Waters

M8AGchiC

report -- doesn't render the reported number of total stores and agents false or misleading.  This isn't some kind of admission.  The definition of active and inactive stores and agents are the company's own definitions.  The company's decisions to employ new definitions both to its current and historical store and agent totals does not mean that it had a duty to do so previously.  And in any event, your Honor, as plaintiff's own chart in paragraph 57 of the complaint shows, the company has more than 40,000 active stores, more than 400,000 active agents, which make up approximately 90 percent of the total stores and agents.  And thus, there could be nothing false or misleading about the company's statement, for example, that it has a large and active network, which plaintiff claims in paragraph 142 is a false statement.

Turning to the second category of alleged misstatements, plaintiff's claims about gross transaction value and revenues are simply speculative.  Plaintiff claims that the company's reported gross transaction value and revenues must be overstated because, again, Muddy Waters couldn't reverse engineer those numbers based on information from the company's online platform.  But the company's disclosures expressly state that the gross transaction value and revenues are calculated based on internal company data to which neither Muddy Waters or plaintiff even claims to have had access.

And in response to the short seller report, the

M8AGchiC

company explained in detail why Muddy Waters' estimates failed to capture all of the company's transactions and revenue.  In fact, Judge, if you look at what Muddy Waters did, which is on Page 7 of the report, which is attached to the complaint, they merely tried to estimate the number of transactions based on the online platform and multiply it by the average home price of the prior year, the prior year, the average price of the prior year.

Now, we submit that even if plaintiffs had verified that this is what Muddy Waters had done and could copy and paste these allegations, these allegations do not come close to meeting the particularity requirement of the PSLRA and rule 9(b) in demonstrating that any of the company's statements with respect to revenue or gross transaction value are false.

Judge, we don't think they have alleged a false or misleading statement, which is obviously fatal to all of the claims.  There are additional grounds for dismissal.

We don't think plaintiff has pled a strong inference of scienter.  Plaintiff doesn't even attempt here to allege motive and opportunity.  Plaintiff's only allegation in support of a recklessness theory is that the company's high-level executives were involved in the day-to-day operations and allegedly had access to data about active versus inactive stores and agents.  But this type of must have known allegation, Judge, that contains none of the particularized

M8AGchiC

facts the PSLRA requires has repeatedly been held to be insufficient to warrant a strong inference of scienter.

And again, even if these allegations were true, they in no way suggest that the company was reckless not to provide its own definitions of active versus inactive stores and agents to investors sooner. It certainly doesn't say anything at all about the gross transaction value or revenue.

Plaintiff also claims in its letter that the company's six-week internal investigation into the short seller's accusations somehow supports an inference of scienter. But that investigation, which, again, the company commenced immediately following the report, only confirmed that the report was baseless and that the company's disclosures were accurate.

Judge, a third independent basis for dismissal, which I alluded to at the outset, is the complete lack of loss causation here. Now, we submit that Muddy Waters' negative characterization of publicly available information from the company's online platform cannot constitute a corrective disclosure. And you don't have to take our word for it, Judge. This is publicly available information. Muddy Waters has to disclose that because they own a significant position or a significant short position in the stock. Otherwise, they'd be trading on a -- potentially trading on nonpublic information. But in any event, look at the stock price. The price reaction

M8AGchiC

to the report definitively refutes any claim of loss causation here. The stock closed at $18.68 the day before the report. The report was published the next day pre-market, and the stock closed at $18.31, which is less than a 2 percent change. And then the next day, the price increased to 19.36, which was higher than the day before the report. And as I mentioned, the 90-day average, which of course the PSLRA mandates with the lookback was higher than the pre-report price. So we submit, while it may be a rare case where it's apparent on the face of the complaint that there could be no loss causation, this is that case, both for Section 11 and then of course for Section 10(b), where they have the burden of pleading loss causation.

Finally, Judge, just briefly, as we mentioned in our letter, we think they have also failed to plead securities act standing. You have the one-sentence allegation that they purchased the company's ADS on the offering date at the offering price. We think there's authority that demonstrates that's not sufficient to satisfy either Section 11's traceability requirement or the requirement under Section 12(a)(2) that plaintiff purchased directly in the offering as opposed to a secondary market.

With that, unless your Honor has any questions, those are the grounds for our anticipated motion.

THE COURT: Thank you.

M8AGchiC

Counsel, just briefly, with respect to the issue of loss causation, remind me, does the complaint include all of the data that you have described regarding the stock price?

MR. FUMERTON:  It does not, your Honor.  But we think it's well settled that the Court can take judicial notice of the stock price.

The plaintiff claims -- what the plaintiff has done is they take the stock price the day before the report and then take the lowest price it reached during the following day and claim that that's a 5 percent drop.  But again, if you look at what the closing price was at the end of that very day and then go out one more day, you'll see that the stock completely recovered.

And plaintiffs are on record in numerous cases saying, you need to go out two days for an efficient market to incorporate the information.  So you've got a less than 2 percent drop on the day of the report.  And then you have a stock price that closed higher, significantly higher the very next day after that.

THE COURT:  Thank you.

Let me hear from you, counsel for plaintiff.  Why don't we start with the loss causation issues.  How do anticipate responding to the argument outlined by defendants' counsel here?

MS. BOARDMAN:  Good afternoon, your Honor.

M8AGchiC

So with respect to loss causation, defendants in their letter raise several arguments that are distinct, and we think that each of those arguments are without merit. On the first issue, which is the stock price decline, first of all, this is an issue of damages. But we do allege in the complaint in detail the stock price decline. That's set out in paragraphs 180 through 1812.

The Muddy Waters report was published before the market opened. And we allege that the stock declined from $18.68 per ADS from the closing price on December 15th, and then opened lower at 17.96 per ADS on December 16th. And then it traded -- and that their stock price declined further during the trading day as low as 17.22. And that is a recognizable stock price decline. The total decline we allege is 5.74 percent.

Now, counsel for defendants mentioned a two-day window. That's an issue that would be determined down the road by experts. That's not an issue that speaks at all to whether we have adequately alleged loss causation, which we have.

We also allege that the stock declined further after the company's response to the Muddy Waters report on Friday, December 17th failed to appease investors' concerns about the accuracy of the report.

So those allegations sufficiently plead loss causation at this stage of the litigation. And the points that

M8AGchiC

defendants raise may go to damages, but they simply don't preclude us from pleading loss causation, which we have.

Defense counsel also mentions that the Muddy Waters report simply repackaged already publicly available information. And that argument also is without merit. This is not a case as in the *Omnicom* case, which they mentioned, where it was simply a --

THE COURT: Can I just pause you on the damages question.

MS. BOARDMAN: Yes.

THE COURT: So you have to provide the defendants with notice of what the relevant economic loss might be and the causal connection between the material misrepresentation and the loss.

So you described this as an issue merely of damages, but what is the relevant economic loss in the first instance?

MS. BOARDMAN: It's the stock price decline from the time that the Muddy Waters report was issued pre-market on December 15th through the company's response to the Muddy Waters report, which caused an additional stock price decline. And there's a total decline in response to the Muddy Waters, report initially, we allege, of 5.74 percent.

THE COURT: Thank you.

What's the loss? Is this class people that sold on that day? Whose loss?

M8AGchiC

MS. BOARDMAN:  Well, your Honor, we have distinct losses for the securities act claims and also for the exchange act claims.  We are talking, in terms of the exchange act claims here -- because loss causation is not an element of the securities act claims, in which damages are based on a statutory formula -- in the exchange act claims, the loss causation is an element of the claim.  And here, it is the stock drop that we have pleaded in response to the Muddy Waters report.

And I should mention that there's no confounding market information on this date.  The Muddy Waters report is essentially the only company-specific news that came out on this day.  So this isn't a case where it's complicated to disaggregate damages for, for example, an earnings announcement.  This is the only company-specific event that took place on this date, and the stock declined.  How much it declined and whether it rebounded and whether a one-day or two-day window are appropriate are not pleading issues. They're issues that are the province of experts down the road.

THE COURT:  Thank you.

Counsel has told me that I can take judicial notice of the price movements in the stock beyond the allegations contained in the complaint.  Do you take issue with that position?

MS. BOARDMAN:  I don't, your Honor.  It's entirely

M8AGchiC

appropriate to take judicial notice of publicly available stock prices, and we don't dispute that.

THE COURT:  Thank you very much.

Please proceed.

MS. BOARDMAN:  Does your Honor have any other questions on loss causation, or should I move on to the other elements of the claim?

THE COURT:  Thank you.

You should feel free to move on.

MS. BOARDMAN:  So first of all, defendants have sought to characterize our allegations as simply parroting a short seller report, and I think it makes sense to take a step back.

KE Holdings is a company that went public on the New York Stock Exchange through an IPO.  Shortly thereafter, conducted a secondary offering.  Each offering raising well over a billion dollars.  And then quarter after quarter reported favorable financial results that consistently beat analyst expectations and consistently beat their guidance.

And then in November of 2021, the company did something that is very strange -- and we submit was an admission -- they suddenly disclosed that large percentages of the stores and agents on their platform were inactive.  Now, in all of the company's public filings, in their annual reports, in their IPO documents, they had consistently highlighted the active nature of their stores and agents, the importance of

M8AGchiC

their physical stores as a competitive advantage.  And their revenues and gross transaction value are directly tied to the number of stores and agents operating on their platform, because the company earns revenues from real estate transactions that are completed on the platform.  So it's a big deal for the company to admit here that as much as 15 percent of its stores and agents were inactive.  And in our complaint, we lay out exactly why that was false and misleading.

And these statements about the active nature of the agents on its platform defendants characterize as puffery.  These are objectively false statements because a substantial portion of the agents and stores on its platform were not active.  And as Muddy Waters found, many of those stores and agents simply didn't exist.  The stores, some, by Muddy Waters were what it labeled ghost stores, meaning the stores simply didn't exist.  And there was also pervasive evidence of cloned stores, where, for example, a number of stores would be registered and in reality, where multiple stores were registered, there was only actually one store.

THE COURT:  Counsel, can I pause you.  Why is the statement false?

Can you point me to the specific statement that you're alluding to.  Counsel for defendants pointed me to a statement in which they -- to paraphrase -- are asserted to have said something along the lines of they had a large number of stores.

M8AGchiC

Can you point me to the specific statement that you assert is false and is demonstrated to have been false as a result of their disclosure of the number of inactive stores?

MS. BOARDMAN:  Yes, your Honor.

So the large and active network statements that defense counsel referenced, that's in a few places.  For example, in paragraph 1412 of the complaint, the statement in its entirety reads, "We believe the large and active network of real estate brokerage brands and their affiliated stores and agents contribute significantly to the success of our platform."  And then they continue, "We believe a large and active network of agents, brokerage stores and brokerage brands across China provides a solid foundation for serving a large number of housing customers."

So here --

THE COURT:  Let me just ask you, counsel, why is defendants' position wrong in your view?

They say it's large.  If some of them were inactive, does that make the statement that they're network is large false?

MS. BOARDMAN:  It does, your Honor.

And I think a good analogy here is the Second Circuit case -- one second.

THE COURT:  For example, if they have 10,000 active and inactive stores and it turns out that they have 8,500

M8AGchiC

active stores, is 8,500 not large?  That's not a large network?

MS. BOARDMAN:  Well, yes, your Honor, it's false.
Because they're not only disclosing the fact the network is large, they're providing specific numbers.  So for example, their description of this is that it is a key success factor and a key operating measure.  So by highlighting the large and active network of stores and agents on its platform, they're creating a duty to speak truthfully and accurately.  So the fact that material portions of the stores and agents on the company's platform are inactive is directly contradicted by the true facts.

THE COURT:  Thank you.

You can proceed.

MS. BOARDMAN:  Thank you, your Honor.

So that's one category of statements, which are the statements that were rendered misleading when defendants spoke about their large and active network.

And those aren't the only category of statements that we allege.  The company provided specific numbers each quarter of stores and agents on its platform.  For example, in its first quarter as a public company, the company stated that as of September 30th, 2020, there were 44,883 stores on its platform.  And then in reality, we alleged that 9.1 percent of those stores were inactive, and that's based on the company's own admission in paragraph 57 of the complaint.

M8AGchiC

And we further allege that the company's admission was itself false because it understated the inflation.  There was actually, as found by Muddy Waters, an even greater inflation in the reported number of stores and agents.  And in fact, there were not merely inactive stores and agents, but there were stores and agents that simply didn't exist, as Muddy Waters' fieldwork confirmed.  There were stores that were closed, there were stores that were cloned stores.  There were agents that simply were not on the platform.

And by stating that these stores and agents were on the company's platform, I would submit that that's not just misleading, it's directly false, because if these stores and agents are not doing anything, then they're essentially not on the platform, whether they exist or not.

THE COURT:  Thank you.

Counsel, can you point me to the specific alleged false statement that is proven false by the information reported in paragraph 57 that you were pointing me to earlier?

MS. BOARDMAN:  So paragraph 57 is what the company came out and admitted in November of 2021, on November 8th, 2021.  They started breaking out the number of inactive stores versus active stores and inactive agents versus active agents.  What's very interesting is not only did they start breaking out that number in the third quarter, but they retroactively broke out the number for each quarter going back to their inception

M8AGchiC

as a publicly traded company.  So we allege elsewhere in the complaint that that actually supports scienter because it shows that they had contemporaneous access to these numbers in real time because --

THE COURT:  Counsel, I apologize.  Give me just a moment.  I do want to hear your argument on scienter, but can I ask you to just point me to the alleged false statement, the falsity of which is demonstrated by the data in paragraph 57.  I understood that to have been your point.  And I just want to make sure I have the opportunity to observe the allegedly false statement now while we're having this conversation.

MS. BOARDMAN:  Your Honor, in the falsity section, for example, of the exchange act claims, that starts in paragraph 136 of the amended complaint.  And we break out the numbers that the company disclosed in their third quarter 2020 press release.  And then we compare those numbers to the company's admission -- it's in the paragraph 57 in that chart -- but it's also broken out in the section of the complaint in paragraph 137.  So for example, in this quarter, the press release provided the number of active stores and agents.  And then based on the company's own admission, at least 3,731 of the stores, which breaks out to about 9.1 percent, were not active stores.  And that's based on the company's own admission.  And likewise, the number of agents on the company's platform, based on the company's admission, at

M8AGchiC

least 64,078 of those agents, which is approximately 15.5 percent.  That's certainly not just a rounding error or not active agents.  That's a huge number.  So we submit that these numbers are material.

And we also plead that the actual inflation is even greater, as found by Muddy Waters, it was more along the lines, as Muddy Waters found, 23 percent to 26 percent inflated.  So this is a very significant inflation.  And it's material to investors who are investing in this company based on the number of agents and stores on its platform, because there's a direct correlation between active agents and stores and the company's ability to generate revenues and gross transaction value.  If the stores and agents are not active, they're not completing transactions, and the company is not generating any revenue from that.

THE COURT:  Thank you.

You can proceed.

MS. BOARDMAN:  So that's one category of falsity, the agent and store count.  And that's really pretty clearcut.

And then the other category, as defense counsel mentioned, is the gross transaction value and the revenues. And as I just said, there's a direct correlation between the company's gross transaction value and revenues and the store and agent count.  Because gross transaction value, which represents the total value of real estate transactions

M8AGchiC

completed on the platform, is a direct function of the stores and agents who are actively using the platform. And then in terms of gross transaction value the company generates its reported revenues.

So Muddy Waters found, based on multiple data points, that the company was inflating its gross transaction value and revenues in at least the second and third quarter of 2021. So for the latter portion of our class period, we also have these allegations of inflated GTV and revenues. And Muddy Waters -- defense counsel can take issue with their methodology, and as we say in our letter, that is an issue of fact, weighing the evidence with respect to falsity, this is not the appropriate juncture for that to be done. What we need to plead at this juncture is plausibility. And Muddy Waters completed a comprehensive investigation using multiple data points that's set out in detail both in the amended complaint and in the Muddy Waters report that we attached to the complaint. That analysis included writing a computer program to capture platform data, speaking with multiple agents through its investigators who were on the ground in China, visiting physical stores and also examining SAIC and other local regulatory filings. So this is a multi-faceted investigation. It has indicia of reliability both because of the multiple data points and multiple investigatory strategies that Muddy Waters utilized and also because of the company's own admissions,

M8AGchiC

where the company about a month before the Muddy Waters report actually admitted that material portions of its stores and agents were inaccurate.  So that's another indicia of reliability that corroborates the Muddy Waters report.  So that's a separate category.

THE COURT:  Could I ask you to comment on that further.

What is it about the disclosures that we discussed earlier that corroborates, in your view, Muddy Waters' conclusions?  How did those correlate to the Muddy Waters finding?

MS. BOARDMAN:  So Muddy Waters began its on-the-ground investigation in China in the second quarter of 2021.  And they were doing fieldwork, they were speaking to agents.  And then all of a sudden, a year after going public, the company decides a month before the Muddy Waters report to suddenly start breaking out active stores and active agents.  So as we allege, that's a significant admission.  And this is exactly what Muddy Waters was investigating at that time.  And it's entirely possible that the company was trying to head off the Muddy Waters report.  And we explain that in our complaint.

The company essentially came out with this admission, and then mixed it with ostensibly favorable financial results that exceeded analysts' expectations.  And that sort of confused the issue.  And the market was happy that the company

was beating financial expectations.  So by doing that -- this is a common strategy for companies to sort of dribble out adverse information and bury it with positive information to try and prevent the stock from dropping.  But that doesn't change the fact that they made this material admission of the fact that they had substantial portions of inactive stores and agents.  And that was exactly what Muddy Waters was investigating at that very time.

And interestingly, an article that came out in July of 2022 after our amended complaint was filed quotes KE's general counsel as saying that the company actually anticipated the Muddy Waters report.

So I think that the fact that Muddy Waters was investigating them at the same time that the company came out with this admission a month before corroborates Muddy Waters' allegations.  And in fact shows that they were accurate, because the company has admitted to inflating stores and agents by listing inactive stores and agents.

So those are the two categories of falsity that we plead.  We also have claims under the securities act based on those false statements in the secondary offering documents.

And then with respect to the exchange act claims, we adequately plead scienter.  As I mentioned earlier, the fact that the company retroactively had these numbers of inactive stores and agents ready to go shows that they had

M8AGchiC

contemporaneous access to that data because it doesn't seem possible, let alone plausible that they could have reconstructed these numbers quarter by quarter going back to the third quarter of 2020.  So that shows that they contemporaneously knew these numbers of inactive stores and agents.

And then we also plead that the company's response to the Muddy Waters report also contributes to an inference of scienter.  The company came out and denied certain aspects of the Muddy Waters report, and they conducted an internal investigation.  But the company still to this date has not identified the international law firm or the big four accounting firm that conducted this investigation.  And even stranger and more obtusely, they haven't said anything about the findings of the internal investigation.

Ordinarily, when a company does an internal investigation that completely exonerates it, they're thrilled to publish the findings or at least provide some sort of details of that.  And here, there is nothing about what the internal investigation found.  They simply said, in a cursory manner, that the Muddy Waters allegations were not substantiated.  So that also contributes to scienter.

And then Muddy Waters also reported that shortly after the issuance of its report, KE Holdings had removed certain information from its platform that was the information that

M8AGchiC

Muddy Waters had used to arrive at some of its calculations. So that also contributes to scienter because it indicates that the company is trying to hide something.

And then there's also the fact that these metrics are key metrics for the company. Stores and agents and, obviously, GTV and revenue are key operating metrics that the company would have known about, would have been paying attention to. And that also underscores scienter.

And all of these facts together, we think, give rise to a strong inference of recklessness that defendants were misrepresenting key facts about the corporation. And the standard for recklessness under the *Novak* case is that the defendants knew or more importantly should have known that they were misrepresenting material facts. And that's exactly what we have here. We have a strong inference of scienter based on recklessness. And that's entirely sufficient to plead scienter. Our inference is more plausible than any opposing inference that defendants simply didn't know this. So we have adequately alleged scienter.

And then with respect to loss causation, we already went over that, but I'm happy to answer any additional questions.

And then defendants' final argument is only with respect to the securities act claims, which is that the lead plaintiff does not have standing or has not pleaded standing.

M8AGchiC

And I respectfully submit that under the case law in the Southern District, there is admittedly a few outlier cases, but the overwhelming majority of cases stand for the prospect that it's sufficient at the pleading stage to allege that the lead plaintiff purchased shares pursuant to, with respect to the 12(a)(2) claims, or traceable to, with respect to the Section 11 claims, the secondary offering documents.  And that's what we have alleged here.  We have a lead plaintiff that purchased on the offering date at the offering price, and that sufficiently pleads standing with respect to the securities act claims.

THE COURT:  Thank you.

Just a couple brief questions for defendant before I set a schedule for this.

First, counsel for defendant, let me hear briefly from you as to the standing argument.  Just as a brief note, the case that you pointed to in your letter was a summary judgment decision, not a motion to dismiss decision.

Why is the standing issue here something tht I can resolve on a motion to dismiss based on the allegations in the complaint?

MR. FUMERTON:  Well, your Honor, our position is they still need to allege facts demonstrating the standing.  And the one sentence essentially legal conclusion that they have standing isn't sufficient.  So the offering date, on the

M8AGchiC

offering price, without more, is insufficient under the *Puda* case that we cite.  And we don't think that procedural difference and posture matters here, given that there are no facts from which the Court can conclude they would have standing.

THE COURT:  Thank you.

I just want to seek your response to one argument made by counsel for plaintiffs in our discussion of the falsity issue.  I read into the comments that they believe that there's a duty to speak -- and there is -- and we looked at the large and active network language.  It may be that plaintiff is going to argue that having made a statement regarding the fact that the network is active, that there's an implied duty to state how active and that the failure to describe the detailed information regarding the degree of inactivity is an issue for the company.

Can I ask you to respond to that argument, which I understand they were going to make, based on the comments.

MR. FUMERTON:  Sure, your Honor.

And we think this is a critical point.  And I'm not sure if counsel misspoke, but the company never disclosed prior to Q3 2021 the specific number of active stores or agents.  That was never a disclosure that was made.  The only disclosure with a specific number was the total agents and stores.

And so we submit that the fact that the company

M8AGchiC

decided to provide additional, more specific information later just demonstrates the additional candor.  It can't demonstrate a false statement or scienter.

Your Honor, if you ask me how many cases I'm working on, and I say I have 20 cases, and I don't tell you that 18 are active right now and the other 2 don't have activity, that's not a false statement, much less a false statement that you can allege with particularity.  This definition of active versus inactive is not some GAAP definition, it's not some industry definition.  They don't allege any of that.  This is the company's own definitions.

And in fact, if you look at the Q3 2021 press release, which is a document certainly incorporated by reference in the complaint, the company outlines the standard for inactive agents.  And agents can become active.  An inactive agent, the company discloses, is they haven't attracted a new customer within the preceding 30 days, for example, right.  But that same agent can become active later.

So again, in terms of alleging a false statement, if the company had reported the total number, a specific number of active agents or stores before, prior to the Q3 2021 release, then we may be dealing with a different claim.  But they don't. And the only mention of active, as your Honor points out, prior to the Q3 2021 is this statement, we believe the large and active number of brands and their stores and agents contribute

M8AGchiC

significantly to the success of our platform.  Not only is that an Omnicare statement, which they don't plead, certainly, any facts demonstrating that the speaker didn't subjectively believe it, but again, their own allegation shows that we're talking about over 400,000 agents, over 40,000 stores, 90 percent of which are active.  The idea that an investor, a reasonable investor could conclude that that's a false or misleading statement we think just is not a plausible inference to draw.

Your Honor, if I could just respond briefly to loss causation too.

THE COURT:  Please do.

MR. FUMERTON:  Counsel pointed to the response to the report.  The response to the report, it can't be a corrective disclosure.  They don't allege any facts demonstrating what was in that response that revealed the falsity of any information.  The response to the report was the company explaining why the report was without merit.  So it's not clear to us how that could possibly constitute a corrective disclosure.

But in any event, if the Court looks at the stock price after the response to the report, it rebounded again to $19, higher than the 18.68 which was the closing price prior to the issuance of the pre-market report.

So again, we don't think there's any facts on this complaint where the Court can conclude that they have

M8AGchiC

adequately pled loss causation.

THE COURT:  Thank you very much.

So let's talk about the schedule for briefing this motion.  Counsel for defendant, when would you propose to file your motion?

MR. FUMERTON:  Your Honor, we would propose a 45-day -- or 44 days, given the calendar -- with 45 days to oppose and 30 days to reply.  And I can give you those dates if that's acceptable to your Honor.

MS. BOARDMAN:  Your Honor, so defendants' motion is currently due under the schedule on August 16th.  So that's provided them with 60 days from the filing of our amended complaint.  So if defendants are seeking additional time to file their motion, we would just ask that we get a commensurate amount of time to file our opposition.

THE COURT:  I will just note, I don't have the document up now, but it's my custom not to set a schedule before these conferences, so let's work from a blank slate.

Counsel for defendant, what, again, is your proposal?

MR. FUMERTON:  Your Honor, our proposal would be Friday, September 23, which is 44 days from today.  And if counsel wants more than 45 days to respond, that's fine with us.  And then we would just request 30 days to reply.

THE COURT:  Thank you.

Counsel for plaintiff, how do you view that proposal?

M8AGchiC

MS. BOARDMAN:  Mr. Fumerton, do you have the date of what would be 45 days from September 23rd?

MR. FUMERTON:  I do.

Your Honor, 45 days from September 23rd is Monday, November 7th, which with 30 days for reply would put our reply at Wednesday, December 7th.

MS. BOARDMAN:  We're fine with 45 days for the opp.

THE COURT:  Thank you.

I'm happy to adopt the briefing schedule as suggested by the parties.  The motion itself will be due on September 23.  Any opposition will be due no later than 45 days following the date of service of the motion.  And any reply will be due no later than 30 days following the filing of the opposition.  I'll issue a short order laying out that briefing schedule.

Anything else that we should take up here before we adjourn?  First, counsel for plaintiffs.

MS. BOARDMAN:  Nothing further, your Honor.

THE COURT:  Thank you.

Counsel for defendants.

MR. FUMERTON:  Nothing from defendants, your Honor.  Thank you very much.

THE COURT:  Thank you all.  This proceeding is adjourned.

(Adjourned)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300