UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

KEITH CHIN, Individually and on Behalf of   :   Civil Action No. 1:21-cv-11196-GHW
All Others Similarly Situated,              :
                                            :
                            Plaintiff,      :   LEAD PLAINTIFF'S MEMORANDUM OF
                                            :   LAW IN OPPOSITION TO DEFENDANTS'
                                            :   JOINT MOTION TO DISMISS THE
            vs.                             :   AMENDED COMPLAINT
                                            :
KE HOLDINGS INC., PENG YONGDONG,            :
XU TAO, SHAN YIGANG, BAO FAN, LI            :
ZHAOHUI, CHEN XIAOHONG, COLLEEN             :
A. DE VRIES, GOLDMAN SACHS (ASIA)           :
L.L.C., MORGAN STANLEY & CO. LLC,           :
J.P. MORGAN SECURITIES LLC, CHINA           :
RENAISSANCE SECURITIES (HONG                :
KONG) LIMITED, GOLDMAN SACHS &              :
CO. LLC and CHINA RENAISSANCE               :
SECURITIES (US) INC.,                       :
                                            :
                            Defendants.     :
                                            :
—————————————————————————— x

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................................1

II.     FACTUAL BACKGROUND................................................................................................2

III.    ARGUMENT.......................................................................................................................5

        A.      The Securities Act Claims Need Only Satisfy Rule 8, But They Also
                Satisfy Rule 9(b) – Which Does Not Add a Scienter Requirement........................6

        B.      Defendants' Failure to Disclose Inactive Stores and Agents Rendered
                Their Statements Materially False and Misleading ................................................7

        C.      The AC Properly Relies on the Muddy Waters Report .........................................11

        D.      Defendants' Merits-Based Attacks on The Muddy Waters Report Do Not
                Constitute a Pleading Failure by Plaintiff..............................................................14

        E.      The AC's Allegations Give Rise to a Strong Inference of Scienter ......................20

        F.      The AC Adequately Pleads Loss Causation ..........................................................23

        G.      Plaintiff Has Adequately Alleged Securities Act Standing ..................................25

II.     CONCLUSION..................................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)..................................................................................................24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .................................................................................................5

*Caiafa v. Sea Containers Ltd.*,
2008 WL 11516813 (S.D.N.Y. May 15, 2008) ...................................................................7

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009) ...........................................................................................7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014).................................................................................................24

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ...........................................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014).................................................................................................7

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y Jan. 26, 2009) .........................................................................7

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................................23

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015).................................................................................................15

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)..................................................................................21

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)..................................................................................6

*Henning v. Orient Paper, Inc.*,
2011 WL 2909322 (C.D. Cal. July 20, 2011).......................................................................11

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)..................................................................................14

**Page**

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).........................................................................21

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  2022 WL 2872671 (E.D.N.Y. July 21, 2022)...........................................................................7

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005)....................................................................................25

*In re eHealth Inc. Sec. Litig.*,
  2021 WL 5855864 (N.D. Cal. Aug. 12, 2021) ........................................................................11

*In re Hebron Tech. Sec. Litig.*,
  2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)..........................................................................11

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................................22

*In re Lehman Bros. Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011).....................................................................................10

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .......................................................11, 14, 15, 22

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010).....................................................................................24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................................25

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
  988 F. Supp. 2d 406 (S.D.N.Y. 2013).....................................................................................11

*In re NIO, Inc. Sec. Litig.*,
  2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)...........................................................................6

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)....................................................................21, 25

*In re Puda Coal Sec. Inc. Litig.*,
  2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013)............................................................................25

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................................................6

**Page**

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................................22

*In re Sanofi Sec. Litig.*,
    2015 WL 365702 (S.D.N.Y. Jan. 28, 2015) ...................................................................7

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).............................................................................................11

*In re Scot. Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................20, 22, 23

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)........................................................................14, 20

*In re SLM Corp. Sec. Litig.*,
    2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ................................................................10

*In re Supreme Indus., Inc. Sec. Litig.*,
    2019 WL 1436022 (N.D. Ind. Mar. 29, 2019)..............................................................9

*In re VimpelCom, Ltd.*,
    2016 WL 5390902 (S.D.N.Y. Sept. 26, 2016)............................................................23

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).........................................................................6

*In re XL Fleet Corp. Sec. Litig.*,
    2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)....................................................11, 15, 16

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ...............................................................................8, 22

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).............................................................................................20

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)..................................................................................15, 25

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
    528 F. Supp. 3d 192 (S.D.N.Y. 2021)........................................................................5

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ...........................................................................11, 24

**Page**

*Lewy v. SkyPeople Fruit Juice, Inc.*,
 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)................................................................6, 13, 15

*Longo v. OSI Sys., Inc.*,
 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)..............................................................................11

*McIntire v. China MediaExpress Holdings, Inc.*,
 927 F. Supp. 2d 105 (S.D.N.Y. 2013)...............................................................................2, 11, 14

*McKenna v. Smart Techs. Inc.*,
 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)..................................................................................7

*Meyer v. JinkoSolar Holdings Co.*,
 761 F.3d 245 (2d Cir. 2014)......................................................................................................8, 9

*Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................................14, 15

*Micholle v. Ophthotech Corp.*,
 2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019).............................................................................10

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
 709 F.3d 109 (2d Cir. 2013)..........................................................................................................6

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000).........................................................................................11, 21, 23

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
 681 F.3d 114 (2d Cir. 2012)..........................................................................................................7

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)..............................................................................9

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..........................................................................9, 10

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)......................................................................................................6, 7

*Set Cap. LLC v. Credit Suisse Grp. AG*,
 996 F.3d 64 (2d Cir. 2021)............................................................................................................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007).....................................................................................................................20

**Page**

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)......................................................................................7

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013).....................................................................20

*Xiang v. Inovalon Holdings, Inc.*,
    254 F. Supp. 3d 635 (S.D.N.Y. 2017)......................................................................25

*Yaroni v. Pintec Tech. Holdings Ltd.*,
    2022 WL 1215450 (S.D.N.Y. Apr. 25, 2022)...........................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k...................................................................................................................7, 25
    §77l(a)(2) ...........................................................................................................7, 25

Federal Rules Of Civil Procudure
    Rule 8 ...............................................................................................................6, 23
    Rule 9(B)........................................................................................................5, 6, 7

28 U.S.C.
    §2072(b).................................................................................................................7

Private Securities Litigation Reform Act of 1995 ("PSLRA")
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..................................................................5

## I.    INTRODUCTION[1]

KE Holdings Inc. ("KE") operates a platform that facilitates real estate transactions in China. Because KE generates revenues from housing transactions completed on its platform, its business is entirely dependent upon the numbers of brokerage stores and agents actively using the platform. Fifteen months after going public, on November 8, 2021, KE announced its results for 3Q21, and revealed that significant portions of the stores and agents that it had previously reported each quarter were *not* actively using its platform – admitting that its agent metrics had been inflated by as much as 15.5%, and its store metrics had been inflated by as much as 9.1%.  ¶¶53, 57.

Not coincidentally, at this time, KE was being investigated by Muddy Waters, a research firm that has successfully exposed fraud at a number of companies.  It was also facing a slowdown in China's real estate market.  ¶¶8, 60.  By mixing its admission with positive results, KE staved off a stock drop, and was able to continue concealing that its store and agent numbers were even more inflated than it had admitted – including because KE was counting stores and agents that did not even exist.  KE's inflated store and agent numbers, in turn, provided cover for the inflated gross transaction values ("GTV") and revenues that it reported in 2Q21 and 3Q21 – which enabled KE to portray a façade of success despite the market slowdown.  Five weeks later, Muddy Waters published its Report, which set out well-documented and corroborated support for its finding that KE's store and agent numbers were inflated by stores and agents that existed only on the platform, but not in reality.  Based on its detailed and thoroughly-explained analysis of KE's platform data, Muddy Waters also determined that KE's GTV was inflated by 75% in 2Q21 and 51% in 3Q21, and that its revenues were inflated by 88% in 2Q21 and 63% in 3Q21.  ¶11.

---

[1] Capitalized terms not defined herein are as defined in the Amended Complaint (the "AC," cited as "¶__"; ECF 51). "MTD" refers to Defendants' Memorandum of Law in Support of Their Joint Motion to Dismiss (ECF 84).  "Def. Ex. __" refers to exhibits to the declaration of Robert A. Fumerton (ECF 85).  "Pl. Ex. __" refers to exhibits to the declaration of Erin W. Boardman, submitted herewith.  Emphasis in quotations is added and citations are omitted.

The AC relies on the Report for a portion of its allegations, but it also relies on KE's admission to having inflated its reported store and agent numbers each quarter during the Class Period until 3Q21. The inclusion of stores and agents that were not actually *on* KE's platform because they were not *using* the platform during the quarters that they had been counted made KE's reported numbers false, or at the very least, incomplete and misleading. The balance of Defendants' motion presents a straightforward question – whether Muddy Waters sufficiently "point[s] to circumstances that . . . render [Plaintiff's] claims plausible." *McIntire v. China MediaExpress Holdings, Inc*., 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013). Because the Court should answer that question in the affirmative, and for all of the reasons below, Defendants' motion should be denied.

## II.    FACTUAL BACKGROUND

KE operates an "integrated online and offline" real estate brokerage platform that facilitates housing transactions in China, including new and existing home sales, rentals, renovation, and financing. ¶¶2, 20, 34. The brokerages on its platform consist of both company-owned and third-party brokerages, including franchise and "connected" stores (which pay fees to use KE's platform and/or brand names). ¶35. KE has grown by leveraging its online platform and its network of brick-and-mortar stores – which provide a key "competitive advantage." ¶¶2, 36, 148, 218.

KE primarily generates revenues from commissions and fees for housing transactions. ¶¶3, 38-39. Its profitability is therefore driven by the number of brokerage stores and agents actively using its platform. ¶¶3, 41. KE considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric[]." ¶¶3, 41, 150, 161, 220. Another "key operating metric" is GTV, which represents the total value of all transactions facilitated on the platform. *Id*.

KE conducted an IPO on the NYSE on August 13, 2020, selling its ADSs at $20. ¶¶4, 20, 45-46. On November 16, 2020 – the start of the Class Period – KE announced its financial results for 3Q20 (its first quarter as a public company), and announced that it planned to conduct a secondary

public offering ("SPO"). ¶¶4, 47-48.  To effectuate the SPO, KE filed registration statements and a prospectus (the "SPO Documents").  ¶¶48-49.  With the assistance of the Underwriter Defendants, KE completed the SPO on November 19, 2020, selling its ADSs at $58.  ¶¶32, 49-50.  The IPO and the SPO each raised more than $2.3 billion in proceeds.  ¶¶4, 46-47, 50.

Once public, KE reported several quarters of positive results that exceeded its guidance and analysts' expectations – including increased numbers of stores and agents on its platform, and corresponding growth in GTV and revenues.  ¶¶5, 51.  Then, in 2Q21, the residential real estate market in China began to experience a slowdown in growth, due in part to increased regulation.  ¶¶5, 52.  Unbeknownst to investors, however, by reporting inflated GTV and revenues – and using inflated agent and store counts to justify those numbers – KE was able to once again exceed its quarterly guidance and analysts' expectations, reporting a net revenue increase of 20% y-o-y.  *Id*.

On November 8, 2021, KE announced its financial results for 3Q21, and revealed that significant portions of the stores and agents on its platform were *inactive*.  ¶¶6, 53.  For the first time, KE provided both the numbers of stores and agents, and the numbers of "active" stores and agents.  *Id*.  KE admitted that for 3Q21, 4,478 of the stores on its platform – 9.1% – were not "active," and 47,472 of the agents on its platform – 10.1% – were not "active."  ¶¶53, 55.  KE also retroactively disclosed the numbers of "active" stores and agents on its platform for each quarter since the IPO – thus admitting that its previously-reported numbers were overstated, as follows:

|                  | 3Q20    | 4Q20    | 1Q21    | 2Q21   |
|------------------|---------|---------|---------|--------|
| **Inactive Agents** | 64,078  | 47,650  | 49,116  | 48,910 |
| **% Overstated**    | 15.488% | 10.697% | 10.247% | 9.788% |
| **Inactive Stores** | 3,731   | 3,510   | 3,780   | 3,822  |
| **% Overstated**    | 9.066%  | 8.081%  | 8.412%  | 7.793% |

¶¶56-57.  These purported disclosures obscured KE's continued inflation of its store and agent counts.  ¶¶7, 59.  This, in turn, provided justification for the inflated GTV and revenues it reported in 3Q21 – allowing KE to report that although net revenues had decreased, it had once again exceeded

its guidance and analysts' expectations, despite a market downturn. ¶¶8, 60.  KE's scheme enabled

it to blunt the impact of its admission and maintain the artificial inflation in its share price.  ¶¶8, 61.

On December 16, 2021, before the markets opened, Muddy Waters – known for exposing

fraud at Chinese companies – published a detailed report on KE.  ¶¶9, 62, 178.  Describing KE as a

"real business with significant amounts of fraud," Muddy Waters explained that it had conducted a

comprehensive investigation – consisting of an analysis of data collected from KE's platform, as

well as field work in multiple cities that included site visits to brokerage stores – and had "found

massive discrepancies between the transaction volumes, store count[s] and agent count[s] reported to

investors" and the results of its investigation.  ¶¶9, 11, 62-63, 178.

Muddy Waters revealed that the reported numbers of stores and agents on KE's platform

were even more significantly inflated than KE had admitted in the 3Q21 press release.  ¶10.  Based

on its analysis of platform data, Muddy Waters estimated that in 2Q21, KE's reported store count

was inflated by 23%, and its reported agent count was inflated by 26%.  ¶¶10, 64-65, 109-110.

Muddy Waters detailed how its field work uncovered substantial evidence of nonexistent stores –

including what it labeled "ghost" stores (stores listed on the platform that did not exist) and "clone"

stores (multiple stores listed on the platform that were actually one store) – as well as inflated agent

counts.  ¶¶10, 66-121.  The Report concluded that, in truth, "far fewer stores and agents use the

platform (or even exist) than [KE] claims."  ¶¶10, 63.  The Report also revealed evidence that KE

had inflated its reported: (i) GTV of new home transactions by 126% during 2Q21 and 3Q21

combined; (ii) GTV of existing home transactions by 33% during 2Q21 and 3Q21 combined; (iii)

GTV of new and existing home transactions combined by 75% in 2Q21; and (iv) GTV of new and

existing home transactions combined by 51% in 3Q21.  ¶¶11, 127, 129, 131.  Muddy Waters also

found that KE had inflated its reported revenues from new and existing home transactions by 88% in

2Q21, and by 63% in 3Q21 – amounting to 77% inflation during 2Q21 and 3Q21 combined.  ¶¶11, 135; ECF 51-1 ("AC Ex. A") at 10-11.[2]

In response to the Report, KE's ADSs fell 4.47%, from a closing price of $18.68 on December 15, 2021, to an opening price of $17.96 on December 16, 2021.  ¶¶12, 180.  KE's share price declined further that day, trading as low as $17.72 – a total decline of 5.74% from the closing price on December 15, 2021.  *Id*.  The price of the KE's ADSs fell again on December 20, 2021, to close at $17.31, after KE issued an incomplete response to the Report, which failed to alleviate investors' concerns.  ¶¶13, 181-182.  For example, KE did not attempt to address Muddy Waters' evidence of ghost stores and clone stores.  ¶181.  KE also announced an "internal review" and promised to "provide updates . . . when appropriate."  ¶¶14, 182.  Six weeks later, however, KE declared that the review was "substantially complete" and "the allegations in the . . . Report were not substantiated" – but did not provide any support, and did not even name the "international law firm" or "forensic accounting experts" involved in the review.  ¶¶14, 183.  To date, it still has not done so.

## III.   ARGUMENT

In deciding a motion to dismiss, the court must "'accept[] as true all factual claims in the complaint and draw[] all reasonable inferences in the plaintiff's favor.'"  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021).  "[T]he Court's task is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered'" later.  *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 200 (S.D.N.Y. 2021).  Although claims under the Exchange Act are subject to the particularity requirements of Rule 9(b), and to the PSLRA, courts "'must be careful not to mistake heightened pleading standards for impossible ones.'"  *Qihoo 360 Tech*, 19 F.4th at 150.

---

[2] Due to an apparent computer glitch, the text of ¶135 (summarizing AC Ex. A at 10-11) was omitted from the filed version of the AC, as was the text of ¶97 (summarizing AC Ex. A at 26-27), ¶101 (summarizing AC Ex. A at 28), the last line of ¶131 (summarizing AC Ex. A at 7), and ¶133 (summarizing AC Ex. A at 10).

A.    **The Securities Act Claims Need Only Satisfy Rule 8, But They Also Satisfy Rule 9(b) – Which Does Not Add a Scienter Requirement**

Although Securities Act claims ordinarily are "'subject only to . . . [Rule] 8(a),'" *N.J. Carpenters*, 709 F.3d at 120, Defendants contend that the AC's claims must satisfy Rule 9(b) "because they 'sound in fraud.'"  MTD at 9; *see Rombach v. Chang*, 355 F.3d 164, 170, 172 (2d Cir. 2004).  But Plaintiff has appropriately exercised its "right to plead in the alternative that defendants violated provisions" of the securities laws "requiring only negligence."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007).[3]  The AC: (1) goes beyond "'a blanket disclaimer'" of fraud; (2) avoids "classic fraud language"; (3) provides a "basis for the claims that is non-fraudulent"; and (4) "separate[s] the factual allegations supporting the fraud claims and negligence claims[.]"  *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021).

In addition to "expressly disclaim[ing] any allegation or inference of fraud or scienter" in connection with the Securities Act claims (¶¶207, 243, 254, 261), the AC addresses those claims in a separate section (¶¶207-221) that avoids fraud-based language – instead alleging that the SPO Documents "were negligently prepared" (¶208), and premising falsity on "Defendants' negligent failure to disclose" omitted facts.  *E.g.*, ¶213.  While "overlapping conduct forms the basis for both" sets of claims, the claims "are analytically distinct[.]"  *NIO*, 2021 WL 3566300, at *5.  Any fraud-based language in the background sections of the AC pertains to allegations that post-date the SPO.  *E.g.*, ¶¶5-8, 51-61.  But even if Rule 9(b) did apply, the AC satisfies those pleading requirements, and Defendants do not challenge the particularity of Plaintiff's Securities Act claims.[4]

Instead, Defendants incorrectly argue that the application of Rule 9(b) to Securities Act

---

[3] *See also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (same); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374-75 (S.D.N.Y. 2011) (alleging a "massive fraud" . . . "does not strip Plaintiffs of the right to plead negligence in the alternative").  A contrary rule would create an "incentive to file separate actions."  *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *8 (S.D.N.Y. Sept. 10, 2012).

[4] The AC: (1) specifies the statements Plaintiff contends were false or misleading (¶¶209, 211, 212, 214, 216, 218, 220); (2) identifies the speakers (¶¶21-25); (3) states where and when the statements were made (¶¶47-49); and (4) explains why the statements were false or misleading (¶¶210, 213, 215, 217, 219, 221).  *See Rombach*, 355 F.3d at 170.

claims imposes an additional substantive element – scienter – on those claims.  MTD at 20-21.

While Securities Act "[c]laims that sound in fraud must satisfy the heightened pleading requirements

of Rule 9(b), . . . that Rule *does not add substantive elements such as scienter* to any claim."  *In re*

*Sanofi Sec. Litig.*, 2015 WL 365702, at *13 n.8 (S.D.N.Y. Jan. 28, 2015), *aff'd sub nom.*, *Tongue v.*

*Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  In fact, the Second Circuit has repeatedly underscored that

scienter is not an element of a §11 or §12(a)(2) claim.[5]  Rule 9(b) itself allows state of mind to "be

alleged generally."  Reading Rule 9(b) to add a scienter requirement to Securities Act claims would

also violate the Rules Enabling Act, which provides that the Federal Rules of Civil Procedure "shall

not abridge, enlarge or modify any substantive right."  28 U.S.C. §2072(b).[6]

### B.    Defendants' Failure to Disclose Inactive Stores and Agents Rendered Their Statements Materially False and Misleading

Based upon KE's own admissions in the 3Q21 press release, the AC alleges that the numbers

of stores and agents reported in the SPO Documents and during the Class Period were materially

false and misleading because they included significant numbers of inactive stores and agents.  *See*

¶¶136-137 (3Q20 press release reporting "44,883" stores and "477,810" agents "as of September 30,

2020" was false because 3,731 stores (9.1%) and 64,078 agents (15.5%) were inactive); ¶¶139, 209

(stores and agents in SPO Documents); ¶¶152-153 (stores and agents in 4Q20 press release); ¶154

(stores and agents in 2020 20-F); ¶¶163-164 (stores and agents in 1Q21 press release); ¶¶165-166

(stores and agents in 2Q21 press release).

---

[5] *See, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84 (2d Cir. 2021); *Tongue*, 816 F.3d at 209; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

[6] *See McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *21 (S.D.N.Y. Apr. 3, 2012) ("[P]rocedural rules cannot eviscerate substantive law . . . . The Securities Act is a strict liability statute . . . and does not . . . require . . . scienter."). Defendants cite three opinions from this District stating that Rule 9(b) imposes a scienter requirement on Securities Act claims.  MTD at 20 & n.7.  In *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at *5 (S.D.N.Y. May 15, 2008), the plaintiffs incorrectly "acknowledge[d]" a scienter requirement.  The Second Circuit affirmed, in a summary order, because the §11 claim failed to satisfy Rule 9(b)'s "particularity" requirements – and did not mention scienter.  331 F. App'x 14, 16 (2d Cir. 2009).  In *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *16 (S.D.N.Y Jan. 26, 2009), the court assumed that *Rombach* imposed a scienter requirement.  *In re Chembio Diagnostics, Inc. Securities Litigation*, 2022 WL 2872671, at *7 (E.D.N.Y. July 21, 2022) relies upon a misreading of *Rombach* and Rule 9(b).

Defendants do not dispute that these figures are material.  Instead, they contend that KE had no duty to disclose that its reported store and agent counts included inactive stores and agents because the reported metrics "were not materially misleading without" that information.  MTD at 10. But KE's reported numbers of stores and agents were *simply false* because they were overstated. Indeed, the inactive stores and agents included in KE's reported metrics were not actually "*on* [KE's] platform" (¶¶139, 154, 209) in the ordinary meaning of the word.  Likewise, the plain import of KE's statements reporting its "[n]umber of stores" and "[n]umber of agents" "as of" the end of each quarter (¶¶136, 152, 163, 165) was that the reported numbers of stores and agents were *actually using* KE's platform *at that time.*  The nonexistent "ghost" and "clone" stores and fake agents found by Muddy Waters certainly were not "on" KE's platform.  *See* ¶¶64-102; ¶¶107-121.[7]

While Defendants suggest that KE's reported store and agent counts were technically true because they never claimed that "all agents and stores were 'active'" (MTD at 11), those numbers were, at the very least, materially misleading.  *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1251 (10th Cir. 2022) (statement that company had "'about 250' quota-bearing sales representatives" when it actually had "'about 200'" "was at least misleading even if not literally false").  No reasonable investor would have understood that KE's counts included large numbers of stores that had "not facilitated any housing transaction during the preceding 60 days" or agents who had "not participated in facilitating any housing transaction during the preceding three months" – *i.e.*, the *entire quarter* for which KE was reporting results.  ¶¶54-55.  *See Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("technically true" descriptions of pollution-prevention measures were misleading if they "were then failing to prevent substantial violations").

Defendants cannot report materially inflated key operating metrics, and then claim that they

---

[7] Defendants do not even attempt to argue that KE's store and agent counts were non-misleading despite the inclusion of *nonexistent* stores and agents.  And as discussed below, their attacks on the veracity of this allegation are without merit.

had no duty to disclose that those metrics were inflated. "'[U]pon choosing to speak'" about those key metrics, Defendants assumed "'a duty to be both accurate and complete.'" *Id.* at 250. The exclusion of inactive stores and agents rendered KE's reported numbers inaccurate *and* incomplete.[8]

Defendants' disclosure duty was amplified by their statements repeatedly tying KE's success to the size and active nature of its store and agent network. *See* ¶¶141, 156, 211 (GTV and revenues are "affected by *the number* of . . . stores and agents on [its] platform *and their activity level*"); ¶¶142, 157, 212 (KE's "*large and active* network of . . . stores and agents contributes significantly to the success of [its] platform"); ¶¶144, 159, 214 (highlighting KE's "growing network of . . . stores and agents that *transact actively* on [its] platform" and its "*proactive engagement* with platform participants both online and offline"); ¶¶146, 216 (identifying "the *numbers of . . . stores and agents* on [KE's] platform" as "*crucial indicators of [its] operations*" and describing the "[s]cale and quality of [its] agent and store network" as "*[k]ey [s]uccess [f]actors*"); ¶¶148, 218 (characterizing KE's "offline stores" as its "*competitive advantage*"). "Because Defendants specifically cited" the size and active nature of KE's network "as a source of [] success, they were obligated to 'to tell the whole truth'. . . by disclosing that" KE's network included significant numbers of inactive stores and agents. *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020); *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *13 (S.D.N.Y. Sept. 27, 2020) ("bullish statements . . . create[d] a disclosure requirement").

Considered in "'context'" – as they must be – these statements also are not puffery. *Davis*, 2020 WL 1877821, at *10. MTD at 11-12. First, statements such as those highlighting "the *number* of . . . stores and agents on [KE's] platform and their *activity level*" (¶¶141, 156, 211) were

---

[8] Thus, Defendants' failure to disclose that KE's key operating metrics were inflated by inactive and nonexistent stores and agents is not akin to omitting a detail that was consistent with their statements or immaterial. *Yaroni v. Pintec Tech. Holdings Ltd.*, 2022 WL 1215450, at *10 (S.D.N.Y. Apr. 25, 2022) (accounting treatment did not affect financials); *In re Supreme Indus., Inc. Sec. Litig.*, 2019 WL 1436022, at *3 (N.D. Ind. Mar. 29, 2019) (backlog detail). MTD at 11-12.

quantified by hard numbers that were inflated by the inclusion of inactive stores and agents.  *E.g.*, ¶¶139, 209.  Second, they "relate[d] to aspects of" KE's business "that [were] touted as sources of its success."  *Davis*, 2020 WL 1877821, at *10 (company's brand was a source of success, so statement that "brand reputation was improving, when . . . it was [allegedly] deteriorating" was not puffery).

Defendants' argument that they disclosed "low activity level[s] for a certain period of time in . . . 2020 due to the COVID-19 pandemic" (MTD at 5, 11) does not withstand scrutiny, because the cited passage actually discussed KE's *rebound* from the pandemic by the start of the Class Period, in 3Q20.  Def. Ex. B at 103.  It explained that following a y-o-y revenue decrease in 1Q20, KE experienced a "V-shaped" rebound in 2Q20 and 3Q20 "after *business activities resumed and demand was released*."  *Id*.  It further explained that "the substantial growth in the number of . . . stores and agents on our platform . . . *more than offset the negative impact of the COVID-19 pandemic*."  *Id*.; *see also* Def. Ex. C at 106; Def. Ex. L at 99 (similar).  Statements in the same documents emphasizing KE's "active network of agents [and] brokerage stores" (¶¶142, 157, 212) "diminishe[d] the impact of" this innocuous discussion of a situation that had passed.  *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *13 (S.D.N.Y. Sept. 17, 2019); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 314 (S.D.N.Y. 2011) ("[A] misleading statement displayed prominently and in numerous places may not be cured by inconspicuous and scattered warnings.").

To the extent Defendants argue that the inclusion of inactive stores and agents was immaterial because KE's share price did not decline following the 3Q21 press release, they ignore that "materiality . . . is not determined by a single factor such as price impact, but must take into account all the relevant circumstances in a particular case."  *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012).  The AC explains that KE maintained the artificial inflation in its share price by pairing this admission with an announcement that it had exceeded its guidance –

while continuing to conceal the full extent of its overstatement of stores and agents.  ¶¶8, 60-61.

### C.    The AC Properly Relies on the Muddy Waters Report

"'The majority of courts . . . have held that a short-seller report, such as the Muddy Waters Report . . . does not implicate the same skepticism as a traditional anonymous source.'"  *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022).  Thus, courts have credited allegations attributed to short-seller reports where they have "indicia of reliability" (*id.*) – such as "where facts are cited that tend to substantiate the[] allegations or reveal the basis for the short-seller's factual assertions[.]"  *In re Hebron Tech. Sec. Litig.*, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021).[9]

KE's admissions in the 3Q21 press release that material numbers of its previously-reported stores and agents were not actively using the platform (¶¶53-57), supply strong indicia of reliability for Muddy Waters' conclusion that "far fewer stores and agents use the platform (or even exist) than [KE] claims." ¶¶10, 63.  *See XL Fleet*, 2022 WL 493629, at *5 ("claims in the [Muddy Waters] report that [the company] admitted were true or did not deny" provided sufficient "indicia of reliability").  Faced with those admissions, Defendants resort to scattershot attacks on the Report and demand a level of detail and comprehensiveness that is neither possible nor required.  MTD at 12-17. However, reliance on a short-seller report does not alter the rule that a plaintiff need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but merely sufficient facts "to support a reasonable belief" that defendants' statements were false or misleading.  *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  Plaintiff has done so here.

---

[9] *See also In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("[C]ourts in this district frequently accept allegations based on short-seller reports at" the pleading stage).  Numerous courts have credited Muddy Waters' research. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20 (2d Cir. 2020); *XL Fleet*, 2022 WL 493629; *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406 (S.D.N.Y. 2013); *McIntire*, 927 F. Supp. 2d at 124 (contention that Muddy Waters is unreliable due to its short position "has been repeatedly rejected"); *In re eHealth Inc. Sec. Litig.*, 2021 WL 5855864 (N.D. Cal. Aug. 12, 2021); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322 (C.D. Cal. July 20, 2011).

The AC and the Report both detail the basis for the allegation that for 2Q21, KE's reported store count was inflated by at least 23%, and its reported agent count was inflated by at least 26% (¶¶64-65, 109-110) – as compared to KE's admission that 7.8% of its previously-reported stores and 9.8% of its previously-reported agents were inactive in 2Q21. ¶57. The AC explains that Muddy Waters arrived at these percentages by developing a computer program to capture the transaction data on KE's platform, and comparing the numbers found through this data collection to the numbers reported in KE's 2Q21 press release. ¶¶64-65, 109-110; *see also* AC Ex. A at 47-71 (detailing data collection methods). Muddy Waters further corroborated its findings through:

- site visits by investigators in "seven cities" in China that were "important markets" for KE, to numerous specific store locations listed on KE's platform (¶¶67, 69-80, 84-85, 94-102);

- speaking to store agents and managers (¶¶67, 72, 75, 77, 85, 118);

- analyzing platform data for "seven cities" to identify "probable clone stores" that were listed as separate stores on KE's platform but occupied the same location (¶¶86-89);

- conducting a "case study" of brokerage stores in the city of Sanhe Langfang that included comparing "SAIC data . . . with the results of physical site visits" (¶92); and

- comparing agent numbers in Shanghai and Beijing that KE reported in its 2020 20-F against SAIC data, which reflected mandatory reporting of employee headcounts (¶¶116-121).

And although Plaintiff is not required to plead evidence, the AC cites a multitude of evidence found by Muddy Waters showing the prevalence of "ghost" and "clone" stores:

- ¶¶69-70 (abandoned "ghost" store);

- ¶¶71-72 (closed store with a "for lease" sign in September 2021, that still appeared on KE's platform with active property listings in December 2021);

- ¶¶73-75 ("closed store front," and a single store accounting for two active ones on platform);

- ¶¶76-81 (one store where two were displayed on KE's platform with different agents);

- ¶¶84-85 (two separate stores on the platform were actually a single store);

- ¶¶87-88 (data collection finding 61 stores on the platform occupied 27 locations in Xiamen, 5 stores occupied 2 locations in Xaikou, 62 stores occupied 31 locations in Dalian, 256 stores occupied 124 locations in Beijing, and 38 stores occupied 19 locations in Nanjiang);

- ¶¶91-92 (evidence "that branch store registrations were being created on paper and filed with . . . local SAIC" offices, "but no physical [store] was being maintained" included SAIC data

showing 51 brokerage stores in Sanhe Langfang, while Muddy Waters was "only able to confirm the existence of 32" of the stores);

- ¶¶94-95 (7 stores with current SAIC registrations, with near-identical addresses "on the same street," established "at the same time" by "the same legal representative," but one store);

- ¶¶98-100 (two stores registered on the same street, but only one physical store);

- ¶102 (restaurant at address where brokerage store was registered); and

- ¶¶103-106 (two instances of less profitable franchised brokerage at addresses where company-owned brokerages were registered with the SAIC).

Muddy Waters' investigative efforts are explained and documented by photographs and screenshots. ¶¶70, 71, 74, 77, 79, 97, 102. *See Lewy*, 2012 WL 3957916, at \*14 (allegations from short-seller adequately pled falsity where "the bases for the investigators['] findings are set forth in detail, including visits to stores and production facilities, with accompanying photographs").

Likewise, the AC cites significant evidence uncovered by Muddy Waters that KE was inflating its reported agent counts. *See* ¶¶111-113 (KE's platform showed 2,050 agents at a brokerage subsidiary in city of Nanchang, but local real estate agent registry showed only 1,307 agents); ¶114 (KE's platform showed that a store had 12 agents, but the local agent registry showed three of those agents had left the brokerage); ¶¶117-119 (KE's 2020 20-F reported approximately 21,000 agents in Shanghai as of December 31, 2020, but annual SAIC filings for KE's Shanghai subsidiaries and other businesses showed a total of 10,197 employees); ¶¶120-121 (KE's 2020 20-F reported approximately "27,000 agents" in Beijing as of December 31, 2020, but SAIC filings for KE's Beijing subsidiaries and other businesses showed a total of 14,236 employees).

Finally, the AC details the basis for Muddy Waters' findings that KE had overstated its GTV and revenues during 2Q21 and 3Q21. *See* ¶¶124-127 (new home GTV was inflated by 126% in 2Q21 and 3Q21 combined); ¶¶128-129 (existing home GTV was inflated by 33% in 2Q21 and 3Q21 combined); ¶¶130-131 (combined GTV was inflated by 75% in 2Q21 and by 51% in 3Q21); ¶¶132-135; AC Ex. A at 10-11 (revenues from new and existing home transactions were inflated by 88% in

- 13 -

2Q21, and by 63% in 3Q21 – or 77% combined).  Given the other indicia of reliability, "[t]hese discrepancies provide an adequate basis for Plaintiff['s] claim."  *McIntire*, 927 F. Supp. 2d at 125.[10]

### D.    Defendants' Merits-Based Attacks on The Muddy Waters Report Do Not Constitute a Pleading Failure by Plaintiff

Defendants' attacks on the Report – and the AC's reliance thereon – "conflate pleading and proof" (*McIntire*, 927 F. Supp. 2d at 125), and do not defeat Plaintiff's claims.

***Use of Confidential Sources***.  Defendants' repeated efforts to analogize this case to *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020), are unavailing.  MTD at 13-14, 17-19, 23.  In contrast to *Miao*, where the complaint did "not allege any independent corroborative facts" and made "threadbare allegations, all reliant on [a short-seller's] attributions to unnamed persons" (442 F. Supp. 3d at at 802), neither the AC nor the Report are *premised on* confidential sources.  The "unnamed" sales agents and store managers mentioned in the Report merely confirmed facts they were in a position to know, such as whether a store had closed (¶78), information about KE's platform data that was visible to agents (¶122), and whether their store employed temporary agents (¶118).  *See Longwei*, 2014 WL 285103, at *1, *3 (crediting report's reliance on "local, unnamed residents" because they were in the best position "to know whether fuel shipments were coming and going from the facilities" at issue).  And the independent corroborative facts in the AC include KE's admissions that portions of its stores and agents were inactive, evidence from Muddy Waters' site visits that includes photographs, and the Report's detailed calculations of GTV and revenue that are not reliant on anonymous sources.  Thus, the AC's "sources, and the sources' sources, are adequately . . . described, and are in any event sufficiently corroborated, to plead [falsity] with particularity[.]"

---

[10] *Id*. ("discrepancies of the large magnitude of those alleged by Plaintiffs raise sufficient circumstantial grounds from which a court could reasonably infer that one or the other number was known [] to be false"); *see also In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 273 (S.D.N.Y. 2014) ("enormous gap between . . . Chinese filings and SEC filings" sufficiently alleged falsity of SEC filings); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 568 (S.D.N.Y. 2012) ("extreme discrepancies alleged in the financial reports, coupled with the logical inference that can be made regarding these figures . . . sufficiently alleges that the statements made in the SEC filings are false").

*Lewy*, 2012 WL 3957916, at \*13-\*14 (reports neither were – "[nor] relie[d] upon – "a 'confidential' source to a degree that undermin[ed] the particularity of plaintiffs' pleadings.").[11]

***Timing***.  Defendants criticize Muddy Waters' analysis of KE's platform data because it "only collected platform data from May 25 to October 22, 2021[.]" MTD at 12.  But this ignores Muddy Waters' corroborating field work and KE's admissions.  Faced with a similar timing issue, the court in *Longwei* rejected the argument that the plaintiffs could not "rely on [short-seller's] investigations from the end of 2012 to allege that [company's] facilities were abandoned at the time of its financial reporting months earlier." 2014 WL 285103, at \*4.  The court found that "[w]hile the investigations . . . do post-date the alleged misstatements, the evidence they uncovered suggests abandonment of Longwei's facilities prior to the statements." *Id*.  Likewise, here, the pervasive instances of ghost and clone stores and overstated agent counts suggest that those issues predated its investigation and were in existence throughout the Class Period.  That inference is even more plausible because KE admitted to including inactive stores and agents in its reported metrics, going back to the 3Q20 totals reported at the start of the Class Period and in the SPO Documents.  ¶57.[12]

***Analysis of Platform Data***.  Next, Defendants assert that the AC fails to show "that the public platform data that Muddy Waters analyzed is the same as the 'internal company data' on which [KE's] SEC disclosures are based." MTD at 14.  Defendants premise this attack on Muddy

---

[11] Because Muddy Waters itself is not anonymous, it is of no consequence that investigators working at its direction are not named in the Report.  MTD at 13.  The Report also does not contain the sort of "significant factual errors" that the short-seller report did in *Miao*, which included "carelessly 'misread[ing] the SEC filing'" on which its allegations were based – which plaintiff then "reproduced" in the complaint. 442 F. Supp. 3d at 804.  Instead, Defendants merely quibble with the Report's methodology.  Nor does the AC "admit" that Muddy Waters' allegations are "speculative."  MTD at 13.  It uses language that affords the appropriate weight to Muddy Waters' inferences.  Finally, Defendants' charge that Plaintiff did nothing to verify the Report is baseless.  MTD at 14, 17.  Lead Counsel attempted to obtain the identities of Muddy Waters' sources, and to speak with former KE employees in China, albeit unsuccessfully.

[12] *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (existence of "systemic . . . problems" at the time of a corrective disclosure "support[ed] an inference that" those problems were "present six months earlier" when the registration statement was issued); *XL Fleet*, 2022 WL 493629, at \*5 (rejecting arguments "regarding the temporal disconnect between the Relevant Period and some of the confidential allegations . . . because the temporal difference is minor and 'allegations concerning activity in one period can support an inference of similar circumstances in [another] period'") (quoting *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)).

Waters' use of the "Find Agent" function on KE's platform (MTD at 7, 13-14, 17), which they claim was not comprehensive, since "agents responsible solely for new home sales" supposedly do not appear on KE's "home page[,]" but instead "are listed separately on . . . the 'New Home' subpage – *and [], in their discretion, can* opt out from the search results page." Def. Ex. J at 1.  But the Report nowhere indicates that Muddy Waters only pulled data from the "Find Agent" search results on KE's "home page" or excluded search results from the "'New Home' subpage," and Defendants provide no support for this.  *Id.*  Regardless, according to KE's response, new home sales agents would *also* need to "opt out from" KE's customer-facing "search results page."  *Id.*  Defendants do not provide any reason why agents would choose to do so – which would be against their financial interest in connecting with customers.  At this stage, Defendants cannot establish that there was a contingency of agents for whom Muddy Waters did not collect data, or that this undermined its analysis.

The "Find Agent" function also was not Muddy Waters' "sole data source[.]"  MTD at 14. Muddy Waters collected "key data points on the number of stores and transactions for new and existing homes" from KE's "Agent Cooperation Network (ACN)."  AC Ex. A at 47.[13]  KE describes the ACN as the "operating system" it uses to "*calculate agents* on [its] platform" (Def. Ex. B at 12, 140), and states that it uses "internal company data" to "calculate" the "number of . . . stores and agents on [its] platform" for purposes of its SEC filings.  ¶¶150, 161, 220.  There is no apparent reason why the platform data available from KE's ACN for metrics as straightforward as its numbers of stores and agents would differ from internal company data.  Thus, it is reasonable to infer that "the public platform data that Muddy Waters analyzed" was consistent with "the 'internal company data'" that KE used to calculate the store and agent numbers reported in its SEC filings.  MTD at 14.

---

[13] The "key data point" Muddy Waters "collected was the number of transactions at the store level."  AC Ex. A at 47. Muddy Waters "frequently" was also able to collect "numerous other data points such as the total number of new and existing home transactions on the platform[,] . . . the number of agents and stores on the platform, plus details on the transactions."  *Id.*  It "also" collected data from individual "store pages[,]" including "the store name, address, [the] link to its SAIC business registration, [and] number of agents[.]"  *Id.*; *see also id.* at 48-74 (further explaining methodology).

*__Field Work__*.  Defendants' efforts to dismiss the numerous instances of nonexistent "ghost" and "clone" stores as "anecdotal" and to proffer "'alternative explanations'" for those findings fare no better.  MTD at 15-16.  Even if comparing Plaintiff's allegations with Defendants' proffered explanation were proper, Defendants' alternative explanation that these "ghost" and "clone" stores were real stores that recently "moved or merged," *and* these "developments" were somehow *accurately and timely* reflected in KE's SEC filings – but were *not* yet reflected on KE's platform, *or* in the stores' SAIC business certificates – is far from "'obvious[.]'"[14]  MTD at 15-16.  And it does not "'render . . . unreasonable'" (*id*.) Plaintiff's allegation that the ghost and clone stores served to inflated KE's reported store counts, as explained herein.

*__Corroboration of Inflated Agent Counts__*.  Defendants' criticisms of Muddy Waters' corroborated findings of discrepancies between the numbers of Shanghai and Beijing-based employees reported to the SAIC, and the numbers of agents claimed in KE's SEC filings, are also unavailing.  MTD at 16-17.  Defendants quote KE's 2020 20-F to argue that Muddy Waters reviewed only KE's "major" subsidiaries and variable interest entities ("VIEs") to determine the number of employees reported to the SAIC.  Def. Ex. L at F-11.  But Muddy Waters *also* reviewed KE's "F-1, dated July 24, 2020", its "F-1, dated Nov 16, 2020," and "public SAIC corporate registry databases" to determine KE's subsidiaries and VIEs.  AC Ex. A at 34 n.50.  For Shanghai, Muddy Waters compared *not only* the two Deyou subsidiaries in KE's 20-F, but also "its other subsidiaries (including its VIE)." *Id.* at 35.  Across these entities, it found only 10,195 employees in Shanghai – less than half of the 21,000 agents claimed in the 20-F.  ¶¶117, 119.[15]  Defendants take issue with the inclusion of Deyou subsidiaries (MTD at 16), but this over-inclusiveness only *underestimates*

---

[14] For example, Defendants' inference would require the Court to accept that the seven stores with current SAIC business registrations that Muddy Waters found "on the same street" in Sanhe Langfang had all actually existed, but only recently merged with the one physical store Muddy Waters found on that street.  ¶¶94-95.

[15] Similarly, in Beijing, Muddy Waters found "28 major *and minor* subsidiaries (including VIEs)."  Def. Ex. A at 36.  Across these entities, KE reported only 14,236 employees, despite claiming approximately 27,000 Lianjia agents. ¶120.

KE's inflation, as does the likelihood that the SAIC numbers included non-agent staff.  ¶119. Further, temporary agents do not account for the discrepancies because six Lianjia stores – each of which would be aware of its own hiring practices – confirmed they do not hire temporary agents. ¶118.

*GTV and Revenue Calculations*.  Defendants' additional attacks on Muddy Waters' evidence that KE had inflated its reported GTV and revenues during 2Q21 and 3Q21 are without merit.  MTD at 17-20.  The AC and the Report explain that Muddy Waters used the program it developed to collect as much transaction data as possible from KE's platform.  ¶122; AC Ex. A at 47-52 (describing data collection).[16]  The Report's reliability is enhanced – not undercut – by the fact that Muddy Waters: (i) acknowledged it was necessary to make assumptions in the course of its calculations; (ii) explained those assumptions, and its GTV and revenue calculations, in detail (AC Ex. A at 53-70); and (iii) made numerous company-favorable assumptions that likely *underestimated* KE's GTV and revenue inflation.  For example, Muddy Waters acknowledged that, to calculate GTV for existing home transactions, "price assumptions were necessary" (¶128) for approximately one-third of the existing home transactions for it collected platform data, and explained in detail its use of CRE price data to estimate prices for those transactions.  AC Ex. A at 56-61.[17]

Likewise, Muddy Waters explained that because the data on KE's platform was "available in 76-day increments[,]" it collected data for "two overlapping 76-day windows" during 2Q21 and 3Q21 (AC Ex. A at 7 & n.13), and then "[a]djust[ed] for the partial [2Q21] data" by "using company[-]favorable assumptions[.]" ¶131.  In particular, Muddy Waters used price "data published

---

[16] Muddy Waters also verified that it had collected data for a comprehensive set of the cities on KE's platform, for both company-owned stores and connected or franchised stores.  ¶123; AC Ex. A at 70-71 (explaining data verification).

[17] Pricing assumptions were *unnecessary* to calculate GTV for: (i) the other two-thirds of existing home transactions, because pricing data was available on KE's platform; or (ii) new home transactions, because Muddy Waters used the prices disclosed in KE's 2020 20-F.  ¶¶124, 128; AC Ex. A at 7, 58.  Defendants criticize the use of "average transaction value" for "the prior year in 2020," but do not dispute that aggregate housing prices *did* remain flat – only pointing to "potential" regional or seasonal price disparities (MTD at 18-19) that would be evened out by the use of aggregate data.

by the China Housing Real Estate Association ['CRE']." AC Ex. A at 61. Muddy Waters then

"applied an *upward* adjustment" of 9.66% "to reflect what should have been stronger sales volumes

in the first half of 2Q21" (as compared to 3Q21), and then "[p]rorat[ed]" the figure to the 91 days in

2Q21. *Id*. Defendants do not explain what is improper about this estimate – instead they ignore it

altogether, accusing Muddy Waters of "excluding 71 of the 183 days[.]" MTD at 18.[18]

Finally, the AC does not ignore any sources of GTV or revenue capable of explaining the

levels of inflation identified by Muddy Waters. Despite the Report's intermittent use of the term

"sales," Muddy Waters "collected. . . the number of transactions at each store, including existing

home transactions, new home transactions *and rental* transactions[.]" AC Ex. A at 48. Thus, Muddy

Waters also would have captured data from the dedicated new home sales team and any "other sales

channels" because they operate "*on* [KE's] platform" Pl. Ex. A (4Q21 6-K) at 4.[19] By analyzing

"the total number" of new home sales "on the platform[,]" the Report provides a sufficient basis for

alleging the falsity of Defendants' stated GTV and revenues. AC Ex. A at 6.

Revenues from platform fees, franchise fees, and other value-added services – which together

made up just RMB 1.1 billion in 2Q21 (Def. Ex. H at 3) and RMB 0.8 billion in 3Q21 (Def. Ex. D at

4) – cannot explain the RMB 17.76 billion revenue gap identified by Muddy Waters in the combined

2Q21-3Q21 period.[20] This is especially true because, contrary to Defendants' assertions, Muddy

Waters accounted for platform fees when calculating revenues. *See* AC Ex. A at 10 & n.16 ("[KE]

[18] The 9.66% adjustment was company-favorable because it "*increase[d]*" Muddy Waters' calculation of KE's GTV – meaning the inflation was reduced – and was not speculative because it was based on housing data for 13 major cities over five months that included all of 2Q21. AC Ex. A at 61-62, 67. Muddy Waters also made company-favorable estimates of transaction values in cities where data was unavailable, and Defendants make no attempt to explain how those estimates were flawed, speculative, or arbitrary. MTD at 18 n.5.

[19] KE's 2Q21 6-K (cited by Defendants) makes no mention of a dedicated new home sales team in its discussion of the sources of new home transaction revenues, and only a vague reference to "other sales channels." *See* Def. Ex. H at 4.

[20] This RMB 17.76 billion figure is derived from the table in ¶135, which is in millions of RMB. KE's reported revenue from home sales in 2Q21 to 3Q21 (RMB 40,900 million), less Muddy Waters' estimate (RMB 23,140 million), yields a gap of RMB 17,760 million, or RMB 17.76 billion. *See also* AC Ex. A at 11.

collects a platform service fee of 8% of such commissions as well as smaller, miscellaneous fees."). Thus, Plaintiff adequately alleges "that it uses the same [pertinent figures] as the SEC filings," and Defendants' alternative sources of revenue "do[] not explain away the enormous gap[s]" alleged in the AC. *Silvercorp Metals*, 26 F. Supp. 3d at 273.

In sum, "Plaintiffs have done what the law requires: they have alleged that [KE's] statements regarding its [GTV, revenues, and reported numbers of stores and] sales agents were false, the reason why the statements were misleading, and the facts that support these allegations." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 471 (S.D.N.Y. 2013).[21]

### E.   The AC's Allegations Give Rise to a Strong Inference of Scienter

The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre"; it need only be strong and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Allegations must be assessed "holistically," not "scrutinized "in isolation." *Id.* at 326. "'[S]trong circumstantial evidence of conscious misbehavior or recklessness'" is sufficient. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016).

The AC alleges that KE simultaneously inflated *all four* of its key operating metrics: its reported GTV by 75% in 2Q21 and 51% in 3Q21, and its reported revenues for new and existing home transactions by 88% in 2Q21 and 63% in 3Q21. ¶¶11, 134. To justify these inflated numbers, KE overstated its reported store and agent counts, by including inactive and nonexistent stores and agents. ¶¶8, 108. By KE's own admissions, the practice of including inactive stores and agents in its reported numbers was longstanding – going back to its IPO – and the rate of inflation ranged from 7.8% to 9.1% for store counts, and 9.8% to 15.5% for agent counts. ¶57. Muddy Waters found that KE's store and agent counts included nonexistent stores and agents. ¶¶10, 64-65. Taken together,

---

[21] Although Defendants' attacks are without merit, "these matters are all fraught with factual issues which" cannot be resolved at the pleading stage because they "require the Court to make findings based on an inadequate evidentiary record, or to determine which of two competing presentations is more credible." *Id.* at 470-71.

each instance of inflation bolsters an inference of scienter. *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.174 (S.D.N.Y. 2007) ("when the number, size, timing, nature, frequency, and context" of accounting improprieties "are taken into account, the balance of the inferences . . . may shift significantly in favor of scienter"). The "size of the alleged fraud" also supports an inference of scienter. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021). This scheme allowed KE to exceed investors' expectations despite a market downturn – as inflated store and agent counts provided cover for inflated GTV and revenue numbers. ¶¶5, 8, 52, 61.[22]

KE's disclosure in the 3Q21 press release – which provided inactive store and agent numbers dating back to 3Q20 – also supports a strong inference that its high-level executives had contemporaneous knowledge that material portions of KE's reported store and agent counts were inactive throughout the Class Period, since it is implausible that KE could have determined this data retroactively. ¶189. Defendants respond that this claim "lies in non-disclosure" (MTD at 22), tacitly confirming that KE had actual knowledge that it was including inactive stores and agents in its reported numbers, but did not divulge that information to investors until 3Q21. Accordingly, the AC does "specifically identify . . . statements containing" contradictory information. MTD at 21 (citing *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020)). Additionally, the timing of KE's admission – released five weeks before the Report – undermines the inference that KE provided the data as a gesture of candor. The more likely inference is that KE made this partial admission to obscure the discrepancies before Muddy Waters released its Report. ¶59. That inference is bolstered by the subsequent admission of KE's general counsel that KE had "anticipated" the Report. Pl. Ex. B at 2. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *20

---

[22] KE's scheme could not have taken place without the knowledge of the Executive Defendants, who were responsible for KE's overall strategy and business development (¶¶21-23), and had control over KE's financial statements (¶185). *See, e.g.*, *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (it was "virtually inconceivable" that a threat to the business "was not communicated to" its executives). At the very least, the Executive Defendants had "access to information contradicting" their claimed GTV, revenue, store and agent counts. *Novak*, 216 F.3d at 308.

(S.D.N.Y. Nov. 18, 2019) ("post-Class Period events and statements" may support scienter).

Beyond Defendants' admission, the SPO Documents make clear that KE "collected agent activity data" and "developed comprehensive profiles of agents" based on "performance data" "transaction records" and "other platform activities." Def. Ex. B at 145-146. The numbers of stores and agents transacting on KE's platform were "objectively verifiable data point[s]" that KE considered "part of its key business metric" which Defendants represented they "monitored" and which they "regularly reported to investors and analysts." *Pluralsight*, 45 F.4th at 1264 (explaining "it is reasonable to infer" knowledge "[u]nder these circumstances"). At the very least, in light of their access to transaction data, KE and the Executive Defendants were reckless in not knowing that store and agent counts included inactive and nonexistent stores and agents. *See Longwei*, 2014 WL 285103, at *4 (finding scienter where defendant "touted the company's 'real time' . . . monitoring"); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (finding scienter where "Defendants claimed they had accurate knowledge" and "visibility" into the misstated information). The same holds true for KE's inflation of its "key" metrics, GTV and revenue.

"[A]dditional 'highly unusual and suspicious facts' lend further support to the inference of scienter in this case." *Scot. Re Grp.*, 524 F. Supp. 2d at 394 n.176. Those facts include Muddy Waters' findings that – in addition to overstating GTV and revenues – KE was: (1) overstating reported commission rates (¶¶192-193); and (2) disguising inflated revenues by routing a sham acquisition through a straw entity, which transferred its interest to KE at a lower price than KE claimed. ¶¶194-195.[23] SAIC data showed that KE acquired a smaller interest than it claimed, with the straw entity acquiring the rest. ¶195. KE failed to explain this transaction in its response to the Report (Def. Ex. J), and Defendants provide no opposing inference to explain either impropriety.

---

[23] Accounting irregularities "may [] be sufficient" for scienter where, as here, there is "evidence of 'corresponding fraudulent intent[.]'" *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 625 (S.D.N.Y. 2005).

Finally, KE's actions following the Report undermine any inference of candor and support a strong inference of scienter. KE conducted an investigation lasting just over one month, about which it provided no detail. ¶190. During the investigation, KE altered its website to remove previously available agent data that Muddy Waters used in its investigation. *Id.* Defendants offer no alternative inference for *why* agent data was removed from KE's website, leaving only Plaintiff's inference: that it was removed to prevent any further fact-checking of KE's reported store and agent counts.

Thus, an inference of scienter is at least as strong as Defendants' opposing inference that "there was no fraud." MTD at 23. Defendants' inference requires the Court to either accept that four key operating metrics at KE were wrongfully overstated without the knowledge of KE executives responsible for financial reporting, or to disregard the AC's factual allegations. It also requires the Court to overlook evidence of additional improprieties and KE's efforts to make its platform less transparent in the wake of the Report – circumstances for which Defendants offer no alternative explanation. Considered holistically, the AC alleges "strong circumstantial evidence of conscious misbehavior or recklessness on the part of defendants." *Novak*, 216 F.3d at 308.

### F.    The AC Adequately Pleads Loss Causation

Loss causation – which is governed by Rule 8 – is "not meant to impose a great burden" and requires only that a plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The AC satisfies this standard by alleging that KE's ADSs tumbled in response to the Report (¶¶12, 180), which revealed KE's inflation of GTV and revenues, and the inclusion of nonexistent stores and agents in its reported counts. ¶¶10-11, 178-179. KE's ADSs fell 4.47% pre-market, opening at $17.96, compared to the prior day's closing price of $18.68. ¶¶12, 180. During the trading day, the price reached a low of $17.72, representing a total decline of 5.74% from the prior day's closing price. *Id.* "[C]ourts in this Circuit have frequently allowed cases to proceed under theories based on intraday

- 23 -

price fluctuations." *In re VimpelCom, Ltd.*, 2016 WL 5390902, at *3 (S.D.N.Y. Sept. 26, 2016).

Defendants make much of the fact that KE's ADSs closed higher than they opened on December 16, 2021, but admit that the ADSs closed lower than they had the previous day. MTD at 1, 3, 7, 24; Def. Ex. I at 9. Thus, KE's ADS price undisputedly declined on December 16, 2021, the day of the Report, from the December 15 closing price of $18.68 – regardless of whether the decline is measured using the intra-day low of $17.72, or the closing price of $18.31. *See* Pl. Ex. C. This is sufficient to allege "'that the market reacted negatively to a corrective disclosure of the fraud[.]'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).[24]

Defendants further assert that KE's share price increased on December 17, when it responded to the Report, and remained high "for the next three months." MTD at 24. But a stock's "recovery does not negate the inference that [Plaintiff] has suffered an economic loss." *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). And intra-day trading prices on December 17 *support* the allegation that the market was unconvinced by KE's incomplete response. ¶¶181-182. The price of KE's ADSs declined pre-market opening – when KE's denial was released – and fell further during the trading day, to a low of $16.60. *See* Pl. Ex. C. Since any subsequent price recovery "raises factual questions not suitable for resolution on a motion to dismiss[,]" courts "assume that the price rose for reasons unrelated to its initial drop." *Acticon*, 692 F.3d at 39-40.[25]

Defendants' contention that the Report could not have revealed the falsity of any statement in the SPO Documents because Muddy Waters' investigation took place after the SPO fails "to meet

---

[24] Moreover, "'whether to measure the price drop by reference to the intra-day [low] price or the closing price should' not be resolved on the pleadings[.]" *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 596 n.22 (S.D.N.Y. 2010).

[25] Defendants' argument that the Report "did not disclose any 'concealed' facts" because its information was "obtained from public sources" (MTD at 24) was explicitly rejected by the Second Circuit in *Lea*, 837 F. App'x at 28. As in *Lea*, Muddy Waters' field work and site visits were "not public information," and the Chinese SAIC filings and platform data it analyzed were "not readily accessible to investors." *Id.*; ¶¶63-64, 68. And because the Report revealed new information about KE's inflated GTV and revenues and nonexistent stores and agents (¶¶178-179), it cannot credibly be reduced to a mere "negative characterization of already-public information." MTD at 24.

- 24 -

their high burden" of proving that the absence of loss causation is "apparent on the face of the complaint[.]" *Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017). As explained above, the systemic nature of the discrepancies found by Muddy Waters – combined with KE's admission that 9.1% of the stores and 15.5% of the agents reported in the SPO Documents were inactive (¶210) – supports an inference that discrepancies existed at the time of the SPO. *See Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 143 n.13.

### G.    Plaintiff Has Adequately Alleged Securities Act Standing

To plead §11 standing, "general allegations that securities were purchased *pursuant or traceable* to a false registration statement" suffice. *Pareteum*, 2021 WL 3540779, at *19.[26] To plead §12(a)(2) standing, allegations that a plaintiff "purchased securities '*in*' or '*pursuant to*' the relevant offerings" are "enough[.]" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 324 (S.D.N.Y. 2013). The AC satisfies both standards. Defendants take issue with the allegation that Plaintiff purchased "pursuant and/or traceable to" the SPO Documents (¶19), ignoring the "Counts" – which make clear that the "traceable" language pertains *only* to the §11 claim. *See* ¶250 (§11 Count alleges Plaintiff purchased "pursuant and/or traceable to" the SPO Documents); ¶¶257, 259 (§12(a)(2) Count alleges Plaintiff purchased "*pursuant to*" the SPO prospectus).[27]

### II.    CONCLUSION[28]

Plaintiff respectfully requests that the Court deny the motion to dismiss in its entirety.[29]

---

[26] While "Defendants cite out-of-circuit authority for the proposition that more specific pleading is required[,]" courts in this District have "reject[ed] such a burdensome pleading standard." *Id.* at *20 n.6. Defendants' only in-circuit case is a summary judgment decision. *See In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *2 (S.D.N.Y. Oct. 1, 2013).

[27] While not required, Plaintiff's certification, showing that it purchased on the date of the SPO, at the offering price (¶19; ECF 24-2), provides "additional facts supporting the plausibility of" the standing allegations. *Pareteum*, 2021 WL 3540779, at *20 n.6. Unlike in *In re Cosi, Inc. Securities Litigation*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005), where the "plaintiffs ha[d] not alleged that they purchased their shares in the" offering, Plaintiff has done that in the Counts.

[28] Because the AC adequately pleads primary violations, the control-person claims are not subject to dismissal.

[29] If the Court grants the motion in whole or in part, Plaintiff respectfully requests leave to amend.

DATED: November 7, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
BRENT E. MITCHELL

*/s/ Erin W. Boardman*
ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
bmitchell@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Erin W. Boardman, hereby certify that on November 7, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 7, 2022.

_/s/ Erin W. Boardman_
ERIN W. BOARDMAN