UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/26/2024

------------------------------------------------------------------ X
:
SASKATCHEWAN HEALTHCARE EMPLOYEE'S :
PENSION PLAN, *individually and on behalf of all others* :
*similarly situated*, :
:
Plaintiff, :
:
-against- :
:
KE HOLDINGS INC., *et al.*, :
:
Defendants. :
:
------------------------------------------------------------------ X

1:21-cv-11196-GHW

MEMORANDUM
OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

KE Holdings Inc. (the "Company") is the largest real estate brokerage company in China.  It operates a network of physical brokerages, as well as an online platform.  In late 2021, Muddy Waters Capital LLC—a short seller—reported its conclusion that the Company had substantially overstated the number of agents and stores that used its platform, as well as the Company's revenues.  The market reacted to the issuance of the report.  The Company's stock slumped briefly after the report was issued.

Saskatchewan Healthcare Employees' Pension Plan (the "Lead Plaintiff") also reacted to the issuance of the Muddy Waters Report and the resulting dip in the Company's stock price.  The Lead Plaintiff filed this case alleging that the Company, its officers and directors, as well as the underwriters of its secondary offering, are responsible for misleading statements in the Company's public disclosures.  The Lead Plaintiff claims that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

Because the Lead Plaintiff has not adequately pleaded scienter, the Lead Plaintiff's claims under the Securities Exchange Act are dismissed, but because the Lead Plaintiff has adequately pleaded that the Company's secondary offering documents contained misleading statements, its

Securities Act claims survive this motion to dismiss. Therefore, Defendants' motion to dismiss the amended complaint is GRANTED in part and DENIED in part.

## I.   BACKGROUND

### A.   Facts[1]

#### 1.   KE Holdings and Its Business

KE Holdings Inc. ("KE Holdings" or the "Company") is a Cayman Islands corporation headquartered in Beijing, China. Am. Compl., Dkt. No. 51 ("FAC"), ¶ 20. The Company "operates an integrated online and offline platform for housing transactions and services in China, under the brand name Beike." *Id.* ¶ 34. The Company "traces its origins to the real estate brokerage brand Lianjia, founded in 2001." *Id.* KE Holdings launched the "Beike" platform in 2018. *Id.* The Beike platform facilitates housing transactions in China "across the residential real estate ecosystem, including existing and new home sales, home rentals, home renovation, and financial solutions." *Id.*

A variety of real estate brokerages use the Beike platform. Company-owned "Lianjia" branded stores use the platform. So too do third-party brokerages that are not owned by the Company: those include "franchise stores, which pay fees to KE Holdings for the use of its 'Deyou' franchise brand, and 'connected' stores, which pay fees to KE Holdings to utilize the platform while maintaining their status as independent brokerage brands." *Id.* ¶ 35.

KE Holdings generates revenues from three sources: "existing home transactions, new home transactions, and emerging and other services." *Id.* ¶ 38. The Company receives several income streams from transactions involving existing homes: the Company receives commissions for transactions facilitated by Lianjia-branded brokerages; franchise fees charges to brokerage firms that operate under one of the Company's franchise brands; and service fees for independent brokerages

---

[1] Unless otherwise noted, the facts are drawn from the amended complaint, Dkt. No. 51, and are accepted as true for the purposes of this motion to dismiss. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). But "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

that use the platform.  *Id.*  The Company also receives commissions from the sale of newly developed properties.

Because the Company primarily generates revenues from commissions, "KE Holdings' profitability is driven, in large part, by the number of brokerage stores and agents on its platform—since more brokerage stores and agents using the platform generally leads to more housing transactions" on the platform.  *Id.* ¶¶ 3, 41.  "For this reason, the Company considers 'the number of real estate brokerage stores and agents on [its] platform' to be a 'key operating metric.'"  *Id.* ¶ 3.  There is a close correlation between the number of agents and stores on the Company's platform and its revenues.  *Id.* ¶ 43.  "Another 'key operating metric' is gross transaction value ('GTV'), which represents the total value of all transactions the Company facilitated on its platform."  *Id.* ¶ 3.  GTV is a significant metric in part because the Company's "value proposition" is "built on its claim to have the leading market share" in China; the Company's market share is determined by reference to its GTV.  *Id.* ¶ 40.  Increased GTV also correlates with increased revenues.  *Id.* ¶ 43.

### 2.   The Individual Defendants

A number of individuals associated with the Company are named as defendants in the case. Defendant Peng Yongdong, one of the Company's founders, served as its Executive Director and Chief Executive Officer.  *Id.* ¶ 21.  He was also the Chair of the Company's Board of Directors.  *Id.* As the Company's CEO, he was responsible for the "[o]verall strategy, business development and management of the Company."  *Id.*  He signed the offering documents for the Company's public offerings in the United States, including the secondary offering that is the subject of this lawsuit.  *Id.*

Defendant Xu Tao was the Company's Chief Financial Officer.  *Id.* ¶ 22.  Since August 2021, he has also served as its Executive Director.  *Id.*  As the Company's CFO, he was responsible for the Company's "[o]verall strategy, business development, accounting . . . [and] internal control . . . ."  *Id.* Mr. Tao also signed the offering documents for the Company's secondary offering.  Defendant Shan Yigang, a co-founder of the Company, was its Executive Director.  *Id.*  He is described as a "key

member" of the Company's management team.  *Id.*  Defendants Yongdong, Tao, and Yigang are collectively defined in the complaint as the "Executive Defendants."

The complaint names four additional individual defendants.  Bao Fan, Li Zhaohui, and Chen Xiaohong served as directors of the Company at the time of its secondary offering.  *Id.* ¶ 24.  They too are alleged to have signed the offering documents for the Company's secondary offering.  And Colleen A. DeVries is named because she was the Company's "Authorized U.S. Representative" in connection with the Company's secondary offering and signed the offering documents in that capacity.  *Id.* ¶ 25.  The complaint pleads no additional information about her role at the company.

### 3.  The Company's Public Offerings in the United States

Seeking to raise new capital by listing its shares in the United States, KE Holdings conducted an initial public offering (the "IPO") on the New York Stock Exchange on August 13, 2020.  *Id.* ¶ 45.  The Company's shares priced at $20.00 per ADS.  *Id.*  The offering was very successful, raising more than $2.3 billion in net proceeds.  *Id.* ¶ 46.

Just three months later, the Company conducted a secondary offering (the "SPO").  The Company filed a registration statement on Form F-1 on November 16, 2020 (the "Registration Statement").  *Id.* ¶ 48.  The Registration Statement became effective two days later.  The Company filed a secondary offering prospectus (the "Secondary Offering Prospectus," and, together with the Registration Statement, the "Secondary Offering Documents") on November 19, 2020.  *Id.* ¶ 49. The Company's secondary offering was also very successful, netting more than $2.3 billion at a valuation of $58.00 per ADA—nearly triple the price at which shares were sold at the IPO just three months before.  *Id.* ¶ 50.  Four of the named defendants acted as underwriters for the secondary offering:  Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, and China Renaissance Securities (Hong Kong) Limited (collectively, the "Underwriter Defendants").  *Id.* ¶¶ 27–32.

In the quarters that followed the secondary offering, KE Holdings reported "successive quarters of positive financial results and operating metrics, including increased numbers of stores and agents on its platform, and corresponding growth in GTV and revenues." *Id.* ¶ 51.  The Company's revenues and GTV surged in 3Q20, 4Q20, and 1Q21, beating the Company's guidance in two quarters.  *Id.*  But in 2Q21, "the real estate market in China began to experience a slowdown in growth," as a result of government intervention.  *Id.* ¶ 52.  Nonetheless, KE Holdings continued to report growth that exceeded its guidance, and analysts' expectations.  *Id.*  It did so, the Lead Plaintiff alleges, by cheating—reporting inflated revenues and other financial metrics—in particular by falsely inflating the Company's store count and GTV.

### 4.  The Company Voluntarily Discloses Its "Active" Stores and Agents

On November 8, 2021, KE Holdings announced what Muddy Waters characterized as a "jaw-dropping" "admission."  *Id.* ¶ 53.  In its prior public filings, the Company disclosed to investors the total number of stores and agents that used its platform.  In the Company's press release announcing its financial results for 3Q21, the Company also identified how many of its stores and agents it considered to be "active."  *Id.*  KE Holdings explained that based on its "accumulated operational experience" it had "introduced the number of active agents and active stores" to "better reflect the operational activeness of stores and agents" on its platform.  *Id.* ¶ 58; Declaration of Robert A. Fumerton ("Fumerton Decl."), Dkt. No. 85, Exhibit D (the "Press Release") at 1 n.3.

The Press Release explained how the Company defined "active" stores and agents as follows:

> "Active stores" as of a given date is defined as stores on our platform excluding the stores which (i) have not facilitated any housing transaction during the preceding 60 days, (ii) do not have any agent who has engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding seven days, or (iii) have not been visited by any agent during the preceding 14 days.
>                                  . . .
> "Active agents" as of a given date is defined as agents on our platform excluding the agents who (i) delivered notice to leave but have not yet completed the exit

procedures, (ii) have not engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding 30 days, or (iii) have not participated in facilitating any housing transaction during the preceding three months.

*Id.* at 1 n.3, 2 n.4.  Applying those definitions, the Company disclosed the number of total and active stores for the third quarter of 2021.  *Id.* at 1 ("**Number of stores** was 53,946 as of September 30, 2021, a 20.2% increase from one year ago.  **Number of active stores** was 49,468 as of September 30, 2021, a 20.2% increase from one year ago.") (emphasis in original).  The Company also disclosed the number of total and active agents for the quarter.  *Id.* at 2 ("**Number of agents** was 515,486 as of September 30, 2021, a 7.9% increase from one year ago.  **Number of active agents** was 468,014 as of September 30, 2021, a 13.1% increase from one year ago.) (emphasis in original).

The Press Release also reported the number of active stores and agents on its platform for prior quarters.  FAC ¶ 56.  The Lead Plaintiff used those numbers to calculate the percentage of stores and agents reported in prior periods that were not active:  in 3Q20, 15.488% of reported agents were not active, and 9.066% of reported stores were not active; in 4Q20, 10.697% of reported agents were not active, and 8.081% of reported stores were not active; in 1Q21, 10.247% of reported agents were not active, and 8.412% of reported stores were not active; and in 2Q21, 9.788% of reported stores were not active, and 7.793% of reported agents were not active.  *Id.* ¶ 57. When it introduced its disclosures of this subset of active agents and stores, the Company did not restate any prior financial or operating metrics, including the Company's GTV, revenue, or the number of its agents and stores.

The Lead Plaintiff alleges that the Company's prior disclosures detailing its total agents and stores were "overstatements."  *Id.* ¶ 61.  But they do not allege that the Company's disclosures of its "active" agents and stores had an impact on the Company's share price.  They allege that by "reporting inflated quarterly GTV and revenues that exceeded analysts' and investors' expectations . . . KE Holdings was able to maintain the artificial inflation in its share price."  *Id.*

### 5.  The Muddy Waters Report

On December 16, 2021, Muddy Waters Capital LLC ("Muddy Waters") published the report that, the Lead Plaintiff alleges, lifted the veil on a massive fraud (the "Report").  FAC Ex. A, Dkt. No. 51-1.  Muddy Waters is a short seller.  To begin its Report, Muddy Waters announced that it had shorted the Company, and explained why:  "because we conclude that the Company is engaged in systemic fraud, **by our estimate, inflating its new home sales GTV by over ~126%** and its commission revenues by approximately ~77-96%."  *Id.* at 2 (emphasis in original).  Muddy Waters reported "massive discrepancies between the . . . store count and agent count reported to investors and the transaction data from our multi-month data collection program from [the Company's] platform."  *Id.*

The Report was long—clocking in at 77 pages in length.  It targeted the Company's financial disclosures for the second and third quarters of 2021.  The Report concluded that the Company had substantially inflated its GTV and revenue for those periods.  *Id.*  The Report also pointed to other indicia of what Muddy Waters described as a "massive fraud," including a "likely sham acquisition seemingly designed to mask the fraudulent revenues."  *Id.*

### a.  Inflated Store Count

The Report concluded that the Company had inflated its 2Q21 store count by at least 23%. *Id.* at 3.  The Report detailed the process that Muddy Waters had used to reach that conclusion. Muddy Waters began by writing a computer program that collected transaction data on the Company's platform for the period from May 25, 2021 through October 22, 2021.  FAC ¶ 64.  The data that Muddy Waters collected from the Company's platform "showed that as of July 16, 2021, the platform listed only 43,026, suggesting that [the Company's] 2Q21 store count was inflated by at least 23%."  Report at 14.

Muddy Waters investigated a sample of the active stores reported on the Company's platform.  Muddy Waters called stores and conducted in-person visits.  The Report details several

visits by Muddy Waters' investigators to what they found to be "ghost stores."  Muddy Waters documented several instances in which its investigators found empty storefronts where the Company reported that it had active stores.  The Report shows photographs of the empty stores. *See, e.g.*, Report at 14-21.  Muddy Waters investigators also confirmed their findings by calling store employees, who confirmed that some of the stores that were listed in the Company's platform as active were, instead, closed.  *Id.* at 17, 19.

Muddy Waters also uncovered instances of what it termed "clone stores."  Muddy Waters' field work found that "despite multiple stores appearing on [the Company's] platform, often only one exists in practice."  *Id.* at 21.  The "clone stores" appeared on the Company's platforms with the same or similar name and/or location but with a different suffix—like A, B, or C.  *Id.*  Even though only one physical store existed, the Company's platform reported each "clone store" as a separate store so long as it had a different suffix.  As a Company agent explained to Muddy Waters' investigator, the "seemingly separate stores" are "located in the same store, purportedly under different managers."  *Id.*

The Report counted a high percentage of "clone stores" on the Company's platform in seven cities that Muddy Waters investigated.  In Xiamen, for example, Muddy Waters found that 41.5% of the Company's reported Lianjia stores were "clone stores."  In Beijing, 9.1% of Lianjia stores were clones.  *Id.*  Again, Muddy Waters corroborated its findings with phone calls to store employees.  *Id.* at 22–23.

Muddy Waters also found significant discrepancies between the number of stores that it had registered with the State Administration for Industry and Commerce (the "SAIC") and the number of its reportedly active stores.  At the time, the SAIC was responsible for market regulation and enforcement, including registering and licensing business organizations.  FAC ¶ 68 n.5.  Muddy Waters found that the Company had registered substantially more stores with the SAIC than were, in fact, active.  Muddy Waters confirmed this finding using a "case study" focused on one city in

China—Sanhe Langfang.  The SAIC data showed 51 Lianjia stores in the city.  Report at 24.  But when Muddy Waters visited the reported stores, they found only 32 active stores.  19 of the registered stores were "ghosts."  That finding contributed to the Report's conclusion that "ghost stores are endemic."  *Id.*

### b. Inflated Agent Count

The Report also concluded that the Company had overstated the number of agents using its platform:  in the second quarter of 2021, the Company had inflated the number of its agents by approximately 26%.  FAC ¶ 109.  Muddy Waters theorized that the Company had to inflate its agent count "to justify its fabricated GTV and revenue figures," since revenue and GTV "are a function of agent count."  *Id.* ¶ 108.

The Report explained the process that Muddy Waters had employed to reach its conclusion.  Muddy Waters again started by mining data from the Company's online platform.  Muddy Waters used the "Find Agent" function on the Company's site.  The data that Muddy Waters collected on July 16, 2021—two weeks after the end of the second quarter of 2021—"detected only 435,888 agents."  Report at 30.  That number was approximately 26% smaller than the Company's reported agent count for the second quarter.  Muddy Waters concluded that the discrepancy was the result of manipulation of the data.

The Report detailed the steps that Muddy Waters undertook to verify the conclusions that it drew from its analysis of the data.  Muddy Waters compared the data that the Company published to the information that the Company disclosed to local government agencies.  Muddy Waters sought to verify its findings by "'compar[ing] a local real estate license registry' in the city of Nanchang 'against the detailed disclosures provided by [KE Holdings] in connection [with its 2019] acquisition'" of Nanchang, a real estate brokerage firm in that city.  FAC ¶ 111 (quoting Report at 31).  "According to Muddy Waters, its collection of KE Holdings' platform data showed that 'in late August 2021, Zhonghuan's Nanchang operation had 363 stores with 2,050 agents.'  But when Muddy Waters

'checked [those] numbers against the Nanchang Registry[,] it found that 'although the reported store count closely matched, the number of Zhonghuan agents was exaggerated by 50%.'"  *Id.* ¶ 113 (quoting Report at 32).  Muddy Waters explained its view that this data confirmed its conclusion that KE Holdings "use[d] former agents who ha[d] left the Company to inflate the agent count on its platform."  Report at 32.

Muddy Waters also verified its conclusions by examining data filed with the SAIC in Shanghai and Beijing—two of the Company's largest markets.  As Muddy Waters explained, "Chinese companies are required to report [their] number of employees to [the] SAIC" in connection with making mandatory "contribution[s] to social insurance for all employees."  Report at 34.  So Muddy Waters found the number of individuals employed by the two Company subsidiaries operating in Shanghai and Beijing.  It compared that number to the number of agents in those cities disclosed in the Company's 2020 Form 20-F.  The results again confirmed the Company's inflated agent count.  The Company reported approximately 21,000 agents in Shanghai as of December 31, 2020.  FAC ¶ 117.  But the SAIC filings showed that the Company's subsidiaries employed only 9,996 employees.  *Id.*  Assuming, favorably, that all of those employees were agents, Muddy Waters calculated that the agent count in Shanghai had been inflated by 106%.  *Id.* ¶¶ 117–119.

Muddy Waters reported that it found the "same pattern" when it examined the same data from Beijing.  *Id.* ¶ 120.  While the Company reported approximately 27,000 agents in Beijing as of December 31, 2020, Muddy Waters found that the 28 Company subsidiaries it identified in Beijing employed a total of only 14,236 employees.  *Id.*  Muddy Waters concluded that the figure "indicat[ed] that [KE Holdings was] exaggerating the number of its agent[s] in Beijing by **90%** . . . ."  Report at 36 (emphasis added).

### c. **Inflated Gross Transaction Value**

The Report also concluded that the Company had substantially inflated its reported GTV for sales of new homes and existing homes in the second and third quarters of 2021.

### i. *GTV of New Home Sales*

Muddy Waters concluded that the Company had inflated the GTV of new home sales facilitated on its platform by approximately 126% in those two quarters.  FAC ¶ 127.  The Report detailed the methodology used by the firm to reach that conclusion.  It was relatively simple.

Muddy Waters started with the total number of new home transactions reported by the Company on its platform.  *Id.* ¶ 124.  The firm then multiplied that number by the average house prices reported by KE Holdings in its filings with the SEC.  (Muddy Waters used 2020 average home prices because 2021 prices were not available and 'housing data show[ed] that the price of new homes in China . . . remained flat from 2020 to 2021."  Report at 7.)  The product of that equation allowed Muddy Waters to estimate the actual GTV of new home sales.  Muddy Waters concluded that the GTV was only RMB 402 billion during the second and third quarters of 2021 combined.  FAC ¶ 127.  "By contrast, the Company reported that GTV of new home transactions on its platform was (i) RMB 498.3 billion in 2Q21; and (ii) RMB 410.1 billion in 3Q21—a GTV of approximately RMB 908 billion during 2Q21 and 3Q21 combined."  *Id.*  Thus, Muddy Waters concluded that the Company had inflated its GTV for new home sales by approximately 126% during those two quarters.

### ii. *GTV of Existing Home Sales*

The Report also asserted that the Company had inflated the reported GTV for existing home sales by approximately 33% in the second and third quarters of 2021.  *Id.* ¶ 129.  Again, Muddy Waters calculated its estimate of the Company's actual GTV based on an examination of existing home transaction data on the Company's platform.  *Id.* ¶ 128.  For many of those transactions, Muddy Waters was able to find actual sales prices.  *Id.*  For many others, however,

Muddy Waters had to make assumptions about the value of the homes that were sold.  *Id.*  Muddy Waters detailed the assumptions that it had made in an appendix to the Report—and characterized the assumptions as being "in the Company's favor."  *Id.*  Had it used more conservative assumptions, Muddy Waters asserted, its estimate of the Company's GTV for existing home sales would have been lower.

"Based on its data collection, Muddy Waters estimated that KE Holdings' actual GTV of existing home transactions through both its Lianjia brokerages and connected stores was 'approximately RMB 775 billion' during 2Q21 and 3Q21 combined.  By contrast, the Company reported that GTV of existing home transactions on its platform was:  (i) RMB 652.0 billion in 2Q21; and (ii) RMB 378.2 billion in 3Q21—a GTV of approximately RMB 1,030.2 billion during 2Q21 and 3Q21 combined."  *Id.* ¶ 129 (quoting Report at 9).  Thus, Muddy Waters concluded, the Company inflated its GTV for existing home sales by approximately 33% during those quarters.

### iii.   Combined GTV of Existing and New Home Sales

Muddy Waters concluded in the Report that the Company's reported total GTV was inflated by approximately 75% in 2Q21 and 51% in 3Q21.  *Id.* ¶ 131.  The firm reached this simply by comparing the aggregate GTV that it had calculated for existing and new home sales with the aggregate GTV reported by the Company for those quarters.  *Id.*  Unsurprisingly, given the substantial inflation that Muddy Waters had found in the components of GTV, the firm found that KE Holdings reported an inflated number for its aggregate GTV as well.

### d.  Inflated Revenues

The Report also concluded that the Company had likely inflated its reported revenues in the second and third quarters of 2021.  Muddy Waters estimated that the Company had likely inflated its revenues from commissions by 77%.  The Report explained the means by which the firm reached that conclusion.  It was, again, relatively straightforward:  Muddy Waters took its estimated GTV

figures for new and existing home sales and multiplied those numbers by the commission rate reported by the Company.  *Id.* ¶ 133.

### e.  Tenor of the Report

The Report does not pull its punches.  It describes the Company's inflated financial metrics as the result of a "massive fraud."  Report at 2.  Muddy Waters describes the Company as a "real business with significant amounts of fraud."  *Id.*  Muddy Waters opines that the Company is a "multivariate fraud, with layers of deception metastasizing throughout its business and representations to investors."  *Id.* at 5.

The vast majority of the Report is devoted to a description of Muddy Waters' conclusions about the Company's important financial metrics and the methodology that the firm used to reach those conclusions.  As described above, that methodology included data mining, and efforts to verify that data through in-person investigations and comparison with other data sets:  the Report presents the empirical basis for its conclusions.  At the same time, the Report makes clear Muddy Water's view of the cause of the inflated numbers that they had found—a "multivariate fraud."

### 6.  The Market Reacts and the Company Responds

KE Holdings' stock closed at $18.68 on December 15, 2021.  FAC ¶ 180.  Muddy Waters tweeted out a link to the Report at 8:46 a.m. EST the next morning—shortly before the market opened in the United States.  In response to the Muddy Waters Report, the price of the Company's ADSs "tumbled 4.47% on unusually heavy trading volume . . . to an opening price of $17.96 on December 16, 2021."  *Id.*  During the course of the trading day on December 16, "as the market digested the Muddy Waters Report," the Company's stock price declined still further, "trading as

low as $17.72 per ADS—a total decline of 5.74% from the closing price on December 15, 2021."
*Id.*[2]

    After the market closed on December 17, 2021, KE Holdings issued a short press release that responded to some—but not all—of the assertions contained in the Muddy Waters Report.  *Id.* ¶ 181.  The Company asserted that "the Company believes the report is without merit and contains numerous errors of fact, unsubstantiated statements, and misleading speculations and interpretations.  The report also shows lack of basic understanding of the housing transactions industry in China."  Fumerton Decl., Ex. J at 1.

    The Company's response explained why it believed that Muddy Waters had based its conclusions on inaccurate data.  It critiqued the Report's calculation of the Company's GTV and revenues from new home sales because the Report "ignores the Company's other sources of revenue," in particular new home sales through connected brokerages that were not operated by the Company under the Lianjia brand.  *Id.*  The Company reaffirmed the accuracy of its reported GTV for new home transactions in the second and third quarters of 2021.  The Report's estimate of the Company's revenues from existing home sales, the Company asserted, foundered on the improper assumptions that Muddy Waters had used:  among other things, using average sales prices for existing home sales, rather than the Company's actual sales data, and extrapolating sales data for the entire quarter based on just 76 days' worth of sales.

    KE Holdings asserted that the methodology used by Muddy Waters to calculate the number of agents and stores using its platform "relies on incomplete information."  *Id.*  The Company stated that the "Find Agent" function used by Muddy Waters to identify agents "does not include sales agents responsible solely for new home sales.  Instead, these agents are listed separately on another

---

[2] The Company's stock traded up from this low point during the course of the trading day, closing at $18.31—down just $0.37 from the day before the issuance of the Report.  Fumerton Decl., Ex. I.  By the end of the day on December 17, 2021, the stock closed at $19.36—higher than before the issuance of the Report.  *Id.*

page on the Company's website . . . and [they] can . . . opt out from the search results page."  *Id.*
Through its errant use of the "Find Agent" tool to develop its data set, the Company asserted,
Muddy Waters undercounted the Company's stores and agents.

The Company's Audit Committee began an internal review of the allegations in the Report.
On January 28, 2021, KE Holdings issued a press release announcing the substantial completion of
that internal review.  Fumerton Decl., Ex. K.  The Company explained that "the audit committee of
the Company consisting of three independent directors (the 'Audit Committee') commenced an
internal review into the key allegations raised in the Muddy Waters Report (the 'Internal Review'),
with the assistance of third-party professional advisors including an international law firm and
forensic accounting experts from a Big-Four accounting firm that is not the Company's auditor.
The Internal Review is now substantially complete.  Based on such Internal Review, the Audit
Committee has concluded that the allegations in the Muddy Waters Report were not substantiated.'"
*Id.* at 1.  As of the date of the filing of the complaint, the Company had not disclosed any other
information about the internal review or the basis for its conclusions.  FAC ¶ 14.

### 7.   KE Holdings' Allegedly Actionable Statements and Omissions

The complaint alleges that the Company made misleading public statements regarding its
financial metrics—particularly, its revenue, GTV, and its agent and store counts.  It alleges that the
data in the Muddy Waters Report shows that the Company's financial metrics were inflated, and that
the Company's decision not to segment "active" agent and stores until November 8, 2021 made its
prior disclosures misleading.  In addition, the complaint points to a number of descriptions of the
Company's use of its financial metrics and asserts that they are misleading.  The complaint identifies
the following statements as actionable.

### a.   The 3Q20 Press Release

On November 16, 2020, the Company issued a press release announcing its financial results
for the third quarter of 2020.  FAC ¶ 136.  The press release was filed as an exhibit to a Form 6K,

signed by Defendant Tao.  *Id.*  The press release reported that the "[n]umber of stores" on KE

Holdings' platform "was 44,883 as of September 30, 2020, a 41.7% increase year-over-year."  *Id.*  It

also represented that the "[n]umber of agents" on the Company's platform "was 477,810 as of

September 30, 2020, a 50.7% increase year-over-year."  *Id.*[3]

The Lead Plaintiff alleges that these statements were false because the Company failed to

disclose that a portion of the agents and stores reported were not "active," as later characterized by

the Company.  The Lead Plaintiff also alleges that these disclosure statements were inaccurate

because "Muddy Waters uncovered substantial evidence that the reported number of stores and

agents on KE Holdings' platform were even more significantly inflated than the Company has

admitted . . . ."  *Id.* ¶ 137.  The Lead Plaintiff asserts that the Muddy Waters Report demonstrates

the falsity of these statements notwithstanding the fact that the Report did not examine the

Company's financial performance prior to the second quarter of the following year.

### b.  The Secondary Offering Documents

The Lead Plaintiff alleges that the Secondary Offering Documents—filed with the SEC in

November 2021 and signed by each of the Defendants—contained a series of false or misleading

statements.  As with the 3Q20 press release, the Secondary Offering Documents contained a

disclosure regarding the number of agents and stores using the Company's platform.  "As of

September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage

stores on [the Company's] platform . . . ."  *Id.* ¶ 139.  The complaint alleges that this statement was

misleading for the same reasons as the equivalent statement in the 3Q20 press release.

The Lead Plaintiff also alleges that statements in the Secondary Offering Documents

regarding the significance of the activity level of the Company's agents and brokerage were false or

---

[3] The Court has identified with underscore those statements that are identified as allegedly fraudulent or misleading in the complaint.  The complaint marks those sections of the statements in bold, italicized text.  However, the documents filed by the Company use bold, italicized text in their original format.  To avoid confusion, the Court has used the fonts from the original documents and has underlined the allegedly fraudulent statements.

misleading.  In particular, the Secondary Offering Documents contained the allegedly actionable

statements, highlighted in underscored text below.

**Specific Factors Affecting Our Results of Operations**

While our business is exposed to general factors affecting the residential real estate industry in China, we believe our results of operations are primarily and more directly affected by the following specific factors:

* * *

***Our ability to attract and retain real estate brokerage stores and agents on our platform***

The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level.  Since the inception of our Beike platform, we have attracted an increasing number of real estate brokerage stores and agents to join our platform while maintaining high service quality.  As of September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage stores on our platform, representing 273 real estate brokerage brands, as compared to over 317,000 agents, 31,000 stores and 185 brands as of September 30, 2019 and over 163 agents, 15,800 stores and 116 brands as of December 31, 2018.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 85 (emphasis added); FAC ¶ 141.

In the portion of the Prospectus describing the Company's "Risk Factors," the Company

made the underscored comment below, which the Lead Plaintiff asserts to be misleading.

RISK FACTORS

* * *

**We cooperate with various real estate brokerage brands, stores and agents on our platform.  If we are not able to develop relationships with new real estate brokerage brands and agents or maintain our relationship with existing real estate brokerage brands and agents on our platform, our operations may be materially and adversely affected.**

We believe the large and active network of real estate brokerage brands and their affiliated stores and agents contributes significantly to the success of our platform.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 26 (emphasis added); FAC ¶ 141.

The Lead Plaintiff also alleges that the following statement is false and misleading.

**Real Estate Brokerage Brands on Our Platform**

<u>We believe a large and active network of agents, brokerage stores</u> and brokerage brands across China <u>provides a solid foundation for serving a large number of housing customers</u>.  As of September 30, 2020, there were over 477,000 agents and over 44,000 community-centric brokerage stores on our platform, representing 273 real estate brokerage brands.  <u>Through the agents, stores and brokerage brands on our platform, we are able to effectively hone local market expertise, generate leads and build relationships with our housing customers</u>.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 166; FAC ¶ 142.

The Lead Plaintiff alleges that these statements were materially false and misleading because they did not accurately reflect the fact that not all of the Company's reported stores and agents were "active."  *Id.* ¶ 143.  The Lead Plaintiff also takes the position that because the Company chose to speak about the importance of the activity level of brokerage stores and agents on their platform, as reflected in these statements, the Defendants "assumed a duty to speak completely and accurately."  *Id.*  The Lead Plaintiff asserts that they did not speak completely, because they failed to disclose that "material portions of both the stores and agents on KE Holdings' platform as of September 30, 2020 were inactive . . . ."  *Id.*

The Lead Plaintiff also alleges that the following statements about the Company's beliefs regarding the importance of its "active" agents, which engaged "proactively" are misleading.

**Specific Factors Affecting Our Results of Operations**

While our business is exposed to general factors affecting the residential real estate industry in China, we believe our results of operations are primarily and more directly affected by the following specific factors:

\* \* \*

***Our ability to increase cooperation with real estate brokers***

\* \* \*

We believe our reputation for high-quality service among the large housing customer base and <u>our growing network of real estate brokerage stores and agents that transact actively on our platform</u> well position us to increase cooperation with existing and new real estate developers.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 93; FAC ¶ 144.

*Who We Are*

Beike is the leading integrated online and offline platform for housing transactions and services. We are a pioneer in building the industry infrastructure and standards in China to reinvent how service providers and housing customers efficiently navigate and consummate housing transactions, ranging from existing and new home sales, home rentals, to home renovation, real estate financial solutions, and other services. We believe our <u>proactive engagement with platform participants both online and offline</u> enables us to know them better and serve them better.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 139; FAC ¶ 144.

The Lead Plaintiff alleges that these statements are materially false and misleading because the Company failed to disclose that not all of its agents were "active." The Lead Plaintiff also asserts that KE Holdings failed to disclose that "a material portion" of the network did not "transact actively on the . . . platform" or "proactively engage "with platform participants . . . ." *Id.* ¶ 145.

The Lead Plaintiff also alleges that the following statements by the Company, regarding the scale of its operations as important factors in its success, are false and misleading:

**Key Operating Metrics**

\* \* \*

*Number of stores and agents*

We believe <u>the numbers of real estate brokerage stores and agents on our platform demonstrate our scale and are crucial indicators of our operations</u>.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 20; FAC ¶ 146.

Key Success Factors

The following are key factors to a successful integrated housing transactions and services platform in China:

<u>Scale and quality of agent and store network. Agents and physical stores are fundamental to China's housing transactions and services market, playing a key role in helping brokerage service providers capture potential customers by serving as a gateway into local communities. It is important to build an extensive agent and store network across brokerage brands.</u> The platform's strong and unique value propositions to agents and store not only increase their stickiness to the platform, but also empower them to meet housing customers' evolving needs and establish trust with customers. An extensive agent and store network with an effective and efficient collaboration mechanism allows the platform to maintain close relationships

with both housing customers and other industry participants such as real estate developers and other home-related service providers.

FAC ¶ 146.

The Lead Plaintiff alleges that these statements too are materially false and misleading because the Company failed to disclose that not all of its agents were "active." *Id.* ¶ 147. And the Lead Plaintiff alleges that by choosing to emphasize the importance of "the numbers of real estate brokerage stores and agents on [the Company's] platform" as important indicators of its success, the Company assumed the burden to speak completely and accurately—a duty the Lead Plaintiff claims it failed to meet by failing to identify those agents and stores that were not "active." *Id.*

The Lead Plaintiff alleges that the Company misled the public by describing offline stores as one of its strengths. The allegedly actionable statement is underscored in the quotation below:

**Our Strengths**

***Largest integrated online and offline platform for housing transactions and services***

                              * * *

Our unparalleled know-hows [*sic*] and capabilities, developed through our success with Lianjia, have been transparently extended to support hundreds of selected brokerage brands joining our platform to help them grow and succeed. <u>Our offline stores serve as an entry point for our customers to our platform</u> as they are conveniently located within the communities <u>and at the same time have become our competitive advantage in the industry</u>.

Fumerton Decl., Ex. B, Dkt. No. 85-2 at 143; FAC ¶ 148. The Lead Plaintiff alleges that this statement was false and misleading because it does not disclose that a portion of the Company's offline stores "were not providing a 'competitive advantage' for the Company because those stores were inactive . . . ." *Id.* ¶ 149.

The Lead Plaintiff asserts that certain of the risk factors detailed in the Secondary Offering Documents were also false and misleading. In particular, the complaint points to the following risk factors:

**We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.**

We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the performance of our business.  Our operating metrics may differ from estimates published by third parties or from similarly titled metrics used by other companies due to differences in methodology and assumptions.  We calculate these operating metrics using internal company data.  If we discover material inaccuracies in the operating metrics we use, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which would negatively affect our business.  If investors make investment decisions based on operating metrics we disclose that are inaccurate, we may also face potential lawsuits or disputes.

*Id.* ¶ 150.

The complaint alleges that these statements were false and misleading because they "portrayed 'inaccuracies' in 'key operating metrics' . . . as hypothetical future risks, when, in truth, the number of stores and agents as of September 30, 2020 that KE Holdings provided in the Secondary Offering Documents were presently inaccurate."  *Id.* ¶ 151.  That is because, the Lead Plaintiff asserts, a substantial portion of the Company's stores and brokers were not "active."  *Id.*  The Lead Plaintiff also points to the Muddy Waters Report as uncovering evidence that the reported numbers of stores and agents were significantly inflated.  *Id.*

### c.   The 4Q20 Press Release

The Lead Plaintiff asserts that the Company's press release reporting its results for the fourth quarter of 2020 and the full year of 2020 contained false and misleading statements about the number of the Company's agents and stores.  The press release was issued on March 15, 2021 and was filed with the SEC under a Form 6K signed by Defendant Tao.  *Id.* ¶ 152.  "Under the heading 'Business Highlights for the Fourth Quarter of 2020,' the 4Q20 press release represented that the '*[n]umber of stores' on KE Holdings*' platform '*was 46,946 as of December 31, 2020, a 25.1% increase from one year ago.*'  It further represented that the '*[n]umber of agents*' on the

Company's platform '***was 493,088 as of December 31, 2020, a 37.9% increase from one year ago.***' *Id.* (emphasis in complaint).

The Lead Plaintiff alleges that those disclosure were inaccurate, again, because they failed to reveal that the number of stores and agents reported by the Company included ones that were not "active." *Id.* And the Lead Plaintiff points to the Muddy Waters Report as providing additional evidence to support the conclusion that the Company's agent and store count were further inflated. *Id.*

### d.  The 2020 Form 20-F

The Company filed its Form 20-F for fiscal year 2020 on April 6, 2021.  According to the Lead Plaintiff, the 20-F contained a number of the same kinds of false and misleading statements contained in the Secondary Offering Documents.  In several instances, the allegedly actionable language used in the Form 20-F is identical to language contained in the Secondary Offering Documents.  Those statements are not repeated below.  *See* FAC ¶¶ 156–162.

The Form 20-F disclosed the number of stores and agents on the Company's platform as of December 31, 2020.  The Form 20-F stated that as of that date, "there were more than 493,000 real estate agents and approximately 47,000 brokerage stores" on the platform.  *Id.* ¶ 155.  As with the Company's other similar disclosures, the Lead Plaintiff points to the fact that those numbers include stores and agents that were not "active," as well as Muddy Water's findings as support for their contention that the statements were misleading.

### e.  The 1Q21 Press Release

The Company issued a press release on May 19, 2021 announcing its financial results for the first quarter of 2021.  *Id.* ¶ 163.  The following day, the Company filed a Form 6-K with the SEC, signed by Defendant Tao, attaching the press release.  *Id.*  In the 1Q21 press release, the Company stated that the "[n]umber of stores" on the Company's platform "was 48,717 as of March 31, 2021, a 25.4% increase from one year ago." *Id.*  The Company also stated that the "[n]umber of agents" on

the platform "was 528,424 as of March 31, 2021, a 41.8% increase from one year ago." *Id.* These

statements were false or misleading, the Lead Plaintiff alleges, because a substantial portion of the

agents and stores reported were not "active." *Id.* ¶ 164.

### f.    The 2Q21 Press Release

Remember that the second quarter of 2021 was the first period evaluated by the Muddy

Waters Report.  So the Lead Plaintiff's allegations regarding the alleged deficiencies of the

Company's disclosures regarding that quarter's results expand beyond their descriptions of the

Company's active stores and agents; they allege deficiencies in the Company's GTV and revenue

disclosures as well.

The Company issued the press release announcing its second quarter 2021 financial results

on August 11, 2021.  *Id.* ¶ 165.  The next day, it filed the press release as an exhibit to a Form 6-K,

signed by Defendant Tao.  *Id.*  The release stated that the "[n]umber of stores" on KE Holdings'

platform "was 52,868 as of June 30, 2021, a 25.1% increase from one year ago," while the "[n]umber

of agents" on the platform "was 548,600 as of June 30, 2021, a 20.3% increase from one year ago."

*Id.*  As with the Company's previous store and agent counts, the Lead Plaintiff alleges that these

statements were false or misleading because they failed to disclose the number of agents and stores

that were not "active."  In addition, the Lead Plaintiffs points to the Muddy Waters' Report to

support the contention that the Company overstated its count.  Unlike the prior periods, however,

which were not investigated by Muddy Waters, Muddy Waters critiqued the Company's store and

agent count for this quarter.

The 2Q21 press release also made a number of assertions regarding the Company's GTV.

The release asserted that the Company's aggregate GTV for the quarter "was RMB1,220.8 billion."

*Id.* ¶ 167.  The press release broke down the Company's quarterly GTV for existing and new home

transactions.  *Id.* ("GTV of existing home transactions was RMB652.0 billion. . . . .  GTV of new

home transactions was RMB498.3 billion . . . .")  The Lead Plaintiff alleges that these statements

were false and misleading because the Company's actual GTV was substantially lower, based on the findings of the Muddy Waters Report. *Id.* ¶ 168.

The 2Q21 press release reported the Company's net revenues for the quarter. *Id.* ¶ 169. The release disclosed that the Company's "[n]et revenues increased . . . to RMB24.2 billion . . . ." *Id.* The release broke out the components of the Company's revenues resulting from existing and new home sales: "Net revenues from existing home transaction services increased by 4.9% [y-o-y,] to RMB9.6 billion (US$1.5 billion) in [2Q21.] Net revenues from new home transaction services increased by 31.9% [y-o-y,] to RMB13.9 billion (US$2.2 billion) in [2Q21.]" *Id.* The Lead Plaintiff alleges that the Muddy Waters Report revealed that the Company had overstated its revenue from new and existing home sales enormously—by approximately 88%. *Id.* ¶ 170.

### g.  The 3Q21 Press Release

The Company issued the press release announcing its third quarter 2021 financial results on November 8, 2021. *Id.* ¶ 171. The next day, it filed the press release as an exhibit to a Form 6-K, signed by Defendant Tao. *Id.* As detailed above, the press release broke out "active" from inactive stores for the first time. *Id.* (The "[n]umber of stores was 53,946 . . . , a 20.2% increase from one year ago" – while the "[n]umber of active stores[] was 49,468 . . . , a 20.2% increase from one year ago." "[A]s of September 30, 2021," the "[n]umber of agents was 515,486 . . . , a 7.9% increase from one year ago" – while the "[n]umber of active agents[] was 468,014 . . . , a 13.1% increase from one year ago."). But the Lead Plaintiff points to the findings of the Muddy Waters Report to contend that the Company's count was substantially inflated.

The Lead Plaintiff asserts that the Company also inflated its reported GTV. The press release disclosed that the Company's GTV for the third quarter of 2021 "was RMB 830.7 billion." *Id.* ¶ 174. The Company broke out the GTV for existing and new home sales as follows. "GTV of existing home transactions was RMB378.2 billion . . . . GTV of new home transactions was RMB410.1 billion . . . ." *Id.* The Lead Plaintiff asserts that these statements were misleading and

fraudulent because they were substantially higher than the GTV calculated by Muddy Waters for the quarter.  *Id.* ¶ 175.

Finally, the Lead Plaintiff alleges that the 3Q21 press release misstated the Company's revenues for the quarter.  The Company reported that "[n]et revenues decreased . . . to RMB18.1 billion" in the quarter.  *Id.* ¶ 176.  The release broke out the components of the Company's revenue resulting from existing and new home sales:  "Net revenues from existing home transaction services were RMB6.1 billion . . . .   Net revenues from new home transaction services increased by 2.5% [y-o-y,] to RMB11.3 billion (US$1.8 billion) in [3Q21.]"  *Id.*  The Lead Plaintiff alleges that the Muddy Waters Report revealed that these disclosures overstated the Company's revenue from new and existing home sales by approximately 63%.  *Id.* ¶ 170.

### 8.   Allegations Regarding Exchange Act Defendants' Scienter

The complaint alleges that the Company and the Executive Defendants (collectively, the "Exchange Act Defendants") acted with scienter.  Many of the allegations of scienter are clearly conclusory in nature.  *See, e.g., id.* ¶ 184 ("[T]he Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew, or at the very least were reckless in not knowing, that they public documents and statements they issued . . . were materially false and misleading when made . . . .").  The Lead Plaintiff alleges that the Exchange Act Defendants knew of the allegedly misleading nature of the information because of their "control over" the "allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information . . . ."  *Id.* ¶ 185.

According to the Lead Plaintiff, the alleged fraudulent scheme "could not have been perpetrated . . . without the knowledge and complicity of . . . the personnel at the highest level of the Company, including the Executive Defendants."  *Id.* ¶ 186.  The Lead Plaintiff alleges that the Executive Defendants can be found to have acted with scienter "by virtue of their high-level

positions within the Company," which made them "privy to confidential information concerning the Company and its business, operations financial statements, and financial condition . . . ." *Id.* ¶ 187.

In addition to these broad allegations, the complaint alleges that the fact that the Company disclosed the number of "active stores" and "active agents" on its platform for prior quarters "gives rise to a strong inference that the Exchange Act Defendants had contemporaneous knowledge . . . that a material portion of the reported stores and agents on its platform were inactive." *Id.* ¶ 189.

The Lead Plaintiff also points to the Company's response to the Muddy Waters Report to support the conclusion that the Exchange Act Defendants acted with scienter. *Id.* ¶ 190. The Lead Plaintiff alleges that the Exchange Act Defendants' "lack of candor in response to the Muddy Waters Report, including (i) their incomplete response; (ii) the speed with which the Company completed its purported internal review; and (iii) the Exchange Act Defendants' failure to release any details about the internal review, also supports a strong inference of scienter." *Id.* ¶ 190. Finally, the Lead Plaintiff alleges that sundry other comments in the Muddy Waters Report regarding alleged malfeasance that was not directly connected to the alleged fraud at the heart of this case, supports the conclusion that the Exchange Act Defendants acted with scienter. *Id.* ¶¶ 191–195.

### B.  Procedural History

This putative class action was initially filed on December 30, 2021. Dkt. No. 1. A number of plaintiffs filed motions asking to be appointed as the lead plaintiff. Dkt. Nos. 14, 17, 19, 22, 26. All of the potential lead plaintiffs dropped out of contention, other than the Saskatchewan Healthcare Employees' Pension Plan (the "Pension Plan"). Dkt. Nos. 31, 32, 34, 35. On March 29, 2022, the Court appointed the Pension Plan as the Lead Plaintiff in this case. Dkt. No. 37. On June 17, 2022, the Lead Plaintiff filed an amended complaint, which is the operative complaint in this case. Dkt. No. 51.

The complaint asserts five claims for relief. Count I claims that the Exchange Act Defendants violated Section 10(b) Securities Exchange Act of 1934 (the "Exchange Act") and Rule

10b-5 promulgated thereunder.  The Lead Plaintiff claims that all of the allegedly misleading statements described in the complaint are actionable under the Exchange Act.  Count II claims that the Executive Defendants are liable under the Section 20(a) of the Exchange Act by virtue of their position as "controlling persons."  This claim is dependent on the viability of the claims pleaded in the first count.

Count III claims that all of the defendants violated Section 11 of the Securities Act of 1933 (the "Securities Act").  Count III is predicated upon the allegedly misleading statements contained in the Secondary Offering Documents.  In Count III, the Lead Plaintiff expressly disclaims its intention to raise any claim based on fraud.  *Id.* ¶ 243 ("This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed.").  Count IV claims that all of the defendants violated Section 12(a)(2) of the Securities Act in connection with the Secondary Offering.  Again, the Lead Plaintiff expressly disclaims any allegations of fraud in connection with this claim.  *Id.* ¶ 254.  And, finally, Count V claims that each of the individual defendants violated Section 15 of the Securities Act, in large part because they were allegedly control persons of the Company and participated in the preparation of, or simply signed, the Secondary Offering Documents.  Here again, the Lead Plaintiff disclaims any allegations or implications of fraud.  *Id.* ¶ 261.

Defendants moved to dismiss the complaint.  Dkt. No. 83 (notice of motion); Dkt. No. 84 (memorandum of law or "Mem.").  Only 25 pages long, the motion is compressed.[4]  Still, the motion surfaces a number of arguments for the dismissal of the complaint.  Defendants argue that the Company's disclosures were not misleading because they chose not to disclose the number of "active" agents and stores.  Mem. at 10–11.  Defendants assert that the Company did not have a duty to disclose what portion of its agents or stores were "active," and that the Company's choice to

---

[4] The complaint and its exhibit are nearly 170 pages long.  And the affidavit submitted by Defendants in support of their motion and its attachments are more than 670 pages in length.  Dkt. No. 85.

disclose that more detailed information should not be read to suggest that the information should have been disclosed before. *Id.* Defendants also contend that certain of the statements targeted by the Lead Plaintiff were non-actionable puffery. *Id.* at 11.[5]

Defendants also contend that the Muddy Waters Report does not provide sufficient support for the Lead Plaintiff's claims. Defendants attack the Report on several fronts. First, they contend that because the Report did not examine any data for periods prior to the second and third quarter of 2021, it cannot support the Lead Plaintiff's Securities Act claims, which relate to statements made in the 2020 Secondary Offering. *Id.* at 12. Second, they argue that short seller reports should be viewed critically and that the Lead Plaintiff's failure to corroborate the Report renders it unreliable. *Id.* at 13. And third, they contend that Muddy Waters' methodology was flawed—in particular because the data upon which it based its conclusions was incomplete. *Id.* at 14–16.

Defendants also assert that the complaint does not adequately plead scienter or loss causation. *Id.* at 20–25. And, finally, they assert that the Lead Plaintiff does not have standing to bring its claims with respect to the Secondary Offering. *Id.* at 25.

The Lead Plaintiff opposed Defendants' motion. Dkt. No. 89 ("Opp'n"). The motion was fully briefed when Defendants filed their reply. Dkt. No. 91. ("Reply").

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A

---

[5] In their brief brief, Defendants do not make an effort to specify which of the many statements identified in the complaint fall into that category.

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (second alteration in original) (internal quotation marks and citations omitted) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* (citation omitted). Under the PSLRA, plaintiffs must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must therefore "do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). In that context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98 (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)). As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as

'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted).  Courts

may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554,

559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir.

2016)) (internal quotation marks omitted).

A court can also consider documents that are "integral to" the complaint.  *Lynch*, 952 F.3d at

79.  In order for a document to meet this exception to the general principle that a court may not

consider documents outside of the pleadings without converting the motion to one for summary

judgment, the complaint must rely heavily upon its terms and effects.  *See DiFolco v. MSNBC Cable*

*LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the

court may nevertheless consider it where the complaint relies heavily upon its terms and effect,

thereby rendering the document integral to the complaint.") (internal quotation marks and citations

omitted).  "However, even if a document is integral to the complaint, it must be clear on the record

that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *Faulkner*

*v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)) (internal quotation marks omitted).  "It must also be clear

that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

(quoting *Faulkner*, 463 F.3d at 134) (internal quotation marks omitted).  "In most instances where

this exception is recognized, the incorporated material is a contract or other legal document

containing obligations upon which the plaintiff's complaint stands or falls, but which for some

reason—usually because the document, read in its entirety, would undermine the legitimacy of the

plaintiff's claim—was not attached to the complaint." *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157.

The Second Circuit has "recognized the applicability of this exception where the documents

consisted of emails that were part of a negotiation exchange that the plaintiff identified as the basis

for its good faith and fair dealing claim, or consisted of contracts referenced in the complaint which

were essential to the claims." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 108–09 (2d Cir.

2021) (first citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); and then citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.4 (2d Cir. 2002)).

"Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issue on the merits, must convert the motion into one for summary judgment." *Id.* at 106. "This requirement 'deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence [outside] the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it.'" *Id.* at 106 (quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 155) (alteration in original). "A district court therefore 'errs when it consider[s] affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.'" *Id.* at 107 (quoting *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000)) (alteration in original).

The Report was attached to the complaint, and therefore, can be considered by the Court. In addition, both parties submitted various filings with the Securities and Exchange Commission (the "SEC") by the Company. *See generally* Fumerton Decl.; Declaration of Erin W. Boardman ("Boardman Decl."), Dkt. No. 90, Ex. A. Although the Court can consider such filings with the SEC, the Court can consider them "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). The Court does not consider the content of the article from the *China Business Law Journal*, which was provided to the Court by the Lead Plaintiff together with its opposition. Boardman Decl., Ex. B. The article was not referenced in the complaint, and is not integral to it.

## III.   DISCUSSION

### A.   The Exchange Act:  Section 10(b) and Rule 10b-5 Liability

The Lead Plaintiff has not plausibly alleged that the Exchange Act Defendants violated the Exchange Act.  While the complaint adequately pleads the existence of a number of misleading statements, the Lead Plaintiff has not adequately pleaded scienter.

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b).  To survive a defendant's motion to dismiss a claim brought under Section 10(b) and Rule 10b-5, a plaintiff must plausibly plead the following elements:  "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341– 42 (2005)).  Defendants challenge the first, second, and sixth elements.

### 1.   False and Misleading Statements or Omissions

#### a.   Legal Standard

 "A statement is misleading if a reasonable investor would have received a false impression from the statement."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted).  When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete."  *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)).  And "literally true statements" are actionable if they "create a materially misleading impression . . . ."  *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The

literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of

defendants' representations, taken together and in context." *Morgan Stanley Info. Fund*, 592 F.3d at

366 (internal quotation marks omitted).  Accordingly, plaintiffs "may not cherry pick certain public

statements for [their] complaint and divorce them from the universe of disclosed information to

plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re

Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v.

Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under section 10(b).

An omission is actionable if the omitted information was subject to "an affirmative legal disclosure

obligation" or the omitted information is "necessary to prevent existing disclosures from being

misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011).  The key is the

"presence of a prior statement that otherwise is or will become materially misleading" because of the

omission.  *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206

(S.D.N.Y. 2019).

To incur liability, misrepresentations or omissions must be material.  An omission is material

if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by

the reasonable investor as having significantly altered the 'total mix' of information made available."

*Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal

quotation marks omitted).  "At the pleading stage, a plaintiff satisfies the materiality requirement of

Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered

significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and

citation omitted).

### i.  *Statements of Opinion*

As a general principle, "[t]o be actionable, a misrepresentation must be one of existing fact,

and not merely an expression of opinion, expectation, or declaration of intention." *In re Moody's*

*Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). Statements of opinion must be examined in the context in which they arise. "[T]he investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.*

Statements of opinion can give rise to liability in two distinct ways, even if they are sincerely believed: if they contain false embedded statements of fact or if they "omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself . . . ." *Id.* at 189; *see Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (applying *Omnicare* beyond Section 11 claims to claims arising under Section 10(b) and Rule 10b-5).

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185–86). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (quoting *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004)) (internal quotation marks omitted). The Second Circuit has firmly rejected the "fraud by hindsight" approach. *See Stevelman v. Alias Rsch., Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (internal quotation marks and citation omitted).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89). A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time." *Omnicare*, 575

U.S. at 188–89.  However, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[ ] not expect that *every* fact known to [a speaker] supports its opinion statement."  *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted).  Therefore, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted).

At the pleading stage, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 209 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted).  The "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194).  The Supreme Court emphasized that this "is no small task for an investor."  *Omnicare*, 575 U.S. at 194.

### ii.  *Corporate Optimism and Puffery*

General statements of optimism and puffery are non-actionable under federal securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'"  *Lopez*, 173 F. Supp. 3d at 29 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)); *see also In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable).  Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because, as stated above, the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'"  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (quoting *Denny v. Barber*, 576 F.2d 465, 470

(2d Cir. 1978)).  Allegations that a defendant should have been "more alert and more skeptical" are

insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future . . . ."

*Id.*

However, like opinion statements, statements of optimism and puffery can be actionable

where they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*,

195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing

facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v.*

*OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir.

2000)).

### b.   Application

#### i.   *The Company Was Not Required to Disclose the Number of its Stores and Agents That Were not "Active"*

The Company was not required to disclose the number of its stores or agents that were not

"active" on its platform.  The fact that the Company later voluntarily disclosed more detailed

information regarding the activity levels of its stores and agents does not support the conclusion that

its prior statements—which did not contain that level of detail—violated the Securities Act.

"It bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to

disclose any and all material information.  Disclosure is required under these provisions only when

necessary to make . . . statements made, in the light of the circumstances under which they were

made, not misleading.  Even with respect to information that a reasonable investor might consider

material, companies can control what they have to disclose under these provisions by controlling

what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (internal

quotations and citations omitted).

The Lead Plaintiff does not allege that the Company was under an affirmative legal

obligation to break out the number of stores or agents on its platform that it considered to be

"active."  Instead, the Lead Plaintiff asserts that by choosing to speak about the number of stores or agents on its platform, its failure to identify that certain of the stores and agents were not "active" made its prior statements incomplete.  The Company was not obligated to provide additional disclosures regarding the activity level of the agents and stores on its platform.  A reasonable investor viewing the Company's disclosures would not understand that all of the reported agents and stores had the same level of activity.

The Company's disclosures indicated that not all of its stores or brokers had high activity levels.  That fact undermines the Lead Plaintiff's argument that the Company was required to break out that information.  *See In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'") (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)); *Stadnick v. Vivint Solar, Inc.,* No. 14-CV-9283 (KBF), 2015 WL 8492757, at *11 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017) ("In considering whether alleged misrepresentations and/or omissions constitute violations of the securities laws, a court must read the offering documents as a whole.").

For example, in its Secondary Offering Documents, KE Holdings disclosed that "the growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform *and their activity level*."  FAC ¶ 211 (emphasis added).  The Company also disclosed that the activity levels of its stores and agents varied.  For example, KE Holdings disclosed that, "[m]any of the brokerage stores on our platform, as well as our transaction service centers, underwent temporary closure in early 2020 as part of China's nationwide efforts to contain the spread of COVID-19.  During that period, all agents were required to stay at home and were unable to serve our housing customers . . . most of the brokerage stores on our platform were subject to . . . low activity level[s] for a certain period of time in . . . 2020 due to the COVID-19 pandemic . . . ."  Fumerton Decl., Ex. B at 103.

In short, reviewed in the context of the Company's disclosures, the Company's choice not to disclose that not all of its stores or agents were "active" over a period of time did not make its disclosure of the aggregate number of its stores and agents inaccurate or incomplete.[6]  A reasonable investor would understand that not all of the stores and agents were active at any time, therefore, the Company was not required to disclose the relative activity level of those stores and agents to make the disclosures complete.

It is noteworthy that the Company did not restate any of its prior disclosures when it elected to voluntarily disclose that portion of its agents and stores that were "active."  The incremental disclosure did not affect the Company's revenues or GTV.  *See, e.g.*, *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 402–03 (S.D.N.Y. 2022) (holding that "Plaintiff offers no plausible allegation that the change from gross-basis to net-basis recognition of revenue would have been material to an investor.  Indeed, Plaintiff acknowledges that 'gross profit remained the same' before and after the restatement . . . .").

And the Lead Plaintiff does not contend that the Company's stock price was affected by the retroactive disclosure of its stores and agents that were not "active" in its November 8, 2021 press release.  Instead, the alleged corrective disclosure in this case was the issuance of the Muddy Waters Report over a month later on December 16, 2021.

In sum, a reasonable investor, reviewing the Company's disclosures in context as a whole, would not have been under the impression that all the agents and stores were "active" during each quarter.  The Company was not required to identify the activity levels of its stores and brokers in order to make its disclosures of their aggregate number correct and complete.

---

[6] The Lead Plaintiff's contention here leads to a slippery slope.  Many companies report, for example, the total number of their employees.  The Lead Plaintiff would require any such company to break out those employees who are presently on leave—or who are unproductive for other reasons.  A reasonable investor would not expect the activity levels for all to be equal or that all be actively working at any time, even in the absence of other disclosures indicating that their activity levels varied.  And here again, the Company's other disclosures indicated that there was variation in the activity levels of stores and agents that had an impact on the Company's productivity.

> ### ii.     The Muddy Waters Report Is Sufficiently Reliable to Support the Lead Plaintiff's Claims

The Muddy Waters Report is a report by a short seller, but it has sufficient indicia of reliability to support the Lead Plaintiff's claims regarding the accuracy of the statements made by the Company.  Judge Engelmayer recently wrote a thoughtful opinion detailing reasons why allegations based on short seller reports should be viewed with caution.  As he wrote, unlike attorneys "with professional obligations to the Court, such as that under Federal Rule of Civil Procedure 11(b) to certify that a pleading's factual averments were the product of an inquiry reasonable under the circumstances," the "author of such a report is economically motivated to drive the issuer's stock price down."  *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023).  With these concerns in mind, Judge Engelmayer wrote that "to the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic interest in driving down the company's stock price—these allegations must be considered with caution."  *Id.*; *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (noting that short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate" (internal quotation marks and citation omitted)).

Judge Engelmayer noted that concerns regarding short-seller reports are heightened when they rely on confidential sources.  "Where these two problematic features coincide—when a complaint's factual attributions to unidentified sources derive not from interviews by plaintiffs' counsel, but from a short-seller report's attributions to such sources—there is still greater need for care."  *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d at 154.  Judge Engelmayer's note of caution regarding short seller reports in *In re DraftKings Inc.* is warranted.  But the opinion should not be misread as stating a rule that short seller reports are to be disregarded.  *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123–24 (S.D.N.Y. 2013) (noting that "[t]he majority of courts that have addressed this issue have held that a short-seller report, such as the Muddy

Waters Report . . . does not implicate the same skepticism as a traditional anonymous source")
(internal quotation marks and citations omitted).  As Judge Engelmayer wrote in a different opinion,
"[t]here is no rule categorically excluding allegations derived from such sources."  *In re Hebron Tech.
Co., Ltd. Sec. Litig.*, No. 20 CIV. 4420 (PAE), 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021).

"[C]ourts in this district frequently accept allegations based on short-seller reports" in the
context of a motion to dismiss.  *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214
(HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014).  As the *In re Hebron Tech. Co.* Court
explained:  "The issue in each case is whether the allegations in the complaint, taken as a whole, state
a claim.  And where there is a basis to view the short seller's factual allegations as reliable as opposed
to fabricated based on self-interest—for example, where facts are cited that tend to substantiate
these allegations or reveal the basis for the short-seller's factual assertions—those allegations are
more apt to be viewed as reliable."  2021 WL 4341500, at *13.  Ultimately, the "reliability of an
analyst's report is a question of fact."  *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 459
(S.D.N.Y. 2022); *see also McIntire*, 927 F. Supp. 2d at 123–24 (holding in the context of a motion to
dismiss that "truth of . . . the Muddy Waters report is a factual dispute not appropriate for resolution
at this stage" (internal quotation marks and citations omitted)).

The Muddy Waters Report contains sufficient indicia of reliability to support the Lead
Plaintiff's claims.  The Report explains the methodology that it used to calculate the number of
stores and agents at the Company during the periods that it examined:  among other things, Muddy
Waters developed a computer program to analyze the data published on the Company's platform.
As detailed above, Muddy Waters took a number of steps to corroborate its analysis of the
Company's accessible data, including in-person site visits, conversations with store agents and
managers, and cross-checking their results with other publicly available databases.  Muddy Waters'
investigative efforts were documented in the Report with photographs, transcripts, and screenshots.
In sum, the Report cites facts that "tend to substantiate these allegations or reveal the basis for the

short-seller's factual assertions"—and it provides sufficiently reliable support for the Lead Plaintiff's claims.  *See In re Hebron Tech. Co.*, 2021 WL 4341500, at *13.

Defendants assert that the fact that the Lead Plaintiff's counsel did not take steps to corroborate independently the facts reported by Muddy Waters requires that the Court disregard the allegations in the complaint that are based on the Report.  Reply at 4 ("Plaintiff even **admits** its counsel **could not corroborate or replicate** Muddy Waters' findings—which alone warrants dismissal.") (emphasis in original).  There is no such categorical rule:  the argument is not supported by the single case Defendants cite to support it.  To support this broad assertion, Defendants point only to *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020).  In that case, Judge Engelmayer evaluated allegations that did "no more than recapitulate the [short seller] Report's characterization of purported interviews with anonymous sources."  *Id.* at 802.  Judge Engelmayer explained that the complaint's allegations were insufficient because the complaint "does not allege any independent corroborative facts, any independent investigation by counsel, or any contact by plaintiff's counsel with the interviewees.  Instead, [the plaintiff] makes . . . five threadbare allegations, all reliant on [the short seller's] attributions to unnamed persons . . . ."  *Id.*

As the quoted text makes clear, Judge Engelmayer was not announcing a rule that the content of short seller reports must be disregarded unless it is independently corroborated by counsel, as Defendants argue here.  Instead, he was simply analyzing allegations based solely on statements by confidential witnesses, applying the standard described by the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).  *See Long Miao*, 442 F. Supp. 3d at 803 ("These allegations bear none of the indicia of reliability that have led courts applying *Novak* to sustain allegations as sufficiently particular.").

Moreover, unlike the short seller report at issue in *Long Miao*, the Muddy Waters Report did not rely on confidential sources.  As detailed above, the Report was based on Muddy Waters' evaluation of the Company's data.  One of several methods that Muddy Waters used to verify its

findings were conversations with individuals who worked at the Company's stores.  But the Report's findings were not based on statements attributed to confidential sources.

Defendants' arguments regarding the reliability and methodology of the Report cannot be resolved by the Court in the context of a motion to dismiss.  Defendants present a number of arguments regarding the "flawed methodology" employed by Muddy Waters developing the Report. Many of Defendants' critiques focus on the insufficiency of the data examined by Muddy Waters— according to Defendants, for example, the data considered by Muddy Waters does not properly reflect all of the Company's internal data, and the assumptions employed by Muddy Waters were inaccurate.  These criticisms may ultimately prove to have merit.  But the Court cannot resolve these issues—which are fundamentally evidentiary in nature—in the context of a motion to dismiss under the guise of a "plausibility" analysis.  "[C]ourts in this district frequently accept allegations based on short-seller reports" at the motion to dismiss phase.  *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4.  The "truth" of the facts reported in the Report is a "factual dispute not appropriate for resolution at this stage."  *McIntire*, 927 F. Supp. 2d at 124; *accord In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d at 459.  The Court must draw all inferences in favor of the Lead Plaintiff at this stage in the case and cannot disregard the complaint's allegations based on Defendants' critique of the Report's methodology.

Despite the fact that the Report analyzes only the Company's results for the second and third quarters of 2021, the Report's findings support the Lead Plaintiff's allegations regarding the alleged falsity of the Company's statements in prior periods.  At this preliminary stage, the Court must draw all reasonable inferences in the plaintiff's favor—in this case, that the alleged fraud that occurred during two quarters supports an inference that the fraud was ongoing in the prior periods.[7] *See Emp.s' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("[T]he Second

---

[7] Or in the case of the Securities Act claims, that the same negligent conduct was at work.

Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." (citing *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143  n.13 (2d Cir. 2010) (holding that the district court erred in concluding that plaintiff failed to state a claim because the district court focused on "problems only in February 2008, when the trading incident occurred, not in July 2007, at the time the prospectus and registration statement issued" because that "conclusion fails to draw a reasonable inference in the plaintiffs' favor . . . . Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.  This is sufficient to raise . . . right to relief above the speculative level." (internal quotation marks and citations omitted)); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001))).  And while the Company's choice not to disclose the number of its "active" agents does not by itself support the conclusion that the Company's disclosures were inaccurate, that fact enhances the plausibility of the Lead Plaintiff's contentions that the Report's findings are suggestive of a substantial overcount of stores and agents in prior periods.

### iii.    Non-Actionable Statements

Many of the statements contained in the Company's Secondary Offering Documents and 2020 Form 20-F are not actionable.[8]  Many of the statements are clearly signaled as statements of

---

[8] The following statements in the Company's Secondary Offering Documents and 2020 Form 20-F are not actionable: (1) "The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level."; (2) "We believe the large and active network of real estate brokerage brands and their affiliated stores and agents contributes significantly to the success of our platform."; (3) "We believe a large and active network of agents, brokerage stores and brokerage brands across China provides a solid foundation for serving a large number of housing customers."; (4) "We believe our reputation for high-quality service among the large housing customer base and our growing network of real estate brokerage stores and agents that transact actively on our platform well position us to increase cooperation with existing and new real estate developers."; (5) "We believe our proactive engagement with platform participants both online and offline enables us to know them better and serve them better."; (6) "We believe the numbers of real estate brokerage stores and agents on our platform demonstrate our scale and are crucial indicators of our operations."; (7) "Scale and quality of agent and store network.  Agents and physical stores are fundamental to China's housing transactions and services market, playing a key role in helping brokerage service providers capture potential customers by serving as a gateway into local communities.  It is important to build an extensive agent and store network across brokerage brands."; (8) "Our offline stores serve as an entry point for our customers to our platform as they are conveniently located within the communities and at the same time have become our competitive advantage in the industry."; and (9) "We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.  We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the

opinion—the Company's beliefs that informed its strategic choices.[9]  The Lead Plaintiff has not adequately pleaded that the Company did not have the belief that was professed in any of these statements.  *See Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185–86).

Moreover, Lead Plaintiff pleads no plausible basis to conclude that these statements made were false or believed to be false.  Take, for example, the first statement in this category identified by the Lead Plaintiff:  "The growth in gross transaction value on our platform and platform service revenues are also affected by the number of real estate brokerage stores and agents on our platform and their activity level."  FAC ¶ 141.  The complaint does not plead facts that support the conclusion that any part of this statement is false or misleading:  the Muddy Waters Report agrees that the number and activity level of brokers affect the Company's revenues.  The complaint similarly fails to plead a basis to conclude that the other statements identified were false.[10]

The Lead Plaintiff asserts that these statements are inaccurate or misleading because they imply a representation about the number or activity level of the Company's stores.  That is not a fair reading of the statements in context.  None of these statements are representations about the actual number of the Company's stores or agents—they are descriptions of the significance of a large market share for the development of the Company's business.  For example, the third statement reads as follows:  "We believe a large and active network of agents, brokerage stores and brokerage brands across China provides a solid foundation for serving a large number of housing customers." *Id.* ¶ 142.  In context, this cannot be read as an assertion regarding the specific number of agents and brokerages that the Company used:  it asserts the uncontroverted principle that "a" large and active network provides a solid foundation for the Company.  *See id.*

---

performance of our business.  If we discover material inaccuracies in the operating metrics we use, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which would negatively affect our business."  These statements are described earlier in the complaint in context and are replicated in part here as a reference for the reader.

[9] *See* statements (1) through (7) above.

[10] *See* Statements (1) through (8) above.

Moreover, the descriptive terms used in these statements, such as "large" and "growing" that are to a large extent "neither quantifiable nor factual, but rather subject to interpretation, within reason"—and are, therefore, not actionable.  *See, e.g.*, *In re Yunji Inc., Sec. Litig.*, No. 19CV6403LDHSMG, 2021 WL 1439715, at *8 (E.D.N.Y. Mar. 31, 2021) (holding that plaintiff's allegations which were focused on descriptors such as "'high-quality' and 'curated,' which as applied generally to several categories of products, are neither quantifiable nor factual, but rather subject to interpretation, within reason, and are statements of opinion" (internal quotation marks and citation omitted)); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless[.]").

The risk factor targeted by the Lead Plaintiff is not actionable because it is a forward-looking statement and the Lead Plaintiff has not adequately pleaded that the risk had materialized at the time of the disclosure.[11]  The judicially created "bespeaks-caution doctrine is a corollary of 'the well-established principle that a statement or omission must be considered in context.'"  *Iowa Pub. Emps. Ret. Sys.*, 620 F.3d at 141 (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1996)).  The doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Id.*; *accord Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) ("Pursuant to the judicially-created 'bespeaks caution' doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered

---

[11] *See* Statement (9) above ("We rely on certain key operating metrics to evaluate the performance of our business, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.  We rely on certain key operating metrics, such as GTV, and the number of real estate brokerage stores and agents on our platform among other things, to evaluate the performance of our business.  If we discover material inaccuracies in the operating metrics we use, or if they are perceived to be inaccurate, our reputation may be harmed and our evaluation methods and results may be impaired, which would negatively affect our business.").

immaterial as a matter of law."). "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *Iowa Pub. Emps. Ret. Sys.*, 620 F.3d at 142.

A threshold issue in determining the applicability of the bespeaks-caution doctrine is a determination of whether the challenged statements are forward-looking in nature. "As a general rule, statements whose truth cannot be ascertained until some time after they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (collecting cases). In discussing the bespeaks-caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004). "A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143.

However, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). In other words, "there is a 'critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur'—particularly where that distinction holds 'enormous significance' for investors." *Id.* (quoting *Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008)) (emphasis in original).

Here, the challenged statements in the Company's risk factors are inherently forward looking. Nonetheless, the Lead Plaintiff argues that those statements are misleading "because they portrayed 'inaccuracies' in 'key operating metrics,' including 'the number[s] of . . . brokerage stores and agents on [the Company's] platform,' as hypothetical future risks, when in truth, the numbers of

stores and agents as of September 30, 2020 that KE Holdings provided in the Secondary Offering

Documents were presently inaccurate." FAC ¶ 151 (alterations in original). But the Lead Plaintiff's

contention does not read the statements in context. The statements do not represent that there are

no inaccuracies in the data, but rather that "perceived inaccuracies in such metrics may harm our

reputation and negatively affect our business." *Id.* at ¶ 150. And the complaint does not allege that

the risk identified in the final sentence—namely that the Company or the investing public had

discovered inaccuracies at the time of the disclosure: instead, the complaint alleges that the public

did not discover alleged inaccuracies until the release of the Muddy Waters Report.

### 2.   Scienter

#### a.   Legal Standard

The Lead Plaintiff's allegations fail to plausibly show that KE Holdings' actionable

statements were made with a wrongful state of mind. A plaintiff alleging securities fraud must allege

"with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has explained that "[t]he PSLRA

requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the

facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks and citation

omitted). The question "is whether *all* of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard." *Id.* at 310 (emphasis in original). To plead scienter for a forward-looking statement, a

plaintiff must allege that the statement was made "with actual knowledge" of its falsity. 15 U.S.C.

§ 78u-5(c)(1)(B).

For all other statements, "recklessness is a sufficiently culpable mental state for securities

fraud in this circuit." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d

187, 198 (2d Cir. 2009) (citations omitted); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d

Cir. 2010) ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.") (internal quotation marks and citation omitted). That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). A plaintiff need not rely exclusively on one of these theories. Indeed, *Kalnit* held that absent allegations of motive, "the strength of the circumstantial [evidence] must be correspondingly greater." *Id.* at 142 (internal quotation marks and citation omitted). That accords with the Supreme Court's admonition to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ." *Tellabs*, 551 U.S. at 310 (emphasis in original).

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks and citation omitted). But a plaintiff alleging recklessness must allege "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (internal quotation marks and citation omitted). "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (internal quotation marks and citation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777.  An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (internal quotation marks and citation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.").  In sum, "[t]he inquiry on a motion to dismiss is as follows:  'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

Rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also DeAngelis v. Corzine,* 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (quoting 15 U.S.C. § 78u–4(b)(2))).

#### b.    Application

The Lead Plaintiff's Exchange Act claims are dismissed because the Lead Plaintiff's allegations fail to raise the requisite strong inference of scienter.  The Court has considered all of the Lead Plaintiff's allegations regarding scienter in their totality and concludes that individually and in

the aggregate they do not adequately plead scienter, but for ease of analysis, the Court discusses each

of the principal scienter allegations individually below.

The Lead Plaintiff alleges that scienter has been pleaded with respect to "[t]he Executive

Defendants, by virtue of their high-level positions with the Company, [who] directly participated in

the management of the Company, were directly involved in the day-to-day operations of the

Company at the highest levels, and were privy to confidential proprietary information concerning

the Company and its business, operations, financial statements, and financial condition, as alleged

herein."  FAC ¶ 187.  The Lead Plaintiff's allegations concerning the Executive Defendants'

positions in KE Holdings are insufficient to plead scienter because they merely rely on the

Executive Defendants' "high-level positions" and involvement "in the day-to-day operations."  *See

Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (quoting *In re PXRE Grp., Ltd., Sec.

Litig.*, 600 F. Supp. 2d 510, 538 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393

(2d Cir. 2009) (summary order) ("Here, Plaintiff argues that the individual Defendants *must have

known* of Matusiak's concerns, due to their positions in PXRE, and due to PXRE's 'intimate

corporate culture.'  The Court finds that such allegations fail to support an inference that

Defendants knew, or had access to, Matusiak's concerns.") (emphasis in original)); *Plumbers &

Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y.

2010) ("Courts in this Circuit have long held that accusations founded on nothing more than a

defendant's corporate position are entitled to no weight."); *In re Sotheby's Holdings, Inc.*, No. 00 Civ.

1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that

boilerplate allegations that defendants knew or should have known of fraudulent conduct based

solely on their board membership or executive positions are insufficient to plead scienter.").

The Lead Plaintiff also alleges that scienter is plausibly pleaded because "[t]he Exchange Act

Defendants, by virtue of their receipt of information reflecting the true facts regarding KE

Holdings, their control over, and/or receipt and/or modification of KE Holdings' allegedly

materially misleading" and that "they failed to ascertain and to disclose such facts, even though such facts were available to them."  FAC ¶¶ 185, 188.  These conclusory allegations are also inadequate to plead scienter.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309.  In *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, the Second Circuit held that because plaintiffs failed to do so, they failed to raise an "inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of [the defendant's] public statements."  531 F.3d 190, 196 (2d Cir. 2008); *see also Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020) (summary order) (stating that plaintiff's allegation that defendants "were aware of a variety of information that Plaintiffs say is inconsistent with those statements" is insufficient to plead recklessness); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020) (holding that, "[t]o the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must 'specifically identify the reports or statements containing this information'" (internal quotation marks and citation omitted)).

Likewise here, the Lead Plaintiff has failed to specifically identify the reports or statements containing any contradictory information.  And as previously discussed, the Company did not have a duty to disclose the number of its "active" stores and agents, rendering the Lead Plaintiff's allegations insufficient.  *See Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001) ("Because . . . this case does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness." (emphasis in original)); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) ("Because the securities laws do not allow fraud by hindsight claims, after-the-fact allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." (internal quotation marks and citation omitted)).

The Lead Plaintiff also alleges that the "Exchange Act Defendants' lack of candor in response to the Muddy Waters Report, including (i) their incomplete response; (ii) the speed with which the Company completed its purported internal review; and (iii) the Exchange Act Defendants' failure to release any details about the internal review, also supports a strong inference of scienter." FAC ¶ 190. At the outset, the undertaking of an internal investigation shortly after the short-seller report was issued to the public undermines the Lead Plaintiff's allegations. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (finding that scienter was not sufficiently pleaded where the "facts [did] not support an inference that [the defendant] was trying to hide anything from its investors. Rather, they suggest[ed] that [the defendant] . . . was endeavoring in good faith to ascertain and disclose future losses."); *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (holding that "the fact that [the defendant] commenced an internal investigation tends to undermine any inference of scienter."). The Lead Plaintiff's subjective characterization of the response as lacking "candor" does not suffice to allege scienter.

The Lead Plaintiff also alleges that KE Holdings "reportedly removed some of the information used by Muddy Waters from its platform." FAC ¶ 190. The Lead Plaintiff alleges that Muddy Waters tweeted that "KE Holdings likely 'chang[ed] its system' in an effort 'to prevent further data collection' that would provide evidence of the Company's fraud." *Id.* This allegation regarding the Company's "likely" motivation is mere speculation. Furthermore, the change to the Company's platform was implemented long after Defendants' alleged misrepresentations and thus does not support a strong inference of scienter at the time that KE Holdings made its statements. *See, e.g., Pope Invs. II, LLC v. Deheng Law Firm*, 586 F. App'x 1, 4 (2d Cir. 2014) (summary order) (stating that an email that "was sent well after the alleged misrepresentation . . . . would not necessarily indicate knowledge . . . at the time of the alleged misrepresentation").

Finally, it is well established in this Circuit that the Lead Plaintiff's allegations concerning Defendants' alleged desire to maintain the "artificial" high price of the stock and to be profitable is not sufficient to plead scienter. *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020) ("[T]he desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive.").

Accordingly, the Lead Plaintiff has failed to plausibly allege scienter because the allegations, taken together, fail to show a strong inference of scienter.[12]  Because the "failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim," the Court need not address Defendants' other arguments for the dismissal of the Lead Plaintiff's Exchange Act claims. *See Caiafa v. Sea Containers Ltd.,* No. 06 CIV. 2565 (RMB), 2008 WL 11516813, at *4 (S.D.N.Y. May 15, 2008); *see also Ato Ram, II, Ltd. v. SMC Multimedia Corp.*, 2004 WL 744792, at *6 n.7 (S.D.N.Y. April 7, 2004) ("Because plaintiff[s] did not adequately plead the element of scienter, I need not address defendants' other arguments concerning [Plaintiffs'] failure to plead the remaining elements with particularity.").

**B.      Section 20(a) Claim**

The Lead Plaintiff has not adequately pleaded a Section 20(a) claim for control person liability.  To plausibly allege a claim for control person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that

---

[12]  The Lead Plaintiff also argues that the strong inference of scienter is "bolstered by the subsequent admission of KE's general counsel that KE had 'anticipated' the Report."  Opp'n at 21.  But as the Court previously stated, the Court cannot consider a report that was neither attached to the complaint, nor incorporated by reference or integral to the complaint—this information was first presented to the Court in Plaintiff's opposition.  Moreover, the fact that the Company anticipated a report by Muddy Waters does not support the most likely inference that the Company was aware that its fraud was about to be discovered.  It is at least equally plausible that the Company simply learned in advance of the fact that Muddy Waters was planning to issue a report:  that the Company anticipated its issuance does not lead to the conclusion that it anticipated that its reported results would be accurate.

the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted).  As discussed above, the Lead Plaintiff has not plausibly pleaded a claim for a primary violation under Section 10(b).  Consequently, the Lead Plaintiff has not stated a plausible claim for control person liability under Section 20(a).

### C.     The Securities Act

The Lead Plaintiff also brings Securities Act claims based on the statements in the Secondary Offering Documents.  The "only statements and omissions actionable under Sections 11, 12(a)(2) and 15 of the Securities Act are those in the Secondary Offering Documents."  FAC ¶ 207.  Because Lead Plaintiff has plausibly alleged based on the Report that KE Holdings' statements in the Secondary Offering Documents regarding its reported number of agents and stores were false and misleading, the Lead Plaintiff's Securities Act claims survive.

### 1.      Standing

The Lead Plaintiff's allegations adequately establish standing.  The Lead Plaintiff alleged that "Lead Plaintiff and the other members of the Class purchased KE Holdings ADSs pursuant and/or traceable to the Registration Statement for the Secondary Offering . . ." and that "Lead Plaintiff and the other members of the Class who purchased KE Holdings ADSs pursuant to the Secondary Offering Prospectus."  FAC ¶¶ 250, 257.  That is all that is required at this preliminary stage.  *See In re Pareteum Sec. Litig.*, No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *19 (S.D.N.Y. Aug. 11, 2021) ("At the pleading stage, a plaintiff's general allegations that securities were purchased pursuant or traceable to a false registration statement sufficiently state a claim."); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) ("[T]o establish standing under § 11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" (quoting *In re WRT Energy Sec. Litig.*, 75 F. App'x 839 (2d Cir. 2003) (summary

order)); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 324 (S.D.N.Y. 2013) ("It is enough, at this stage, for Plaintiffs to allege that they purchased securities 'in' or 'pursuant to' the relevant offerings.").

### 2.    The Pleading Standard and Scienter

The Lead Plaintiff's claims under the Securities Act are not subject to the heightened pleading standards of Rule 9(b), and the Lead Plaintiff is not required to plead scienter.  Therefore, the Lead Plaintiff's failure to plead scienter adequately does not require dismissal of its claims under the Securities Act.  "Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions.  Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)).  "Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11 or 12."  *Id.* (citing 15 U.S.C. § 77o).  "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."  *Id.*

"Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC:  (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *Id.* at 360 (citing 15 U.S.C. §§ 77k (a), 77l(a)(2)).

 "Fraud is not an element or a requisite to a [Securities Act] claim" and "a plaintiff need allege no more than negligence to proceed under" that provision.  *Rombach*, 355 F.3d at 171.  Nevertheless, the heightened pleading standard applies to claims brought under the Securities Act if they sound in fraud.  *Id.* at 167 ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of

fraud.").  "*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'"  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (quoting *Rombach*, 355 F.3d at 172).

 "In practice, courts rely on four factors to determine whether Section 11 claims sound in fraud:  whether '(1) the complaint contains merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; (2) the allegations themselves include classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the courts to parse the complaints.'"  *In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 392 (E.D.N.Y. 2013)).

All four of these factors weigh in favor of the conclusion that the Lead Plaintiff's Securities Act claims do not sound in fraud.  At the outset, as detailed above, the complaint contains numerous blanket disclaimers of fraud with respect to the Securities Act claims.  *See, e.g.*, FAC ¶ 207 ("The allegations set forth above in §§ I-IV are incorporated by reference herein, except to the extent they sound in fraud.  The Securities Act allegations herein are based in strict liability and negligence, and Lead Plaintiff expressly disclaims any allegation or inference of fraud or scienter for these allegations."); FAC ¶ 243 ("This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed.").

In addition to the blanket disclaimers, the complaint is "structured so as to draw a clear distinction between negligence and fraud claims."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007).  The allegations related to the Securities Act claims reside in a separate section of the complaint, and each Securities Act claim is pleaded independently.  *See* FAC §§ VI, VIII(C)–(E).

As a result, the Court is not required to parse the complaint to understand the basis for the Securities Act claims.

Furthermore, the Securities Act claims specifically allege that the Defendants acted negligently.  For instance, Lead Plaintiff bases these allegations on "Defendants' *negligent* failure to disclose" information and that the Secondary Offering documents "were *negligently* prepared."  FAC ¶¶ 208, 210, 213 (emphasis added).  These claims allege alternative grounds of liability—negligence rather than fraud.  That the conduct underlying the alleged claims of negligence and fraud overlap does not deprive the Lead Plaintiff of the opportunity to plead that Defendants acted negligently in the alternative.  The fact that the Muddy Waters Report used language asserting that the Company's conduct constituted a massive "multivariate fraud" does not change the result.  The predicate of the Securities Act claims are the factual conclusions presented in the Muddy Waters Report—not Muddy Waters' characterization of the Company's motivations.  Alleging a "massive fraud . . . does not strip Plaintiffs of the right to plead negligence in the alternative . . . ."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374–75 (S.D.N.Y. 2011).  A contrary rule "would create a perverse incentive to file separate actions."  *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *8 (S.D.N.Y. Sept. 10, 2012).

In sum, the Lead Plaintiff's Securities Act claims "sound in negligence, not in fraud."  *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300 at *5.  Because the Lead Plaintiff's allegations are "analytically distinct, even if overlapping conduct forms the basis for both," do not "simply rely on a blanket disclaimer to cordon off their claims into fraud and negligence; they plead each allegation separately," and allege alternative grounds of liability, the Lead Plaintiff's allegations under the Securities Act claims are not subject to the heightened pleading standards under Rule 9(b), and the Lead Plaintiff's failure to plead scienter is not fatal to these claims.  *Id.*

### 3.   Loss Causation

#### a.   Legal Standard

"A plaintiff's burden to plead loss causation is 'not a heavy one.'" *DoubleLine Capital*, 413 F.

Supp. 3d at 212 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d

Cir. 2015)).   "To plead loss causation, a plaintiff must allege 'that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered.'"   *Id.* (quoting *Suez Equity Inv'rs, L.P.*

*v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).   "She may do so either by alleging (a) 'the

existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure

of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk

concealed by the fraudulent statement.'"   *Id.* (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501,

511, 513 (2d Cir. 2010)).   In this case, the Lead Plaintiff alleges that the market reacted negatively to

the corrective disclosure contained in the Muddy Waters Report.

#### b.   Application

The Lead Plaintiff has adequately pleaded loss causation because the market reacted

adversely to the disclosures in the Report.   The complaint alleges that the market price of the

Company's ADSs dipped materially following the release of the Report.   The stock closed at $18.68

the day before the Report's release.   After the Report was released, the Company's shares declined

by 4.47% before the market opened.   The share value dipped to an intraday low of $17.72—a 5.74%

decline from the closing price prior to the release of the Report.   The stock closed down the day

after the Report's release at $18.31—a, small, but measurable decline of approximately 1.6% from

the closing price before the release of the Report.   The intraday price fluctuation alone would permit

the Court to find that the Lead Plaintiff had adequately pleaded causation.   *See, e.g.*, *In re VimpelCom,*

*Ltd.*, No. 1-15-CV-8672 (ALC), 2016 WL 5390902, at *3 (S.D.N.Y. Sept. 26, 2016) ("As an initial

matter, courts in this Circuit have frequently allowed cases to proceed under theories based on

intraday price fluctuations.") (collecting cases).   And the stock closed down at the end of trading the

day following its release, which also supports the Lead Plaintiff's claim. The fact that the stock traded up on subsequent days may affect the definition of the class or the appropriate measure of damages, but does not negate the sufficiency of the Lead Plaintiff's allegations regarding causation.

## IV.     CONCLUSION

Defendants' motion to dismiss the amended class action complaint is granted in part and denied in part. Defendants' motion is granted with respect to the Lead Plaintiff's claims arising under the Exchange Act. Defendants' motion is granted in part and denied in part with respect to the Lead Plaintiff's Securities Act claims. The motion is granted with respect to the statements in the Secondary Offering Documents that the Court identified as non-actionable in Section III.A.1.b.iii above. All of the Lead Plaintiff's other claims under the Securities Act survive this motion to dismiss.

The Lead Plaintiff has requested that it be granted leave to replead the complaint if the Court granted any part of Defendants' motion. Opp'n at 25 n.29. The Federal Rules of Civil Procedure provide that courts should "freely give" leave to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI*, 493 F.3d at 108 (citation omitted). Accordingly, the amended complaint is dismissed, without prejudice. Within twenty-one days, Lead Plaintiff may file a second amended complaint to cure the deficiencies articulated in this opinion. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 83.

SO ORDERED.

Dated:  February 26, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge