UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

KEITH CHIN, Individually and on Behalf of
All Others Similarly Situated,

                       Plaintiff,

    vs.

KE HOLDINGS INC., PENG YONGDONG,
XU TAO, SHAN YIGANG, BAO FAN,
LI ZHAOHUI, CHEN XIAOHONG,
COLLEEN A. DE VRIES, GOLDMAN
SACHS (ASIA) L.L.C., MORGAN STANLEY
& CO. LLC, J.P. MORGAN SECURITIES
LLC, CHINA RENAISSANCE SECURITIES
(HONG KONG) LIMITED, GOLDMAN
SACHS & CO. LLC and CHINA
RENAISSANCE SECURITIES (US) INC.,

                    Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:21-cv-11196-GHW

**THIRD AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

<u>DEMAND FOR JURY TRIAL</u>

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................... 5

III.    PARTIES ..................................................................................................................... 6

        A.      Lead Plaintiff ................................................................................................... 6

        B.      KE Holdings ..................................................................................................... 6

        C.      The Individual Defendants ............................................................................... 7

        D.      The Underwriter Defendants ............................................................................ 7

IV.     SUBSTANTIVE ALLEGATIONS ............................................................................. 9

        A.      Background of the Company's Business .......................................................... 9

        B.      KE Holdings Raises Billions of Dollars Through an IPO and a Secondary
                Offering in the United States .......................................................................... 12

        C.      KE Holdings Reports Positive Financial Results and Operating Metrics .............. 13

        D.      KE Holdings Discloses that It Has Been Including Inactive Stores and
                Agents in Its Reported Metrics ....................................................................... 14

        E.      Muddy Waters Finds Substantial Evidence that the Reported Numbers of
                Stores and Agents on KE Holdings' Platform Were Significantly Inflated ......... 17

                1.      Evidence of Inflated Store Counts ...................................................... 17

                        a.      Muddy Waters Finds a Multitude of Nonexistent "Ghost
                                Stores" ..................................................................................... 19

                        b.      Muddy Waters Finds a Multitude of Double-Counted
                                "Clone Stores" ........................................................................ 25

                        c.      Muddy Waters' Case Study in the City of Sanhe Langfang
                                Finds that KE Holdings' Store Count Was Inflated by 59% ......... 28

                        d.      Muddy Waters Finds Brokerage Stores that Were
                                Registered as Company-owned Lianjia stores, but Were
                                Actually Less Profitable Franchised Deyou Stores ...................... 33

                2.      Evidence of Inflated Agent Counts ...................................................... 34

a.    Local Government Real Estate Websites Shows that KE Holdings Overstated the Number of Agents on Its Platform ........ 36

b.    SAIC Data from Shanghai and Beijing – KE Holdings' Two Largest Markets –Shows that KE Holdings Overstated the Number of Agents on Its Platform ........................................... 37

F.    Muddy Waters Also Finds Evidence that KE Holdings Had Reported Inflated GTV and Revenues During at Least 2Q21 and 3Q21 ............................ 39

1.    Evidence of Inflated GTV ........................................................................ 40

a.    Muddy Waters Finds that New Home GTV Was Inflated by Approximately 126% in 2Q21 and 3Q21 ...................................... 40

b.    Muddy Waters Finds that Existing Home GTV Was Inflated by Approximately 33% in 2Q21 and 3Q21 ..................... 42

c.    Muddy Waters Finds that Combined GTV Was Inflated by Approximately 65% in 2Q21 and 3Q21 ....................................... 43

2.    Evidence of Inflated Revenues ................................................................ 44

G.    The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information................................................... 46

H.    The Release of the Muddy Waters Report and the Continued Fallout ................. 47

V.    CLASS ACTION ALLEGATIONS ................................................................................. 49

VI.    CLAIMS ........................................................................................................................... 50

A.    COUNT I:  For Violations of Section 11 of the Securities Act (Against All Defendants)............................................................................................................. 50

B.    COUNT II:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants) ........................................................................................ 52

C.    COUNT III:  For Violations of Section 15 of the Securities Act (Against the Individual Defendants)................................................................................... 54

VII.    PRAYER FOR RELIEF ................................................................................................. 55

Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by its counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of KE Holdings Inc. ("KE Holdings" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of those who purchased or otherwise acquired the American Depository Shares ("ADSs") of KE Holdings pursuant or traceable to the registration statements and prospectus, as amended, issued in connection with the Company's November 19, 2020 secondary offering (the "Secondary Offering"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.     KE Holdings, through its "Beike" brand, operates what it describes as "the leading integrated online and offline platform for housing transactions and services in China." The Company has expanded its business by leveraging the benefits of both its online brokerage platform, and its network of physical brokerage stores across China. Its brick-and-mortar stores provide a key "competitive advantage," serving as an "entry point" for customers and providing localized insight into the housing market and customers' needs.

3.     KE Holdings primarily generates revenues from commissions and fees for housing transactions and services. Therefore, its profitability is driven by the number of brokerage stores and agents on its platform – since more brokerage stores and agents using the platform generally leads to

more housing transactions taking place on the platform.  For this reason, the Company considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric." Another "key operating metric" is gross transaction value ("GTV"), which represents the total value of all transactions the Company facilitated on its platform.

4.    The Company went public in the United States via an initial public offering ("IPO") on the New York Stock Exchange ("NYSE") on August 13, 2020.  Just three months later, on November 16, 2020 – the same day that it announced financial results for its first quarter as a public company – KE Holdings also announced that it planned to conduct the Secondary Offering.  The IPO and the Secondary Offering *each* raised more than *$2.3 billion* in net proceeds for the Company.

5.    Thereafter, KE Holdings reported several quarters of positive financial results and operating metrics that exceeded its guidance and analysts' expectations – including increased numbers of stores and agents on the Company's platform, and corresponding growth in GTV and revenues.  Then, in the second quarter of 2021 ("2Q21"), the residential real estate market in China began to experience a slowdown in growth due to increased government regulation.  However, by reporting inflated GTV and revenues – and using overstated agent and store counts to support those numbers – KE Holdings was able to once again exceed its quarterly guidance, and analysts' expectations.

6.    On November 8, 2021, KE Holdings announced its financial results for the third quarter of 2021 ("3Q21"), and disclosed that significant portions of the stores and agents on the Company's platform were *inactive*.  For the first time, the Company disclosed both the numbers of stores and agents on its platform, and the numbers of "active" stores and agents – providing those numbers for 3Q21, and each quarter going back to the IPO.  The percentages of inactive stores

disclosed by KE Holdings ranged from 7.8% to 9.1%, while the percentages of inactive agents disclosed by KE Holdings ranged from 9.8% to 15.5%.

7.      In fact, the reported numbers of stores and agents on KE Holdings' platform were even more inflated than the Company disclosed, and included not just inactive stores and agents, but nonexistent ones.

8.      KE Holdings' ongoing inflation of its store and agent counts, in turn, provided support for the inflated GTV and revenues that it reported in 3Q21 – allowing the Company to once again announce that it had exceeded its guidance and analysts' expectations, despite a downturn in China's residential real estate market.  This enabled KE Holdings to blunt the impact of its disclosure concerning inactive agents and stores, while still failing to disclose the extent of its overstatement of store and agent counts.

9.      On December 16, 2021, shortly before the markets opened, Muddy Waters Capital LLC ("Muddy Waters") published a detailed, 77-page report setting forth the results of its investigation of KE Holdings.[1]  Muddy Waters explained that it conducted a comprehensive investigation consisting of an analysis of data collected from KE Holdings' platform, as well as field work in multiple cities that included site visits to brokerage stores.

10.     The Muddy Waters Report revealed that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than the Company had disclosed in the 3Q21 press release.  Based on its analysis of platform data, for example, Muddy Waters estimated

---

[1]      The "Muddy Waters Report" or the "Report" (cited as "Report at __") is attached hereto as Exhibit A, and is electronically available at https://d.muddywatersresearch.com/tou/?redirect=/content/uploads/2021/12/MW_BEKE_12162021.pdf.  Muddy Waters is a research-based equity investor known for exposing fraud at China-based companies, including Luckin Coffee Inc., Rino International Corp., China MediaExpress Holdings, Duoyan Global Water Inc., Sino-Forest Corp., Superb Summit International Group Ltd., and China Huishan Dairy Holdings Co.  Muddy Waters disclosed a short position in KE Holdings ADSs.

that in 2Q21, KE Holdings' reported store count was inflated by 23%, and its reported agent count was inflated by 26%.  Report at 14, 30.  Muddy Waters further detailed how its field work uncovered substantial evidence of nonexistent stores and agents.  Based on its investigation, Muddy Waters concluded that, in truth, "far fewer stores and agents use the platform (or even exist) than [KE Holdings] claims."  *Id*. at 3.

11.    The Muddy Waters Report also revealed evidence that KE Holdings had materially overstated its reported GTV and revenues during at least 2Q21 and 3Q21.  Based on its investigation, Muddy Waters found that KE Holdings had inflated its reported: (i) GTV of new home transactions by 126% during 2Q21 and 3Q21 combined; (ii) GTV of existing home transactions by 33% during 2Q21 and 3Q21 combined; (iii) GTV of new and existing home transactions combined by 75% in 2Q21; and (iv) GTV of new and existing home transactions combined by 51% in 3Q21. Report at 7-9.  Muddy Waters likewise found that KE Holdings had inflated its reported revenues from new and existing home transactions by 88% in 2Q21, and by 63% in 3Q21 – amounting to a 77% inflation during 2Q21 and 3Q21 combined.  *Id*. at 11.  Muddy Waters summarized its findings as follows:

> *We are short [KE Holdings] because we conclude the Company is engaged in systemic fraud*,[2] by our estimate, inflating its new home sales GTV by over ~126% and its commission revenues by approximately ~77–96%.  *We found massive discrepancies between the transaction volumes, store count and agent count reported to investors* and the transaction data from our multi-month data collection program from [KE Holdings'] platform.  We corroborated these discrepancies by spot-checking our findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits.
>
> [KE Holdings'] mantra, oft repeated on Company earnings calls, is "doing the right thing, even if it is difficult."  Nothing could seem further from the truth.  Put simply, we found massive fraud . . . .  *Our field work found ghost stores, clone stores* and undisclosed schemes to inflate revenues by round tripping cash through connected brokerages. . . . *[T]his is a real business with significant amounts of fraud*.

---

[2]    All emphasis in quotations is added unless otherwise noted.

Report at 2. (Emphasis altered).

12.     In response to the Muddy Waters Report, the price of KE Holdings' ADSs tumbled 4.47% on unusually heavy trading volume, from a closing price of $18.68 per ADS on December 15, 2021, to an opening price of $17.96 per ADS on December 16, 2021. The price of the Company's ADSs declined further during the trading day, as the market digested the Muddy Waters Report, trading as low as $17.72 per ADS – a total decline of 5.74% from the closing price on December 15, 2021.

13.     The price of the Company's ADSs fell again on December 20, 2021, to close at $17.31 per ADS, after the Company issued an incomplete response to the Muddy Waters' Report, which failed to persuade investors that the Report lacked merit.

14.     Despite announcing an "internal review" of the Muddy Waters Report and assuring investors that "[t]he Company [would] provide updates on the internal review when appropriate," just six weeks later, KE Holdings reported that the review was "substantially complete," and declared that "the allegations in the Muddy Waters Report were not substantiated" – but failed to provide any supporting details. Indeed, KE Holdings did not even provide the name of the "international law firm and forensic accounting experts" involved in the supposed internal review.

15.     The effect of the Muddy Waters Report and the subsequent events related to the issues raised in the Report continued to adversely impact the price of KE Holdings' stock through at least March 11, 2022.

## II.    JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1331.

18.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b).  KE Holdings ADSs trade and were distributed in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, the Underwriter Defendants (defined below) for the Secondary Offering conduct substantial operations in this District; and the ADSs are listed and trade on the NYSE, a national securities exchange based in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.    PARTIES

### A.    Lead Plaintiff

20.     As set forth in its Certification previously filed with the Court and incorporated herein by reference, Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan purchased KE Holdings ADSs on November 19, 2020 at the Secondary Offering price of $58.00 per ADS pursuant and/or traceable to the Secondary Offering Documents, and was damaged thereby.

### B.    KE Holdings

21.     Defendant KE Holdings is a Cayman Islands corporation headquartered in Beijing, China.  Under the brand name Beike, the Company operates an integrated online and offline platform that facilitates housing transactions between service providers and customers, including existing and new home sales, home rentals, home renovation, and real estate financial solutions.  KE Holdings conducted an initial public offering ("IPO") on August 13, 2020, and its ADSs now trade on the NYSE under the ticker symbol "BEKE."  Each ADS represents three Class A ordinary shares of the Company.

- 6 -

### C.    The Individual Defendants

22.    Defendant Peng Yongdong is a co-founder of the Company and was, at all relevant times, an Executive Director and the Chief Executive Officer of KE Holdings.  He has also served as Chairman of the Board of Directors since May 2021.  He signed the Offering Documents for the Secondary Offering.

23.    Defendant Xu Tao was, at all relevant times, the Chief Financial Officer of KE Holdings, and has also served as its Executive Director since August 2021.  He signed the Offering Documents for the Secondary Offering.

24.    Defendant Shan Yigang is a co-founder of the Company and was, at all relevant times, an Executive Director of KE Holdings.  He signed the Offering Documents for the Secondary Offering.

25.    Defendants Bao Fan, Li Zhaohui, and Chen Xiaohong each served as a director of the Company at the time of the Secondary Offering, and signed the Offering Documents for the Secondary Offering.

26.    Defendant Colleen A. De Vries ("De Vries") served as a Senior Vice President of KE Holdings at the time of the Secondary Offering.  De Vries was KE Holdings' "Authorized U.S. Representative" in connection with the Secondary Offering, and signed the Offering Documents in New York, New York in that capacity.

27.    The individual defendants referenced above in ¶¶22-26 are collectively referred to herein as the "Individual Defendants."

### D.    The Underwriter Defendants

28.    Defendants Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, and China Renaissance Securities (Hong Kong) Limited ("China Renaissance") served as joint bookrunners of the Secondary Offering and representatives of the

underwriters.  Collectively, they received commissions and other professional fees of approximately $35.4 million in connection with the Secondary Offering.

29.    As shown below in a chart from the Prospectus on Form 424B4, dated November 19, 2020 (the "Secondary Offering Prospectus"), which is incorporated and forms part of the Secondary Offering Documents, the Underwriter Defendants received and offered the following number of ADSs for sale:

| Underwriter | Number of ADSs |
|---|---|
| Goldman Sachs (Asia) L.L.C. | 16,992,000 |
| Morgan Stanley & Co. LLC | 8,142,000 |
| J.P. Morgan Securities LLC | 6,018,000 |
| China Renaissance Securities (Hong Kong) Limited | 4,248,000 |
| **Total** | **35,400,000** |

30.    The above underwriters also received an option – which they exercised in full – to purchase on a *pro rata* basis up to 5,310,000 additional ADS at the Secondary Offering price, less underwriting discounts and commissions.

31.    Defendant Goldman Sachs & Co. LLC. ("GS&C") is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282.  GS&C is Goldman Sachs' SEC-registered broker-dealer affiliate in the U.S.  The Secondary Offering Prospectus represented that Goldman Sachs offered ADSs for sale in the U.S. through GS&C, and, upon information and belief, GS&C did offer the ADSs for sale in the U.S. Accordingly, GS&C acted as an underwriter of the ADSs and is liable under the Securities Act in the same manner and to the same extent as the other underwriters, including Goldman Sachs.

32.    Defendant China Renaissance Securities (US) Inc. ("CRSI") is a New York corporation whose principal executive office is located at 600 Fifth Avenue, 21st Floor, New York,

New York 10020.  CRSI is China Renaissance's SEC-registered broker-dealer affiliate in the U.S.

The Secondary Offering Prospectus represented that China Renaissance offered ADSs for sale in the

U.S. through CRSI, and, upon information and belief, CRSI did offer the ADSs for sale in the U.S.

Accordingly, CRSI acted as an underwriter of the ADSs and is liable under the Securities Act in the

same manner and to the same extent as the other underwriters, including China Renaissance.

33.    The underwriters identified above, including GS&C and CRSI, are collectively

referred to herein as the "Underwriter Defendants."  The Underwriter Defendants participated in

drafting and disseminating the Offering Documents, soliciting investors for the Secondary Offering,

and marketing and pricing the Secondary Offering.  The Underwriter Defendants failed to conduct

adequate due diligence in connection with the Secondary Offering, and were negligent in failing to

ensure that the Offering Documents were prepared accurately and in accordance with the rules and

regulations governing their preparation.  The Underwriter Defendants' negligence was a substantial

factor leading to the harm complained of herein.

34.    Unless otherwise noted, KE Holdings, the Individual Defendants, and the Underwriter

Defendants are collectively referred to herein as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company's Business

35.    Defendant KE Holdings operates an integrated online and offline platform for

housing transactions and services in China, under the brand name Beike.  The Company's Beike

platform, launched in 2018, facilitates housing transactions between service providers and customers

across the residential real estate ecosystem, including existing and new home sales, home rentals,

home renovation, and financial solutions.  KE Holdings traces its origins to the real estate brokerage

brand Lianjia, founded in 2001, which it now operates as part of the Beike platform.  The Company

serves a range of real estate industry participants, including housing customers, brokerage brands and agents, and developers.

36.    The brokerages on the Beike platform consist of both Company-owned Lianjia stores, and third-party brokerages that are not owned by the Company.  Third-party brokerages include franchise stores, which pay fees to KE Holdings for use of its "Deyou" franchise brand, and "connected" stores, which pay fees to KE Holdings to utilize the Beike platform while maintaining their status as independent brokerage brands.

37.    KE Holdings has expanded its operations by leveraging the integrated online and offline nature of its business.  According to the Company, its "extensive" network of "community-centric" physical stores represents a key strength, serving "as convenient access points for local . . . customers," and enabling KE holdings "to amass housing information offline" and gain insights into customers' needs.

38.    The foundation of the Company's platform is its "Agent Cooperation Network," which uses a commission allocation mechanism to prescribe rights and obligations to the various brokers and agents involved in each housing transaction, in effort to foster cooperative and efficient transactions.

39.    KE Holdings has three revenue sources: existing home transactions, new home transactions, and emerging and other services.  For existing home transactions, KE Holdings generates revenues from: (i) commissions for housing transactions facilitated by Lianjia, as well as commissions split with other brokerage firms that collaborate with Lianjia agents; (ii) franchise fees charged to brokerage firms associated with the Company's franchise brands, including Deyou; (iii) platform service fees charged to "connected" brokerages that utilize the Beike platform; and (iv) fees for other value-added services, such as closing services.  For new home transactions, KE

Holdings generates revenues from sales commissions charged to real estate developers for new home sales that the Company completes. For emerging and other services, KE Holdings generates revenues from other home-related services, such as financial services and home renovation services.

40.     During the first half of 2020, KE Holdings reportedly generated 51.3% of its revenues from new home transactions, 46.1% from existing home transactions, and 2.67% from emerging and other services.

41.     The Company's method of revenue recognition differs based upon whether a transaction involved a new, versus an existing home transaction, as well as whether the transaction was facilitated by a Company-owned Lianjia store, versus a connected store. For all new home transactions, KE Holdings recognizes revenue from commissions on a gross basis. For existing home transactions, KE Holdings recognizes revenue from commissions: (i) on a gross basis for Company-owned Lianjia stores; and (ii) on a net basis for connected stores.

42.     KE Holdings' profitability is driven, in large part, by the number of brokerage stores and agents on its platform – since more brokerage stores and agents using the platform generally leads to more housing transactions taking place on the platform. Therefore, the Company considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric." Another "key operating metric" is GTV, which represents the total value of all transactions the Company facilitated on its platform during a given period, as evidenced by signed contracts.

43.     The Muddy Waters Report explained the importance of GTV to KE Holdings' business model, as follows:

> [KE Holdings'] value proposition is built on its claim to have the leading market share, measured by gross transaction value (GTV), in brokered housing transactions in China. The Company claims a market leading GTV in existing and new home sales through its in-house brokerage (Lianjia) and its connected stores. [KE Holdings] also claims a GTV growth rate that vastly outperforms the underlying housing market.

- 11 -

Report at 2.

44.    Using KE Holdings' reported financial metrics, Muddy Waters illustrated the close correlation between the number of stores and agents on KE Holdings' platform, on the one hand, and the Company's reported GTV and revenues, on the other hand:



*Id.* at 3.

45.    KE Holdings claims to have generated a GTV of RMB2,128 billion (US$313 billion), and facilitated over 2.2 million housing transactions on its platform, during 2019 – making it China's largest housing transactions and services platform and the second largest commerce platform across all industries.  According the Company, as of September 30, 2020, the Beike platform had over 270 real estate brokerage brands, over 44,000 community-centric stores and over 477,000 agents across 103 cities in China.

**B.    KE Holdings Raises Billions of Dollars Through an IPO and a Secondary Offering in the United States**

46.    Seeking to raise capital from the public by listing its shares on a U.S. stock exchange, on August 13, 2020, KE Holdings conducted an IPO of 121.9 million of its ADSs (each representing three Class A ordinary shares), at $20.00 per ADS.

47.    That day, the Company filed with the SEC a final prospectus on Form 424B4, and its ADSs began trading on the NYSE.  KE Holdings raised more than *$2.3 billion* in net proceeds from the IPO, after the underwriters exercised their over-allotment option.

48.    Just three months later, KE Holdings raised *an additional* $2.3 billion by again tapping the U.S. capital markets.  On November 6, 2020, the Company filed with the SEC, on a confidential basis, a draft registration statement on Form F-1 for the Secondary Offering.

49.    Thereafter, on November 16, 2020, KE Holdings filed with the SEC a registration statement on Form F-1 (the "Registration Statement"), which would be utilized for the Secondary Offering.  The Registration Statement disclosed that the Company intended to offer 35.4 million additional ADSs to the public, and that the Underwriter Defendants had the right to exercise an over-allotment option to purchase an additional 5,310,000 ADSs.  The SEC declared the Registration Statement effective on November 18, 2020.

50.    On November 19, 2020, KE Holdings filed the Secondary Offering Prospectus with the SEC on Form 424B4 which, together with the Registration Statement, constitute the "Secondary Offering Documents" or the "Offering Documents."

51.    KE Holdings and the Underwriter Defendants priced the Secondary Offering at $58.00 per ADS – *nearly triple* the price at which the ADSs were sold in the IPO.  After the Underwriter Defendants fully exercised their over-allotment option, the Company once again received more than *$2.3 billion* in net proceeds.

C.    **KE Holdings Reports Positive Financial Results and Operating Metrics**

52.    Following the IPO and the Secondary Offering, KE Holdings reported successive quarters of positive financial results and operating metrics, including increased numbers of stores and agents on its platform, and corresponding growth in GTV and revenues.  For example, KE Holdings reported that: (i) in 3Q20, net revenues increased by 70.9% year-over-year ("y-o-y"),

"driven by solid growth of GTV"; (ii) in 4Q20, net revenues increased by 57.6% y-o-y, "exceeding the high end of [the Company's] previous guidance range"; and (iii) in 1Q21, net revenues increased by 190.7% y-o-y, "beating both the top end of [the Company's] previous guidance and street consensus."

53.    In 2Q21, the residential real estate market in China began to experience a slowdown in growth, due in part to a series of "market-cooling measures" and increased regulation imposed by the government.  However, by reporting inflated GTV and revenues – and using overstated agent and store counts to support those numbers – KE Holdings was able to once again exceed the high end of its quarterly guidance, and analysts' expectations.  In particular, the Company reported that net revenues increased by 20% y-o-y in 2Q21, "beating both the high end of [the Company's] guidance and street consensus."

### D.    KE Holdings Discloses that It Has Been Including Inactive Stores and Agents in Its Reported Metrics

54.    Then, on November 8, 2021, KE Holdings announced its financial results for 3Q21. In what Muddy Waters later described as a "jaw-dropping" "admission" "[f]or a company that [went public] a little more than a year ago" (Report at 14), KE Holdings disclosed that significant portions of the stores and agents on the Company's platform were inactive.  For the first time, the Company provided a breakdown of the number of stores versus "active" stores on its platform, stating that "as of September 30, 2021," the "[n]umber of stores was 53,946 . . . , a 20.2% increase from one year ago" – while the "[n]umber of active stores[] was 49,468 . . . , a 20.2% increase from one year ago." Thus, KE Holdings disclosed that 4,478 stores – ***approximately 9.1%*** – were not "active" stores.

55.    The 3Q21 press release provided the following definition of "[a]ctive stores":

"Active stores" as of a given date is defined as stores on our platform excluding the stores which (i) have not facilitated any housing transaction during the preceding 60 days, (ii) do not have any agent who has engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new

customers and conducting property showings) during the preceding seven days, or (iii) have not been visited by any agent during the preceding 14 days.

56.     The 3Q21 press release likewise provided a breakdown of the number of agents versus "active" agents on its platform, stating that "as of September 30, 2021," the "[n]umber of agents was 515,486 . . . , a 7.9% increase from one year ago" – while the "[n]umber of active agents[] was 468,014 . . . , a 13.1% increase from one year ago." Thus, KE Holdings disclosed that 47,472 agents – *approximately 10.1%* – were not "active" agents. The 3Q21 press release provided the following definition of "[a]ctive agents":

> "Active agents" as of a given date is defined as agents on our platform excluding the agents who (i) delivered notice to leave but have not yet completed the exit procedures, (ii) have not engaged in any critical steps in housing transactions (including but not limited to introducing new properties, attracting new customers and conducting property showings) during the preceding 30 days, or (iii) have not participated in facilitating any housing transaction during the preceding three months.[3]

57.     The 3Q21 press release also retroactively provided the numbers of "active stores" and "active agents" on KE Holdings' platform on a quarterly basis, for each quarter since the Company's IPO, stating as follows:

> The numbers of active stores on our platform are 41,152, 43,436, 44,937 and 49,046 as of September 30, 2020, December 31, 2020, March 31, 2021 and June 30, 2021, respectively.
>
> *         *         *
>
> The numbers of active agents on our platform are 413,732, 445,438, 479,308 and 499,690 as of September 30, 2020, December 31, 2020, March 31, 2021 and June 30, 2021, respectively.

58.     A comparison of the quarterly numbers of "active" stores and agents that KE Holdings disclosed in the 3Q21 press release, and the quarterly numbers of stores and agents that the Company previously reported, is set forth in the following chart:

---

[3]     Muddy Waters characterized the Company's definition as "a very low bar for an agent to remain listed as 'active' on the platform." Report at 14 n.25.

- 15 -

**Reported vs. Active Agents and Stores**

| | Reported | Active | Amount Overstated | Percent Overstated |
|---|---|---|---|---|
| | | | **3Q20** | |
| Agents: | 477,810 | 413,732 | 64,078 | 15.488% |
| Stores: | 44,883 | 41,152 | 3,731 | 9.066% |
| | | | **4Q20** | |
| Agents: | 493,088 | 445,438 | 47,650 | 10.697% |
| Stores: | 46,946 | 43,436 | 3,510 | 8.081% |
| | | | **1Q21** | |
| Agents: | 528,424 | 479,308 | 49,116 | 10.247% |
| Stores: | 48,717 | 44,937 | 3,780 | 8.412% |
| | | | **2Q21** | |
| Agents: | 548,600 | 499,690 | 48,910 | 9.788% |
| Stores: | 52,868 | 49,046 | 3,822 | 7.793% |

59.     The 3Q21 press release stated that KE Holdings had "introduced the number of active agents and active stores" to "better reflect the operational activeness of stores and agents on [its] platform[,]" and attributed the decision to the Company's "accumulated operational experience[.]"

60.     In fact, the reported numbers of stores and agents on KE Holdings' platform were even more inflated than the Company disclosed, and included not just inactive stores and agents, but nonexistent ones.

61.     The Company's continued inflation of its store and agent counts, in turn, provided support for inflated GTV and revenues.  In the 3Q21 press release, KE Holdings again reported inflated GTV and revenues for 3Q21, stating that although net revenues had decreased by 11.9% y-o-y in 3Q21, "the Company had nonetheless "exceed[ed] both the high end of [its] guidance and street consensus."

62.     By reporting inflated quarterly GTV and revenues that exceeded analysts' and investors' expectations, even in the face of a downturn in China's residential real estate market, KE Holdings was able to maintain the artificial inflation in its share price.  At the same time, the Company was able to blunt the impact of its disclosure concerning inactive agents and stores, while still failing to disclose the extent of its overstatement of store and agent counts.

E.    **Muddy Waters Finds Substantial Evidence that the Reported Numbers of Stores and Agents on KE Holdings' Platform Were Significantly Inflated**

63.    On December 16, 2021, Muddy Waters published its Report detailing the results of its investigation of KE Holdings.  With respect to the numbers of stores and agents that KE Holdings reported on its platform, Muddy Waters explained that it "***found massive discrepancies*** between the . . . store count and agent count[s] reported to investors and the transaction data from [its] multi-month data collection program from [KE Holdings'] platform."  Report at 2.

64.    Muddy Waters explained that it "corroborated these discrepancies by spot-checking [its] findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits."  *Id*.  Based on its analysis of platform data, field work, and site visits, Muddy Waters concluded that, in truth, "***far fewer stores and agents use the platform (or even exist) than [KE Holdings] claims***."  *Id*. at 3.

1.    **Evidence of Inflated Store Counts**

65.    In order to investigate the Company's reported store counts, Muddy Waters explained that it first analyzed KE Holdings' platform data – and found that the Company was inflating its 2Q21 store count by ***at least 23%***.  *Id*. at 14.  As Muddy Waters explained, it "wrote a [computer] program to collect the transaction data on [KE Holdings'] platform."  *Id*. at 2.  The "program captured the transaction data on [KE Holdings'] platform from May 25[, 2021] to October 22, 2021."  *Id*. at 5. n.2.[4]

66.    In KE Holdings' 2Q21 press release, the Company publicly reported having 52,868 brokerage stores on its platform as of June 30, 2021.  2Q21 Press Release; *see also id.* at 14. According to Muddy Waters, however, the platform data that it collected "showed that as of July 16,

---

[4]    Muddy Waters' methodology is set out in detail in Appendix I of the Report.  *Id*. at 47-71.

2021" – just two weeks later – "the platform listed only 43,026 stores," indicating that KE Holdings'
"2Q21 store count was inflated by at least 23%."  Report at 14.  Muddy Waters summarized its
findings in the following table:

| Comparison of BEKE Claimed Store Number vs. BEKE's Own Platform Data | # of stores |
|---|---|
| Number of stores reported by BEKE (2Q 2021) | 52,868 |
| Lianjia stores from collected data (as of 7/16/2021) | 7,516 |
| Connected stores from collected data (as of 7/16/2021) | 35,510 |
| Number of stores found on BEKE's platform | 43,026 |
| Inflated % | 23% |

*Id.*

67.    To corroborate these findings, Muddy Waters then "conducted field work and
physical site visits" to a sampling of brokerage stores listed on the Company's platform.  *Id.*  That
field work reportedly uncovered a "multitude" of what Muddy Waters termed "ghost stores" – *i.e.*,
brokerage stores that were listed on KE Holdings' platform as active stores, but did not exist, and
"clone stores" – *i.e.*, brokerage stores that were listed on KE Holdings' platform as multiple, separate
stores, but were actually a single store.  *Id.*  Based on these findings, Muddy Waters "***conclude[d]
that [KE Holdings'] actual store count [was] even lower than" Muddy Waters' "data collection
alone" had indicated***.  *Id.*; *see also id.* at 3.

68.    Muddy Waters explained that its "investigators visited seven cities that [were]
important markets for" KE Holdings' directly-owned Lianjia brokerage stores, its Deyou-branded
franchise stores, or its recently-acquired brokerages.  *Id.* at 15.  According to Muddy Waters, the
seven cities that its investigators made field visits to were:

> [1] Beijing – a major market for Lianjia; [2] Langfang – a suburb of Beijing which
> also has a lot of Lianjia and Deyou operations and which shows as having a high
> level of activity at each store[;] [3] Shanghai – the second largest market for Lianjia;
> [4] Nanchang . . . ; [5] Hangzhou . . . ; [6] Nanjing . . . ; and [7] Shenzhen . . . .

*Id*. at 15 n.26.  Muddy Waters stated that it also made "[c]ontact . . . with [KE Holdings'] Lianjia, Deyou, and other connected store agents and managers at many other Tier 1, New Tier 1, Tier 2 cities."  *Id*.

69.     In the course of its field work, Muddy Waters found "discrepancies in the names, addresses, [and] locations of the stores in comparison [to] the information shown on the [Company's] platform" and in pertinent "SAIC registrations."  *Id*. at 15.[5]  According to Muddy Waters, [i]n many locations, where [it] should have found thriving, active stores, [it] found the opposite."  *Id*.  The Report provided a number of examples of Muddy Watters' site visits to the Company's brokerage stores, as follows.

<blockquote>a.     <strong>Muddy Waters Finds a Multitude of Nonexistent "Ghost Stores"</strong></blockquote>

70.     <u>*Ghost Store Example 1: The Nanchang Zhonghuan Ershishanzhong Store*</u>.  In the city of Nanchang, Muddy Waters visited a Zhonghuan[6] brokerage store known as "Ershishanzhong."  The store appeared to be an active store on KE Holdings' platform, based on screen shots that showed 136 and 89 properties listed through the store as of October 5, 2021, and December 7, 2021, respectively.  *Id*.  According to Muddy Waters, "[t]he store's address listed on [KE Holdings'] platform [led] to a large apartment complex, while its SAIC certificate provide[d] a more detailed address."  *Id*.

---

[5]     "SAIC" refers to the State Administration for Industry and Commerce, the government agency in China formerly responsible for market regulation and enforcement, including registering and licensing business organizations.  In March 2018, the State Administration for Market Regulation ("SAMR") was established to replace the SAIC.  In practice, however, the SAMR and its local branches sometimes continue to be referred to as the SAIC.

[6]     KE Holdings acquired Zhonghuan Real Estate Agency, a regional real estate brokerage firm, in 2019.

71.    However, when Muddy Waters' "investigator visited the store's SAIC[-]registered address," the investigator "found a derelict and abandoned store front located in a former gate guard's room[,]" and "found no further evidence of" the store's "existence elsewhere." *Id*. at 15. Based on this site visit, Muddy Waters concluded that the "abandoned guard's room is not likely an active location." *Id*. The Report provided the following photograph of the location:



*Id*. at 16.

72.    *Ghost Store Example 2: The Nuojia Chengjia 9 Dragon Seal Flagship Store*. Muddy Waters also investigated KE Holdings' "Nuojia Chengjia 9 Dragon Seal Flagship Store." *Id*. According to data collected from KE Holdings' platform, the store had 12 agents as of August 2021; 23 to 24 agents as of October 2021; and 14 agents as of December 2021. *Id*. at 16-17. Furthermore, data collected from KE Holdings' platform in October and December 2021 showed 266 to 350 active property listings. *Id*. However, when Muddy Waters' "investigator visited [the] store at the address

listed on [KE Holdings'] platform in September 2021," the investigator "found the store closed[,] with a 'for lease' sign displayed" (*id*. at 17), as shown in the following photograph:



*Id*.

73.     According to Muddy Waters, its investigator "then contacted a store agent to confirm the store address[,]" and was informed that the store had "moved to another store" known as "Shuxiangmendi." *Id*.  As Muddy Waters explained, the "Shuxiangmendi" store was "listed on the [Company's] platform as a separate store" – meaning that "the platform ha[d] two stores listed, including one that ha[d] been shut down[,]" when there was actually only one active store.  *Id*.

74.     *Ghost Store Example 3: The Seven Colors Baichuan Store*.  Muddy Waters also conducted a site visit to KE Holdings' "Seven Colors Baichuan Store" in September 2021, and found another apparent instance of a "double-counted" store.  *Id*.  "According to [KE Holdings'] platform," the "store had 4 [to] 8 agents, almost 200 clients and over 164 properties listed for sale or rent in the past three months" – indicating that it was "a thriving brokerage and certainly an 'active store.'" *Id*. However, Muddy Waters' site visit revealed that the store "[did not] exist." *Id*. at 18.

75.    According to Muddy Waters, "[t]he address listed on [the] store page only contain[ed] the name of the road," without providing a "street number." After finding a "detailed address on [the store's] SAIC certificate[,]" Muddy Waters' investigator visited the "location in September 2021" and found "a closed store front" (*id.*), as depicted in the following photograph:



*Id.*

76.    Muddy Waters explained that "[w]hen a store agent was contacted to check the address, the agent confirmed she worked at Seven Colors Baichuan[,] but gave the address of another store" on the Company's platform – "Zhonghuan Youjia No. 3 Store" located at "788 Bayuehu Road." *Id.* Muddy Waters concluded that this was "a single location accounting for two active stores on [KE Holdings'] platform." *Id.*

77.    <u>*Ghost Store Example 4: Sanhe Langfang Lianjia Yanjiao Branches 2 and 15*</u>. In the city of Langfang, Muddy Waters reported finding "two Lianjia branches registered to the same street in the SAIC database." *Id.* Muddy Waters explained that "[o]n [KE Holdings'] platform, Branch 2 and [Branch] 15 [were] known as Tianyang Cheng No. 2 and Tianyang Cheng No. 6, respectively[,]"

and "Yatai Street" [was] listed as the location for both stores. *Id*. According to Muddy Waters, that information was consistent with "the SAIC business certificates" for the two stores. *Id*.

78.     Since the addresses for these stores provided on KE Holdings' platform contained "only . . . the street name" and "no street number," Muddy Waters "contact[ed] the stores' agents to get directions." *Id*. Muddy Waters "spoke with the agents at these two stores," and was "given identical locations for the branch: go to the intersection of Yatai Blvd. and Tianyang Cheng, [and] look for Building No. 9, on the ground floor, next to the Commercial Bank." *Id*. When Muddy Waters followed these directions, it reportedly "found only one Lianjia store at Building No. 9, on the ground floor, next to the Commercial Bank" (*id*.), as shown in the following photograph:



*Id*. at 19.

79.     When Muddy Waters "visited the store in the fall of 2021[,]" it observed "Branch No. 15's business registration hanging on the wall." *Id*. "An agent at the store" then "confirmed" to Muddy Waters "that the local Tianyang[ C]heng Store No[.] 2 (Branch No. 2) was closed and had merged with Tianyang [C]heng Store No. 6 (Branch No. 15)." *Id*. According to Muddy Waters, the agent explained that: "We are Store No. 6 . . . . [T]here was another store, but it was closed . . . .

Store No. 2 used to be across the street.  But when its lease was up, they closed the store and moved here."  *Id.*  Based on its investigation, Muddy Waters concluded that Tianyang Cheng No. 2 and Tianyang Cheng No. 6 were "clearly the same store[,] even though "both stores appear[ed] separately on [KE Holdings'] platform."  *Id.*

80.  Although stores that were closed or merged into other stores, such as Branch No. 2 (Store No. 2) and Branch No. 15 (Store No. 6) should have been removed from the platform or "show[n] zero agents[,]" Muddy Waters reported that both of those stores "continue[d] to be" displayed on KE Holdings' platform "with transactions and active agents," (*id.* at 20), as depicted in the following screen shots:



*Id.*

81.  Muddy Waters also compared the names of the agents shown on KE Holdings' platform as working at Store No. 2 and Store No. 6 as of November 2021, and reported that there

was "no overlap" – indicating that the Company continued to list both stores on its platform as

separate, active stores, after Store No. 2 had been merged into Store No. 6.  *Id*. at 20-21.

82.    Muddy Waters hypothesized that – in addition to inflating KE Holdings' reported

store count – the inclusion of ghost stores on the Company's platform enabled KE Holdings to report

inflated transaction volumes.  *Id*. at 20.  Muddy Waters reported that platform data showed 22

transactions for Branch No. 2 (Store No. 2), and 35 transactions for Branch No. 15 (Store No. 6)

between May 25, 2021 and October 22, 2021. *Id*. at 19.  According to Muddy Waters, platform data

from 30 other Lianjia stores in Sanhe Langfang showed that those stores had an average transaction

volume of 22 transactions per store during the same five-month period.  *Id*. at 20.  Since "Branch

No. 2 and [Branch] No. 15 [were] actually one store," Muddy Waters compared "their combined

transaction volume . . . to the average transaction volume per store for the remaining stores[,]"and

found that it was "159% higher than other Lianjia stores in Sanhe Langfang[.]"  *Id*. at 19-20.  Muddy

Waters summarized its findings in the following chart:

| 5 Month Transaction Volumes Comparison | | | |
|---|---|---|---|
| | # of Existing Homes | # of New Homes | # of Total Homes |
| Branch No. 2, Tianyang Cheng Store No. 2 | 21 | 1 | 22 |
| Branch No. 15, Tianyang Cheng Store No. 6 | 31 | 4 | 35 |
| Subtotal | 52 | 5 | 57 |
| Other 30 stores' average | 19 | 3 | 22 |
| Difference % | 175% | 63% | 159% |

*Id*. at 20.

### b.    Muddy Waters Finds a Multitude of Double-Counted "Clone Stores"

83.    According to the Report, KE Holdings also utilized "clone stores" to inflate its

reported store count. *Id*. at 21.  Muddy Waters described this tactic as follows: KE Holdings would

"set[] up multiple stores on its platform with the same or [a] similar name and/or location but a

different suffix, such A, B or C."  *Id*.  But "despite multiple stores appearing on [KE Holdings']

platform, often only one [store] exist[ed] in practice."  *Id*.

84.    In particular, Muddy Waters found evidence of a "large number of fake" Lianjia brokerage stores that appear[ed] active on the platform but [did] not exist." *Id*. at 24.  As Muddy Waters explained, KE Holdings' franchise brand "Deyou labels its stores A and B based on the stores' performance and the number of agents each store has." *Id.* at 21.  According to Muddy Waters, it had expected "Lianjia's A/B/C stores designations [to] follow[] a similar ranking system[.]" *Id*.  However, Muddy Waters' investigation revealed that "seemingly separate stores on [KE Holdings'] platform" were actually "located in the same store, purportedly under different managers." *Id*.

85.    Muddy Waters reported that the Lianjia brokerage stores known as "Quanshuiwan Flagship [Store] A" and "Quanshuiwan [Flagship Store] C" "appear[ed]" as "two separate stores" on KE Holdings' platform – with "different number[s] of agents, [] different number[s] of clients serviced, and [] different number[s] of listings." *Id*. at 22.  Specifically, the webpage for the "Quanshuiwan Flagship A store" displayed "18 agents, 1100 clients and 124 listing properties[,]" while the webpage for the "Quanshuiwan Flagship C store" displayed "15 agents, 150 clients and 163 listing properties[.]" *Id*.

86.    Yet when Muddy Waters "contacted Quanshuiwan Flagship C store," it was informed by an agent that "the A store and the C store [were] the same store." *Id*.  According to Muddy Waters, "[t]he agent told [its] investigator that the reason the A and C stores were listed separately [was] because the store ha[d] two managers, and dividing the agents, listings and clients into two groupings under A and C [made] it easier to keep track of the business of the respective managers operating out of the same store." *Id*.  The agent reportedly "confirmed that the letter designation of Lianjia stores on the platform represent[ed] the number of mangers or teams" operating out of the

store – and not the actual store count[].ˮ *Id*. at 23.  As Muddy Waters noted, under this system, "one

store can easily turn into two, three or more stores on the platform.ˮ  *Id*.

87.    Muddy Waters confirmed that this practice was widespread by examining platform

data for Lianjia brokerages across seven cities, as of November 30, 2021. *Id*. at 21.  Muddy Waters

explained that it "found five cities with significant numbers of cloned Lianjia [brokerage] stores on

[KE Holdings'] platform.ˮ  *Id*. at 21.  In particular, platform data indicated that in the cities of

"Xiamen and Haikou, 41% and 32% of the Lianjia storesˮ were "probable clone storesˮ – along with

9.1% of the stores in the Company's "key market of Beijing[.]ˮ  *Id*. at 21, 24.

88.    Muddy Waters provided the following example of its methodology for determining

the percentages of clone stores:

> [O]ur data collection in Xiamen found 82 stores. 61 of these stores had designations
> suggesting that they were clones (such as ending with A, B or C), but they occupied
> only 27 locations.  So, to estimate the number of clone stores, we simply subtracted
> the number of stores with such A/B/C designations (61) by the number of locations
> (27) to get a suspected to 34 clone stores.  Of the 82 stores in Xiamen, we therefore
> estimated that 41.5% were clones.

*Id*. at 23.

89.    Muddy Waters set forth the percentages of likely clone stores in the cities that it

examined in the following table:

| | # of stores on BEKE's platform | # of stores with clone designations (e.g. A, B, C) | # of locations with multiple clone stores | Estimated # of clone stores | % of fake stores |
|---|---|---|---|---|---|
| | a | B | c | d=b-c | e=d/a |
| Xiamen | 82 | 61 | 27 | 34 | 41.5% |
| Haikou | 28 | 5 | 2 | 9 | 32.1% |
| Dalian | 330 | 62 | 31 | 31 | 9.4% |
| Beijing | 1,452 | 256 | 124 | 132 | 9.1% |
| Nanjing | 277 | 38 | 19 | 19 | 6.9% |

Note: The cloned store are the stores in one location with the name of [____]A store, [____]B store, or
[____]C store, etc.; or [____]No.1 store, [____]No.2 store, or [____]No.3 store, etc.

*Id*. at 23; *see also id*. at 21.  Muddy Waters further explained that since "[n]ot all stores on [KE Holdings'] platform show[ed] SAIC certificates or detailed addresses" capable of verification, "the actual number of clone stores might be even higher."  *Id*. at 21.

90.    Muddy Waters reportedly "spot checked this analysis by searching on Baidu Maps[,]" and found that "[i]n instances of clone stores," there was "only one store listed on the map with the store name," and no "B or C stores."  *Id*. at 24.  Muddy Waters further noted that on KE Holdings' platform, "the A store usually show[ed] all [of] the detailed information[,] including address and business license, but the B or C stores [did] not."  *Id*.  Muddy Waters reasoned that this was "likely why approximately 30% of the stores listed on the platform [did] not have complete store information and/or a verifiable business license."  *Id*.  Moreover, Muddy Waters reported "that store names were frequently changing, and many stores did not display a correct and/or specific address, instead giving a vague, highly simplified general location or an incorrect location."  *Id*.

91.    Muddy Waters concluded that the "pattern of clone stores" uncovered by its investigation showed "that there [were] far fewer stores than appear[ed] on [the Company's] platform," and that KE Holding's "exaggeration of its store count [was] likely far more egregious than even the platform data suggest[ed]."  *Id*. at 21.

          **c.    Muddy Waters' Case Study in the City of Sanhe Langfang Finds that KE Holdings' Store Count Was Inflated by 59%**

92.    According to Muddy Waters, the number of Lianjia brokerage stores reported in KE Holdings' "SEC filings generally align[ed] with the number of Lianjia stores registered [with] a given city's [local] SAIC."  *Id*. at 24.  However, Muddy Waters reported that its "field work across China revealed . . . many stores with active SAIC registrations that did not exist."  *Id*.  As Muddy Waters explained, this "suggest[ed] that branch store registrations were being created on paper and filed with . . . local SAIC" offices, "but no physical operation was being maintained."  *Id*.

93.     In order to "[t]o investigate these store count discrepancies further[,]" Muddy Waters conducted a case study of Company-owned Lianjia brokerage stores in the city of Sanhe Langfang. *Id*.[7] According to Muddy Waters, it "compared" publicly-available "SAIC data . . . with the results of physical site visits." *Id*. Muddy Waters reported that "SAIC data show[ed] 51 Lianjia stores located in Sanhe Langfang." *Id*. "Yet when [Muddy Waters] tried [to] visit [those] locations," it reportedly was "only able to confirm the existence of 32" brokerage stores – with the remaining 19 appearing to be "ghost stores." *Id*. Indeed, Muddy Waters "observ[ed] non-existent stores, double[-]counted stores, and stores that appeared to be entirely different brands – including" KE Holdings' franchise brand Deyou. *Id*.[8]

94.     Muddy Waters explained that its "site visits and field work" in Sanhe Langfang "indicate[d] that [KE Holdings] overstated the store count" in that city "by 59%" – "by keeping branch SAIC registrations current" even though the registrations did not actually represent active stores. *Id*. Given that KE Holdings claimed to have "an extensive national network" of Lianjia stores, Muddy Waters posited "that Sanhe Langfang [was] representative of" other cities, and that overstated Lianjia store counts were "endemic" throughout China. *Id*. at 24, 74.

95.     *Case Study Example 1 – Muddy Waters found only one store where SAIC registrations indicated there were seven*. Muddy Waters provided an example from its field work in Sanhe Langfang, in which it found seven Lianjia brokerage stores registered with the SAIC in the

---

[7]     "Sanhe Langfang is a satellite city of Beijing located within the Hebei province." *Id*. at 24. Muddy Waters explained that it "chose this city for a deep dive because [KE Holdings] purports to be strong in and around Beijing, and the Company supposedly maintains a significant number of Lianjia brokerages in the area." *Id*. Indeed, since "[t]he Sanhe Langfang Lianjia stores displayed very high numbers of transactions per store," Muddy Waters "expected to find a high degree of activity." *Id*.

[8]     This discrepancy is significant because KE Holdings reports revenue on a gross basis for its wholly-owned Lianjia stores, and collects platform fees from its franchised Deyou stores.

same vicinity, but only two physical stores – one of which was closed. *Id*. at 24. In particular, SAIC data for all seven Lianjia stores showed nearly-identical addresses "on the same street[,]" and showed that the stores were "established at the same time" (May 25-26, 2017) "with the same legal representative" (an individual named "Song Xinghua"). *Id*. at 24 & n.37. According to Muddy Waters, "[a]ll of these branches . . . filed . . . annual reports with SAIC in the past four years and ha[d] active current registrations." *Id*. at 27.

96.    Muddy Waters explained that it "visited the street to verify the existence of these stores but found only one store" known as "Sanhe Lianjia Yanjiao Branch No. 53 . . . in suite A1-8." *Id*. at 24-25. Muddy Waters then reportedly "spoke with an agent at the operating Lianjia store[,]" who "confirmed that there was indeed only one Lianjia store on the street." *Id*. at 25.

97.    Muddy Waters also found additional "discrepancies" when it "compar[ed] the data of the confirmed store with the SAIC data[.]" *Id*. As the Report explained:

> The only unique store of the seven observed, Branch No. 53, is located at E2-A1-8 of the MOBO apartment complex. . . . On [KE Holdings] platform, Branch 53 is also known as Lianjia ShouErTianCheng No. 2[,] and the listed address matches with the address plaque hung outside of the store. . . . However, the store has a different address listed in its SAIC business license certificate. The accompanying SAIC business license provided to the store page shows Branch No. 53 is registered in District E, building 1, 1st Floor, Unit 1, Suite A1-8, which should be E1-A1-8 and not E2-A1-8 as listed elsewhere.

*Id*. at 25-26. Muddy Waters posited that KE Holdings was "intentionally creat[ing] inconsistencies such as these to misrepresent its actual store counts." *Id*. at 26.

98.    Muddy Waters further explained that "[t]wo of the seven Lianjia stores in question [were] registered" to adjacent addresses – "Branch No. 53 in unit A1-8 and Branch No. 54 in unit A1-9." *Id*. Although the branches appeared "in the SAIC records as two different locations," in fact "[t]he same single store occupie[d] these two addresses[.]" *Id*. The Report provided the following photograph of the location, showing a single Lianjia store, "bookended by" two Deyou

franchise stores:



*Id.* at 27.

99.    <u>*Case Study Example 2 – Muddy Waters found that Branch No. 10 and Branch No. 79*</u> <u>*were a single store*</u>.  In another example from its case study of Sanhe Langfang, Muddy Waters reportedly found "two [Lianjia] branches registered to the same street address in the SAIC database[,]" but only one physical store.  *Id.*  As Muddy Waters explained, "both Branch No. 10 and Branch No. 79" appeared on KE Holdings' platform "with the same vague location description: 'Shenwei North Street.'"  *Id.* at 72.  Indeed, Muddy Waters found that "[t]he use of similar but different store names and the extremely vague store location descriptions and addresses [was] a common theme on [KE Holdings'] platform."  *Id.* at 27.  Muddy Waters posited that this tactic was designed to "obfuscate, allowing some stores to exist on paper alone."  *Id.* at 72.

100.    According to Muddy Waters, its site visit showed that Lianjia "Branches 10 and 79 [were] co-located" – even though they appeared on KE Holdings' platform "as distinct and different stores" – "with different store numbers, different branch numbers, and different SAIC business

- 31 -

registrations." *Id*. at 27.[9]  During its site visit, Muddy Waters observed that the "SAIC business license displayed on the wall was for Branch No. 79." *Id*.  On the opposite wall, however, Muddy Waters observed "award banners" for "both Branch No. 10[] and Branch No. 79[.]" *Id*.  According to Muddy Waters, "[t]he agent at the store stated that Branch No. 10 . . . was closed and had merged with Branch [No.]79[.]" *Id*.

101.    However, platform data collected by Muddy Waters reportedly showed "13 exiting home and 2 new home transactions" at Branch No. 10, and "27 existing home and 2 new home transactions" at Branch No. 79 during the period from May 25, 2021 to October 22, 2021.  *Id*.  Muddy Waters explained that – "like the example of Branch No. 2 (Tianyang Cheng No. 2) and No. 15 (Tianyang Cheng No. 6)" – "both stores" continued to "display[] active transactions even after one was closed and the two [had] seemingly merged." *Id*.

102.    *Case Study Example 3 – Lianjia Branch No. 51 did not exist.*  In its case study of Sanhe Langfang, Muddy Waters found "[a]nother store [that] simply didn't exist." *Id*. at 28.  Muddy Waters explained that Lianjia "Branch [No.] 51 [was] registered at Zhugedian Village in Yanjiao Town." *Id*.  However, when Muddy Waters conducted a site visit during the fourth quarter of 2021, it "could not find any Lianjia or other real estate brokerage[.]" *Id*.

103.    *Case Study Example 4 – Lianjia Branches No. 4 and No. 88 were registered on the same street, but only Branch No. 88 existed.*  In another example from its case study of Sanhe Langfang, Muddy Waters reported that Lianjia "Branch[] [No.] 4 and" Lianjia Branch No. "88 [were] registered on the same street, only two stores [apart]." *Id*.  Both branches reportedly "filed their 2020 annual reports and [were] supposedly active" brokerage stores.  *Id*. at 76.  But when Muddy Waters visited the location during the fourth quarter of 2021, it "found one Lianjia store" –

---

[9]      *See also id*. at 72 (depicting screenshots from KE Holdings' platform).

"Branch [No.] 88" – and found "a restaurant" at [t]he location where Branch 4" should have been (*id.*), as depicted below:



*Id.* at 29.  Baidu Maps corroborated that Branch No. 4 did not exist – likewise showing the restaurant at Branch No. 4's registered location.  *Id.* at 75-76.

### d. Muddy Waters Finds Brokerage Stores that Were Registered as Company-owned Lianjia stores, but Were Actually Less Profitable Franchised Deyou Stores

104.    Muddy Waters' investigation also uncovered instances of brokerage stores that were registered as Company-owned Lianjia brokerages, but were actually franchised Deyou brokerages. Muddy Waters explained that "[w]hen reviewing Lianjia's SAIC registrations, [it] found two Lianjia stores that share[d] addresses with two Deyou stores."  *Id.* at 76.  "More importantly," during a site visit, Muddy Waters reportedly "found a Deyou store at one of these physical locations, but not [a] Lianjia [store]."  *Id.*

105.    According to Muddy Waters, Lianjia "Branch No. 56" was registered with the SAIC at: "ShouErYuan TianCheng, District E, building 7, 1st Floor, Unit 1, Suite A1-8 in the Yanjiao

New High-Tech Zone[.]" *Id*.  However, "[t]he same address [was] also registered with the SAIC" as

the location of the "Langfang Wisdom Deyou Real Estate Agency Co., Ltd." *Id*.

106.    In another instance, Muddy Waters reportedly found that Lianjia "Branch No. 36 and

another Deyou store share[d] [the] same registered address" – "Yanjiao New Development Zone,

West side of Yanxing Rd., Xiangxin Store, No. 92." *Id*. at 77.  "When [Muddy Waters] visited" that

location, however, it "only the found the Deyou store[.]" *Id*.

107.    As Muddy Waters explained, these Deyou brokerages "appear[ed] to be pulling

double duty – doubling up as [] Lianjia store[s] and being counted as [] Deyou store[s]." *Id*. at 76.

The Report further explained:

> Lianjia stores and Deyou franchise stores present very different economic
> contributions to [KE Holdings].  All of the commissions collected by Lianjia stores
> are reported on a gross basis, while only a small percent of the commissions
> generated by Deyou stores plus some other possible fees flow to [KE Holdings] from
> Deyou operations.  Therefore, changing from a Lianjia to a Deyou store is not a
> matter of rebranding, but one of economics – directly impacting commission
> revenue.

*Id*. at 77.

## 2.    Evidence of Inflated Agent Counts

108.    According to Muddy Waters, its investigation also uncovered evidence that KE

Holdings was significantly overstating the number of agents on its platform.  *Id*. at 5, 30.  Muddy

Waters explained that  "[m]ultiple [i]ndependent [d]ata [p]oints" supported this finding, including

platform data, local government real estate websites, and SAIC data.  *Id*. at 30; *see also id*. at 31-37.

As Muddy Waters further explained, "much like the store count, [its] field work and independent

evidence . . . suggest[ed] that the agent count [was] even more exaggerated" than its analysis of

platform data indicated.  *Id*. at 5.

109.    Muddy Waters described the significance of the agent overstatement, as follows:

Home sales on [KE Holdings'] platform are a function of the number of agents using

its platform. Clearly, the more agents on the platform, the more home sales closed and recorded through the platform, and the larger the Company's GTV and related revenues. This link between agent growth and GTV and revenue growth is an important pillar of the narrative supporting [the Company's] stock price.

*Id*. at 30. In other words, since "[r]evenue and GTV are a function of agent count," Muddy Waters posited that, "to justify its fabricated GTV and revenue figures," KE Holdings "also significantly inflated the number of agents on its platform" to mislead investors about the scale of its business. *Id*. at 38, 41.

110. As it did with KE Holdings' store count, Muddy Waters first examined data that it collected from the Company's platform – which indicated that KE Holdings was "inflat[ing] its agent count by ***approximately 26%***." *Id*. at 30. Muddy Waters explained that it "used a program to collect the number of agents listed on the Company's platform as of July 16, 2021[,]" and used the "Find Agent" function on KE Holdings' platform "to locate the agents." *Id*.

111. In KE Holdings' 2Q21 press release, the Company publicly reported having 548,600 agents on its platform as of June 30, 2021. 2Q21 Press Release; *see also* Report at 30.[10] According to Muddy Waters, however, the platform data that it collected on July 16, 2021 – two weeks after the end of 2Q21 – "detected only 435,888 agents," which "suggest[ed]" that KE Holdings' 2Q21 agent count was "inflated . . . by approximately 26%." *Id*. Muddy Waters summarized its findings in the following table:

| Comparison of BEKE Claimed Agent Number vs. BEKE Platform Data | |
| --- | --- |
| | # of Agents |
| Number of agents reported by BEKE (2Q 2021) | 548,000 |
| Number of Lianjia agents from collected data (as of 7/16/2021) | 115,940 |
| Number of Connected stores agents from collected data (as of 7/16/2021) | 319,948 |
| Total agents on BEKE's platform (as of 7/16/2021) | 435,888 |
| Difference | (112,112) |
| **Inflated %** | **26%** |

---

[10]    Muddy Waters used a slightly lower figure – 548,000 – which it took from an investor presentation for 2Q21, posted by KE Holdings to its investor relations website, which reported "548,000+" agents as of June 30, 2021. *Id*. at 30.

*Id*.

### a. Local Government Real Estate Websites Shows that KE Holdings Overstated the Number of Agents on Its Platform

112.    Muddy Waters sought to verify these findings by "compar[ing] a local real estate license registry" in the city of Nanchang "against the detailed disclosures provided by [KE Holdings] in connection [with its 2019] acquisition" of the real estate brokerage firm Zhonghuan. *Id*. at 31.

113.    Muddy Waters described the local real estate registry as follows:

As a protection against unscrupulous real estate agents, the city of Nanchang in Jiangxi Province provides a quantitative score and ranking for all agents, tracking good and bad behaviors with 100 points (5 stars) being the highest ranking.

These scores are listed in Nanchang City's Real Estate Broker Credit Registry (the "Registry"). Agents with scores below 60 are entered onto a blacklist and their brokerage credentials are cancelled. The Registry is public and searchable. Local authorities confirmed that the Registry is updated frequently and that the registry is [] current, displaying whether an agent is still with an agency, or if they have resigned or have been blacklisted.

*Id*. (footnotes omitted).

114.    According to Muddy Waters, its collection of KE Holdings' platform data showed that "in late August 2021, Zhonghuan's Nanchang operation had 363 stores with 2,050 agents." *Id*. at 32. But when Muddy Waters "checked [those] numbers against the Nanchang Registry[,]" it found that "although the reported store count closely matched, the number of Zhonghuan agents was exaggerated by 50%." *Id*. at 32. The Report summarized these findings in the following table:

| Zhonghuan's operation in Nanchang | # of Stores | # of Agents |
|---|---|---|
| BEKE platform | 363 | 2,050 |
| Nanchang Real Estate Bureau Registry | 360 | 1,307 |
| Inflated % | 1% | 50% |

*Source: Nanchang Housing Security and Real Estate Administration database, Data collected from BEKE platform*

*Id*.

115.    Muddy Waters found a similar pattern when it looked at a single store.  "[A]ccording to [KE Holdings'] platform, Zhonghuan Youjia No. 3 store supposedly ha[d] 12 agents" as of December 10, 2021.  *Id*. at 32.  "Yet when [Muddy Waters] compared the listed agents at Zhonghuan Youjia No. 3 and the Registry," it reportedly "found three agents [who] had . . . left Zhonghuan." *Id*. at 33.

116.    Indeed, "the Nanchang registry implie[d] that the number of active agents [was] substantially less than the number of agents on the platform," which Muddy Waters explained was "likely because the registry [was] scrubbed far more often for real estate agents who drop out of the business or leave the Company."  *Id*.  Muddy Waters concluded that KE Holdings "use[d] former agents who ha[d] left the Company to inflate the agent count on its platform."  *Id*. at 32.

### b.    SAIC Data from Shanghai and Beijing – KE Holdings' Two Largest Markets –Shows that KE Holdings Overstated the Number of Agents on Its Platform

117.    Muddy Waters explained that it examined SAIC data for Shanghai and Beijing because those cities were KE Holdings' "two primary markets" – collectively generating 32% of the Company's reported revenues for 2020.  *Id.* at 34; *see also* 2020 20-F at 19.[11]  As Muddy Waters further explained, "Chinese companies are required to report [their] number of employees to [the] SAIC" in connection with making mandatory "contribution[s] to social insurance for all employees." Report at 34.  Therefore, Muddy Waters performed "[a] simple check of the SAIC data for [KE Holdings'] subsidiaries" – which indicated "that the Company [was] materially inflating its agent count in the[] key markets of Shanghai and Beijing.  *Id*.

118.    <u>Shanghai</u>:  According to KE Holdings' 2020 20-F, the Company's Lianjia brokerages "had approximately . . . 21,000 agents" in Shanghai as of December 31, 2020.  2020 20-F at 60; *see*

---

[11]    KE Holdings' Annual Report for the year ended December 31, 2020 was filed with the SEC on Form 20-F on April 6, 2021 (the "2020 20-F").

*also* Report at 34 n.48.  Muddy Waters examined KE Holdings' SEC filings and SAIC corporate registry databases, and identified two Company subsidiaries in Shanghai.  Report at 34 & n.50. Muddy Waters then looked at "the annual SAIC data for [KE Holdings'] Shanghai subsidiaries" from publicly-available databases, and found a total of 9,996 employees registered at the two subsidiaries.  *Id.* at 34-35.  Muddy Waters also examined the Company's other Shanghai businesses, including variable interest entities, and found 199 additional employees registered with the SAIC. *Id.* at 35.

119.    Muddy Waters' investigator also contacted six Lianjia stores in Shanghai, and was reportedly told "that Lianjia stores do not employ part-time or temporary agents and that Lianjia pays social insurance for its employees" – meaning that the number of employees reported in the "SAIC data should generally match the agent count reported by the Company in its SEC filings."  *Id.* at 36.

120.    Instead, the total number of registered Shanghai employees found by Muddy Waters – 10,197 – was *106%* lower than the 21,000 Shanghai-based agents that the Company reported in its 2020 20-F.  *Id.* at 35.  Muddy Waters posited that the true agent overstatement was likely even greater, since a portion of "of the 10,197 employees reported in the SAIC data . . . should be non-agent support staff[.]"  *Id.*

121.    Beijing:  Muddy Waters reported that it encountered "the same pattern when [it] compare[d]" KE Holdings' SEC "disclosures with independent records from the Company's other key market, Beijing."  *Id.* at 5, 36.  According to KE Holdings' 2020 20-F, the Company's Lianjia brokerages "had approximately 27,000 . . . agents" in Beijing as of December 31, 2020.  2020 20-F at 60; *see also* Report at 34 n.48.  Muddy Waters examined KE Holdings' SEC filings and SAIC corporate registry databases, and identified 28 Company subsidiaries and variable interest entities in

Beijing.  Report at 36 & n.53.  According to Muddy Waters, SAIC data for those entities showed

that they "reported a total of only 14,236 employees[.]"  *Id*. at 36.  That figure "indicat[ed] that [KE

Holdings was] exaggerating the number of its agent in Beijing by ***90%***" in comparison to the 27,000

Beijing-based agents that the Company reported in its 2020 20-F.  *Id*.

122.    Moreover, since KE Holdings is headquartered in Beijing, "[a] large portion of [its]

employees are based" there, including employees working in non-agent roles such as platform

operations, research and development, and administration.  2020 20-F at 130; *see also* Report at 36.

Therefore, Muddy Waters explained that the actual agent overstatement was likely even greater,

since the 14,236 employees registered with the SAIC would presumably include a significant

number of non-agent employees.  Report at 37.

### F.    Muddy Waters Also Finds Evidence that KE Holdings Had Reported Inflated GTV and Revenues During at Least 2Q21 and 3Q21

123.    Muddy Waters explained that, in order "[t]o assess the authenticity of [KE Holdings']

reported GTV and associated commission revenues, [it] wrote a program to collect the publicly

available [transaction] data on [KE Holdings'] platform."  *Id*. at 6.  Muddy Waters described its

research methodology in detail, in a 24-page appendix to the Report.  *Id*. at 47-71 ("Appendix I:

Data Collection Methodology and Results").  The Report contained the following summary:

> The program begins with the Find Agent function in the app.  After finding the agents, it collects the stores with which they are affiliated and the store information. Then it collects the transaction information and other transaction details that are included in its code.  The [KE Holdings] platform contains at least 15 collectable data points, including the total number of new and existing home sales on the platform.  The Lianjia and Deyou agents with whom we spoke also confirmed that the transactions posted on the external network match up with sales transactions on their internal network.  We collected and analyzed code and detailed transaction data accessible via [KE Holdings'] external platform from May through mid-November 2021, enabling us to compare [the Company's] claimed GTV over that period to the GTV evidenced by the data on [its] platform.

*Id*. at 6 (footnotes omitted); *see also id*. at 5 n.2.

124.    "To verify that [its] collected data was comprehensive," Muddy Waters then "compared the key metrics from the data [it] collected from the platform with [KE Holdings'] SEC disclosures."  Muddy Waters reported the following results of this comparison:

> [KE Holdings] reported connecting with 278 real estate brokerage brands other than Lianjia.  [2020 20-F at 60.]  In our July data collection, we identified 310 brands.  [KE Holdings] stated that its Lianjia stores operate in 29 cities in China.  [*Id*.]  Our collected data captured Lianjia brokerage transaction data in 29 cities.  [KE Holdings] reported that its platform includes connected brokerages in "more than 100 economically vibrant cities in China."  [2020 20-F at 54.]  We collected transaction data from connected and franchise stores with agents for 142 cities, including Beijing and Shanghai.

*Id*. at 6-7 (footnotes omitted).

### 1.    Evidence of Inflated GTV

#### a.    Muddy Waters Finds that New Home GTV Was Inflated by Approximately 126% in 2Q21 and 3Q21

125.    Muddy Waters first analyzed KE Holdings' reported GTV of new home transactions, by comparing the reported GTV to data that Muddy Waters collected from the Company's platform.  Muddy Waters explained its methodology for analyzing GTV of new home transactions, in pertinent part:

> The methodology for comparing [KE Holdings'] claims against the data we collected for new home sales on its platform was straightforward and required few assumptions.  We collected data covering late May through mid-November 2021, which gave us the number of new home transactions on the platform during that period for both Lianjia and connected brokerages.  We then multiplied this transaction data by the new home prices previously disclosed by [KE Holdings] . . . .

*Id*. at 7.

126.    Muddy Waters further explained:

> In its SEC filings, [KE Holdings] disclosed the average price per new home transaction on its platform for both Company[-]owned and connected brokerages in 2020.  For Lianjia, [KE Holdings] disclosed GTV and the number of transactions, which yield an average price of RMB 2.06 million per new home.  For the connected brokerages, [KE Holdings'] numbers equate to an average price of RMB 1.4 million per new home.

*Id.* (footnote omitted); *see also id.* at 55.  Since "housing data show[ed] that the price of new homes in China . . . remained flat from 2020 to 2021[,]" Muddy Waters "use[d] the average prices for 2020 reported by [KE Holdings] in its SEC filings to estimate" 2Q21 and 3Q21 "GTV from the collected transaction data."  *Id.* at 7 (footnote omitted).

127.    Since "data from [KE Holdings'] platform [was] available in 76-day increments" (*id.* at 7 n.13), Muddy Waters examined "the number of new home transactions collected from [KE Holdings'] platform for Lianjia stores for two overlapping 76-day windows" (*id.* at 7), as set forth in the following table:

| | May 25, 2021 - Aug 8, 2021 | | | | June 30, 2021 - Sep 13, 2021 | | |
|---|---|---|---|---|---|---|---|
| Ref. | City | | # of transactions | Ref. | City | | # of transactions |
| 1 | Dalian | 大连 | 1,119 | 1 | Dalian | 大连 | 1,144 |
| 2 | Shenyang | 沈阳 | 680 | 2 | Shenyang | 沈阳 | 660 |
| 3 | Jinan | 济南 | 1,082 | 3 | Jinan | 济南 | 782 |
| 4 | Chengdu | 成都 | 4,180 | 4 | Chengdu | 成都 | 4,240 |
| 5 | Zhenzhou | 郑州 | 1,046 | 5 | Zhenzhou | 郑州 | 745 |
| 6 | Changsha | 长沙 | 432 | 6 | Changsha | 长沙 | 339 |
| 7 | Qingdao | 青岛 | 585 | 7 | Qingdao | 青岛 | 495 |
| 8 | Foshan | 佛山 | 209 | 8 | Foshan | 佛山 | 181 |
| 9 | Nanjing | 南京 | 787 | 9 | Nanjing | 南京 | 699 |
| 10 | Yantai | 烟台 | 522 | 10 | Yantai | 烟台 | 403 |
| 11 | Guangzhou | 广州 | 659 | 11 | Guangzhou | 广州 | 664 |
| 12 | Shijiazhuang | 石家庄 | 337 | 12 | Shijiazhuang | 石家庄 | 315 |
| 13 | Tianjin | 天津 | 808 | 13 | Tianjin | 天津 | 717 |
| 14 | Hefei | 合肥 | 388 | 14 | Hefei | 合肥 | 348 |
| 15 | Wuhan | 武汉 | 1,238 | 15 | Wuhan | 武汉 | 1,129 |
| 16 | Xi'an | 西安 | 614 | 16 | Xi'an | 西安 | 693 |
| 17 | Hangzhou | 杭州 | 312 | 17 | Hangzhou | 杭州 | 340 |
| 18 | Wuxi | 无锡 | 159 | 18 | Wuxi | 无锡 | 94 |
| 19 | Beijing | 北京 | 1,661 | 19 | Beijing | 北京 | 1,379 |
| 20 | Suzhou | 苏州 | 363 | 20 | Suzhou | 苏州 | 323 |
| 21 | Shanghai | 上海 | 1,278 | 21 | Shanghai | 上海 | 1,308 |
| 22 | Langfang | 廊坊 | 97 | 22 | Langfang | 廊坊 | 69 |
| 23 | Xiamen | 厦门 | 154 | 23 | Xiamen | 厦门 | 108 |
| 24 | Chongqing | 重庆 | 859 | 24 | Chongqing | 重庆 | 940 |
| 25 | Dongguan | 东莞 | 68 | 25 | Dongguan | 东莞 | 57 |
| 26 | Shenzhen | 深圳 | 222 | 26 | Shenzhen | 深圳 | 207 |
| 27 | Zhongshan | 中山 | 55 | 27 | Zhongshan | 中山 | 61 |
| 28 | Huizhou | 惠州 | 49 | 28 | Huizhou | 惠州 | 40 |
| 29 | Haikou | 海口 | 0 | 29 | Haikou | 海口 | 1 |
| Total | | | 19,963 | Total | | | 18,501 |

*Id.* at 8.

128.    Based on the number of new home transactions found by Muddy Waters' data collection, and the average sales price reported by KE Holdings in its SEC filings, Muddy Waters "estimate[d] that [KE Holdings'] actual GTV [of] new home sales" through both its Lianjia

brokerages and connected stores was only RMB 402 billion during 2Q21 and 3Q21 combined. *Id*.

at 7. By contrast, the Company reported that GTV of new home transactions on its platform was:

(i) RMB 498.3 billion in 2Q21; and (ii) and RMB 410.1 billion in 3Q21 – a GTV of approximately

RMB 908 billion during 2Q21 and 3Q21 combined. *See id*. Thus, Muddy Waters' analysis

indicated that KE Holdings had inflated its GTV of new home transactions by ***approximately 126%***

during 2Q21 and 3Q21. *Id*. at 7-8. Muddy Waters summarized its analysis in the following table:

**The Collected Data Suggest BEKE Grossly Overstates its New Home GTV**

| RMB M | Avg. Price per Home | 76 days (May 25 - Aug 8) # of new homes | Estimated GTV | 2Q 2021 (91 days) Estimated GTV | 2Q 2021 Reported GTV | 2Q 2021 Inflated% |
|---|---|---|---|---|---|---|
| New homes - Lianjin | 2.06 | 19,963 | 41,099 | 49,211 | 83,800 | 70% |
| New homes - Connected Stores | 1.40 | 93,975 | 131,668 | 157,655 | 414,500 | 163% |
| Total | | 113,938 | 172,767 | 206,866 | 498,300 | 141% |
| RMB M | Avg. Price per Home | 76 days (Jun 30 - Sep 13) # of new homes | Estimated GTV | 3Q 2021 (92 days) Estimated GTV | 3Q 2021 Reported GTV | 3Q 2021 Inflated% |
| New homes - Lianjin | 2.06 | 18,501 | 38,089 | 46,108 | 72,550 | 57% |
| New homes - Connected Stores | 1.40 | 87,998 | 123,293 | 149,249 | 337,550 | 126% |
| Total | | 106,499 | 161,382 | 195,358 | 410,100 | 110% |
| RMB M | Avg. Price per Home | 152 days # of new homes | Estimated GTV | 2Q-3Q 2021 Estimated GTV | 2Q-3Q 2021 Reported GTV | 2Q-3Q 2021 Inflated% |
| New homes - Lianjin | 2.06 | 38,464 | 79,189 | 95,319 | 156,350 | 64% |
| New homes - Connected Stores | 1.40 | 181,973 | 254,961 | 306,904 | 752,050 | 145% |
| Total | | 220,437 | 334,150 | 402,224 | 908,400 | 126% |

*Id*. at 9.

### b. Muddy Waters Finds that Existing Home GTV Was Inflated by Approximately 33% in 2Q21 and 3Q21

129. Next, Muddy Waters analyzed KE Holdings' reported GTV of existing home

transactions, by comparing the reported GTV to data that Muddy Waters collected from the

Company's platform. Muddy Waters summarized its methodology for analyzing GTV of existing

home transactions, in pertinent part:

> The methodology for estimating existing home GTV required more assumptions than
> for new homes. Our estimate of [KE Holdings'] GTV exaggeration of existing home
> transactions would be significantly greater had we not intentionally made so many
> assumptions in the Company's favor.

> Our program collected hundreds of thousands existing home transactions during the period. For many such existing home transactions, prices were also readily available, making price assumptions unnecessary. For other existing home transactions, however, price assumptions were necessary to estimate GTV.

*Id*. at 9; *see also* Appendix 1 at 58-69 (setting forth a detailed explanation of Muddy Waters' methodology and assumptions).

130.    Based on its data collection, Muddy Waters estimated that KE Holdings' actual GTV of existing home transactions through both its Lianjia brokerages and connected stores was "approximately RMB 775 billion" during 2Q21 and 3Q21 combined. *Id*. at 9. By contrast, the Company reported that GTV of existing home transactions on its platform was: (i) RMB 652.0 billion in 2Q21; and (ii) RMB 378.2 billion in 3Q21 – a GTV of approximately RMB 1,030.2 billion during 2Q21 and 3Q21 combined. *See id*. Thus, Muddy Waters' analysis indicated that KE Holdings had inflated its GTV of existing home transactions by ***approximately 33%*** during 2Q21 and 3Q21. *Id*. Muddy Waters summarized its analysis in the following table:

| RMB M | 2Q 2021 | | | 3Q 2021 | | | 2Q-3Q 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% |
| GTV of existing home sales by Lianjia | 309,500 | 216,839 | 43% | 185,300 | 160,866 | 15% | 494,800 | 377,706 | 31% |
| GTV of existing home sales by connected stores | 342,500 | 232,630 | 47% | 192,900 | 164,791 | 17% | 535,400 | 397,421 | 35% |
| GTV of existing home sales | 652,000 | 449,469 | 45% | 378,200 | 325,657 | 16% | 1,030,200 | 775,126 | 33% |

*Id*.

### c.    Muddy Waters Finds that Combined GTV Was Inflated by Approximately 65% in 2Q21 and 3Q21

131.    Muddy Waters then analyzed the inflation in KE Holdings' reported GTV of new and existing home transactions on a combined basis. KE Holdings' reported GTV of new and existing home transactions was approximately RMB 1,150.2 billion in 2Q21, and approximately RMB 788.4 billion in 3Q21.[12]

---

[12]    *See* 2Q21 Press Release; 3Q21 Press Release. These figures do not include reported GTV of "emerging and other services." *Id*.

132.    According to Muddy Waters, however, "the data collected from [KE Holdings']

platform" indicated that 3Q21 GTV of new and existing home transactions was "RMB 521 billion,

compared to a reported RMB 788 billion" – which amounted to approximately a "***51%***

***overstatement***" of 3Q21 GTV.  Report at 7.  For 2Q21, Muddy Waters "[a]djust[ed] for the partial

Q2 data" by "using company[-]favorable assumptions[,]" which "yielded an estimated" 2Q21 GTV

of new and existing home transactions of RMB 656 billion, compared to a reported RMB 1,150

billion – which amounted to approximately a "***75% overstatement***" of 2Q21 GTV.  *Id*.  Muddy

Waters estimated that, on a "combined" basis for 2Q21 and 3Q21, KE Holdings had "inflated its

reported platform GTV" of new and existing home transactions by ***approximately 65%***.  *Id*.  Muddy

Waters summarized its analysis in the following table:

| RMB BN | 2Q 21 | 3Q 21 | 2Q-3Q 2021 |
|---|---|---|---|
| Reported home sales GTV | 1,150 | 788 | 1,939 |
| Home sales GTV estimate from collected data | 656 | 521 | 1,177 |
| **Inflated %** | **75%** | **51%** | **65%** |

*Source: MW Data Collection*

*Id*.

### 2.    Evidence of Inflated Revenues

133.    Finally, Muddy Waters evaluated the impact of KE Holdings' GTV inflation in 2Q21

and 3Q21 on the Company's reported revenues from new and existing home transactions during

those quarters.  *See id*. at 10.

134.    "Based on [KE Holdings'] reported [new and existing] home sales GTV and service

revenues," Muddy Waters determined that KE Holdings' "reported commission rates for new home

sales were 2.79% in 2Q 2021 and 2.76% in 3Q 2021."  *Id*.  It further determined that "[t]he reported

commission rates for Lianjia stores' existing home sales and connected stores' existing home sales

were 2.75% and 0.32% in 2Q 2021 and 2.86% and 0.41% in 3Q 2021."  *Id*.  Muddy Waters

summarized the reported commission rates in the following table:

| Reported commission rate | 2Q 2021 | 3Q 2021 | 2Q-3Q 2021 |
|---|---|---|---|
| New home sales by Lianjia and connected stores | 2.79% | 2.76% | 2.77% |
| Existing home sales by Lianjia | 2.75% | 2.86% | 2.79% |
| Existing home sales by connected stores | 0.32% | 0.41% | 0.35% |

*Id.*

135.    Muddy Waters then "appl[ied] [KE Holdings'] reported commission rates to the GTV data" that it had "collected from [the Company's] platform[.]" *Id.*[13]

136.    Through this analysis, Muddy Waters found that KE Holdings' actual revenues from new and existing home transactions "were only approximately RMB 23 billion" in 2Q21 and 3Q21 combined – compared to a reported RMB 40.9 billion – which amounted to approximately a ***77% overstatement*** during 2Q21 and 3Q21.  *Id.* at 10.  For 2Q21, Muddy Waters determined that KE Holdings' actual revenues from new and existing home transactions were approximately RMB 12.5 billion, compared to a reported RMB 23.5 billion – which amounted to an ***overstatement of approximately 88%*** in 2Q21.  *Id.* at 11.  For 3Q21, Muddy Waters determined that KE Holdings' actual revenues from new and existing home transactions were approximately RMB 10.7 billion, compared to a reported RMB 17.4 billion – which amounted to an ***overstatement of approximately 63%*** in 3Q21.  *Id.*  Muddy Waters summarized its analysis in the following table:

---

[13]    As Muddy Waters explained, KE Holdings' commission revenues are a direct "function of its GTV[.]"  *Id.*  Moreover, because KE Holdings recognizes revenues from commissions on a gross basis for all new home transactions – regardless of whether they were facilitated by a Company-owned Lianjia store, or by a connected store – new home transactions have an outsized impact on the Company's revenues.  *See id.* at 9-10.

| BEKE Likely Inflated Its Home Sales Transaction Services Revenues (using reported commission rates) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2Q 2021 | | | 3Q 2021 | | | 2Q - 3Q 2021 | | |
| RMB M | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% | Reported | MW estimate | Inflated% |
| GTV of new home sales by Lianjia and connected | 498,300 | 206,866 | 141% | 410,100 | 195,358 | 110% | 908,400 | 402,224 | 126% |
| Reported commission rate | 2.79% | 2.79% | | 2.76% | 2.76% | | 2.77% | 2.77% | |
| Rev from new home sales | 13,900 | 5,770 | 141% | 11,300 | 5,383 | 110% | 25,200 | 11,153 | 126% |
| GTV of existing home sales by Lianjia | 309,500 | 216,839 | 43% | 185,300 | 160,866 | 15% | 494,800 | 377,706 | 31% |
| Reported commission rate | 2.75% | 2.75% | | 2.86% | 2.86% | | 2.79% | 2.79% | |
| Rev from existing home sales by Lianjia | 8,500 | 5,955 | 43% | 5,300 | 4,601 | 15% | 13,800 | 10,556 | 31% |
| GTV of existing home sales by connected stores | 342,300 | 232,630 | 47% | 192,900 | 164,791 | 17% | 535,400 | 397,421 | 35% |
| Reported commission rate | 0.32% | 0.32% | | 0.41% | 0.41% | | 0.35% | 0.35% | |
| Rev from existing home sales by connected stores | 1,100 | 747 | 47% | 800 | 683 | 17% | 1,900 | 1,431 | 33% |
| GTV of home sales | 1,150,300 | 656,335 | 75% | 788,300 | 521,015 | 51% | 1,938,600 | 1,177,350 | 65% |
| Revenue from commission of home sales | 23,500 | 12,473 | 88% | 17,400 | 10,667 | 63% | 40,900 | 23,140 | 77% |

*Source: BEKE's Public Filings, Data collected from BEKE's platform, MW calculation*

*Id.*

### G. The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information

137.    The Secondary Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

138.    The Secondary Offering Documents repeatedly highlighted the numbers of stores and agents on KE Holdings' platform, stating that, "*[a]s of September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage stores on [the Company's] platform* . . . ."

139.    The statements referenced above in ¶138 were materially false and misleading when made because they negligently failed to disclose that – as Muddy Waters found – the reported numbers of stores and agents on KE Holdings' platform were significantly inflated, and included inactive stores and agents, as well as nonexistent ones.  In addition, KE Holdings' subsequent disclosure that: (i) at least 3,731 of the stores – *approximately 9.1%* – were not "active" stores; and (ii) at least 64,078 of the agents – *approximately 15.5%* – were not "active" agents supports a

plausible inference that Muddy Waters' findings are suggestive of a substantial over-count of stores and agents.

**H.    The Release of the Muddy Waters Report and the Continued Fallout**

140.    On December 16, 2021, shortly before the markets opened, Muddy Waters issued its comprehensive, 77-page report on its investigation of KE Holdings.[14]  Muddy Waters summarized its findings as follows:

> ***We are short [KE Holdings] because we conclude the Company is engaged in systemic fraud***, by our estimate, inflating its new home sales GTV by over ~126% and its commission revenues by approximately ~77–96%.  ***We found massive discrepancies between the transaction volumes, store count and agent count reported to investors*** and the transaction data from our multi-month data collection program from [KE Holdings'] platform.  We corroborated these discrepancies by spot-checking our findings through primary due diligence on [KE Holdings'] stores, including field interviews and site visits.
>
> [KE Holdings'] mantra, oft repeated on Company earnings calls, is "doing the right thing, even if it is difficult."  Nothing could seem further from the truth.  Put simply, we found massive fraud . . . . ***Our field work found ghost stores, clone stores*** and undisclosed schemes to inflate revenues by round tripping cash through connected brokerages. . . . ***[T]his is a real business with significant amounts of fraud***.

Report at 2.  (Emphasis altered).

141.    As set forth above, the Muddy Waters Report revealed a multitude of evidence showing that the reported numbers of stores and agents on KE Holdings' platform were significantly inflated – and included not just inactive stores and agents, but nonexistent ones.  The Muddy Waters Report also revealed evidence that KE Holdings had materially overstated its reported GTV and revenues during at least 2Q21 and 3Q21.

142.    In response to the Muddy Waters Report, the price of KE Holdings' ADSs tumbled 4.47% on unusually heavy trading volume, from a closing price of $18.68 per ADS on December 15, 2021, to an opening price of $17.96 per ADS on December 16, 2021.  The price of the Company's

---

[14]    Muddy Waters tweeted a link to The Report at 8:48 EST on December 16, 2021.

ADSs declined further during the trading day, as the market digested the Muddy Waters Report, trading as low as $17.72 per ADS – a total decline of 5.74% from the closing price on December 15, 2021.

143.    On Friday, December 17, 2021, after the close of the market, KE Holdings issued a press release, filed with the SEC on Form 6-K, attempting to address some, but not all, of the Muddy Waters Report.  For example, the press release stated that Muddy Waters' agent count was "incomplete" because "agents responsible solely for new home sales" could "in their discretion, [] opt out from the search results page" on the Company's "'Find Agent' function" (without explaining why an agent would have any reason to do so) – and did not even attempt to address Muddy Waters' evidence of ghost stores and clone stores.

144.    The press release also stated that KE Holdings' "Board of Directors ha[d] authorized the independent audit committee to conduct an internal review of the key allegations contained in the Muddy Waters' report, with assistance and advice from independent third-party advisors to be engaged by the audit committee."  The press release assured investors that "[t]he Company [would] provide updates on the internal review when appropriate."  Reflecting investors' dissatisfaction with the Company's incomplete response, the price of KE Holdings' ADSs fell to a closing price of $17.31 per ADS on Monday, December 20, 2021.

145.    Just six weeks later, on January 28, 2022, KE Holdings issued a press release announcing that its internal review of Muddy Waters' allegations was "substantially complete," and declaring that "the allegations in the Muddy Waters Report were not substantiated" – but failing to provide any supporting details.  Indeed, KE Holdings did not even provide the name of the "international law firm and forensic accounting experts" involved in the supposed internal review. To date, the Company had not released any additional information about the internal review.

146.    The effect of the Muddy Waters Report and the subsequent events related to the issues raised in the Report continued to adversely impact the price of KE Holdings' stock through at least March 11, 2022.

## V.    CLASS ACTION ALLEGATIONS

147.    Lead Plaintiff brings this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased or otherwise acquired KE Holdings ADSs pursuant or traceable to the Offering Documents, including purchasers who were successfully solicited by any defendant, seeking to pursue remedies under the Securities Act. Excluded from the Class are Defendants and their families; officers, directors and affiliates of Defendants and members of their immediate families at all relevant times; legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

148.    The members of the Class are so numerous that joinder of all members is impracticable. KE Holdings ADSs are actively traded on the NYSE and millions of shares were sold in the Secondary Offering. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, there are likely hundreds, if not thousands, of members in the Class. Record owners and other Class members may be: (i) identified from records maintained by KE Holdings or its transfer agent; (ii) notified of the pendency of this action using a form of notice customarily used in securities class actions; and (iii) given an opportunity to exclude themselves from the Class.

149.    Common questions of law and fact exist as to all Class members that predominate over any questions solely affecting individual Class members, including:

(a)       whether Defendants violated the Securities Act;

- 49 -

(b)      whether Defendants negligently misrepresented or omitted material information in the Offering Documents; and

(c)      whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

150.    Lead Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by Defendants' conduct.

151.    Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

152.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged.  There will be no difficulty in managing this action as a class action.

## VI.    CLAIMS

### A.    COUNT I:  For Violations of Section 11 of the Securities Act (Against All Defendants)

153.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

154.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed.

155.    The Registration Statement, which was incorporated in and formed part of the Secondary Offering Documents, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

156.    KE Holdings was the registrant for the Secondary Offering.  As an issuer of securities to the public, KE Holdings is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

157.    The Individual Defendants each signed and/or authorized the signing of the Registration Statement.  Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material misstatements and/or omissions of material facts.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

158.    The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the Secondary Offering was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

159.    Defendants were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Secondary Offering Documents were complete, accurate or non-misleading.

160.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

161.    Lead Plaintiff and the other members of the Class purchased KE Holdings ADSs pursuant and/or traceable to the Registration Statement for the Secondary Offering and have sustained damages as a result.  The price of the ADSs has declined substantially subsequent and due to Defendants' violations.

162.    At the time of their purchases of KE Holdings ADSs, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein, and could not have reasonably discovered those facts prior to the disclosures herein.

163.    Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time this action was filed.  Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

**B.    COUNT II:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants)**

164.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

165.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend

to allege, fraud or scienter, which are not elements of a Section 12(a)(2) claim, and any implication of fraud or scienter is disclaimed.

166.    By means of the defective Secondary Offering Prospectus, Defendants promoted and sold KE Holdings ADSs to Lead Plaintiff and other members of the Class.

167.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Secondary Offering Prospectus for their own financial benefit.  But for their participation in the Secondary Offering, including their solicitation, the Secondary Offering could not, and would not, have been accomplished.  Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the Secondary Offering and do it at the price set forth in the Secondary Offering Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Secondary Offering Prospectus and participated in its being declared effective by the SEC.  The Secondary Offering Prospectus was calculated to create interest in KE Holdings ADSs and was widely distributed by, or on behalf of, the Underwriter Defendants for that purpose; and

(b)    conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of KE Holdings ADSs to the investing public by issuing, promoting and supervising the distribution and ultimate sale of KE Holdings ADSs to the investing public.

168.    The Secondary Offering Prospectus contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above.  Defendants owed Lead Plaintiff and the other members of the Class who purchased KE Holdings ADSs pursuant to the Secondary Offering Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

169.    Lead Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Secondary Offering Prospectus at the time Lead Plaintiff acquired KE Holdings ADSs.

170.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased KE Holdings ADSs pursuant to the Secondary Offering Prospectus sustained damages in connection with their purchases.  Accordingly, Lead Plaintiff and the other members of the Class who hold the ADSs issued pursuant to the Secondary Offering Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADSs to the defendants sued herein.  Class members who have sold their ADSs seek damages to the extent permitted by law.

**C.    COUNT III:  For Violations of Section 15 of the Securities Act**
      **(Against the Individual Defendants)**

171.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

172.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is disclaimed.

173.    The Individual Defendants each were control persons of KE Holdings by virtue of their positions as directors and/or senior officers of KE Holdings.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of KE Holdings.

174.    The Individual Defendants each were culpable participants in the primary violations of Sections 11 and 12(a)(2) of the Securities Act alleged herein, based on their having signed or authorized the signing of the Secondary Offering Documents and having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying the Class accordingly, designating Lead Plaintiff as class representative, and appointing Lead Counsel as Class Counsel;

B.    Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.    Awarding rescission or a rescissory measure of damages, to the extent available under the Securities Act, together with prejudgment interest thereon;

D.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, counsel and expert fees; and

E.    Granting such other, further and/or different relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  May 13, 2024                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                               SAMUEL H. RUDMAN
                                               DAVID A. ROSENFELD
                                               ERIN W. BOARDMAN

*/s/ Erin W. Boardman*
ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com