UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

KEITH CHIN, Individually and on Behalf of
All Others Similarly Situated,

                                 Plaintiff,

       vs.

KE HOLDINGS INC., COLLEEN A. DE
VRIES, GOLDMAN SACHS (ASIA) L.L.C.,
MORGAN STANLEY & CO. LLC, J.P.
MORGAN SECURITIES LLC, GOLDMAN
SACHS & CO. LLC and CHINA
RENAISSANCE SECURITIES (US) INC.,

                          Defendants.

——————————————————————— x

: Civil Action No. 1:21-cv-11196-GHW-BCM
:
: DECLARATION OF ERIN W. BOARDMAN
: IN SUPPORT OF UNOPPOSED MOTION
: FOR PRELIMINARY APPROVAL OF
: SETTLEMENT, CERTIFICATION OF THE
: SETTLEMENT CLASS, AND APPROVAL
: OF NOTICE TO THE SETTLEMENT
: CLASS

4927-0319-0389.v1

I, ERIN W. BOARDMAN, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of New York and admitted to practice before this Court.  I am a partner with the law firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), Lead Counsel for Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("SHEPP" or "Plaintiff/Lead Plaintiff") and the Settlement Class in the above-captioned action (the "Action").  I was actively involved in the prosecution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Action.[1]

2.      I submit this declaration, pursuant to Rule 23 of the Federal Rules of Civil Procedure, Local Civil Rule 7.1(a)(3), and this Court's Order dated September 10, 2025 (ECF 165), in support of Lead Plaintiff's unopposed motion for: (i) preliminary approval of the proposed $4.95 million Settlement reached for the benefit of the Settlement Class;[2] (ii) certification of the proposed Settlement Class for purposes of the Settlement; (iii) approval of the form and manner

---

[1]      Unless otherwise defined herein, capitalized terms and acronyms have the meaning ascribed to them in the Stipulation of Settlement, filed on September 9, 2025 (ECF 163-1) ("Stipulation").

[2]      The Stipulation defines the Settlement Class as: "[A]ll Persons that purchased or otherwise acquired KE Holdings ADS during the Settlement Class Period or traceable to the Follow-On Offering's registration statement.  Excluded from the Settlement Class are Defendants, the Former Defendants, the officers and directors of KE Holdings and the Underwriter Defendants (at all relevant times), members of their Immediate Families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant or Former Defendant has a controlling interest; provided, however, that, notwithstanding anything set forth above, any 'Investment Vehicle' (as defined above) shall not be excluded from the Settlement Class.  Also excluded from the Settlement Class is any Person who timely and validly requests exclusion from the Settlement Class."  ECF 163-1, ¶1(ee).

4927-0319-0389.v1

of the settlement notices to members of the Settlement Class; and (iv) the scheduling of a final fairness hearing ("Settlement Hearing"), along with setting deadlines in connection therewith.

## I.    SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT

3.    This Action alleges claims against KE Holdings Inc. ("KE Holdings" or the "Company") and Colleen A. De Vries (the "KE Holdings Defendants"), and Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, and China Renaissance (US) Inc. (the "Underwriter Defendants" and, together with the KE Holdings Defendants, "Defendants"), on behalf of the Settlement Class for alleged violations of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k, 77l(a)(2), and 77o) and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b 5 promulgated thereunder (17 C.F.R. §240.10b 5) by the U.S. Securities and Exchange Commission ("SEC"). This case was vigorously litigated until the proposed settlement agreement was reached on September 8, 2025.

4.    Lead Counsel and Plaintiff zealously, efficiently, and effectively prosecuted the Action. The Settlement was not achieved until Plaintiff, *inter alia*: (a) successfully achieved the appointment as Lead Plaintiff with Robbins Geller as Lead Counsel in March 2022 (ECF 37); (b) investigated and drafted the Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"), filed on June 17, 2022 (ECF 51); (c) exchanged pre-motion to dismiss letter briefs with Defendants and participated in a telephonic hearing to discuss the pre-motion to dismiss letters; (d) opposed Defendants' motion to dismiss, via extensive written briefing; (e) filed the Second Amended Complaint for Violations of the Federal Securities Laws (the "Second Amended Complaint"), on March 18, 2024 (ECF 101); (f) exchanged pre-motion to dismiss letters with Defendants regarding their anticipated motion to dismiss the Second Amended

Complaint and participated in a telephonic hearing to discuss the pre-motion letters; (g) filed the Third Amended Complaint for Violations of the Federal Securities Laws (the "Operative Complaint"), on May 13, 2024 (ECF 112); (h) negotiated a case schedule with Defendants to govern all major procedural deadlines in the case (ECF 131) and participated in an Initial Pre-Trial Conference; (i) served Defendants with Plaintiff's first sets of document requests, and responded and objected to Defendants' initial document requests; (j) participated in an in-person status conference with Magistrate Judge Barbara Moses; (k) reached an agreement with Defendants on the terms of a protective order, which Magistrate Judge Moses entered in September 2024 (ECF 138); (l) negotiated the terms of an electronically-stored information ("ESI") protocol to govern the production of documents in this Action; (m) engaged in protracted negotiations with Defendants regarding the disputed scope of discovery and production of relevant and responsive documents; (n) filed a motion for class certification (ECF 143-146), analyzed Defendants' opposition to the motion, and began preparing a reply brief; and (o) engaged in extensive settlement negotiations under the supervision of mediator David M. Murphy of Phillips ADR Enterprises (the "Mediator"), which included preparation of detailed opening and reply mediation statements (supported with expert damages analyses), and participation in a joint mediation session.[3]

5.     The proposed settlement of $4.95 million is the result of hard-fought and contentious litigation pursued by zealous advocates on both sides and takes into consideration the

---

[3]     As discussed further below, while the parties did not reach a settlement during this session, Mr. Murphy gained a thorough understanding of the parties' positions during the joint session and, on April 2, 2025, Mr. Murphy made a Mediator's proposal of a settlement based upon a cash payment of $4.95 million.  Both sides accepted Mr. Murphy's proposal and thereafter agreed to the material terms of the Settlement.

4927-0319-0389.v1

significant risks specific to this case.  The Settlement is also the product of arm's-length negotiations by experienced counsel for Plaintiff and Defendants, who had a comprehensive understanding of both the strengths and potential weaknesses of their respective positions.

6.      Lead Counsel and Plaintiff submit that the proposed Settlement is a fair, reasonable, and adequate result for the Settlement Class.  Based upon their investigation, research, and analysis, Plaintiff and Lead Counsel believe that the claims asserted in the Action have significant merit.  Indeed, Plaintiff's perseverance through three and-a-half years of litigation resulted in its partial success at the pleadings stage.  Discovery was underway at the time settlement was reached, and Lead Counsel believes continued discovery would have revealed evidence to support Plaintiff's claims, defeat a potential summary judgment motion, and sustain a jury verdict in Plaintiff's favor.

7.      Despite the strength of Plaintiff's claims and the likelihood of discovering evidence to support them, there were substantial risks to Plaintiff's ability to obtain, protect, and ultimately recover a favorable judgment after trial.  Significantly, KE Holdings lacked any applicable insurance coverage, creating a risk that adequate funds would not be available to fund a judgment.  Even if Plaintiff succeeded in bolstering its claims with discovery, further litigation would likely only reduce the funds available for recovery on behalf of the Settlement Class.  There was also a risk that Plaintiff would not be able to enforce a judgment against assets in China.

8.      Plaintiff also faced significant risks and challenges associated with discovery.  For example, the parties had dramatically different views on the appropriate scope of the case.  They disputed: (i) the continued relevance of the Muddy Waters Report and other background allegations in the case following the Court's Order on Defendants' motion to dismiss; (ii) whether the contents of any dismissed misstatements were relevant to the surviving claims for discovery

- 4 -

purposes; and (iii) the appropriate relevant time period, with Plaintiff seeking a relevant time period of two and a-half years, and Defendants seeking to limit it to just six weeks. After multiple meet-and-confer conferences, and numerous letters and emails setting forth the parties' diametrically opposed positions on these issues, the parties remained largely at an impasse and Plaintiff and Lead Counsel were preparing to move the Court to compel production of the contested discovery.

9. In addition, Plaintiff faced the risk that it would not prevail on its pending motion for class certification. Defendants maintained that a class could not be certified because neither Plaintiff nor any member of the class could trace their American Depository Shares ("ADSs") to the registration statement for the Follow-On Offering, as Section 11 requires. While Plaintiff believed that it would successfully rebut Defendants' arguments, there remained a real risk that the Court would agree with Defendants and decline to certify a class.

10. Moreover, continued litigation may have led to years of delay and significant expense before recovery of damages for the Settlement Class. The parties faced voluminous document review (with many, if not most, of the documents being in Chinese), Plaintiff discovery, depositions, the completion of class certification briefing, expert discovery, summary judgment, trial, and any appeals. Plaintiff accepted the mediator's proposal, described below, with a full understanding and appreciation of the serious risks involved in proceeding with its claims through trial, where Plaintiff's success would have hinged on proving each of the elements of its claims.

11. Plaintiff and Lead Counsel have evaluated the available facts that weigh in favor of and against Plaintiff's claims. Plaintiff and Lead Counsel considered these facts, together with the other factors discussed herein, before concluding that the Mediator's proposal to settle the Action for $4.95 million provides fair, reasonable, and adequate consideration to the Settlement Class.

- 5 -

4927-0319-0389.v1

12.     In addition, the intended request for an award of attorneys' fees of up to 33-1/3% of the Settlement Fund is fair to both the Settlement Class and Lead Counsel, is supported by Plaintiff, and warrants this Court's preliminary approval.  This fee request is similar to other fee requests approved by courts in this Circuit and is justified in light of the result obtained, the risks undertaken by Lead Counsel, the quality of representation, and the nature and extent of the legal services performed.  Lead Counsel, as described below, vigorously prosecuted this Action on a wholly contingent basis for three and-a-half years and advanced or incurred significant litigation expenses.  Lead Counsel has long borne the risk of an unfavorable result.  It has not received any compensation for its substantial efforts, nor have its expenses been recovered.

13.     Lead Counsel should also be awarded its litigation expenses not to exceed $125,000, plus interest on that amount at the same rate as earned by the Settlement Fund, as the costs and expenses incurred in prosecuting this Action were reasonable and necessary in order to achieve the result obtained on behalf of the Settlement Class.  These charges, costs, and expenses related to: (a) factual and legal research, as well as photocopying, imaging, and printing; (b) transportation, hotels, and meals when Lead Counsel was required to travel; (c) court fees; (d) the fees and expenses of an investigator and a damages expert; and (e) mediation expenses. These modest expenses were reasonably and necessarily incurred to, *inter alia*, plead Plaintiff's claims with particularity, defend against Defendants' motion to dismiss, and obtain a settlement on the terms proposed.

## II.    FACTUAL BACKGROUND OF THE LITIGATION

14.     KE Holdings operates an integrated online and offline real estate brokerage platform that facilitates housing transactions and services in China, including new and existing

4927-0319-0389.v1

home sales, rentals, renovation, and financing. ¶¶2, 21, 35.[4] The brokerages on KE Holdings' platform consist of both company-owned stores and third-party brokerages, which pay fees to use KE Holdings' platform and/or brand names. ¶36. KE Holdings has grown by leveraging its online platform and its network of brick-and-mortar stores—which provide a key "competitive advantage." ¶¶2, 37.

15.    KE Holdings primarily generates revenues from commissions and fees for housing transactions. ¶¶3, 39-40. Its profitability is therefore driven by the number of brokerage stores and agents actively using its platform. ¶¶3, 42. KE Holdings considers "the number of real estate brokerage stores and agents on [its] platform" to be a "key operating metric." *Id*. Another "key operating metric" is GTV, which represents the total value of all transactions facilitated on the Company's platform during a given period. *Id*. The number of stores and agents on KE Holdings' platform is closely correlated with the Company's reported revenue and GTV. ¶44.

16.    KE Holdings conducted an initial public offering ("IPO") on August 13, 2020, selling 121.9 million of its ADSs, at $20.00 per ADS. ¶¶4, 21, 46. Approximately three months later, on November 19, 2020, KE Holdings completed the Follow-On Offering, selling its ADSs at $58.00 per ADS—nearly triple the price at which the ADSs were sold in the IPO—and netting more than $2.3 billion in proceeds. ¶¶4, 48-51.

17.    The registration statements and prospectus for the Follow-On Offering (the "Offering Documents") highlighted the number of stores and agents on KE Holdings' platform, claiming that "[a]s of September 30, 2020, there were more than 477,000 real estate agents and over 44,000 brokerage stores on [the Company's] platform . . . ." ¶138. The Operative Complaint

---

[4] All references to "¶__" and "¶¶__" are to the Operative Complaint.

4927-0319-0389.v1

alleged that those figures were materially false and misleading because the reported numbers of stores and agents on KE Holdings' platform were significantly inflated, and included inactive stores and agents, as well as nonexistent ones. ¶139.

18.     The Operative Complaint alleged that for several quarters after the Follow-On Offering, KE Holdings reported positive financial results and operating metrics that exceeded its guidance and analysts' expectations—including increased numbers of stores and agents on its platform and corresponding growth in GTV and revenues. ¶¶5, 52. In the second quarter of 2021, the residential real estate market in China experienced a slowdown in growth. ¶¶5, 53. Plaintiff alleged that by reporting inflated GTV and revenues—and using overstated agent and store counts to support those numbers—KE Holdings was able to again exceed its guidance and analysts' expectations. *Id*. On November 8, 2021, the Company issued a press release announcing that for the third quarter of 2021, it had again "exceed[ed]" its "guidance and street consensus." ¶61.

19.     According to the Operative Complaint, KE Holdings' apparent success overshadowed a critical disclosure in the November 8, 2021 press release: KE Holdings disclosed that only a portion of the stores and agents claimed to be on the Company's platform were actually "active" on its platform. ¶¶6, 54.

20.     The press release provided the number of "active stores" and "active agents" for each quarter dating back to the Company's IPO. For the period ending September 30, 2020—the period for which the Offering Documents reported store and agent counts—the press release reported that of the 477,810 agents claimed to be on KE Holdings' platform for that period, only 413,732 were active—meaning that approximately 15.5% were not "active" agents. And of the 44,883 stores claimed to be on KE Holdings' platform, only 41,152 were active—meaning that approximately 9.1% were not "active" stores. ¶¶6, 58, 139.

4927-0319-0389.v1

21.     The Operative Complaint alleged that, in fact, the reported numbers of stores and agents on KE Holdings' platform were even more inflated than the Company disclosed, and included not just inactive stores and agents, but nonexistent ones.  ¶¶7, 60.  Plaintiff alleged that KE Holdings' ongoing inflation of its store and agent counts, in turn, provided support for the inflated GTV and revenues that it reported in the November 8, 2021 press release—allowing the Company to once again announce that it had exceeded its guidance and analysts' expectations, despite a downturn in China's residential real estate market.  ¶¶8, 61.  This allegedly enabled KE Holdings to blunt the impact of its disclosure concerning inactive stores and agents, while still failing to disclose the extent of its overstatement of store and agent counts.  ¶¶8, 62.

22.     On December 16, 2021, shortly before the markets opened, a research-based investor known as Muddy Waters published a 77-page report setting forth the results of its investigation of KE Holdings (the "Muddy Waters Report").  ¶¶9, 63, 140.  Muddy Waters explained that it had conducted an investigation—consisting of an analysis of KE Holdings' platform data, as well as field work in multiple cities that included site visits to brokerage stores––and had "found massive discrepancies between the transaction volumes, store count[s] and agent count[s] reported to investors" and the results of its investigation.  ¶¶9, 11, 63-64, 140.

23.     According to the Operative Complaint, the Muddy Waters Report revealed that the reported numbers of stores and agents on KE Holdings' platform were even more significantly inflated than KE Holdings had admitted in the November 8, 2021 press release.  ¶10.  Plaintiff alleged that the Muddy Waters Report further revealed that KE Holdings had inflated its GTV and revenues.  ¶11.  Plaintiff alleged that in response to the Muddy Waters Report, the price of KE Holdings' ADSs fell 4.47%.  ¶¶12, 142.

24.    The Operative Complaint alleged that the price of KE Holdings' ADSs fell again on December 20, 2021, after the Company issued an incomplete response to the Muddy Waters Report, which failed to alleviate investors' concerns.  ¶¶13, 143-144.  Plaintiff further alleged that the effect of the Muddy Waters Report and the subsequent events related to the issues raised in the Report continued to adversely impact the price of KE Holdings' stock through at least March 2022.  ¶¶15, 146.

## III.    PROCEDURAL HISTORY

25.    Litigating this case was highly contentious and involved significant disputes during all phases.  Defendants advanced vigorous challenges at the pleading stage, and the parties disputed numerous discovery issues following the Court's partial denial of Defendants' motion to dismiss.  Thousands of hours of attorney and staff time were required to investigate the claims, prepare detailed pleadings, and mount a defense to Defendants' motion to dismiss.  Further time was dedicated to negotiating and attempting to resolve the parties' disputes as to the scope of discovery, an issue over which the parties met and conferred multiple times for many hours, and which was poised for motion practice prior to the settlement of this Action.

### A.    The Initial Complaint Was Filed and SHEPP Was Appointed Lead Plaintiff

26.    On December 30, 2021, Keith Chin initiated this action by filing a complaint in this District.  ECF 1.  That complaint alleged claims solely under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against KE Holdings and two of its executives, for alleged misstatements and omissions during an August 13, 2020 through December 16, 2021 class period.  *Id*.

27.    In accordance with the Private Securities Litigation Reform Act of 1995's ("PSLRA") requirements, on December 30, 2021, notice was published advising putative class members of their right to file a motion for appointment as lead plaintiff.  15 U.S.C. §§78u-4(a)(1),

- 10 -

(a)(3)(B)(i).  In response to that notice, five putative class members moved for appointment as lead plaintiff.  ECF 13, 17, 19, 22, 26.  On March 29, 2022, this Court appointed Plaintiff as Lead Plaintiff and approved its selection of Robbins Geller as Lead Counsel.  ECF 37.

> **B.**     **Plaintiff Vigorously Advanced Its Claims at the Pleadings Stage and Partially Defeated Defendants' Motion to Dismiss**

28.    Lead Counsel thoroughly investigated the putative class's claims, which consisted of, *inter alia*, (i) reviewing and analyzing the Company's public statements, including: (a) KE Holdings' periodic public filings with the SEC; (b) transcripts of KE Holdings' senior management's conference calls with investors and analysts; and (c) press releases issued by the Company; and (ii) reviewing and analyzing other public information regarding the Company and the case, including: (a) analyst reports issued about KE Holdings, including the Muddy Waters Report; (b) media reports about KE Holdings; and (c) other public news media and data.

29.    Based on the results of its investigation, Plaintiff filed its Amended Complaint on June 17, 2022, alleging claims arising under: (i) §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), during a November 16, 2020 through December 16, 2021 class period; and (ii) §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77o) in connection with KE Holdings' follow-on ADS offering on November 19, 2020 (the "Follow-On Offering").  ECF 51.

30.    In addition to newly asserting claims under the Securities Act, the Amended Complaint also added as defendants: (i) Shan Yigang, Bao Fan, Li Zhaohui, Chen Xiaohong, and Colleen A. De Vries, each of whom signed the offering documents for the Follow-On Offering; and (ii) Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, China Renaissance Securities (Hong Kong) Limited, Goldman Sachs & Co. LLC, and China Renaissance Securities (US) Inc., each of which was an underwriter for the Follow-On Offering.

- 11 -

31.     On July 26, 2022, Defendants filed their pre-motion to dismiss letter, which set forth the legal and factual arguments they intended to advance in support of their motion to dismiss. ECF 74.  Lead Plaintiff filed its letter in response on July 29, 2022.  ECF 76.

32.     On August 10, 2022, the Court held a telephonic hearing to discuss the pre-motion to dismiss letters, during which the Court heard substantive arguments regarding the anticipated motion to dismiss from both Defendants and Lead Plaintiff.

33.     On September 23, 2022, Defendants moved to dismiss the Amended Complaint on numerous grounds, arguing that Plaintiff had failed to plead falsity or scienter, which they contended required dismissal of all claims, that the absence of loss causation was apparent on the face of the Amended Complaint, requiring dismissal of all claims, and that Plaintiff had failed to plead standing to bring the Securities Act claims.  ECF 84.[5]

34.     Plaintiff filed its opposition on November 7, 2022, arguing, *inter alia*, that: (i) Plaintiffs' Securities Act claims did not "sound in fraud" and were not subject to the particularity requirements of Federal Rule of Civil Procedure 9(b); (ii) Defendants' failure to disclose KE Holdings' inactive stores and agents made their statements materially false and misleading; (iii) Plaintiff properly relied on the Muddy Waters Report, and Defendants' merit-based attacks on the Report were inappropriate at the pleading stage; (iv) the Amended Complaint pled the requisite strong inference of scienter for the Exchange Act claims; (v) the Amended Complaint adequately alleged causation for both the Exchange Act claims and the Securities Act claims; and (vi) Plaintiff had adequately alleged Securities Act standing.  ECF 89.  On December 7, 2022, Defendants filed a reply in further support of their motion to dismiss.  ECF 91.

---

[5]     Pursuant to the PSLRA, Defendants' motion stayed all formal discovery in this matter.

4927-0319-0389.v1

35.     On February 26, 2024, the Court issued a detailed Memorandum Opinion & Order ("Order") partially denying Defendants' motion to dismiss.  ECF 100.  The Court dismissed Lead Plaintiff's Exchange Act claims and found that certain statements alleged in connection with the Securities Act claims were not actionable, but held that "[a]ll of the Lead Plaintiff's other claims under the Securities Act survive this motion to dismiss."  *Id*. at 60.  In particular, the Court held that "[b]ecause Lead Plaintiff has plausibly alleged based on the [Muddy Waters] Report that KE Holdings' statements in the . . . Offering Documents regarding its reported number of agents and stores were false and misleading, the Lead Plaintiff's Securities Act claims survive."  *Id*. at 55. Finally, the Court granted Plaintiff leave to amend the complaint.  *Id*. at 60.

36.     Plaintiff filed a Second Amended Complaint on March 18, 2024.  ECF 101.  The parties participated in a pre-motion conference concerning Defendants' anticipated motion to dismiss the Second Amended Complaint on April 10, 2024, during which the Court explained, "the pendency of this motion to dismiss will . . . continue to stay proceedings in the case."  ECF 108 at 4:5-7.  That same day, on April 10, 2024, the Court entered an Order finding "good cause to stay this case pending briefing and resolution of the anticipated motion to dismiss the second amended complaint."  ECF 107.

37.     Plaintiff subsequently reached an agreement with Defendants to remove two alleged misstatements concerning GTV and revenues, in exchange for Defendants forgoing their anticipated motion to dismiss the Second Amended Complaint.  Plaintiff then filed a proposed third amended complaint, accompanied by a joint letter from the parties.  ECF 110.  On May 10, 2024, the Court entered a memo endorsement granting Plaintiff leave to file the proposed third amended complaint, and lifting the discovery stay.  ECF 111.

- 13 -

38.     On May 13, 2024, Plaintiff filed the Operative Complaint, which alleged only the Securities Act claims that were sustained in the Court's Order.  ECF 112.  Defendants filed their answers on June 17, 2024.  ECF 122, 127-128.

### C.     Plaintiff Diligently Pursued Fact Discovery

#### 1.     The Commencement of Discovery

39.     On June 17, 2024, the Court issued an Order scheduling an initial pretrial conference for July 1, 2024, and directed the parties to submit a joint letter and proposed case management plan in advance of the conference.  ECF 123.

40.     The parties held their Rule 26(f) conference telephonically on June 20 and 21, 2024, during which they conferred about and negotiated a proposed discovery schedule.

41.     On June 24, 2024, the parties submitted to the Court a joint letter and a Proposed Civil Case Management Plan and Scheduling Order in accordance with the Court's instructions, in which they agreed upon all deadlines required by the Court.

42.     The Court held the initial pretrial conference telephonically on July 1, 2024.  The same day, the Court entered the Civil Case Management Plan and Scheduling Order (the "Scheduling Order").  ECF 131.

43.     On July 15, 2024, the parties served initial disclosures pursuant to Rule 26(a).  The same day, the parties also served requests for the production of documents.  Lead Plaintiff's First Set of Requests for the Production of Documents to Defendants contained 41 requests regarding all aspects of the claims upheld by the Court.

44.     On August 14, 2024, the parties served their responses and objections to the initial requests for production.  SHEPP responded and objected to Defendants' 25 separate requests for the production of documents to Plaintiff.

- 14 -

45. The parties negotiated a Stipulated Protective Order designed to maintain the confidentiality of documents, testimony, or other information produced during discovery in this Action, which Magistrate Judge Moses approved on September 27, 2024.  ECF 138.

46. On October 24, 2024, Magistrate Judge Moses held an in-person status conference with the parties.

47. Also on October 24, 2024, Lead Plaintiff voluntarily dismissed, without prejudice, its claims against defendants China Renaissance Securities (Hong Kong) Limited, Peng Yongdong, Xu Tao, Shan Yigang, Bao Fan, Li Zhaohui, and Chen Xiaohong (the "Former Defendants").  ECF 140.

48. The parties also negotiated the terms of a Protocol governing the form of production for ESI, which they executed on December 23, 2024.

### 2. The Parties Dispute the Appropriate Scope of Discovery

49. During the course of the Action, the parties met and conferred on numerous occasions to discuss the format, timing, and scope of document productions.

50. In their separate responses and objections to Plaintiffs' initial requests for production, the KE Holdings Defendants and the Underwriter Defendants both asserted that, based on their restrictive view of the surviving scope of the case, they would only produce documents related to the approximately six-week period from October 15, 2020 to November 27, 2020.  Both sets of Defendants also refused to produce documents concerning, *inter alia*: (i) the Muddy Waters Report; (ii) KE Holdings' internal investigation into the allegations in the Report; (iii) the November 8, 2021 press release's disclosure that portions of the stores and agents on the Company's platform were inactive; and (iv) KE Holdings' GTV and revenues.

- 15 -

51.     The parties engaged in protracted communications concerning Defendants' responses and objections to Plaintiff's requests for production, including multiple meet-and-confer calls, substantive letter exchanges, and email correspondence.  In support of its request for broader discovery, Plaintiff argued that the Muddy Waters Report and KE Holdings' investigation into the Report were relevant because the Muddy Waters Report provided the basis for the Operative Complaint's allegations.  Plaintiff also argued that the November 8, 2021 press release remained relevant because, as the Court explained in its Order, KE Holdings' choice not to disclose the number of active stores and agents in the Offering Documents "enhance[d] the plausibility of" Plaintiff's allegation that the Muddy Waters Report's findings were "suggestive of a substantial over[-]count of stores and agents in prior periods."  ECF 100 at 44.  Finally, Plaintiff maintained that, even though the Court had determined that the GTV and revenue statements were not actionable, documents concerning GTV and revenues were relevant to materiality and causation.

52.     In contrast, Defendants argued that the sole remaining issue was whether the numbers of stores and agents on KE Holdings' platform as of September 30, 2020, as reported in the Offering Documents, was accurate.

53.     At the time of the Settlement, negotiations to obtain documents responsive to Plaintiff's discovery requests remained ongoing and unresolved.  Plaintiff expended significant time reviewing, researching, and analyzing the discovery issues, and was prepared to immediately move to compel further responses if the mediation failed.

### D.    Plaintiff's Motion for Class Certification

54.     On November 1, 2024, Plaintiff filed its motion for class certification, supported by a memorandum of law and, *inter alia*, a declaration of SHEPP's then-Manager of Corporate Finance and Plan Liabilities, Pam Peters.  ECF 143-145.

4927-0319-0389.v1

55.     On December 20, 2024, Defendants filed their opposition to the motion for class certification.  ECF 147-150.  In their opposition brief, Defendants contested Plaintiff's ability to satisfy two of the four Rule 23(a) requirements—adequacy of representation and typicality—and both of the Rule 23(b)(3) requirements—predominance and superiority.  Defendants primarily argued that a class should not be certified because neither Plaintiff nor any member of the class could trace their ADSs to the registration statement for the Follow-On Offering, as Section 11 requires.

56.     First, Defendants contended that Plaintiff lacked standing because it could not establish tracing, and was therefore neither adequate nor typical under Rule 23(a).  Second, Defendants argued that individual issues predominated and a class action was inferior to other available forms of relief because class members would likewise be unable to trace their shares to KE Holdings' Follow-On Offering, as opposed to the IPO.  Defendants contended this was so because all KE Holdings ADSs were held by a depository trust company in "fungible bulk," such that purchasers acquired a *pro rata* interest in an undifferentiated pool of securities.

57.     Plaintiff was in the process of preparing its reply when the Settlement was reached. Plaintiff was prepared to demonstrate that it bought the ADSs at issue directly in the Follow-On Offering, since it purchased the ADSs on the day of the Follow-On Offering, at the offering price, via a broker affiliated with the underwriter whose depository trust company account was credited with the newly issued ADSs, and did not pay a commission—a factor courts have found to be "strong evidence that the securities were purchased directly in a registered offering . . . ." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 84 (S.D.N.Y. 2018).  Thus, Plaintiff was prepared to argue that it could prove its standing by the requisite preponderance of the evidence, and was therefore adequate and typical under Rule 23(a).

- 17 -

58.     Plaintiff was also prepared to argue that Defendants' standing argument was premature as to the rest of the class because tracing is a merits issue that is not appropriately considered at the class certification stage.  Plaintiff would have further argued that Defendants' contention that the Follow-On Offering's "fungible bulk" structure made tracing impossible failed because any class member able to show it purchased directly in the Follow-On Offering necessarily bought the very thing being offered and sold: newly issued ADSs.  Plaintiff would have supported its argument with recent case law rejecting the same arguments that Defendants made in their opposition—thereby showing that individual tracing issues would not overwhelm any common questions or undermine the superiority of a class action.

**E.     Mediation and Settlement**

59.     The parties began exploring the possibility of a settlement in early 2025. Specifically, the parties agreed to engage in mediation and subsequently retained David M. Murphy, Esq., of Phillips ADR, to act as Mediator in the Action.

60.     In preparation for the March 27, 2025 mediation, Plaintiff and Defendants each submitted and exchanged opening and reply mediation statements with exhibits, supporting their respective positions and assessments of the risks of continuing litigation.  Both parties focused their briefing on the risks and benefits of further litigation, and each articulated their competing views regarding the merits of Plaintiff's claims, the likelihood that the Court would certify a class, and recoverable damages.

61.     The parties also discussed KE Holdings' lack of applicable insurance coverage and the potential obstacles to enforcing a judgment against assets in China.

62.     The mediation with Mr. Murphy took place on March 27, 2025.  The parties engaged in good-faith negotiations but did not reach a settlement that day, but following additional

settlement discussions with Mr. Murphy, the parties received a mediator's proposal on April 2, 2025 to settle the Action in return for a cash payment of $4.95 million, which the parties each accepted on April 7, 2025.  The parties agreed to the Settlement subject to the negotiation of non-monetary terms and Court approval.

## IV.    RISKS OF CONTINUED LITIGATION

63.    At the time of the Settlement, Lead Counsel had a thorough understanding of the issues and risks present in this case.

64.    Plaintiff believed it could continue to successfully litigate the Action and compile supporting evidence.  At the time of the Settlement, support for Plaintiff's claims included:

(a)    This Court determined that Plaintiff had properly alleged that KE Holdings' statements in the Offering Documents "regarding its reported number of agents and stores were false and misleading[.]"  ECF 100 at 55.

(b)    This Court determined that the Muddy Waters Report had "sufficient indicia of reliability to support the Lead Plaintiff's claims." *Id*. at 41.

(c)    This Court determined that the fact that substantial portions of stores and agents were not active during the period at issue in the Offering Documents "enhance[ed] the plausibility of the Lead Plaintiff's contentions that the [Muddy Waters] Report's findings [were] suggestive of a substantial over[-]count of stores and agents in prior periods." *Id.* at 44.

(d)    This Court rejected Defendants' negative causation defense and found that any subsequent rebound in the price of KE Holdings' ADSs did "not negate . . . causation." *Id*. at 60.

65.    Plaintiff believes that continued discovery likely would have corroborated the allegations and supported resolution in favor of the Settlement Class.

4927-0319-0389.v1

66.     At the same time, there were considerable risks and uncertainties if the case continued. At the time the Settlement was reached, the most significant risks to recovery for the Settlement Class included the following:

(a)     The risk that Settlement Class Members would not be able to recover any damages with respect to any claim, due to the absence of insurance proceeds and the potential obstacles to enforcing a judgment against assets in China.

(b)     The risk that Defendants would prevail in their efforts to limit discovery to a six-week period, involving only the narrow issue of KE Holdings' store and agent numbers as of September 30, 2020.

(c)     The risk that discovery would reveal information and documents supporting Defendants' defenses, and undermining Plaintiff's theory of the case.

(d)     The risk that Defendants would prevail on their negative causation arguments at a later stage of the litigation, thereby substantially limiting the amount of recoverable of damages.

(e)     The risk that Defendants would prevail in opposing Plaintiff's motion for class certification based on their standing and tracing arguments.

(f)     The risk that Defendants would prevail at summary judgment or trial by establishing that the store and agent numbers reported in the Offering Documents were accurate, or that any inaccuracies were immaterial.

(g)     The risk that expert testimony or important factual evidence would be limited or excluded.

- 20 -

(h)     The risk that a "battle of the experts" would fall in Defendants' favor, with the jury finding Defendants' experts more credible, undermining Plaintiff's ability to prove the elements of its claims or establish damages.

67.     In summary, while Plaintiff was optimistic that it would continue to develop strong evidence and support that evidence with credible expert opinions, it faced both factual and legal challenges in presenting this matter to a jury, and practical risks with respect to collecting on any favorable judgment.  Lead Counsel and Plaintiff carefully considered these risks before accepting the Mediator's proposal.

## V.     NATURE AND ADEQUACY OF SETTLEMENT

68.     The proposed Settlement was the result of arm's-length negotiations between zealous advocates on both sides and could not have been reached without the substantial participation and assistance of a capable mediator with extensive experience in negotiating the resolution of actions of this type.  In the estimation of Lead Counsel, the compromise embodied in the stipulation with Defendants represents a successful resolution of a complex and risky class action.

### A.     History of Settlement Negotiations

69.     Zealous settlement discussions occurred at a full-day, formal mediation with Mr. Murphy on March 27, 2025.  Additionally, following the formal mediation, the parties participated in discussions with Mr. Murphy concerning their respective settlement positions.  The settlement discussions were led by David A. Rosenfeld and the undersigned, both of whom have considerable experience in litigating and resolving complex class action lawsuits.  The lead negotiators on the defense side had similar substantial experience and included Jonathan Rosenberg and B. Andrew Bednark of O'Melveney & Myers LLP.  During the mediation, Lead Counsel advocated for

- 21 -

Plaintiff's position by explaining the strengths of the case to Mr. Murphy, and addressing counter-arguments from Defendants.

70.    Throughout the March 27, 2025 mediation session, the parties' respective assessments of the strengths and weaknesses of the case widely differed, and no settlement was reached.  Nevertheless, the substantive discussions about the strengths and weaknesses of the case in the presence of Mr. Murphy laid the groundwork for continuing conversations and negotiations.

71.    Following the mediation session, the parties continued settlement discussions through Mr. Murphy.  On April 2, 2025, Mr. Murphy offered a mediator's proposal to both sides proposing a settlement of the Action in exchange for a cash payment of $4.95 million.  The parties accepted the mediator's proposal on April 7, 2025, and thereafter notified the Court of the proposed Settlement.  *See* ECF 156.

### B.    Preliminary Approval Motion

72.    Following protracted negotiations with Defendants over the terms of the Stipulation, on September 9, 2025, Plaintiff filed its unopposed motion for preliminary approval of the Settlement, along with the Stipulation.  ECF 161-163.  The preliminary approval motion also sought certification of the Settlement Class for settlement purposes, approval of the form and manner of notice to the Settlement Class, and the scheduling of the Settlement Hearing and dates relevant thereto.  ECF 161.

73.    On September 10, 2025, the Court issued an Order directing Plaintiff to "file one or more sworn affidavits setting forth all of the facts that it wishes for the Court to take into account in evaluating the motion" for preliminary approval.  ECF 165 at 1.  The Court further directed "that Plaintiff file an affidavit describing the means by which it calculated the estimated average recovery amount for each allegedly damaged ADS as set forth in the proposed notice to the class."

- 22 -

4927-0319-0389.v1

*Id*. This declaration and the declarations of Pam Peters and Scott D. Hakala, Ph.D., CFA are submitted herewith, as Exhibits A and B, respectively, in response to the Court's September 10, 2025 Order.

      **C.**      **The Settlement Is in the Best Interests of the Settlement Class and Warrants Preliminary Approval**

74.     Plaintiff believes it would have prevailed on the merits of the case but acknowledges there was a very real risk, as discussed above, that the Settlement Class would not prevail at trial. Settlement Class Members faced an additional substantial risk that they would not be able to recover any damages with respect to any claim, due to KE Holdings' lack of insurance and the potential obstacles to enforcing a judgment against assets in China.

75.     Additionally, Plaintiff risked losing the case before trial at summary judgment and faced the additional pretrial risk that its experts would be excluded following *Daubert* motions. Had Plaintiff's case successfully reached trial, the Settlement Class faced the risk that a jury would find Defendants' alleged misstatements immaterial or otherwise inactionable. There were also risks that the jury would reduce the damages awarded or find that Defendants had not caused the Settlement Class any damage. Furthermore, even if Plaintiff prevailed at trial and was able to obtain a judgment, post-trial proceedings and appeals could have significantly delayed any recovery to the Settlement Class in a case that has already been pending for more than three and-a half years.

76.     Having considered the foregoing, and evaluating Defendants' likely defenses at trial, it is my informed judgment, based upon the litigation to date and the extensive experience of Lead Counsel in litigating shareholder class actions, that the proposed settlement of this matter for a payment of $4.95 million in exchange for a mutual release of all claims and on the other terms

4927-0319-0389.v1

set forth in the Stipulation, provides fair, reasonable, and adequate consideration and is in the best interest of the Settlement Class.

## VI.    THE PROPOSED PLAN OF ALLOCATION[6]

77.    Upon final approval of the Stipulation and Settlement by the Court and entry of a judgment that becomes a final judgment, the Net Settlement Fund will be distributed according to the proposed Plan of Allocation on a *pro rata* basis to Authorized Claimants with a recoverable loss of more than $10 based on each Authorized Claimant's Recognized Claim.

78.    The Net Settlement Fund will be distributed to Settlement Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim.  Settlement Class Members' claims will be calculated under the Plan of Allocation set forth in the Notice.  *See* ECF 163-1, Ex. A-1.  The proposed Plan of Allocation was created by Lead Counsel with the assistance of an experienced forensic economic and damages expert, Scott D. Hakala, Ph.D., CFA.  The proposed Plan of Allocation is intended to fairly apportion the net proceeds of the Settlement based on the inflation and subsequent declines in KE Holdings' ADS price attributable to the alleged misrepresentations as of the date of a Settlement Class Member's purchases or acquisitions and sales of KE Holdings ADSs, and whether the shares were purchased pursuant to KE Holdings' November 19, 2020 Follow-On Offering.  *See generally* Declaration of Scott D. Hakala, Ph.D., CFA Regarding the Proposed Plan of Allocation ("Hakala Decl."), attached hereto as Exhibit B.

---

[6]    The summary of the Plan of Allocation provided herein is intended only to explain the basis on which the plan was developed in order to assist the Court in evaluating the fairness, reasonableness, and adequacy of the proposed Settlement.  Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan of Allocation, which is set forth in full in the Notice and will be applied by the Claims Administrator according to its express terms.

4927-0319-0389.v1

79.     The proposed Plan of Allocation estimates the amount of alleged artificial inflation in the prices of KE Holdings ADSs that was proximately caused by Defendants' alleged wrongdoing, and is intended to be consistent with Lead Counsel's theory of the case. In calculating the estimated damages per share, Lead Counsel and Dr. Hakala considered price changes in KE Holdings ADSs related to the respective alleged corrective disclosures and adjusted the price change for factors that were attributable to market or industry forces and for non-case-related Company-specific information, if any. *See* Hakala Decl., ¶¶8-15.

80.     Using the determinations of the amount of inflation in KE Holdings ADS price at different points during the Settlement Class Period, the Plan of Allocation apportions damages to Settlement Class Members based on the difference between the amount of inflation on the date they purchased or acquired their securities and the date they sold them.

81.     If a Settlement Class Member has more than one purchase, acquisition, or sale of KE Holdings ADS during the Settlement Class Period or traceable to the Follow-On Offering's registration statement, all purchases, acquisitions, and sales will be matched on a "First in First Out" (FIFO) basis. Sales of KE Holdings ADS during the Settlement Class Period or traceable to the Follow-On Offering's registration statement will be matched first against any holdings at the beginning of the Settlement Class Period and then against purchases in chronological order, beginning with the earliest purchase made during the Settlement Class Period or traceable to the Follow-On Offering's registration statement.

82.     A "Recognized Loss Amount" will then be calculated for each purchase or acquisition of KE Holdings ADS during the Settlement Class Period from November 19, 2020 through March 10, 2022 or traceable to the Follow-On Offering's registration statement.

- 25 -

Settlement Class Members who realized a net gain on their overall transactions in KE Holdings ADSs during the Settlement Class Period will not be entitled to recovery.

83.    Based on Lead Counsel's experience in this and other securities actions, its understanding of the factual circumstances giving rise to this Action, and the risks of continued litigation, including the risks as to both liability and damages, Lead Counsel believes the proposed Plan of Allocation set forth in the Notice provides a fair, reasonable, and adequate method of compensating Settlement Class Members for the economic harm they suffered as a result of the violations of the federal securities laws alleged in the Action.

## VII.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

84.    The successful prosecution of this Action required Lead Counsel and its staff to perform over 3,000 of hours of work and incur significant expenses.  Based on the extensive efforts on behalf of the Settlement Class, as described above, I also submit that Lead Counsel's request for an award of attorneys' fees of up to 33-1/3% of the Settlement Amount, plus interest, is fair, reasonable, and should be preliminarily approved.[7]

85.    Lead Counsel believes the percentage method is the appropriate method of fee recovery because, *inter alia*, it aligns the attorneys' interest in obtaining a fair fee with the Settlement Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances.  Courts throughout the Second Circuit have applied the

---

[7]    The Notice will advise the Settlement Class that Lead Counsel intends to request an award of attorneys' fees in an amount not to exceed 33-1/3% of the Settlement Amount, plus interest, and for payment of litigation expenses not to exceed $125,000, plus interest.  ECF 163-1, Ex. A-1.  The Notice will provide Settlement Class Members sufficient time to submit objections to Lead Counsel's fee and expense application.  Should any timely objections be received, Lead Counsel will address them in connection with its motion for final approval of the Settlement.

4927-0319-0389.v1

percentage-of-recovery method in awarding fees.  Lead Counsel believes the percentage sought in this case is reasonable in light of the effort required and the results obtained.

### A.    The Anticipated Fee Request Is Reasonable

#### 1.    The Results

86.    Considering the nature and extent of the litigation, the diligent prosecution of the Action, the complexity of the factual and legal issues presented, and the other factors described above, Lead Counsel believes the intended request for an award of attorneys' fees of up to 33-1/3% of the Settlement Amount is fair and reasonable.

87.    A 33-1/3% fee award is well within percentages awarded by courts in this District and throughout the Second Circuit and is justified by the specific facts and circumstances in this case and the substantial risks Plaintiff had to overcome at the pleadings stage of the Action, and to prepare to overcome at trial, as set forth herein.

#### 2.    The Requested Fee Is Supported by Plaintiff

88.    Plaintiff actively monitored the Action and consulted with Lead Counsel during the course of settlement negotiations.  Plaintiff spent considerable time and effort fulfilling its duties and responsibilities in this case, including reviewing briefs, and consulting with Lead Counsel concerning the merits of the Action.  As a result, Plaintiff developed an understanding of the strengths and weaknesses of this case, the risks of continued litigation, and the nature and extent of Lead Counsel's efforts on behalf of the Settlement Class.

89.    As reflected in the Declaration of Pam Peters (attached hereto as Exhibit A), on behalf of SHEPP, Plaintiff believes the intended fee request is fair and reasonable in light of the result achieved and supports the award of Lead Counsel's intended fee request.

4927-0319-0389.v1

### 3.    The Requested Fee Is Supported by the Effort Expended and Results Achieved

90.    As set forth herein, the $4.95 million cash settlement was achieved as a result of extensive prosecutorial and investigative efforts, which resulted in the Court largely upholding the Securities Act claims.  Plaintiff went on to engage in intense pursuit and negotiation of discovery; class certification briefing; and hard-fought mediation, including written submissions and in-person negotiations.

91.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.  Plaintiff's success was by no means assured. Defendants disputed whether the store and agent numbers in the Offering Documents were materially inaccurate, denied the allegations in the Muddy Waters Report, and sought to attribute declines in KE Holdings' ADS price to unrelated factors.  Were this Settlement not achieved, it is possible Plaintiff would not have been successful on the merits at trial or that a jury could have found no liability or damages.  Plaintiff also faced the risk that the Court would credit Defendants' arguments against class certification and decline to certify a class.  Even if Plaintiff prevailed at trial, Plaintiff and the Settlement Class likely faced years of costly and risky appellate litigation against Defendants with ultimate success far from certain.  Finally, Plaintiff faced the high risk it would be unable to collect on a judgment against Defendants.

92.    As a result of this Settlement, hundreds, if not thousands, of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.  These risk factors also support Lead Counsel's request for an award of attorneys' fees of up to 33-1/3% of the Settlement Amount.

4927-0319-0389.v1

**4.    The Risk of Contingent Class Action Litigation Supports the Intended Fee Request**

93.    A determination of a fair fee should include consideration of the contingent nature of the fee, the financial burden by Lead Counsel, and the difficulties Lead Counsel overcame to obtain the Settlement.

94.    This Action was prosecuted by Lead Counsel on an "at-risk" contingent fee basis. Lead Counsel fully assumed the risk of an unsuccessful result. Lead Counsel has received no compensation for its services during the course of this litigation and has incurred significant expenses in litigating for the benefit of the Settlement Class. Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved. Because the fee was entirely contingent, Lead Counsel knew and accepted that it would receive no fee without a successful result, and a successful result could (and did) take years of difficult work to achieve.

95.    Lead Counsel's efforts were performed on a wholly contingent basis despite significant risk in the face of determined opposition. Under these circumstances, Lead Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained. Under all circumstances present here, a fee of up to 33-1/3% plus expenses is fair and reasonable.

96.    There are numerous cases, including many handled by my firm, where lead counsel agreed to litigate the matter on a contingent fee basis and, after expenditure of thousands of hours of time and significant out-of-pocket costs, received no compensation whatsoever. The losses suffered by lead counsel in other actions where insubstantial settlement offers were rejected, and where lead counsel ultimately received little or no fee, should not be ignored. Lead Counsel knows

- 29 -

from personal experience that, despite the most vigorous and competent of efforts, attorneys' success in contingent litigation is never assured.

97.     Lawsuits such as this are expensive to litigate.  Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded but ignore the fact that those fees fund enormous overhead expenses incurred over the course of many years of litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by Lead Counsel, and help pay the monthly salaries of the firms' attorneys and staff.

### 5.     The Standing and Expertise of Lead Counsel

98.     Lead Counsel is among the most experienced and skilled securities litigation law firms in the field, as illustrated by Lead Counsel's firm biography attached hereto as Exhibit C. Indeed, Lead Counsel has consistently obtained significant recoveries for defrauded investors, including in: *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (recovering in excess of $7.2 billion for investors); *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.) (largest securities class action settlement following a trial: $1.575 billion); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.) (largest pharmaceutical securities class action settlement ever: $1.2 billion); *In re Am. Realty Cap. Props., Inc., Litig.*, No. 1:15-mc-00040 (S.D.N.Y.) (recovering $1.025 billion for investors); *In re UnitedHealth Group, Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) (recovering over $925 million); *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314 (N.D. Cal.) ($809.5 million recovery); *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033 (N.D. Cal.) ($490 million recovery); *In re Alphabet, Inc. Sec. Litig.*, No. 18-cv-06245 (N.D. Cal.) ($350 million recovery).

99.     The quality of work Lead Counsel provided in attaining the Settlement should also be evaluated in light of the quality of opposing counsel in this Action.  Over the course of the

- 30 -

Action, Defendants were well represented by teams of attorneys from O'Melveny & Myers LLP, Skadden, Arps, Slate, Meagher & Flom LLP, and Goodwin Procter LLP.    Faced with knowledgeable, experienced, and formidable opposing counsel, Lead Counsel was nonetheless able to partially withstand Defendants' dismissal attempt and still persuade Defendants to settle the Action for $4.95 million.

## B.    The Anticipated Request for Litigation Expenses and Charges Is Reasonable

100.    In addition to fees, Lead Counsel intends to request up to $125,000 for expenses and charges reasonably and necessarily incurred in prosecuting Plaintiff's claims for the past three and-a-half years.    Lead Counsel respectfully submits that this amount is appropriate, fair, and reasonable and should be preliminarily approved.

101.    Since December 2021, Lead Counsel has known it may never recover any of the expenses it incurred in prosecuting this case.    Lead Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate it for the lost use of the funds dedicated to this Action.    Accordingly, Lead Counsel was motivated to, and did, take steps to minimize expenses where practicable without jeopardizing the vigorous and efficient prosecution of this Action.

102.    The expenses, charges, and costs incurred were necessary and appropriate in light of the complex nature of the Action and were associated with, among other things, hiring investigators and consultants, service of process, online legal and factual research, and mediation.

103.    Plaintiff may also seek an award of up to $5,000, pursuant to 15 U.S.C. §77z-1(a)(4) in connection with its representation of the Settlement Class.    Plaintiff dedicated time and resources to monitoring the developments in the Action, and participating in settlement negotiations.

- 31 -

4927-0319-0389.v1

## VIII.   CONCLUSION

104.   For all the foregoing reasons, Lead Counsel respectfully requests the Court preliminarily approve the proposed Settlement, certify the proposed Settlement Class for purposes of the Settlement, approve the form and manner of the settlement notices to members of the Settlement Class, and schedule a Settlement Hearing, along with setting deadlines in connection therewith.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 23, 2025, at Melville, New York.

<i>s/ Erin W. Boardman</i>
ERIN W. BOARDMAN

4927-0319-0389.v1